IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| NEWPORT 222 MITCHELL STREET, LLP., | : | CHAPTER 7 |
| | : | CASE NO. 24-54060-SMS |
| Debtor. | : | |

## MOTION FOR AN ORDER PURSUANT TO BANKRUPTCY RULE 2004 AUTHORIZING EXAMINATION OF BI 68, LLC AND DIRECTING THE PRODUCTION OF DOCUMENTS

Balfour Beatty Construction, LLC (the "**Movant**" or "**Balfour**"), as a creditor and party in interest, by and through counsel, hereby files this *Motion for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Examination of BI 68, LLC and Directing the Production of Documents* (the "**Motion**"). In support of the Motion, the Movant respectfully shows the Court as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §1334. This is a core proceeding pursuant to 28 U.S.C. §157(B). Venue of this proceeding is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The predicates for the relief requested herein are Section 105(a) of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "**Bankruptcy Code**"), Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 2004-1 of the Local Rules of Practice for the United States Bankruptcy Court for the Northern District of Georgia.

### PROCEDURAL BACKGROUND

3. On April 22, 2024 (the "**Petition Date**"), the above-captioned Debtor ("**Newport**" or "**Debtor**") initiated the above-captioned bankruptcy case (the "**Bankruptcy Case**") in the United States Bankruptcy Court for the Northern District of Georgia.

4.      S. Gregory Hays has been appointed as the Chapter 7 Trustee of the Debtor (the "**Trustee**").

5.      On or about May 22, 2024, Movant filed in this Court a certain *Motion for Relief from Automatic Stay* [Doc No. 22] in which Movant sought relief from the automatic stay to allow Balfour to proceed with litigation against the Debtor in the Gwinnett Action. On or about September 24, 2024, Movant filed in this Court a certain *Emergency Motion for Confirmation That Stay is Already Terminated or, in the Alternative, Relief from the Automatic Stay and Related Relief* [Doc. No. 28] in which Movant sought to confirm the termination of the stay.

## SUBSTANTIVE BACKGROUND

6.      In the Spring of 2021, the Debtor owned certain property located at 222 Mitchell Street SW, Atlanta, Georgia 30303 (the "**Property**") and informed Balfour that Newport intended to award Belfour a contract to perform work on a construction project at the Property (the "**Project**"). The development of the Property, located near Mercedes Benz Stadium in downtown Atlanta, and commonly referred to as the "Gulch", is one of the most significant real estate development projects currently taking place in Atlanta. Moreover, the timing of the completion of the development is intended to coincide with the 2026 World Cup matches taking place in Atlanta. The development of the Property has been widely publicized and has received significant local media attention.

7.      Balfour began work on the Project in Spring of 2021, and its lien rights started at the point construction began.

8.      Debtor represented to Balfour that it was obtaining construction financing for the Project and sent Balfour a draft Contractor's Letter (the "**Contractor's Letter**") draft generated

by Debtor's lender, BI 68, LLC (the "**Lender**" or "**BI**"), that it further represented to Balfour that Balfour was required to sign it as a condition of BI making the loan. July of 2021.

9.       On or about October 12, 2021, Debtor and Balfour entered into a written construction contract ("**Construction Contract**") that encompassed the prior work and work necessary to complete the Project, and contained an affirmative representation by Debtor that it had or would secure all necessary financing to pay Balfour in full for the work detailed by the Construction Contract, approximately $40,000,000.

10.      Debtor also represented and agreed in the Construction Contract that it would not vary the terms of its financing for the Project without providing written notice to Balfour.

11.      From and after execution of the Construction Contract, the Debtor never notified Balfour of any variances in the Project financing.

12.      On or about December 10, 2021, Balfour and BI, through Debtor, negotiated and finalized the Contractor's Letter, which stated that BI would provide a loan for the Project "up to $75,000,000" for a project identified only as "222 Mitchell Street Core and Shell Construction," the same project that was the subject of the Construction Contract.

13.      Balfour signed the Contractor's Letter, and BI made a loan on or about December 16, 2021.

14.      Unknown to Balfour but known to Debtor, BI did not make a loan only to Debtor and did not make a loan for an amount sufficient to cover the cost of the Construction Contract.

15.      Instead, BI made a loan to numerous Newport entities, of which the Debtor was just one, and the Loan was cross-collateralized by numerous properties that were in various stages of development, in addition to the Debtor's Property. The following is the caption from the applicable Loan Agreement, a true and correct copy of which is attached as **Exhibit 1** hereto,

which identifies the many parties to the Loan Agreement:

## LOAN AGREEMENT

THIS LOAN AGREEMENT (this "Agreement") is made as of this 16th day of December, 2021 (the "Effective Date"), by and between NEWPORT 0 MITCHELL STREET, L.P., NEWPORT 76 FORSYTH STREET, L.P., NEWPORT 110 SPRING STREET, L.P., NEWPORT 135 FORSYTH STREET, L.P., NEWPORT 136 PEACHTREE STREET, L.P., NEWPORT 138 PEACHTREE STREET, L.P., NEWPORT 140 MITCHELL STREET, L.P., NEWPORT 140 SPRING STREET, L.P., NEWPORT 142 PEACHTREE STREET, L.P., NEWPORT 142-150 MITCHELL STREET, L.P., NEWPORT 144 PEACHTREE STREET, L.P., NEWPORT 168 TRINITY AVENUE, L.P., NEWPORT 170 MITCHELL STREET, L.P., NEWPORT 172 TRINITY AVENUE, L.P., NEWPORT 222 MITCHELL STREET, L.P., NEWPORT 223 MITCHELL STREET, L.P., NEWPORT 235 MITCHELL STREET, L.P., and NEWPORT GORDON COMMERCIAL LOFTS, L.P., each a Delaware limited partnership (collectively, "Borrower") and BI 68 LLC, a Florida limited liability company ("Lender").

16.     Further unknown to Balfour, but known to the Debtor and BI, the Loan was cross-collateralized by Land that is listed on the Loan Agreement attached as **Exhibit 1** hereto, as inclusive of 30 pages of legal descriptions for 76 Forsyth Street, 135 Forsyth Street, 222 Mitchell Street, 140 Spring Street, 110 Spring Street, 223 Mitchell Street, 231 Mitchel Street aka 227 Mitchell Street, 233 Mitchell Street, 211-221 Mitchell Street, 142-150 Mitchell Street, 168 Trinity Street, 170 Mitchell Street, 172 Trinity Avenue, 136 Peachtree Street, and 140 Mitchell Street. These parcels, less 222 Mitchell, are referenced collectively as the "**Cross-Collateralized Property**"),

17.     Further unknown to Balfour, but known to the Debtor and BI, the Loan was not sufficient to cover the full cost of the Construction Contract as the Budget attached as Exhibit E to the Loan Agreement (the "**Budget**") contemplated an additional equity investment by Debtor of $36,244,919, and that equity investment was a condition of a Second Advance under the Loan.

18.     Based on the Budget, Debtor had already spent $47,697,644 on the Cross-Collateralized Property and was receiving advances under the Loan of an additional $17,071.088. In contrast, the Budget showed Debtor had spent $20,451,104 on the Property (222 Mitchell) and

was to receive a Loan Advance of $9,208,552. This budget, which was not provided to Balfour, shows that the proposed financing for the development of the Debtor's Property was not sufficient to finance the construction services and materials to be provided by Balfour.

19.     Following the Loan Closing on or about December 16, 2021, Balfour and its subcontractor provided significant services and materials in the development of the Property which also significantly enhanced the value of the Property for the benefit of both the Debtor and the Lender.

20.     By early 2023, the Debtor had failed to make certain payments to Balfour and its subcontractors. The Debtor, however, continued to accept services and materials from Balfour and its subcontractors and Debtor continued to assure that Balfour would be paid. After the Debtor continued to fail to pay for services rendered at the Property, and in order to protect its rights under Georgia law, Balfour filed a lien on the Property in the amount of $10,942,292.19.

21.     The reason for non-payment in 2023 was known to the Lender and Debtor, but unknown to Balfour, as the Budget amount had reached the point where Debtor was obligated to contribute additional equity.

22.     Further, on June 20, 2023, Balfour properly filed a construction lien and initiated litigation against the Debtor in the Superior Court of Gwinnett County, Georgia styled *Balfour Beatty Construction, LLC v. Newport 222 Mitchell Street, L.P., et. al*, Case No. 23-A-05346-2 (the "**Gwinnett Action**"). The Gwinnett Action was modified to include the equity owner of the Debtor and unidentified controlling members of the Debtor as defendants in addition to the Debtor.

23.     Throughout 2023 and into early 2024, Balfour continued to pursue its rights and remedies and held discussions with the Debtor and its Lender regarding the payment of its claims.

24.     The Gwinnett Action was initially stayed, as Balfour was informed that another developer was going to take over for Debtor, pay Balfour for the unpaid amounts in the Balfour Lien, and complete the Project.

25.     By late October of 2023, Balfour was informed that instead of the new developer taking over and paying for Balfour's work and taking over the Construction Contract, BI was simply going to foreclose on the Property and the Cross-Collateralized Property.

26.     On November 3, 2023, Balfour filed a complaint against BI in the Superior Court of Fulton County, State of Georgia (the "**Fulton County Litigation**") regarding a lien priority dispute related to the Property. BI was registered in Georgia on the same date and was subsequently dissolved on September 13, 2024.

27.     Balfour sought and obtained a temporary restraining order ("**TRO**") against foreclosure of the Property, and that TRO remained in place through January of 2024.

28.     Because Balfour's interest was limited to the Property, BI went forward with its foreclosure against the Cross-Collateralized Property ("**1st Foreclosure Against Collateral**"). In the Fulton County Litigation, the Court ultimately lifted the TRO finding that the issue of Balfour's first priority lien position would not be impaired if the Property were foreclosed on by BI.

29.     The value shown for the Cross-Collateralized Property that Lender received from 1st Foreclosure Against Collateral should have obtained is significant given that those properties were developed and income producing, and the Budget, as reflected below, showed expenditures of nearly $60,000,000 into those properties prior to the 1st Foreclosure Against Collateral:

BUDGET

| South Downtown Sources and Uses | | | | | | | |
|---|---|---|---|---|---|---|---|
| SOURCES: | Spent to Date | Reimbursement at Closing | First Advance | Second Advance | Additional Equity | Additional Advances | Project Total |
| Loan Amount | $0 | $791,448 | $9,208,552 | $15,000,000 | $0 | $50,000,000 | $75,000,000 |
| Sponsor Equity | $47,597,654 | $0 | $7,862,537 | $0 | $36,494,919 | $0 | $91,955,109 |
| **Total Sources** | **$47,597,654** | **$791,448** | **$17,071,089** | **$15,000,000** | **$36,494,919** | **$50,000,000** | **$166,955,109** |
| | | | | | | | |
| **USES:** | | | | | | | |
| **222 Uses:** | | | | | | | |
| 222 - Acquisition Price | $13,352,500 | $0 | $0 | $0 | $0 | $0 | $13,352,500 |
| 222 - Hard Costs | $3,359,962 | $647,365 | $4,562,034 | $11,653,939 | $26,105,894 | $0 | $46,359,193 |
| 222 - Government Fees | $151,402 | $103,321 | $120,277 | $0 | $0 | $0 | $375,000 |
| 222 - Architecture | $2,034,749 | $17,671 | $155,000 | $165,000 | $566,463 | $0 | $2,939,883 |
| 222 - FF&E | $0 | $0 | $0 | $0 | $660,000 | $0 | $660,000 |
| 222 - Engineering/Testing | $44,966 | $0 | $35,000 | $12,000 | $222,414 | $0 | $314,380 |
| 222 - Marketing | $97,310 | $2,800 | $0 | $0 | $538,890 | $0 | $639,000 |
| 222 - Miscellaneous Soft Costs | $482,277 | $20,091 | $55,000 | $15,000 | $242,989 | $0 | $615,357 |
| 222 - Tenant Improvements | $0 | $0 | $0 | $0 | $535,821 | $33,269,498 | $33,805,319 |
| 222 - Leasing Commissions | $927,939 | $0 | $0 | $0 | $0 | $7,565,502 | $8,493,441 |
| 222- Developer Fee | $0 | $0 | $835,809 | $442,467 | $2,163,271 | $0 | $3,441,568 |
| 222 - Carry Costs | $0 | $0 | $196,444 | $174,666 | $1,115,791 | $0 | $1,406,901 |
| 222 - Tax Escrow | $0 | $0 | $0 | $486,908 | $550,000 | $0 | $1,036,908 |
| 222 - Insurance Escrow | $0 | $0 | $265,357 | $50,000 | $0 | $165,000 | $510,357 |
| 222 - Hard Cost Contingency | $0 | $0 | $0 | $0 | $2,867,506 | $0 | $2,867,506 |
| 222 - Soft Cost Contingency | $0 | $0 | $0 | $0 | $675,879 | $0 | $675,879 |
| 222 - TI/LC Contingency | $0 | $0 | $0 | $0 | $0 | $2,000,000 | $2,000,000 |
| Closing Costs | $0 | $0 | $605,000 | $0 | $0 | $0 | $605,000 |
| Interest Reserve | $0 | $0 | $1,000,000 | $2,000,000 | $0 | $7,000,000 | $10,000,000 |
| Structuring Fee | $0 | $0 | $1,125,000 | $0 | $0 | $0 | $1,125,000 |
| Broker Fee | $0 | $0 | $273,631 | $0 | $0 | $0 | $273,631 |
| **222 Subtotal** | **$20,451,104** | **$791,448** | **$9,208,552** | **$15,000,000** | **$36,244,919** | **$50,000,000** | **$131,696,023** |
| | | | | | | | |
| **Hotel Row & Excess Collateral Uses:** | | | | | | | |
| Excess - Acquisition Price | $19,857,640 | $0 | $0 | $0 | $0 | $0 | $19,857,640 |
| HR - Acquisition Price | $5,023,200 | $0 | $0 | $0 | $0 | $0 | $5,023,200 |
| HR - Hard Costs | $4,206,434 | $0 | $3,026,079 | $0 | $0 | $0 | $7,232,513 |
| HR - Government Fees | $33,440 | $0 | $76,560 | $0 | $0 | $0 | $110,000 |
| HR - Architecture | $563,722 | $0 | $95,128 | $0 | $0 | $0 | $658,850 |
| HR - FF&E | $0 | $0 | $1,500 | $0 | $0 | $0 | $1,500 |
| HR - Engineering/Testing | $69,916 | $0 | $60,584 | $0 | $0 | $0 | $130,500 |
| HR - Marketing | $55,072 | $0 | $134,368 | $0 | $0 | $0 | $189,440 |
| HR - Miscellaneous Soft Costs | $56,131 | $0 | $80,369 | $0 | $0 | $0 | $136,500 |
| HR - Tenant Improvements | $0 | $0 | $2,404,342 | $0 | $0 | $0 | $2,404,342 |
| HR - Leasing Commissions | $52,487 | $0 | $753,695 | $0 | $0 | $0 | $806,182 |
| HR - Developer Fee | $228,507 | $0 | $202,255 | $0 | $0 | $0 | $430,762 |
| HR - Carry Costs | $0 | $0 | $100,000 | $0 | $0 | $0 | $100,000 |
| HR - Tax Escrow | $0 | $0 | $89,054 | $0 | $214,924 | $0 | $303,979 |
| HR - Insurance Escrow | $0 | $0 | $35,000 | $0 | $35,076 | $0 | $70,076 |
| HR - Hard Cost Contingency | $0 | $0 | $648,602 | $0 | $0 | $0 | $648,602 |
| HR - Soft Cost Contingency | $0 | $0 | $35,000 | $0 | $0 | $0 | $35,000 |
| HR - TI/LC Contingency | $0 | $0 | $120,000 | $0 | $0 | $0 | $120,000 |
| **Hotel Row & Excess Collateral Subtotal** | **$27,146,549** | **$0** | **$7,862,537** | **$0** | **$250,000** | **$0** | **$35,259,086** |
| **Total Uses** | **$47,597,654** | **$791,448** | **$17,071,089** | **$15,000,000** | **$36,494,919** | **$50,000,000** | **$166,955,109** |

30.     On March 5, 2024, and within 90 days of the filing of the Bankruptcy Case, the Property was foreclosed (the "**2nd Foreclosure**") by BI pursuant to a certain Deed Under Power of Sale effective March 5, 2024. Although the Debtor had previously valued the Property in the tens of millions of dollars, and despite the amount of return that the Lender received from 1st Foreclosure Against Collateral, the Lender essentially took title to the Property in exchange for a $1 Million credit bid and without regard to how much the Loan was decreased by the value of the 1st Foreclosure Against Collateral or, apparently, whether the Debtor was even indebted to the Lender based on recoveries the Lender may have received from its prior foreclosure action.

31.     Movant is informed and believes that the Debtor and its principals did not seek to protect the value of the Debtor's property interests or to protect its creditors, including Balfour and its subcontractors. Certain of the Debtor's former principals, who also may have guaranteed the Lender's debt, remain involved in the development of the Property. Balfour is informed and believes, that the Debtor's failure to protect its property rights prior to the 2nd Foreclosure, which were estimated to be in the tens of millions of dollars, has caused significant damage to the creditors of this Debtor including the Movant.

32.     The Property was the primary asset of the Debtor and Belfour believes that the events surrounding the 2nd Foreclosure require investigation to determine whether the Lender was owed anything related to the Property given that the Loan may have been satisfied by the 1st Foreclosure Against Collateral and/or whether 2nd Foreclosure sale to the Lender was collusive, whether the Chapter 7 Bankruptcy Estate has any interest in the Property and whether the Estate has claims or causes of action against the Lender and other parties. There is significant uncertainty regarding the disposition of the Property and the Foreclosure. Further, the $1 Million credit bid at the Foreclosure sale is shockingly low in light of the public valuations placed on the Property. To the best of the knowledge, information and belief of the Movant, the foreclosure sale has never been confirmed under Georgia law. Additional documentation and information are needed to further understand the Foreclosure transaction involving the Debtor and potential causes of action available for the benefit of the Estate.

## RELIEF REQUESTED AND BASIS THEREFOR

33.     Bankruptcy Rule 2004 authorizes the examination of any entity, whether the Debtor or a non-debtor entity, relating "to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate."

Fed. R. Banker. P. 2004(b). Courts interpret the right to use Rule 2004 as an investigative tool very broadly, likening such examinations as licensed "fishing expeditions." *See In re M4 Enters, Inc.*, 190 B.R. 471, 474 (Bankr. N.D. Ga. 1995).

34.     Section 704 of the Bankruptcy Code sets forth the duties of the Trustee, including the duty to "investigate the financial affairs of the debtor." *See* 11 U.S.C. § 704(a)(4). Due to the foreclosure sale of the Property, this Bankruptcy Estate has no liquid assets or cash to fund the investigation sought herein. By this Motion, Movant seeks to assist the Trustee in investigating the financial affairs and assets of the Debtor to attempt to determine whether any: a) assets or opportunities were diverted or improperly transferred from the Debtor incident to the Foreclosure; and b) causes of action are available for the benefit of the Estate.

35.     Additional information regarding the Foreclosure is critical to the determination of whether the disposition of the Property was appropriate and whether this Estate has any claims or causes of action against the Lender or any interest in the Property.

36.     By this Motion, the Movant seeks to be permitted to conduct an examination of BI concerning any and all matters within the scope permitted by Rule 2004(b) (the "**Bankruptcy Rule 2004 Exam**") and obtain the Documents from BI. A similar motion was recently filed with respect to the Debtor. The topics to be covered in the Bankruptcy Rule 2004 Exam and the Documents to be produced prior to the Bankruptcy Rule 2004 Exam are specified in the *Notice of Bankruptcy Rule 2004 Examination of BI 68, LLC and the Production of Documents* attached hereto as **Exhibit 2**.

WHEREFORE, the Movant prays that this Court enters an order, substantially in the form as the proposed order attached as **Exhibit 3** hereto, that:

1.  Grants this Motion;

2.  Compels BI 68, LLC to produce to the Movant all documents requested in **Exhibit 2** attached hereto;

3.  Authorizes the examination of BI 68, LLC through a representative or representatives of BI 68, LLC at a mutually convenient time and place; and

4.  Grants the Movant such other and further relief as is just and proper.

Respectfully submitted this 8th day of May, 2025.

LAW OFFICES OF HENRY F. SEWELL JR., LLC

*/s/ Henry F. Sewell, Jr.*
Henry F. Sewell, Jr.
Georgia Bar No. 636265
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
(404) 926-0053
hsewell@sewellfirm.com

and

HUDSON LAMBERT PARROTT, LLC

*/s/ Kevin H. Hudson*
Kevin H. Hudson
Georgia Bar No. 374630
15 Piedmont Center, Suite 200
3575 Piedmont Road NE Atlanta, Georgia 30305
Telephone: 404-554-8181
khudson@hlpwlaw.com
zhall@hlpwlaw.com
ctakeuchi@hlpwlaw.com

*Counsel for Balfour Beatty Construction, LLC*

## **EXHIBIT 1**

**LOAN AGREEMENT**

# Exhibit 1

## LOAN AGREEMENT

THIS LOAN AGREEMENT (this "Agreement") is made as of this 16th day of December, 2021 (the "Effective Date"), by and between NEWPORT 0 MITCHELL STREET, L.P., NEWPORT 76 FORSYTH STREET, L.P., NEWPORT 110 SPRING STREET, L.P., NEWPORT 135 FORSYTH STREET, L.P., NEWPORT 136 PEACHTREE STREET, L.P., NEWPORT 138 PEACHTREE STREET, L.P., NEWPORT 140 MITCHELL STREET, L.P., NEWPORT 140 SPRING STREET, L.P., NEWPORT 142 PEACHTREE STREET, L.P., NEWPORT 142-150 MITCHELL STREET, L.P., NEWPORT 144 PEACHTREE STREET, L.P., NEWPORT 168 TRINITY AVENUE, L.P., NEWPORT 170 MITCHELL STREET, L.P., NEWPORT 172 TRINITY AVENUE, L.P., NEWPORT 222 MITCHELL STREET, L.P., NEWPORT 223 MITCHELL STREET, L.P., NEWPORT 235 MITCHELL STREET, L.P., and NEWPORT GORDON COMMERCIAL LOFTS, L.P., each a Delaware limited partnership (collectively, "Borrower") and BI 68 LLC, a Florida limited liability company ("Lender").

## PRELIMINARY STATEMENT

A.    Borrower is or shall be in the process of developing, designing and obtaining entitlements with respect to new Improvements to be constructed on the Land, and otherwise constructing the Project (as defined below).

B.    Borrower has requested a loan from Lender for the purpose of financing the construction and renovation of Improvements (as defined herein) to the Project; and to provide for Hard Costs and Soft Costs (as defined herein) with respect to such Improvements.

C.    Lender has agreed to make and Borrower has agreed to accept a loan, subject to the terms, covenants and conditions hereinafter set forth.

NOW THEREFORE, in consideration of any and all advances made by Lender, the mutual promises contained herein, and other good and valuable considerations, the receipt and adequacy of which are hereby conclusively acknowledged, the parties, intending to be legally bound, agree as follows:

## ARTICLE I

## PRELIMINARY STATEMENT, DEFINITIONS, RULES OF CONSTRUCTION AND EXHIBITS

Preliminary Statement.  The above Preliminary Statement is true and correct and is hereby incorporated into and made a part of this Agreement.

Section 1.1    Definitions.  In addition to the terms defined elsewhere herein, as used in this Agreement and the Exhibits attached hereto, the following terms shall have the following meanings unless the context clearly requires otherwise:

(a)        "222 Mitchell" means the collateral located at 222 Mitchell Street, Atlanta, Georgia 30303; 76 Forsyth Street, Atlanta, Georgia 30303; 110 Spring Street, Atlanta, Georgia 30303; 140 Spring Street, Atlanta, Georgia 30303; and 135 Forsyth Street, Atlanta, Georgia 30303.

(b)        "222 Mitchell Construction Contract" means the AIA Standard Form of Agreement dated October 12, 2021, entered into between Newport 222 Mitchell Street, L.P. and Balfour Beatty Construction, LLC for the construction of any Improvements relating to the 222 Mitchell property or otherwise at the Land, as same may from time to time be amended, which contract has been delivered to Lender, and which contract (i) provides a guaranteed maximum construction cost to Borrower, where (a) no more than X percent (X%) of the Budget shall be classified as allowances, and (b) no less than X percent (X%) of the trades shall be bought out, (ii) contains a certified trade and material breakdown itemizing all Hard Costs including, but not limited to, labor, materials, and overhead to complete the Project contemplated by the 222 Mitchell Plans, and (iii) contains a schedule for the construction of the Project, (iv) contains a turnkey, lien-free outside date for completion (Final Completion) of the 222 Mitchell Construction Project, including issuance of a certificate of completion, subject to Force Majeure, and (v) provides for a X percent (X%) retainage. Any amendment to the foregoing items (i) through (iii) of the 222 Mitchell Construction Contract shall require Lender's prior written consent (not to be unreasonably withheld, conditioned or delayed), and Borrower shall deliver to Lender any material amendments made to the 222 Mitchell Construction Contract. In the event of a material change to the 222 Mitchell Construction Contract which Lender reasonably believes will have an adverse effect on the Project, in Lender's sole discretion, Lender shall have the right to object to the amendment(s) to the 222 Mitchell Construction Contract and require Borrower to amend same.

(c)        "222 Mitchell Construction Project" means the work contemplated by the 222 Mitchell Construction Contract and the 222 Mitchell Plans.

(d)        "222 Mitchell Owner" means Newport 222 Mitchell Street, L.P., a Delaware limited partnership; Newport 76 Forsyth Street, L.P., a Delaware limited partnership; Newport 110 Spring Street, L.P. a Delaware limited partnership; Newport 140 Spring Street, L.P., a Delaware limited partnership; and Newport 135 Forsyth Street, L.P., a Delaware limited partnership.

(e)        "222 Mitchell Plans" means the plans and specifications relating to the 222 Mitchell Construction Project including but not limited to the plans for the construction of new Improvements, which shall be constructed by Borrower in accordance with the terms of this Agreement. A list of the 222 Mitchell Plans are set forth on Schedule V. Once approved by Lender, the 222 Mitchell Plans shall not be materially modified or amended without Lender's prior written consent, where such consent shall be in Lender's sole discretion.

(f)        "Additional Advance" means each Advance after the Initial Advance in the amounts of no less than X Dollars ($X) and no greater than X Dollars ($X). Lender shall not be obligated to make any Additional Advance that would cause the outstanding principal balance of the Loan to exceed $X.

(g)        "Additional Equity Escrow Deposit" means an equity deposit by the Borrower into escrow with the Lender in the Construction Escrow Account equal to the greater of

2

(A) $X (the Hotel Row Equity Escrow Deposit shall not be a credit to the Borrower toward the $X requirement) or (B) an amount sufficient to put the Project, inclusive of Hotel Row and 222 Mitchell, In Balance, as defined herein.

(h)    "Advance" means the disbursement of the Loan pursuant to this Agreement, including, without limitation, the Initial Advance and each Additional Advance.

(i)    "Advance Request" means a written request at least thirty (30) days prior to the desired funding date submitted by Borrower to Lender for the Additional Advance to be funded into the Construction Reserve Account pursuant to this Agreement. The Advance Request shall be in the form of Schedule III, which may be changed by Lender in its sole discretion. Notwithstanding anything herein to the contrary, Borrower hereby acknowledges and agrees that Lender can rely upon any Advance Request executed by Kevin Murphy or Thomas Bullock.

(j)    "Affiliate" means, as to any Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person. If such Person is an individual, "Affiliate" shall include any member of the immediate family (including parents, spouse, children and siblings) of such individual and any trust whose principal beneficiary is or limited partnership whose general partner is such individual or one or more members of such immediate family and any Person who is Controlled by any such member or trust.

(k)    "Agreement" or "Loan Agreement" means this Loan Agreement.

(l)    "Appraisal" means an appraisal of the fair market value of the Land or the Project, as applicable, prepared by an Appraiser selected by Lender in its sole discretion.

(m)    "Appraiser" means a member of a national appraisal organization that is certified in the State of Georgia, that has adopted the Uniform Standards of Professional Appraisal Practice (USPAP) established by the Appraisal Standards Board of the Appraisal Foundation, which is not an Affiliate of any of the Obligors or such other professional association acceptable to Lender.

(n)    "Appraised Value" means the fair market value of the Land or Project, as applicable, as determined by the Appraiser, and contained in the Appraisal submitted to the Lender.

(o)    "Borrower" means, individually and collectively, Newport 0 Mitchell Street, L.P., Newport 76 Forsyth Street, L.P., Newport 110 Spring Street, L.P., Newport 135 Forsyth Street, L.P., Newport 136 Peachtree Street, L.P., Newport 138 Peachtree Street, L.P., Newport 140 Mitchell Street, L.P., Newport 140 Spring Street, L.P., Newport 142 Peachtree Street, L.P., Newport 142-150 Mitchell Street, L.P., Newport 144 Peachtree Street, L.P., Newport 168 Trinity Avenue, L.P., Newport 170 Mitchell Street, L.P., Newport 172 Trinity Avenue, L.P., Newport 222 Mitchell Street, L.P., Newport 223 Mitchell Street, L.P., Newport 235 Mitchell Street, L.P., And Newport Gordon Commercial Lofts, L.P., each a Delaware limited partnership.

(p)    "Borrower's Address" means 170 Mitchell Street, SW, Atlanta, Georgia 30303.

3

(q)        "Borrower's Architect" means, with respect to the 222 Mitchell Construction Project, BLDGS, Inc., and, with respect to the Hotel Row Construction Project, SSOE, Inc. (dba SSOE / Stevens & Wilkinson). Except for architects hired to complete tenant improvements which Borrower will provide Lender written notice of, no other architect for the Project may be engaged by Borrower without the prior written approval of Lender (not to be unreasonably withheld, conditioned or delayed), and such architect enters into such documents as are reasonably requested by Lender.

(r)        "Borrower's Engineer" means a firm or individual duly licensed engineer identified in the engineer agreement entered by Borrower and approved by Lender in writing. Except for engineers hired to complete tenant improvements which Borrower shall give Lender written notice of, no other engineer for the Project may be engaged by Borrower without the prior written approval of Lender (not to be unreasonably withheld, conditioned or delayed), and such engineer enters into such documents as are reasonably requested by Lender.

(s)        "Borrower's Operating Account" means such deposit operating accounts of Borrower established with and maintained with one or more banks, which accounts shall be subject to Borrower's Operating Account Pledge Agreement and Borrower's Operating Account DACA.

(t)        "Borrower's Operating Account DACA" means those certain deposit account control agreements to be executed among Borrower, Lender and the depository set forth therein, pursuant to which a Borrower's Operating Account is held. Each Borrower's Operating Account DACA shall be in a form approved by Lender.

(u)        "Borrower's Operating Account Pledge Agreement" means those certain Operating Account Pledge Agreements pursuant to which Borrower pledged to Lender a security interest in any and all accounts of Borrower, including, without limitation, each of Borrower's Operating Account.

(v)        "Broker" shall mean Jones Lange LaSalle.

(w)        "Budget" means the total project budget with respect to the construction of new Improvements in accordance with the Plans, approved by Lender in its sole and absolute discretion. The Budget is attached hereto as Exhibit "E" and shall not be altered or changed without the prior written consent of Lender, such consent not to be unreasonably withheld.  The Budget applies not only to the line items (rows) but also to the source of funds to require that Borrower's equity in relation to loan funds shall be allocated in line with the Budget.  For further clarification, the Budget functions from left to right such that, for example, Borrower and Lender must allocate the "Additional Equity" to pay for all of the line items in the Additional Equity column.

(x)        "Business Day" means any day during which Lender is scheduled to be open for business.

(y)        "Closing" or "Closing Date" means the time of the execution and delivery hereof by Borrower and Lender.

(z)        "Code" means the Uniform Commercial Code as from time to time enacted in the State of Georgia.

4

(aa)    "Collateral" means (i) the Project and the Fixtures situated thereon, together with all rights, title, estate and interest owned by the Borrower each other grantor party thereto and encumbered by the Mortgage, (ii) all personal property, whether now or hereafter existing or now owned or hereafter acquired by Borrower and encumbered by the Mortgage, (iii) the Collateral, as such term is defined in the Pledge Agreement, (iv) intentionally deleted, (v) the Interest Reserve Account, (vi) all escrow accounts held by or on behalf of Borrower (including, without limitation, reserve accounts, Imposition escrow accounts, insurance escrow accounts, and all other escrow accounts established related to the Borrower and or the Project), (vii) the Construction Reserve Account, and (viii) all other assets, whether real, personal or mixed, that now or at any time hereafter secure any of the Obligations. The Collateral and each item thereof shall serve as cross-collateral for all of the Obligations.

(bb)    "Commencement Date" means the date construction of any improvements at each Construction Project commences, which is deemed to include any site work, after issuance of a building permit.

(cc)    "Commitment" means that certain letter of intent from Lender to Borrower dated October 31, 2021, as amended from time to time.

(dd)    "Completion Guaranty" means that certain guaranty of payment and performance of the obligations of Borrower, with respect to the development, design, entitlements, demolition, and construction of new Improvements on the Project, executed by Guarantor in favor of Lender of even date herewith.

(ee)    "Construction Contract" means individually and collectively, the Hotel Row Construction Contract and the 222 Mitchell Construction Contract.

(ff)    "Construction Contractor" means Balfour Beatty. Except for contractors hired for tenant improvements which Borrower shall give Lender written notice of, no other construction contractor may be engaged by Borrower with respect to the Project without the prior written approval of Lender (not to be unreasonably withheld, conditioned or delayed). The Construction Contractor must licensed and legally existing general contractor in good standing and duly authorized and licensed to conduct business in Georgia.

(gg)    "Construction Disbursement" means a disbursement of funds from the Construction Reserve Account, which shall each be no less than X Dollars ($x).

(hh)    "Construction Project" means, collectively, the 222 Mitchell Construction Project and the Hotel Row Construction Project.

(ii)    "Construction Reserve Account" means the deposit account to be established by Lender into which all Advances shall be disbursed. All funds held in the Construction Reserve Account, from time to time, shall be used exclusively to fund Hard Costs and Soft Costs of the Project as contemplated in the Budget, and the approved Construction Contract, and otherwise in accordance with the Loan Documents, including, but not limited, to the Construction Reserve Pledge Agreement. Borrower acknowledges that the Construction Reserve Account may not be a separate account but simply a book keeping entry on Lender's books and thus the funds held in the Construction Reserve Account may be co-mingled with other funds of

5

Lender. For the avoidance of any doubt, Borrower is not entitled to any interest earned on the funds within the Construction Reserve Account.

(jj)     "Construction Reserve Pledge Agreement" means that certain Construction Reserve Pledge Agreement pursuant to which Borrower pledged to Lender a security interest in the Construction Reserve Account.

(kk)     "Contingency Reserve" means a reserve of the Loan Amount as set forth on multiple line items and grouped by applicable categories in the Budget, which must be in the minimum amount of five percent (X%) of the aggregate Hard Costs and Soft Costs (but excluding the Interest Reserve, acquisition price, Closing costs, the Structuring Fee and Broker fees, each as outlined in the Budget) for the Construction Project and may only be used as set forth in Article VII. Provided however that, notwithstanding the foregoing, in no event shall the Contingency be less than the amount identified in the Budget.

(ll)     "Control" means the possession or ability, directly or indirectly, of the power to direct the management or operations of a person, corporation, partnership or other entity, whether by ownership interest, by contract, or otherwise.

(mm)     "Construction Schedule" means the anticipated timeline of key events related to predevelopment, construction of the Improvements, and satisfaction of the Loan, attached hereto as Schedule I and incorporated herein by this reference.

(nn)     "Debt Service" means, for any period of determination, the sum of all interest, Servicing Fee, and principal due under the Loan.

(oo)     "Debt Service Coverage Ratio' means as of the date of determination, a fraction, stated as a ratio, having (a) a numerator equal to the Net Operating Income, and (b) a denominator equal to the Debt Service, for the Property based on the applicable period preceding the date of determination, as determined by Lender in its sole and absolute discretion.

(pp)     "Deemed Approval Requirements" shall mean that, with respect to any new Lease or any amendment or modification of an existing Lease, Borrower has submitted a written request for the approval of such Lease or such amendment or modification to Lender (hereinafter each such request shall be referred to as a "Lease Approval Request"), which request must include, as applicable, the Lease or the amendment or modification, as applicable, to be approved. The first such written request shall include a legend prominently displayed at the top of the first page thereof in solid capital letters in bold face type of a font size not less than fourteen (14) as follows: "**WARNING: THIS IS BORROWER'S FIRST REQUEST. IF YOU FAIL TO RESPOND TO OR FAIL TO EXPRESSLY DENY THIS REQUEST FOR APPROVAL IN WRITING WITHIN TEN (10) BUSINESS DAYS AFTER YOUR RECEIPT, YOU WILL BE DEEMED TO HAVE APPROVED THIS REQUEST.**" (hereinafter such Lease Approval Request shall be referred to as the "First Request"). If Lender shall have failed to respond to such First Request within ten (10) Business Days after Lender's receipt of such First Request, Borrower shall deliver to Lender a second copy of such Lease Approval Request, which Lease Approval Request shall include a legend prominently displayed at the top of the first page thereof in solid capital letters in bold face type of a font size not less than fourteen (14) as follows: "**WARNING: THIS IS**

6

BORROWER'S SECOND AND FINAL REQUEST. IF YOU FAIL TO RESPOND TO OR FAIL TO EXPRESSLY DENY THIS REQUEST FOR APPROVAL IN WRITING WITHIN FIVE (5) BUSINESS DAYS AFTER YOUR RECEIPT, YOU WILL BE DEEMED TO HAVE APPROVED THIS REQUEST." (hereinafter such Lease Approval Request shall be referred to as the "Second Request"). In the event Lender shall have failed to respond to such Second Request within five (5) Business Days after the Administrative Agent's receipt of such Second Request, then such Lease Approval Request shall be deemed to be approved and the Deemed Approval Requirements shall have been satisfied.

(qq)     "Default" means any event, condition or state of facts which, with the giving of notice, the passage of time, or both, may constitute an Event of Default.

(rr)     "Default Rate" means the lesser of (a) the Maximum Rate, or (b) X percent (X%) per annum. Lender may, in determining the Maximum Rate in effect from time to time, take advantage of any law, rule or regulation in effect from time to time available to Lender which exempts Lender from any limit upon the rate of interest it may charge or grants to Lender the right to charge a higher rate of interest than that permitted by Florida Statutes, Chapter 687. In the event that at the time of the occurrence of an Event of Default there is no Maximum Rate in effect then the Default Rate shall be X percent (X%) per annum.

(ss)     "Development Management Agreement" means any management agreement now or hereafter executed by and between Borrower, as company, and a development management company, as manager.

(tt)     "Development Management Company" means Newport RE, L.P., a Delaware limited partnership, which company is controlled, directly or indirectly, by the Guarantor, or such other company as Lender may approve in its reasonable discretion and such Development Management Company shall enter into such documents as are reasonably requested by Lender.

(uu)     "Draw Request" means a written request at least fifteen (15) days prior to the desired funding date submitted by Borrower to Lender for each requested Construction Disbursement from Lender, which shall be funded from the Construction Reserve Account pursuant to this Agreement. Each Draw Request shall be in the form of Schedule II. Notwithstanding anything herein to the contrary, Borrower hereby acknowledges and agrees that Lender can rely upon any Draw Request executed by Kevin Murphy or Thomas Bullock.

(vv)     "Estimated Completion Date" means the expected date by which the construction of Hotel Row Construction Project and the 222 Mitchell Construction Project will be completed in accordance with the Plans. As of the Effective Date, the Estimated Completion Date for the 222 Mitchell Construction Project is April 21, 2023 and the Estimated Completion Date for the Hotel Row Construction Project is February 25, 2022. Each Estimated Completion Date may be amended from time to time by Lender, in Lender's sole and absolute discretion, to reflect the conditions of construction at such time.

(ww) "Exit Fee" means an exit fee in the amount of X% of the Loan Amount (i.e. $X). In the event of any partial repayment in accordance with the terms hereof, a pro rata Exit Fee shall be payable with respect to any such repayment.

(xx) "Event(s) of Default" means those events described in Article VIII hereof.

(yy) "Force Majeure" shall mean a delay due to acts of God, governmental restrictions, stays, judgments, orders, decrees, enemy actions (including acts of terrorism), civil commotion, fire, casualty, strikes, work stoppages, shortages of labor or materials or other causes beyond the reasonable control of Borrower, provided that adverse economic conditions, inflation, and other conditions of general applicability shall not be deemed a cause beyond the reasonable control of Borrower, and lack of funds in and of itself shall not be deemed a cause beyond the reasonable control of Borrower.

(zz) "Fixtures" means all property and equipment now owned or hereafter acquired by Borrower and now or hereafter located under, on, or above the Land, whether or not permanently affixed, which to the fullest extent permitted by applicable law in effect from time to time shall be deemed fixtures and a part of the Land.

(aaa) "Final Completion" shall mean when (a) all fixtures, furniture and equipment have been purchased and installed in the Project, (b) the Project is open and operating, and (c) the Construction Project is completed in accordance with the Plans. Lender shall determine the Final Completion date in its sole but reasonable discretion, but in accordance with subparts (a), (b), and (c) above.

(bbb) "Governmental Authority" means any (domestic or foreign) federal, state, county, municipal or other government, governmental department, commission, board, bureau, court, agency or any instrumentality of any of them.

(ccc) "Governmental Requirement" means any law, statute, code, ordinance, order, rule, regulation, judgment, decree, writ, injunction, franchise, permit, certificate, license, authorization, or other direction or requirement of any Governmental Authority now existing or hereafter enacted, adopted, promulgated, entered, or issued applicable to the Project, or the Borrower.

(ddd) "Guarantor" shall mean, collectively, NEWPORT SOUTH DOWNTOWN MASTER, L.P., a Delaware limited liability company, and OLAF KUNKAT, an individual, as guarantors pursuant to the Guaranties, and such other parties as become a Guarantor from time to time after the date hereof pursuant to a Guaranty.

(eee) "Guaranty" or "Guaranties" means the guaranties of the repayment of the Loan and performance of all obligations of Borrower, pursuant to the terms set forth in any guaranty entered in connection with the Loan, including, without limitation, the Limited Guaranty and the Completion Guaranty executed by Guarantor in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified in writing from time to time.

(fff) "Hard Costs" means the direct construction costs of building the Improvements, whether infrastructure or vertical improvements, required in connection with the

8

development or construction of the Improvements intended to be constructed at the Construction Project and as set forth on the Budget.

(ggg)    "Hotel Row" means the collateral located at 227 Mitchell Street, Atlanta, Georgia 30303; 233 Mitchell Street, Atlanta, Georgia 30303; 223 Mitchell Street, Atlanta, Georgia 30303; and 211-221 Mitchell Street, Atlanta, Georgia 30303.

(hhh)    "Hotel Row Construction Contract" means the AIA Standard Form of Agreement dated April 6, 2021, entered into between Newport SDT D&C, L.P. and Balfour Beatty Construction, LLC for the construction of the Hotel Row Construction Project, as same may from time to time be amended, which contract has been delivered to and approved by Lender, and which contract (i) provides a guaranteed maximum construction cost to Borrower, where (a) no more than X percent (x%) of the Budget shall be classified as allowances, and (b) no less than X percent (x%) of the trades shall be bought out, (ii) contains a certified trade and material breakdown itemizing all Hard Costs including, but not limited to, labor, materials, and overhead to complete the Project contemplated by the Hotel Row Plans, (iii) contains a schedule for the construction of the Hotel Row Construction Project, (iv) contains a turnkey, lien-free outside date for completion (Final Completion) of the Hotel Row Construction Project, including issuance of a certificate of completion, subject to Force Majeure, and (v) provides for a X percent (X%) retainage.  Any amendment to the foregoing items (i) through (iii) of the Hotel Row Construction Contract shall require Lender's prior written consent (not to be unreasonably withheld, conditioned or delayed), and Borrower shall deliver to Lender any material amendments made to the Hotel Row Construction Contract.  In the event of a material change to the Hotel Row Construction Contract which Lender reasonably believes will have an adverse effect on the Hotel Row Construction Project, in Lender's sole discretion, Lender shall have the right to object to the amendment(s) to the Hotel Row Construction Contract and require Borrower to amend same.

(iii)    "Hotel Row Construction Project" means the work contemplated by the Hotel Row Construction Contract and the Hotel Row Plans.

(jjj)    "Hotel Row Equity Escrow Deposit" has the meaning assigned to such term in Section 6.1(c) herein.

(kkk)    "Hotel Row Plans" means the plans and specifications relating to the Hotel Row Construction Project including but not limited to the plans for the construction of new Improvements, which shall be constructed by Borrower in accordance with the terms of this Agreement. A list of the Hotel Row Plans are set forth on Schedule V.  Once approved by Lender, the Hotel Row Plans shall not be materially modified or amended without Lender's prior written consent, where such consent shall be in Lender's sole discretion.

(lll)    "Impositions" means all (i) real estate and personal property taxes and other taxes and assessments, public or private; utility rates and charges including those for water and sewer; all other governmental and non-governmental charges and any interest, costs, fines or penalties with respect to any of the foregoing; and charges for any public improvement, easement or agreement maintained for the benefit of or involving the Project, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever that at any time prior to or after the execution of the Loan Documents may be assessed, levied or imposed upon

9

the Project or the Rents or income received therefrom, or any use or occupancy thereof, (ii) other taxes, assessments, fees and governmental and non-governmental charges levied, imposed or assessed upon or against the Borrower or any of its properties and (iii) taxes levied or assessed upon the mortgage and the Note, or any other Loan Documents.

(mmm)    "Improvements" means any improvements on the Land, including, without limitation any improvements currently existing on the Land and any improvements thereto after the date hereof, as expressly referred to and contemplated herein with respect to the improvements to be constructed by Borrower on the Land after the date hereof, pursuant to the Plans, including, any site development work necessary for, soil or infrastructure work, or actual construction of improvements located on or at the Land, including any and all parking areas, landscaping improvements, Fixtures, appliances, and installations necessary or appropriate to the foregoing, together with the electrical, plumbing and other work necessary for the operation of the foregoing. No improvements, other than those commenced and completed in accordance with the Plans, shall be commenced without the Lender's prior written consent.

(nnn)    "In Balance" or "in balance" means that the unadvanced portion of the Loan, in the aggregate and in each item of Hard Cost and Soft Cost, equals or exceeds the estimated remaining cost, in the aggregate and per item, to complete the new Improvements in accordance with the Plans and the Budget, including without limitation, the funding of any impositions, insurance or other reserves required under the terms of the Loan Documents and as otherwise contemplated by the Budget, amounts necessary to obtain the final certificates of completion, all applicable permits to open and operate the Improvements, purchasing and installing all fixtures, furniture and equipment including all tenant improvements (including, without limitation, all of Borrower's obligations under any leases necessary to satisfy all requirements of landlord to enable the tenants to accept their respective demised premises), payment of leasing commissions and a sufficient Interest Reserve to cover any cash flow shortfalls until the Debt Service Coverage Ratio is 1.00x. For purposes of defining In Balance, the Contingency Reserve shall not be included in the unadvanced portion of the Loan. The Lender's estimate of the remaining cost shall be determinative and binding upon the Borrower absent manifest error. For further clarification, if any portion of the Contingency Reserve is reallocated to another line item, pursuant to the terms herein, such reallocated portion shall be considered included in the unadvanced portion of the Loan when determining whether the Loan is in balance.

(ooo)    "Indebtedness" means, with respect to any Person: (i) all indebtedness or other obligations or liabilities (whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent or joint or several) of such Person for borrowed money or for the deferred purchase price of property or services, (ii) all obligations of such Person under direct or indirect guaranties in respect of, and absolute or contingent or other obligations of such Person to purchase or otherwise acquire or otherwise assure a creditor against loss in respect of, Indebtedness of any other Person, (iii) all indebtedness or other obligations of any other Person for borrowed money or for the deferred purchase price of property or services secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any lien, security interest or other charge or encumbrance upon or in property owned by such Person, (v) all obligations of such Person to make reimbursement or payment in respect of letters of credit and bankers' acceptances, (vi) respecting any preferred stock issued by the referenced Person bearing any mandatory dividend, interest or other return, or subject to any mandatory

10

repurchase or redemption, that is payable in cash or any other property (other than common stock or like preferred stock of such Person), and (vii) the net liabilities of such Person under all interest rate swap, interest rate collar, interest rate cap, interest rate floor, forward rate agreements, currency exchange agreements, commodity swaps or other agreements or arrangements designed to protect against fluctuations in interest rates or currency, commodity or equity values, each calculated on a basis reasonably satisfactory to the Lender and in accordance with accepted practice at the request of the holder thereof.

(ppp)     "Initial Advance" means (i) the first Advance hereunder made on the Closing Date, in the amount of X Dollars ($X) and 00/100 Dollars and (ii) a subsequent Advance to occur on January 31, 2022 (or earlier at Lender's sole and absolute discretion) in the amount of X Dollars ($X), each Initial Advance to be used pursuant to the "initial advance" column of the Budget and closing costs approved by Lender, in its sole and absolute discretion.

(qqq)     "Insurance Requirements" means the insurance policies and other insurance requirements described on Exhibit "C" required to be maintained by Borrower during the term of the Loan.

(rrr)     "Interest Reserve" has the meaning set forth in Section 11.1(a) of this Agreement.

(sss)     "Interest Reserve Account" means that certain interest reserve deposit account to be established by Lender, into which Borrower shall deposit the Interest Reserve. All funds held in the Interest Reserve Account, from time to time, shall be used exclusively to pay the Debt Service on the Note.  Borrower acknowledges that the Interest Reserve Account may not be a separate account but simply a book keeping entry on Lender's books and thus the funds held in the Interest Reserve Account may be co-mingled with other funds of Lender. For the avoidance of any doubt, Borrower is not entitled to any interest earned on the funds within the Interest Reserve Account.

(ttt)     "Interest Reserve Insufficiency" means (i) the undisbursed portion of the Interest Reserve is insufficient to defray in its entirety the entire amount of interest to be held in the Interest Reserve pursuant to the terms of this Agreement, or (ii) Borrower fails to replenish the Interest Reserve as required pursuant to this Agreement.

(uuu)     "Invested Capital" means Borrower's investment capital in the Project prior to the date of the Additional Advance which sum shall include Borrower's Equity and shall total, in the aggregate, not less than the sum required to bring the Loan and the Budget In Balance in connection with the construction of the new Improvements as anticipated pursuant to the then existing (and Lender approved) Budget and Plans.  In no event shall the Invested Capital be less than $X at the time of Closing and $X before the Second Advance.

(vvv)     "Land" means the real property described in Exhibit "A" attached hereto, to be encumbered by the Mortgage, upon which the Improvements, as from time to time exist, are located, including all of the rights, privileges and appurtenances thereunto belonging, and all of the estate, right, title and interest of the Borrower therein or thereto, either in law or in equity, now or hereafter acquired, and in and to all streets, roads and public places, opened or proposed, in

11

front of or adjoining the Land, and all easements and rights-of-way, public or private, now or hereafter used in connection with the Land.

(www)    "Lender" means BI 68 LLC, a Florida limited liability company, its successors and/or assigns.

(xxx)    "Lender's Address" means 2601 S. Bayshore Drive, Suite 1400, Miami, Florida 33133, and its successors, participants and assigns.

(yyy)    "Lender's Construction Advisor" means such party that shall be designated as such by Lender provided, however, that the Lender may at any time and in its sole discretion terminate the services of such advisor and any other advisor appointed hereunder, and may appoint another advisor, satisfactory to Lender, to perform services as Lender's Construction Advisor.

(zzz)    "Limited Guaranty" means the limited guaranty of repayment of the Loan and performance of the obligations of Borrower executed by Guarantor in favor of Lender of even date herewith.

(aaaa)    "Loan" or "Loan Amount" means the principal obligation of up to X Dollars ($X), as evidenced by the Note. Until the Second Advance Requirements are satisfied prior to the Second Advance Deadline and Borrower has delivered the Second Advance Request Notice to Lender, Lender's liability with respect to Advances shall be limited to the Initial Advance.

(bbbb)    "Loan Documents" mean, collectively, the Commitment and those items required by the Commitment and by any other document or instrument executed, submitted, or to be submitted by Borrower or others in connection with the Loan.  By way of example, such documents may include, but are not limited to, the (a) Note, (b) Mortgage, Assignment of Leases and Rents, and Security Agreement, (c) Loan Agreement, (d) Assignment of Leases and Rents, (e) Financing Statements, (f) Borrower's Affidavit(s), (g) certificates and/or written consents for Borrower and Guarantor, (h) Title Insurance Commitment and Title Insurance Policy, (i) Survey, (j) Insurance policies, (k) Opinions of Counsel, (l) Letters regarding Governmental Requirements, (m) financing statements, (n) Environmental Indemnity Agreement; (o) Pledge Agreement, (p) Assignment of Agreements Affecting Real Estate, (q) the Guaranties executed by the Guarantor; (r) the Borrower's Operating Account Pledge Agreement; and (s) any and all amendments or supplements to any of the foregoing.

(cccc)    "Loan Extension Fee" means X (X%) of the Loan Amount which shall be paid not less than ninety (90) days prior to the then current Maturity Date.

(dddd)    "Loan Party" means, collectively, the Borrower, Guarantor, Pledgor and each Obligor.  Notwithstanding the foregoing, for purposes hereof Loan Party shall include any person or other party that is liable or has encumbered any property or Collateral to secure any of the Obligations and shall include the Borrower, Guarantor, Pledgor and any other parties that may hereafter guarantee, pledge or otherwise become liable in respect of any of the Obligations.

(eeee)    "Maturity Date" means, subject to the extension option provided in Section 2.5(e), (a) thirty (30) months from the Closing Date unless extended in accordance with this

12

Agreement, or (b) any earlier date on which the entire Loan is required to be paid in full, by acceleration or otherwise, under this Agreement or any of the other Loan Documents.

(ffff)    "Maximum Rate" means the maximum interest rate (whether limited or unlimited) that may legally be charged on loans or extensions of credit made by any bank and/or lender or creditor under the laws (whether codified or not) of the State of Florida or of the United States whichever is applicable and higher as such rate (or the absence thereof) now exists or may hereafter be increased (or the ceiling, if any on the legal rate of interest eliminated) by legislation or otherwise

(gggg)    "Minimum Debt Yield" shall mean the quotient of (x) the Net Operating Income for the Project divided by (y) the Loan Amount.

(hhhh)    "Minimum Interest Yield" shall mean the product of (x) the Loan Amount multiplied by (y) 0.XXX.

(iiii)    "Monthly Report" means a written report from the Borrower to Lender providing (a) a detailed summary of the status of the Project as it relates to approvals, permitting, development, entitlements, construction, leases, purchase agreements, reservations, deposits and/or operational matters; (b) copies of Borrower's financial reports (and quarterly, semi-annual or annual reports when applicable); (c) any updates to (including any amendments to and restatements of) the Construction Project budget(s) and timeline(s) (whether in preliminary or final form); (d) any and all newly entered agreements, contracts, and related instruments or documents which have been entered by Borrower or otherwise provided to Borrower in connection with and related to the Project and the proposed construction of the Construction Project, including but not limited to, approvals, permits, licenses, contracts, zoning, platting, building and development related documents, (e) evidence of the use of the sums contained in the Construction Reserve Account for the Construction Project in accordance with the approved Budget, and (f) any other documents reasonably requested by Lender.

(jjjj)    "Mortgage" means that certain deed to secure debt, assignment of leases and rents, and security agreement of even date herewith from Borrower, as grantor, in favor of Lender, as Mortgagee, which secures the Note and other Obligations and constitutes a first priority security  title to the Land and Improvements, and a first security interest in the Fixtures, leases, rents, personal property and all other property (whether real, personal or mixed, tangible or intangible) intended to be encumbered by the Mortgage.

(kkkk)    "Net Operating Income" means Operating Revenue less Operating Expenses.

(llll)    "Note" means a promissory note of even date herewith from the Borrower to the Lender in the face amount of the Loan, any renewals, supplements, and amendments thereto and any other note given to the Lender secured by the future advance provision of the Mortgage or by any of the Collateral.

(mmmm)    "Note Rate" means the rate at which interest shall accrue under the Note, which shall be a floating interest rate equal to the greater of: (i) the sum of (a) SOFR Rate rounded up to the nearest one-eighth of one percent, plus (b) the Rate Spread, or (ii) X percent (X%). Upon

13

the occurrence of an Event of Default, the Note Rate shall have the same meaning as the "Default Rate".

(nnnn)    "Obligations" means, collectively, (i) the unpaid principal amount of and accrued interest on the Note; (ii) all liabilities and other obligations of payment and performance under the Mortgage or any of the Loan Documents, or under any other agreement creating a lien to secure any Obligation; and (iii) all other obligations and liabilities in favor of the Lender or its successor or assigns (primary, secondary, direct, contingent, sole, joint or several, whether similar or dissimilar or related or unrelated) of the Borrower or any Obligor, or any of them, as the case may be, due or to become due, now existing or hereafter incurred, contracted or acquired, whether arising under, out of or in connection with the Loan Documents or otherwise.

(oooo)    "Obligors" means each person or other party (other than the Borrower) that is liable or has encumbered any property or Collateral to secure any of the Obligations and without limiting the generality of the foregoing, Obligors shall include the Pledgor, Guarantor, and any other parties that may hereafter guarantee or otherwise become liable in respect of any of the Obligations.

(pppp)    "OFAC" means the U.S. Department of Treasury's Office of Foreign Assets Control.

(qqqq)    "Operating Expenses" means all reasonable and necessary expenses of operating the Project in the ordinary course of business which are paid in cash by Borrower and which are directly associated with and fairly allocable to the Project, all as reasonably determined by Lender, including monthly accruals for estimated annual ad valorem real estate taxes and assessments and insurance premiums or (without duplication) regularly scheduled tax and insurance impounds paid to Lender (if any), maintenance costs, management fees (as and if approved by Lender as provided in this Agreement), and costs, wages, salaries, personnel expenses, accounting, legal and other professional fees, fees and other expenses incurred by Lender and reimbursed by Borrower or any Loan Party under the Loan Documents. Operating Expenses shall exclude: Debt Service, capital expenditures, any expense for which Borrower was or is to be reimbursed from proceeds of the Loan or insurance or by any third party and any non-cash charges such as depreciation and amortization; and such other sums as reasonably determined by Lender. Operating Expenses shall also include reserves for maintenance and furniture, fixtures and equipment (as and if required by Lender as provided in this Agreement), commencing not earlier than two (2) years following the date of Final Completion of each Project.

(rrrr)    "Operating Income" means all cash receipts received from operation of the Project, or otherwise arising in respect of the Mortgaged Property (as defined in the Mortgage) after the date hereof, including receipts from leases and parking agreements, concession fees and charges, other miscellaneous operating revenues and proceeds from rental or business interruption insurance, excluding security deposits and earnest money deposits until they are forfeited by the depositor, advance rentals, until they are earned, proceeds from a sale or other disposition of any Mortgaged Property and any interest, dividends or other earnings derived from any investments which are authorized by Lender in writing.

14

(ssss)    "Other Contracts" means any contract or subcontract (other than the Construction Contract) to provide service, labor or materials to the Project which exceeds $X in value or which cannot be performed in less than three (3) months. The service providers, materialmen, contractors and subcontractors under the Other Contracts are sometimes hereinafter collectively referred to as the "Other Contractors."

(tttt)    "Permitted Encumbrances" means the "Title Exceptions" approved by Lender attorney contained in Schedule B-II of the Title Insurance Commitment, and, after issuance of the Title Insurance Policy, such matters which are approved by Lender in writing.

(uuuu)    "Person" means an individual, corporation, partnership, limited liability company or partnership, association, joint stock company, trust, unincorporated organization, joint venture or governmental authority or other regulatory body.

(vvvv)    "Plans" means, collectively, the Hotel Row Plans and the 222 Mitchell Plans.

(wwww)    "Pledge Agreement" means the Pledge Agreement dated as of even date herewith between Pledgor in favor of Lender assigning all of the Pledgor's limited partnership interests in Borrower to Lender, as the same may from time to time be amended, restated, replaced, supplemented or otherwise modified in writing.

(xxxx)    "Pledged Accounts" shall mean those certain accounts established and to be held and disbursed in accordance with this Agreement that Lender may require from time to time, in Lender's reasonable discretion, including but not limited to, the Construction Reserve Account, the Interest Reserve Pledge Agreement, each Borrower's Operating Account, all escrow accounts held by or on behalf of Borrower (including, without limitation, reserve accounts, Imposition escrow accounts, insurance escrow accounts, and all other escrow accounts established related to the Borrower and or the Project), and all other accounts of Borrower, as established from time to time, all of which are pledged in favor of Lender in accordance with the Loan Documents.

(yyyy)    "Pledgor" means Newport South Downtown Master, L.P., a Delaware limited partnership.

(zzzz)    "Prohibited Person" shall mean any Person (a) listed in the Annex to, or otherwise subject to the provisions of, the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order"); (b) that is owned or controlled by, or acting for or on behalf of, any Person that is listed to the Annex to, or is otherwise subject to the provisions of, the Executive Order; (c) with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order; (d) who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; (e) that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, http://www.treas.gov.ofac/t11sdn.pdf or at any replacement website or other replacement official publication of such list; or who is an affiliate of or affiliated with a Person listed above.

15

(aaaaa)     "Project" means the Land and Improvements.

(bbbbb)     "Property Manager" means an independent reputable third party approved by Lender and engaged by Borrower as the manager of the day to day operations, construction, maintenance, leasing, repair, sale, parking or other components of the Project (which is not managed by the Hotel Manager) which management shall be pursuant to and in accordance with a Property Management Agreement.

(ccccc)     "Property Management Agreement" means a written property management, operations, maintenance, leasing, repair, sale or other agreement with respect to components of the Project between Borrower and a Property Manager, which agreement shall be approved by Lender.

(ddddd)     "Protective Advances" means any disbursements and other advances made by Lender for: (i) the payment of taxes, maintenance, care, protection or insurance on or with respect to the Project; (ii) the discharge of any liens recorded or filed against the Project; (iii) the curing of waste of the Project; (iv) indemnification obligations regarding environmental liabilities associated with the Project; (v) service charges and expenses incurred by reason of a default or Event of Default hereunder, including late charges, attorneys' fees and court costs; and (vi) all other charges, disbursements, advances, costs and expenses now or hereafter incurred by Lender pursuant to any of the Loan Documents or as permitted by applicable law.

(eeeee)     "Rate Spread" means X (X) basis points.

(fffff)     "Release Property" shall mean the real property described in Exhibit "D", attached hereto and incorporated herein by reference.

(ggggg)     "Rents" means all of the rents, royalties, issues, revenues, income, profits and other benefits now or hereafter arising from the Project and the occupancy, use and enjoyment thereof.

(hhhhh)     "Sanctions" means, collectively, any sanctions administered or enforced by the United States Government, including OFAC, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority.

(iiiii)     "Second Advance" shall mean the first Advance after the Initial Advance.

(jjjjj)     "Second Advance Deadline" shall mean March 31, 2023.

(kkkkk)     "Second Advance Request Notice" shall mean a written notice from Borrower to Lender requesting the Second Advance and confirming that all Second Advance Requirements have been satisfied.

(lllll)     "Second Advance Requirements" has the meaning assigned to such term in Section 6.3(m) hereof.

(mmmmm)     "Service Concurrency Approvals" means all approvals required from all applicable Governmental Authorities as to the sufficiency of the level of government services

available to the Project (such as water and sewer, fire protection, parks, schools, police and roads) from the Commencement Date through the date that construction is completed.

(nnnnn)     "Single Purpose Entity" shall mean a Person (other than an individual, a government, or any agency or political subdivision thereof), which exists solely for the purpose of owning the Project, conducts business only in its own name, does not engage in any business or have any assets unrelated to the Project, except such other assets as may be permitted by this Agreement, does not have any Indebtedness other than as permitted by this Agreement, has its own separate books, records, and accounts (with no commingling of assets), holds itself out as being a Person separate and apart from any other Person, and observes corporate and organizational formalities independent of any other entity, and which otherwise constitutes a single purpose, bankruptcy remote entity as determined by Lender.

(ooooo)     "SOFR Rate" means the 30-day Secured Overnight Financing Rate as reported in The Wall Street Journal or similar publication. The SOFR Rate shall in no event be less than X (0.X%) regardless of the reported SOFR Rate in effect from time to time.

(ppppp)     "Soft Costs" means all costs in the Budget that are not Hard Costs.

(qqqqq)     "Structuring Fee" means a non-refundable structuring fee of X percent (X%) of the Loan Amount.

(rrrrr)     "Subguard Insurance" means a policy of insurance insuring the performance of the Construction Contractor's subcontractors under the Construction Contract, in favor of Lender, and otherwise in form and substance acceptable to Lender in Lender's sole and absolute discretion.

(sssss)     "Subsidiary" means any corporation or other entity with respect to which Borrower and/or any Obligor, or any combination thereof, owns or controls, directly or indirectly, X% or more of the capital stock of any class, beneficial interest or similar rights and interests.

(ttttt)     "Survey" means a survey of the Land prepared by a registered land surveyor, showing the boundaries, written legal description, Improvements, building locations, encroachments, projections, legal setbacks, zoning setbacks, easements (recorded and visible), rights-of-way, and area of the Land in square feet and acres. The survey must be (i) acceptable to Lender and be prepared in accordance with the ALTA/NSPS 2016 minimum standards, and (ii) certified, under seal, to the Lender and the Title Insurer.

(uuuuu)     "Title Insurance Commitment" means, collectively, ALTA Commitment for Title Insurance, Commitment Nos. 21000090563N, 21000090563O and 21000090563P issued to the Lender by the Title Company committing the Title Insurer to issue the Title Insurance Policy. All requirements of the Title Insurance Commitment contained in Schedule B-I must be deleted no later than Closing and the standard exceptions contained in Schedule B-II of the Title Insurance Commitment except for real estate taxes which are not yet due and payable must also be deleted no later than Closing. Only Permitted Encumbrances (those approved by Lender's attorney) are acceptable B-II exceptions. The Title Insurance Commitment shall contain any additional matters, schedules, endorsements or affirmative coverage required by Lender's counsel, including but not limited to, a an ALTA 9 Endorsement.

(vvvvv)        "Title Company" means Stewart Title Guaranty Company, its successors and assigns.

(wwwww)        "Title Insurance Policy" means a loan title insurance policy issued to the Lender by the Title Company, pursuant to the title insurance commitment on an extended coverage basis in an amount not less than the Loan Amount, insuring that the Mortgage is a first lien upon the Land subject only to the Permitted Encumbrances.  Said policy shall contain (i) only the Permitted Encumbrances, and (ii) a pending disbursement provision acceptable to Lender which obligates the Title Company to deliver to Lender (at no expense to Lender) a written endorsement to the policy each time an Advance is made hereunder increasing the amount of policy coverage to the amount of the Loan actually disbursed.  The Title Company shall also deliver to Lender evidence, reasonably acceptable to Lender, confirming that the Title Insurance Policy has been paid for by the Borrower and that all endorsements for additional advances of Loan proceeds and any other endorsements required pursuant to the terms of this Agreement or as may be requested by Lender will be issued without cost or expense to Lender.  In addition, the Lender may require that, upon payment to the Title Company of the promulgated rate premium then in effect, the Title Insurance Policy shall insure, to the extent permitted by the Mortgage, future advances of money which Lender may make to the Borrower or its successors in ownership of the Land in the same priority as though originally secured by the Mortgage.

(xxxxx)        "Unadvanced Loan Proceeds" means the Loan Amount less any Advances.

(yyyyy)        "Underwriting Fee" means a non-refundable underwriting fee of $X.

Section 1.2     Rules of Construction.

(a)        a capitalized term shall have the meaning assigned to it in Section 1.1, or as specifically defined in any other Section or Subsection hereof;

(b)        an accounting term not otherwise defined shall have the meaning assigned to it in accordance with generally accepted accounting principles in the United States of America;

(c)        words that are defined in the Code and not otherwise defined herein shall have the meanings ascribed to them in the Code;

(d)        words in the singular include the plural and the plural include the singular, and reference to any gender shall include all other genders, as the sense of the context requires;

(e)        "or" is not exclusive;

(f)        "and" may be conjunctive or disjunctive in the sole and absolute discretion of Lender; and

(g)        captions of Articles, Sections and Subsections are for convenient reference only, and shall not affect the construction or interpretation of any of the terms or provisions of this Agreement.

18

Section 1.3    Exhibits and Schedules. Exhibits and schedules attached to this Agreement are incorporated herein by reference as if set out in full.  The exhibits and schedules to this Agreement are:

(a)    Exhibit "A" is the legal description of the Land.

(b)    Exhibit "B" is the ownership and structure of the Borrower and each entity Guarantor.

(c)    Exhibit "C" are the Insurance Requirements to be maintained during the term of the Loan.

(d)    Exhibit "D" is the Release Property

(e)    Exhibit "E" is the Budget

(f)    Exhibit "F" [INTENTIONALLY OMITTED]

(g)    Exhibit "G" [INTENTIONALLY OMITTED]

(h)    Schedule H is the Construction Schedule, which includes a development timeline with respect to the redevelopment of the Project in accordance with the Plans and the Budget.

(i)    Schedule II is the form of Draw Request.

(j)    Schedule III is the form of Advance Request.

(k)    Schedule IV is the Leasing Parameters.

(l)    Schedule V is a list of the Plans.

## ARTICLE II

### THE LOAN AND COLLATERAL

Section 2.1    Description of Loan. Subject to all of the terms, representations, warranties, covenants and conditions in this Agreement, Lender agrees to lend to Borrower and Borrower agrees to borrow from Lender a principal amount of up to X DOLLARS ($X), subject to the terms, conditions and approvals set forth herein, to be used in accordance with the Loan Documents, applied toward the financing of the refinance, construction and renovation of the Project, the real estate tax and insurance escrows to be held in accordance with the Mortgage, the Interest Reserve Account for payment of interest on the Loan in accordance with the Note, and the Construction Reserve Account for the development, design, marketing, and construction of the Project, and as otherwise contemplated by the Loan Documents. No funds disbursed hereunder shall be used for personal, family, agricultural or household purposes.

19

Section 2.2    Evidence of and Security for the Loan. The Loan shall be evidenced by the Note, which Note shall be secured by the Mortgage; the Assignment of Leases and Rents; any pledged accounts including, but not limited to the Pledge Agreement and the Account Pledge Agreement; the Assignment of Agreements Affecting Real Estate; and by such other security instruments and documents as may be required by Lender, and all Collateral therefore, including, but not limited, to those mentioned in the Commitment, this Agreement and the other Loan Documents.

Section 2.3    Cross-Collateral. The Collateral and each item thereof shall serve as cross-collateral for all of the Obligations.

Section 2.4    Structuring Fee and Underwriting Fee. On or before Closing, Borrower shall pay the Structuring Fee and Underwriting Fee to Lender.

Section 2.5    Note Terms.

(a)    Note Rate. The Note executed on the Effective Date to evidence the Loan shall bear interest at the Note Rate.

The Note Rate shall be calculated on the basis of the actual number of days elapsed divided by a 360-day year. The Note Rate shall initially be set on the date of the Initial Advance and shall be adjusted, if applicable, by Lender (a) on the first day of the first (1st) full calendar month after the date of the Initial Advance (i.e., such period to include the month of the Initial Advance if the Initial Advance occurs on the first calendar day of the month) and (b) every one (1) month thereafter on the first effective date of the month as subsequently published in the Wall Street Journal, also known as the Telerate (each date in (a) and (b) above being an "Adjustment Date") based on the then applicable SOFR Rate. In the event no such SOFR Rate is published in The Wall Street Journal on such date, then the next immediately preceding date on which the SOFR Rate is published by The Wall Street Journal shall be used. In the event the SOFR Rate ceases to be published or is otherwise unascertainable, Lender shall select a comparable reference rate as the new index for purposes of calculating the Note Rate.

(b)    Interest. On the Closing Date, Borrower shall make a payment of interest only from the Closing Date through the last day of the month in which the Closing Date occurred. Thereafter, commencing on the first day of the second calendar month immediately following Closing, Borrower shall pay interest in arrears on the first Business Day of each month (each, a ""Payment Date"") for the immediately preceding month, until all amounts due under the Loan Documents are paid in full on the Maturity Date. All such monthly payments of interest, shall be paid to Lender by ACH payment (or such other instructions as Lender may from time to time provide). Borrower agrees that if proceeds of the Loan are wired into escrow for closing, interest begins accruing from the date such proceeds are wired into escrow, regardless of whether the Closing Date occurs on the same date or a later date.

(c)    Late Fee. Borrower shall pay Lender a late charge of X percent (X%) per payment penalty (the "Late Fee") applied to any payment overdue, for any installment not received by the Lender within seven (7) calendar days after the installment is due unless the Default Rate has already been applied.

20

(d)      Maturity Date.  The Loan shall mature on the Maturity Date unless otherwise extended by the terms of this Agreement.

(e)      Loan Extension Option.  Borrower shall have one (1) loan extension option to extend the term of the Loan for one (1) additional period of twelve (12) additional months (the "Loan Extension Option"), provided that at the time of the Loan Extension Option (i) no Event of Default has occurred at the time of the applicable Maturity Date and at the time Borrower exercises the Loan Extension Option to extend the term of the Note, (ii) Borrower shall notify Lender in writing of Borrower's desire to exercise the Loan Extension Option at least ninety (90) days prior to the applicable Maturity Date, (iii) all interest payments due and payable in accordance with the Note at the time Borrower exercises the Loan Extension Option have been timely paid by Borrower, including the depositing of all required amounts into the Interest Reserve Account, (iv) an "as-is" Appraisal has been performed no more than sixty (60) days prior to the then applicable Maturity Date and performed by an independent Appraiser selected by Lender and paid for by Borrower reflecting a loan to value ratio for the Project of no greater than X (X%), (v) Borrower has deposited any additional amounts into any reserve accounts required under this Agreement or any of the other Loan Documents; (vi) the Budget has been re-balanced to account for unfinished tenant improvements and leasing commissions, (vii) [intentionally omitted]; (viii) all applicable certificates of completion have been delivered to Lender; and (ix) Borrower has timely paid the Loan Extension Fee.

(f)      Exit Fee.  Upon repayment of the Loan at any time (including prior to the Maturity Date) (i) Borrower pays to Lender an exit fee in the amount of X (X%) of the Loan Amount (the "**Exit Fee**").

(g)      Joint and Several Liability.  Each Borrower's obligations to the Lender herein shall be joint and several.

Section 2.6   Minimum Interest Yield.  Subject to the terms and provisions of the Note, including, but not limited to, payment of the Exit Fee, Borrower may pay the principal portion of the Loan at any time, provided, however that notwithstanding anything herein to the contrary, in no event shall the total interest due and payable to the Lender under the Loan be less than the Minimum Interest Yield. Borrower shall give Lender not less than sixty (60) days prior written notice of its intent to make any prepayment.

Section 2.7   Borrower's Operating Account.  During the term of the Loan (including any extended term pursuant to the Loan Extension Option) and post maturity (including, without limitation, during an Event of Default), Borrower hereby irrevocably authorizes Lender to automatically debit from any one or more of Borrower's Operating Accounts (maintained with Lender or a third party pursuant to a Borrower's Operating Account DACA) from time to time, the amount of accrued interest, principal, and all other costs and charges due under the Loan Documents on each date when due, and Borrower agrees to maintain on each applicable due date sufficient available and cleared funds in such account to cover such payments. The foregoing authorization shall remain in effect until Borrower repays to Lender in cash all amounts due and owing under the Loan Documents. Borrower hereby grants to Lender a security interest in all of Borrower's right, title and interest in and to each Borrower's Operating Account (and any and all replacement or supplemental or additional operating accounts maintained by Borrower from time

21

to time), any and all assets from time to time therein, all proceeds thereof and all distributions in connection therewith, as security for the prompt payment and performance of the Obligations (pursuant to each Borrower's Operating Account Pledge Agreement). Borrower agrees to execute, and cause any third party depository to execute, a Borrower's Operating Account DACA as soon as practical after Borrower establishes a Borrower's Operating Account (but in no event later than the Second Advance). Borrower shall deposit, or cause to be deposited, all rents, security deposits, other lease related payments, and other revenues associated with the Project, as applicable into a Borrower's Operating Account during the term of this Agreement. So long as no Event of Default shall have occurred and be continuing, Borrower shall be permitted to withdraw funds from the Borrower's Operating Account to make disbursements therefrom in the ordinary course of business and to make any distributions permitted by the Loan Documents. During the continuance of any other Event of Default, Borrower shall not be permitted to withdraw funds or make disbursements from any of Borrower's Operating Accounts without Lender's prior written consent, which may be withheld in Lender's sole and absolute discretion.

Section 2.8    Servicer. In addition to all other rights of Lender contained herein or in any other Loan Document, Lender shall have the right to (but not the obligation) engage a loan servicer, including its affiliate, to administer the Loan (or any portion thereof) on Lender's behalf and Lender shall have the right (but not the obligation) to charge a monthly servicing fee to Borrower for such services of X% of the Loan Amount per annum based on a 360 day calendar year hereunder from time to time (the "**Servicing Fee**"), which Servicing Fee shall accrue during the time any such servicer is engaged by Lender and shall be due and payable by Borrower, from time to time, upon request by Lender, including without limitation, upon payment of any portion or all of the interest due under the Loan from time to time, whether paid from the Interest Reserve Account or not. Lender is authorized by Borrower to debit any account held by Lender in connection with the Loan for any fees and/or costs due the Lender related to the foregoing servicer.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.1    Representations and Warranties of Borrower. Borrower hereby represents and warrants to Lender that:

(a)    Representations and Warranties in Loan Documents. All of the representations and warranties of Borrower contained in the Mortgage and all of the other Loan Documents are true and correct and are incorporated herein by reference as if set out in full.

(b)    Other Financing. The Borrower has not (i) received any other financing for or with respect to the Project, or (ii) received any other financing for the operation, management, maintenance, development and construction of the Improvements.

(c)    Governmental Requirements and Other Requirements. The Land and the Improvements as currently existing and when constructed in accordance with the Plans, do and shall comply with all covenants, conditions and restrictions affecting the Land or any portion

thereof (including but not limited to the Permitted Encumbrances), and do and shall comply with all Governmental Requirements.

(d)      Use of the Project.  There is no (i) plan, study or effort by any Governmental Authority or any non-governmental person or agency which may adversely affect the current or planned use of the Project, or (ii) any intended or proposed Governmental Requirement (including, but not limited to, zoning changes) which may adversely affect the current or planned use of the Project.

(e)      Moratorium.  There is no moratorium or like governmental order or restriction now in effect with respect to the Project and, to the best of Borrower's knowledge, no moratorium or similar ordinance or restriction is now contemplated.

(f)      Access; Permits.  The Land has adequate rights of access to public ways and all licenses, permits, approvals or consents of Governmental Authorities or public or private utilities (including electrical power, gas, telephone, water, sewer, sanitary sewer and storm drainage facilities) having jurisdiction necessary in connection with the Project have been issued (or will be issued as required in connection with the Project) and are in good standing.

(g)      Conditions of Project.  No defect or condition of the Land or the soil or geology thereof exists which will impair the construction, use, or the operation of the Project for its intended purpose. The Budget is true and correct in all material respects as of the date hereof, and represents the Budget for the Construction Reserve Account, all of which funds shall be used in connection with the Project as provided herein for completion of the construction of the Improvements to be completed in accordance with the Plans, and such Plans comply with all applicable laws and the requirements of all leases entered into by Borrower. Any and all pro formas, billing reports, and other information provided to Lender with respect to the Project as of the date hereof are true and correct.

(h)      Labor and Materials.  All labor and materials contracted for in connection with the construction of Improvements commenced by Borrower shall be used and employed solely on the Land in said construction and only in accordance with the Plans.

(i)      Surveys.  The Survey, and all plot plans and other documents heretofore furnished or to be furnished by the Borrower to the Lender with respect to the Land and Improvements are accurate and complete as of their respective dates. There are no encroachments onto the Land and no improvements on the Land encroach onto any adjoining property.

(j)      Sale of Securities.  The Borrower has not instituted, caused to be instituted or been a party to and, to the best of Borrower's knowledge, there has not been any public offering with respect to the Land and the Improvements, or either, or any interest in or securities issued by the Borrower, in each case within the meaning of the Securities Act of 1933 or the Securities Exchange Act of 1934, as amended, or any regulations or rulings thereunder.

(k)      Construction Contractor and Other Contracts.  The Construction Contract and all Other Contracts are (or will be from and after they are entered) in full force and effect and are (or will be from and after they are entered) the legal, valid and binding obligations of the Construction Contractor and each contractor under the Other Contracts, as applicable, enforceable

23

in accordance with the respective terms thereof; the Construction Contractor is (or will be) a duly licensed general contractor under the laws of the State of Georgia; and each contractor under the Other Contracts is (or will be) a duly licensed contractor under the laws of the State of Georgia.

(l)      Litigation.   There is no action, suit, proceeding, or investigation now pending (or to the best of the Borrower's or any Obligor's knowledge, threatened in writing) against, involving or affecting Borrower, the Project, or any Obligor at law, in equity or before any Governmental Authority that if adversely determined as to the Borrower, the Project or any Obligor, would result in a material adverse change in their respective businesses, financial condition or their operation and ownership of the Project or any of their properties, nor is there any basis for such action, suit, proceeding or investigation.

(m)      Organization, Standing, Corporate Powers, etc.

(i)      Each Borrower (x) is duly organized as a Delaware limited partnership, validly existing and in good standing under the laws of the jurisdiction of its organization, (y) has all requisite power and authority to conduct its business as now being conducted and to own its properties and assets, and (z) is duly qualified to do business in every jurisdiction wherein the failure to so qualify would have a material adverse effect. The limited partners executing the Loan Documents on behalf of Borrower have full power and authority to execute any and all Loan Documents on behalf of Borrower and have obtained the required consents, if any, from the limited partners of Borrower and Pledgor.

(ii)      Each Pledgor (x) is duly organized as a Delaware limited partnership, validly existing and in good standing under the laws of the jurisdiction of its organization, (y) has all requisite power and authority to conduct its business as now being conducted and to own its properties and assets, and (z) is duly qualified to do business in Georgia and in every jurisdiction wherein the failure to so qualify would have a material adverse effect. The Person executing the Loan Documents on behalf of Pledgor has full power and authority to execute any and all Loan Documents on behalf of Pledgor and has obtained the required consents, if any, from all parties required.

(iii)      Each of the Borrower and Obligors, if any, has all requisite power and authority, corporate, partnership or otherwise, to execute and deliver and to perform all of their respective Obligations under the Loan Documents to which it is a party.

(iv)      None of the Borrower or Obligors, if any, use or have used any trade names in the conduct of their business and have not had or used another name, nor been the surviving entity in a merger, nor acquired any other business.

(n)      Authorization of Borrowing, etc.

(i)      The execution, delivery and performance of this Agreement and the other Loan Documents, and in the case of the Borrower, the borrowings hereunder and the execution and delivery of the Note and the Mortgage, (i) have been duly authorized by all requisite company action, (ii) do not and will not violate any Governmental Requirement or provision of applicable law, any governmental rule or regulation, any order of any court or other agency of government to which any Borrower or any entity Obligor, if any, is subject or the articles of

24

organization, operating agreement or articles of organization of Borrower or any entity Obligor and (iii) does not violate any provision of any indenture, agreement or other instrument to which Borrower or any of the Obligors, if any, are a party or by which Borrower or any of the Obligors or any of their respective properties or assets are bound, or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or otherwise) a default under any provision of such indenture, agreement or other instruments, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the properties or assets of Borrower or any of the Obligors, if any, other than liens in favor of the Lender as provided in the Loan Documents. Each of the Loan Documents to which Borrower or Obligors, if any, is a party is the legal, valid and binding agreement and obligation of Borrower and/or the Obligors, as the case may be, enforceable against them in accordance with the terms thereof.

    (ii)    No registration with, consent or approval of, or other action by any federal, state or other governmental authority, regulatory body or court of law is required in connection with the execution, delivery and performance of this Agreement by any Borrower or Obligor, if any, or with the execution and delivery of and performance under the Loan Documents, the borrowings thereunder by any of them or, if so required, such registration has been made, such consent or approval has been obtained and is final and not appealable or such other action has been taken heretofore and proof thereof furnished to the Lender.

    (o)    <u>Financial Statements</u>.  The Borrower and the Obligors have furnished financial statements to Lender as requested.  Such financial statements fairly present the financial condition and the results of operations of Borrower and the Obligors, respectively, as of the dates and for the periods indicated; show all known material liabilities, direct or contingent, of Borrower or Obligors, as of the respective dates thereof, and were prepared in accordance with generally accepted accounting principles. Borrower represents that all information and documentation furnished by Borrower and Obligors to Lender remains true and correct in all material respects and there have been no materially adverse changes in the financial condition of Borrower or Guarantor.

    (p)    <u>Payments of Taxes</u>. The Borrower and each Obligor has filed or caused to be filed all federal, state and local tax returns that are required to be filed and has paid or caused to be paid all taxes as shown on such returns or on any assessment received by it, to the extent that such taxes have become due.

    (q)    <u>Compliance or Exemption from ILSA</u>. The Project is exempt from any and all registration requirements under the Interstate Land Sale Full Disclosure Act ("ILSA") throughout the term of this Loan, and the Project shall at all times be exempt of the requirements of ILSA.

    (r)    <u>Federal Reserve Regulations</u>. Neither the Borrower nor any of the Obligors is engaged principally in, nor has, as one of its important activities, the business of obtaining credit for the purpose of purchasing or carrying any "margin security" (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System of the United States). No part of the proceeds of the Loan will be used for the purpose, directly or indirectly, whether immediate, incidental or ultimate, of purchasing or carrying, within the meaning of such Regulation U, any such "margin security."

       (s)      Investment Company Act. Neither the Borrower nor any of the Obligors is an "investment company" within the meaning of the Investment Company Act of 1940 and any amendments thereto.

       (t)      Single Purpose Entity. Each Borrower is and has at all times since its formation been a Single Purpose Entity and shall remain a Single Purpose Entity throughout the term of the Loan, and has not and will not:

       (i)      engage in any business or activity other than the ownership, operation and maintenance of the Project, and activities incidental thereto;

       (ii)      acquire or own any assets other than (A) the Project, and (B) such incidental personal property as may be necessary for the ownership, leasing, maintenance and operation of the Project;

       (iii)      merge into or consolidate with any Person, or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

       (iv)      fail to observe all organizational formalities, or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the Governmental Requirements of the jurisdiction of its organization or formation, or amend, modify, terminate or fail to comply with the provisions of its organizational documents;

       (v)      own any subsidiary or make any investment in any Person;

       (vi)      commingle its assets with the assets of any other Person;

       (vii)      incur any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (A) the Debt and/or (B) trade and operational indebtedness incurred in the ordinary course of business with trade creditors, provided such Indebtedness is (1) unsecured, (2) not evidenced by a note, (3) on commercially reasonable terms and conditions, and (4) due not more than sixty (60) days past the date incurred and paid on or prior to such date; provided, however, the aggregate amount of the Indebtedness described in (B) shall not exceed at any time X (X%) of the outstanding principal amount of the Debt.  No Indebtedness other than the Debt may be secured (subordinate or pari passu) by the Project;

       (viii)      fail to maintain all of its books, records, financial statements and bank accounts separate from those of its affiliates and any constituent party.  Borrower's assets have not and will not be listed as assets on the financial statement of any other Person; provided, however, Borrower's assets may be included in a consolidated financial statement of its affiliates provided (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Borrower and such affiliates and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such affiliates or any other Person and (ii) such assets shall be listed on Borrower's own separate balance sheet.  Borrower has maintained and will maintain its books, records, resolutions and agreements as official records;

(ix)    enter into any contract or agreement with any general partner, member, shareholder, principal or affiliate, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties;

(x)    maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xi)    assume or guaranty the debts of any other Person, hold itself out to be responsible for the debts of any other Person, or otherwise pledge its assets for the benefit of any other Person or hold out its credit as being available to satisfy the obligations of any other Person;

(xii)    make any loans or advances to any Person;

(xiii)    fail to file its own tax returns (except that Borrower may file or may include its filing as part of a consolidated federal tax return) unless prohibited by Governmental Requirements from doing so;

(xiv)    fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name or fail to correct any known misunderstanding regarding its separate identity;

(xv)    fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations (to the extent there exists sufficient cash flow from the Project to do so after the payment of all operating expenses and shall not require any equity owner to make additional capital contributions to Borrower);

(xvi)    without the unanimous written consent of all of its partners, members or shareholders, as applicable, (a) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any Creditors Rights Laws, (b) seek or consent to the appointment of a receiver, liquidator or any similar official, (c) take any action that might cause such entity to become insolvent, or (d) make an assignment for the benefit of creditors;

(xvii)    fail to allocate shared expenses (including, without limitation, shared office space) or fail to use separate stationery, invoices and checks;

(xviii)    fail to remain solvent, fail to pay its own liabilities (including, without limitation, salaries of its own employees) from its own funds or fail to maintain a sufficient number of employees in light of its contemplated business operations (in each case to the extent there exists sufficient cash flow from the Project to do so); or

(xix)    acquire obligations or securities of its partners, members, shareholders or other Affiliates, as applicable.

(xx)    Borrower shall not change (or permit to be changed) Borrower's (a) name, (b) identity (including its trade name or names), (c) principal place of business set forth in

27

Article I of this Agreement, or (d) if not an individual, Borrower's corporate, partnership or other structure, without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Borrower shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein. At Lender's request, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower intends to operate the Project and representing and warranting that Borrower does business under no other trade name with respect to the Project.

   (xxi) Borrower will continue to engage in the businesses now conducted by it as and to the extent necessary for the ownership, maintenance, management and operation of the Project. Borrower will qualify to do business and will remain in good standing under the laws of the jurisdiction as and to the extent required for the ownership, maintenance, management and operation of the Project.

   (u) [Reserved].

   (v) Title to Collateral/Priority of Security Interest.

   (i) The Collateral is, and so long as the Borrower is obligated to the Lender, will be, owned solely by Borrower or Pledgor, as applicable. No other person or party has or will have any right, title, interest or lien therein, thereto or thereon, other than liens or interests approved by the Lender in writing. The Collateral is free and clear of all judgements, liens, and encumbrances other than the Permitted Encumbrances.

   (ii) Subject (i) to filing and recordation of the appropriate instruments in the appropriate offices of the proper jurisdictions, (ii) as to the enforcement of remedies, to bankruptcy, insolvency, and other laws affecting creditors' rights generally and to moratorium laws, from time to time in effect, and (iii) to general equitable principles which may limit the right to obtain the remedy of specific performance, each of the security interests granted to the Lender in the Collateral pursuant to the Mortgage, the Pledge Agreement, Assignment of Leases and Rents, Account Pledge Agreement, Assignment of Agreements Affecting Real Estate, and other Loan Documents or pledges constitutes a valid first priority security interest or lien in and on the Collateral covered thereby, granting the rights and remedies inuring to a mortgagee under the Mortgage and to a secured party under applicable law. The Borrower and the Guarantor hereby authorize Lender and its agents or counsel to file financing statements that indicate the Collateral (y) owned by Borrower as all assets of the borrower, or words of similar effect, or (z) as being of an equal, greater or lesser scope, or with greater or lesser detail, than as set forth in the Mortgage, Guaranty, and other Loan Documents.

   (w) <u>Exhibit and Schedule Information</u>. The information contained in all exhibits and schedules to this Agreement is true, correct and complete in all material respects and such of the exhibits and schedules which are lists contain all names, information, descriptions or locations, as the case may be, required by this Agreement to be shown thereon.

(x)     O.S.H.A. and Environmental Matters. The Borrower and Obligors, if any, have duly complied with, and their respective properties are in full compliance in all material respects with the provisions of the Federal Occupational Safety and Health Act, the Environmental Protections Act, and the Resource Conservation and Recovery Act ("RCRA") and all rules and regulations thereunder and all similar state and local laws, rules and regulations, including, but not limited to, any and all of the foregoing relating in any manner to underground tanks and other storage facilities or equipment and the removal and disposal of asbestos; there have been no outstanding citations, notices or orders of noncompliance issued to Borrower, or Obligors, if any, or relating to their businesses or properties under any such laws, rules or regulations.

The Borrower and Obligors, if any, have been issued all required federal, state and local licenses, certificates or permits relating to their businesses and properties, and the same are in compliance in all respects with, all applicable federal, state and local laws, rules and regulations relating to air emissions, water discharge, noise emissions, solid or liquid waste disposal, hazardous waste or materials, or other environmental, health or safety matters.

The Borrower and Obligors, if any, hereby agree to indemnify and hold the Lender harmless from and against any liability, loss, damage, suit, action or proceeding pertaining to solid or hazardous waste materials or other waste-like or toxic substances arising out of or in connection with this Agreement, any of the Loan Documents, or the transactions contemplated hereunder, including but not limited to claims of any federal, state or municipal government or quasi-governmental agency or any third person, whether arising under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), RCRA, or any other federal, state or municipal law or regulation, or tort, contract or common law. This provision shall survive the full payment of the Obligations and the termination of the Loan Documents.

(y)     OFAC and Other Sanctions. Borrower nor any Obligor nor any of their respective members, partners, directors, officers, employees, agents, representatives, subsidiaries or Affiliates, to the knowledge of Borrower, is a person currently the subject of any Sanctions, nor located, organized or resident in a country or territory that is the subject of Sanctions.

(z)     Insurance. All insurance maintained by Borrower covering the Project are on terms and coverages as required under the terms of this Agreement and the Mortgage. To the extent proceeds payable under such insurance policies are insufficient to cover the cost incurred due to any loss, casualty or damage otherwise covered by such insurance policies, Borrower has adequate funds available to pay any such deficiencies.

(aa)     Development Rights. The Project has sufficient development rights as of the Closing Date to develop and construct Improvements on the Land as contemplated hereunder, by the Plans and in the diligence documents delivered by Borrower to Lender prior to the date hereof.

(bb)     Ownership of Collateral. Each of the Borrower and Pledgor, as applicable, has good title to the Collateral owned by it, and the Collateral is free and clear of all judgments, liens, and encumbrances, except Permitted Encumbrances. Any construction, demolition or other work performed in connection with the Project, or labor or materials provided for the Project, prior to the Closing has been paid for in full by Borrower.

(cc)     Solvency.

29

(i)    Each Loan Party is solvent; (ii) the pledge of the Collateral as contemplated herein to Lender will not render any Loan Party insolvent; (iii) each Loan Party has made adequate provision for the payment of all of its creditors other than Lender; and (iv) no Loan Party has entered into this transaction to provide preferential treatment to Lender or any other creditor of any Loan Party in anticipation of seeking relief under federal or state bankruptcy or solvency laws.

(ii)    To the best of Borrower's knowledge and belief after due investigation, immediately before and immediately after giving pro forma effect to the Loan transaction contemplated in this Agreement, (i) the fair value of the total property and assets of the Borrower is greater than the total amount of liabilities (including, without limitation, contingent liabilities) of the Borrower; (ii) the present fair saleable value of the property and assets of the Borrower is not less than the amount that will be required to pay the probable liability of the Borrower on its debts as they become absolute and matured; and (iii) the Borrower is not engaged in business or in a transaction, or is about to engage in business or in a transaction, for which its property and assets would constitute an unreasonably small capital. Further, the Borrower does not intend to, or believe that it will, incur debts or liabilities beyond its ability to pay such debts and liabilities as they mature, and the Borrower does not intend, in consummating the Loan transaction, to hinder, delay or defraud either present or future creditors or any other Person to which the Borrower is or, on or after the date of this Agreement, will become indebted.

(dd)    Brokers.  The Borrower represents and warrants to Lender that the only broker or finder involved in this Loan is the Broker.  Borrower shall be responsible for any and all brokerage fees related to the Loan.  If a claim for brokerage commission in connection with the Loan is made by any broker or finder, other than the Broker, claiming to have dealt through or on behalf of one of the parties hereto, Borrower, Guarantor and Broker shall indemnify, defend and hold harmless the Lender from all liabilities, damages, claims, costs, fees and expenses whatsoever (including reasonable attorneys' fees and court costs at any and all appellate levels) with respect to said claim.

(ee)    Organizational Chart.  The organizational chart attached hereto as Exhibit "B" is a true and correct current organizational structure chart of Borrower, each entity Pledgor, and their constituent entities.

Section 3.2    Reaffirmation, Survival of Representations and Warranties.  With each request for an Advance made by Borrower pursuant to this Agreement, Borrower:

(a)    covenants, warrants and represents to the Lender that all representations and warranties of Borrower and any Obligor contained in this Agreement shall be true at the time of Borrower's execution of this Agreement and at the time such Advance is requested and is made by the Lender (unless made as to a specific date), and shall survive (i) the execution, delivery and acceptance thereof by the Lender and the other parties and the closing of the transactions described therein or related thereto, and (ii) the making of each Advance.  Borrower and the Lender expressly agree that any misrepresentation or breach of any warranty whatsoever contained in this Agreement shall be deemed material;

(b)        represents and warrants to the Lender that there does not then exist an Event of Default or any event or condition which, with notice, lapse of time and/or the making of such Advance or otherwise, would constitute an Event of Default; and

(c)        reaffirms as of the date of said request for an Advance all of the representations and warranties of Borrower and any Obligor contained in this Agreement.

Section 3.3       Reliance on Representations.  The Borrower acknowledges that the Lender has relied upon Borrower's and Obligors' representations and information delivered to Lender in connection with the Loan, has made no independent investigation of the truth thereof and is not charged with any knowledge contrary thereto that may be received by an examination of the public records wherein the Land is located or that may have been received by any officer, director, agent, employee, or shareholder of Lender.  The representations and warranties contained herein shall survive to the fullest extent provided by and in accordance with the Loan Documents and applicable law.

# ARTICLE IV

## AFFIRMATIVE COVENANTS

Section 4.1       Construction Reserve Account.  Borrower shall use the entire Construction Reserve Account for the completion of the Construction Project and the Improvements, and for the payment of the Hard Costs and Soft Costs in connection therewith in accordance with the Budget. Such funds will be disbursed by Lender to Borrower in accordance with the terms of this Agreement. All funds deposited into the Construction Reserve Account, or allocated thereto, shall be used exclusively as contemplated in the Budget and otherwise in accordance with the Loan Documents.  Lender shall be notified in writing of any changes in the Budget, as specifically permitted by this Agreement.  Notwithstanding anything contained herein, except for payments to the Development Manager and reimbursement to Borrower (or its Affiliates) for capital contributions in excess of the required Invested Capital as of the Initial Advance (which capital has been used to pay the Construction Contractor), in no event shall any portion of the Loan, nor any payments be made to any Affiliate of Borrower; it being understood that all Construction Disbursements are to be used to pay the Construction Contractor and other parties who have completed work with respect to the completion of the Improvements in accordance with the Plans and the approved Budget. The Additional Equity Escrow Deposit and all equity from Borrower necessary for Borrower to complete the Construction Project shall be deposited into the Construction Reserve Account and shall be disbursed by Lender upon satisfaction of the requirements set forth herein.

Section 4.2       Total Project Costs - Borrower's Obligations To Pay.  Borrower shall furnish to Lender upon written request of Lender, from time to time, evidence satisfactory to Lender of the estimated total cost of completing the Improvements commenced as permitted pursuant to this Agreement (including those set forth in the Budget), a breakdown of the Hard Costs and Soft Costs advanced with respect thereto, and from and after the Commencement Date provide confirmation that Borrower has sufficient funds to complete and construction commenced

with respect to the Construction Project (or the portion thereof currently under construction) pursuant to the Plans, and the timeline to complete any such Improvements.

Section 4.3    Construction of Improvements.  Borrower shall cause any Improvements demolished or commenced to be constructed upon the Land by Borrower, in a good and workmanlike manner in strict accordance with the Plans, this Loan Agreement, and all Governmental Requirements, the rules and regulations now existing or hereafter adopted by the applicable authorities having jurisdiction over the Project, and any and all covenants, conditions, restrictions, easements or similar matters affecting the Project.

Section 4.4    Time and Manner of Construction.  Borrower shall (a) cause construction of any Improvements commenced by Borrower to be continuously and diligently constructed in a timely manner and shall not permit or allow any material interruption of demolition or construction of any Improvements commenced by Borrower; and (b) cause the construction of the Improvements commenced by Borrower to be completed (including all approaches, services, utilities and other infrastructure and vertical improvements in connection therewith) in accordance with the Plans and a certificate of completion to be issued.  All Improvements to be completed in accordance with the Plans shall be completed by or before three (3) months after the Estimated Completion Date.

Section 4.5    Governmental Requirements, Permits and Licenses.  Borrower and the Construction Contractor shall satisfy and comply with all Governmental Requirements applying to and affecting the demolition and construction of Improvements per the Plans and shall obtain and maintain in full force and effect until the Loan has been repaid in full all necessary licenses, permits and similar matters with respect thereto and the Project, without cost or expense to Lender. Without limiting the generality of the foregoing, Borrower shall, upon request of Lender, deliver to Lender prior to commencement of any construction on the Land, copies of all licenses, consents, permits, certificates and other documents reasonably requested by Lender to evidence or confirm Borrower's ability to complete the Construction Project.  In the event any such necessary licenses, permits and similar matter is suspended or terminated by any Governmental Authority, Lender may refuse to make further Advances hereunder for work attributed to such suspended or terminated license or permit until such license or permit, or similar matter is reinstated.

Section 4.6    [Intentionally Omitted.]

Section 4.7    Purchase of Additional Assets.  In the event Borrower shall acquire any other real property (or any interest therein), from and after the date hereof, Borrower shall (a) execute and deliver to Lender a mortgage whereby such additional property is mortgaged in favor of Lender, (b) cause a title policy,  pursuant to which Lender is insured, to be issued in favor of Lender with respect to such additional property and in an amount as reasonably required by Lender, and (c) execute and deliver such additional documentation as is requested by Lender in connection therewith.

Section 4.8    Inspections.  Borrower shall permit Lender, Lender's agent, and any Governmental Authority full and free access to the Project upon advance notice, at any time during normal business hours, and at all other reasonable times to (a) inspect the Project and all materials used in construction of the Improvements or stored on the Land, and (b) examine all Plans,

drawings, work details, books and records (including, but not limited to budgets, income tax returns, financial statements, rent rolls and other documents related thereto) and any and all other matters relating to or connected with the operation and management of the Project and the construction of any Improvements. Any inspection of the Project permitted by this Agreement shall be solely for the benefit of the party or parties contracting for such inspection. No third party shall be entitled to claim any loss or damage as a result either of such inspections or the failure to make the same. Further, upon request by Lender upon and during the continuance of a default, Borrower shall permit Lender or its authorized representative to attend any weekly, bi-weekly, or other regularly scheduled meetings between Borrower and its Construction Contractor and/or Engineer.

Section 4.9    Non-Conformity of Work. Borrower shall promptly after receiving notice from Lender of construction which does not conform with the requirements of the Plans or then applicable Governmental Requirements, proceed to correct the same. Borrower shall, at its expense, make good all work and materials damaged by such defective construction.

Section 4.10    Delivery of Documentation. Borrower shall, upon Lender's reasonable request, deliver to Lender or Lender's representative, or both, invoices, bills of sale, statements, receipted vouchers, or agreements under which Borrower claims title to any materials, fixtures or articles used or to be used in the construction of the Improvements or operation of the Project.

Section 4.11    Plans and Approvals. From time to time upon the request of Lender, Borrower shall deliver to Lender copies of the Plans and any approvals required from the Governmental Authority in accordance with Governmental Requirements for the redevelopment of the Project pursuant to the Plans. Borrower shall diligently and continuously pursue final approval of the Plans and final approvals from the Governmental Authority in accordance with Governmental Requirements for the development of the Project in accordance therewith.

Section 4.12    Notices

(a)    Borrower shall give prompt written notice to Lender of (i) any action or proceeding instituted by or against Borrower or any Obligor in any court or by any Governmental Authority, or of any such proceedings threatened against Borrower or any Obligor which might result in a judgment or judgments, and (ii) any other action, event or condition of any nature known to Borrower or of which it should have knowledge which constitutes an Event of Default, or a default of Borrower or any Obligor under any contract, instrument or agreement to which Borrower or any Obligor is a party or by which Borrower, any Obligor, or any of their respective properties or assets may be bound or to which any may be subject, which default might have a material adverse effect upon the business, operations, properties, assets or conditions (financial or otherwise), of Borrower or any Obligor.

(b)    Borrower shall furnish to Lender a copy of any notice, claim or demand given by Borrower to or received by Borrower from the Construction Contractor, any contractor under the Other Contracts, or any contractor, subcontractor or material supplier, or any other third party, promptly upon the giving or receipt of any such notice, claim or demand, if such notice, claim or demand is material (i) to the performance of Borrower hereunder or under any other Loan Document, (ii) to the performance of the Borrower or the Construction Contractor under the

33

Construction Contract, any Other Contract, or any contract or subcontract for materials or labor, or (iii) to the acquisition or maintenance of any building or development license, permit, or similar matter required in connection with the demolition and completion of Improvements, or the operation, ownership, management or redevelopment of the Project.

Section 4.13    Further Assurances.  Borrower shall, in addition to those items and other matters set forth in the Commitment or the other Loan Documents, deliver to Lender all items, documents, writings, reports and information reasonably required by Lender, from time to time, to consummate the Loan, or otherwise administer and/or oversee the Loan.

Section 4.14    Obligations, Taxes and Laws.  Borrower shall pay all indebtedness and obligations promptly and in accordance with their respective terms, and pay and discharge promptly all taxes, assessments, and governmental charges or levies imposed upon it or in respect of its properties, when the same shall become due (subject to Borrower's right to contest same in accordance with the Loan Documents), as well as all claims for labor, materials, and supplies or otherwise which, if unpaid, might become a lien or charge upon such properties or any part thereof, and timely comply with all applicable laws and governmental rules and regulations.

Section 4.15    Financial Statements, Reports, Documents etc.  In the case of Borrower, maintain a system of accounting established and administered in accordance with generally accepted accounting principles consistently applied, and set aside on its books all such proper reserves for each fiscal year for depreciation, obsolescence, amortization, bad debts and other purposes as shall be required by such generally accepted accounting principles.  The Borrower, as specified herein below, will furnish to the Lender:

(a)    Upon request of Lender, as to Borrower, financial statements, balance sheets and statements of income, rent rolls, retained earnings and statements of cash flows for such year (consolidated if applicable, in which case, all consolidating statements shall be furnished to the Lender as herein provided) which may be internally prepared or prepared by a certified public accountant of recognized standing reasonably acceptable to the Lender.

(b)    Upon request of Lender, as to Borrower and any Obligor, copies of all federal income tax returns which the Borrower and any Obligor may file with the Internal Revenue Service and copies of all management reports, briefs, memoranda or other writings prepared for the Borrower or Subsidiaries by its auditors, accountants, and management or financial consultants.

(c)    Upon request of Lender, the Borrower shall deliver to or otherwise make available to Lender any and all newly entered (during the prior quarterly period) agreements, contracts, documents, or instruments, which have been entered by Borrower or otherwise provided to Borrower in connection with and related to the Project, including but not limited to, approvals, permits, licenses, Other Contracts, zoning, platting, building and development related documents.

(d)    Within fifteen (15) days of each calendar month end during the term of the Loan the Borrower shall deliver to Lender the Monthly Report and, for those month's representing the end of a fiscal quarter (March, June, September, December).

(e)    [Intentionally Omitted.]

34

(f)      Upon written request of Lender, statements for the operation of the Project reflecting the operations for any such period requested and a current rent roll, each in form, substance and detail reasonably satisfactory to the Lender.  Rent rolls shall include tenant names, lease expiration dates, location, guarantor information, security, annual or monthly rent details (as applicable), and such other information as Lender may reasonably require.

(g)      Promptly, from time to time, such other information regarding the operation, business, affairs and financial condition of the Borrower or the Obligors and the Project as the Lender may reasonably request.

Section 4.16      Continued Assistance.  Promptly, from time to time as the Lender may reasonably request, perform such acts and execute, acknowledge, deliver, file, register, deposit or record any and all further instruments, agreements and documents, including without limitation, Uniform Commercial Code Continuation Statements or other documentation related to the securing the Collateral, whether to continue, preserve, renew, record or perfect interests conferred by this Agreement or the other Loan Documents, as well as the priority thereof.  Borrower irrevocably constitutes and appoints Lender as their attorney-in-fact, with full power of substitution, such appointment being coupled with an interest, to enforce Lender's rights with respect to the above further assurances, provided however, that Lender shall not exercise the foregoing power of attorney unless Borrower fails to perform such requested action within ten (10) Business Days after written request.

Section 4.17      Compliance.  Borrower and each Obligor shall pay and perform all of the Obligations in accordance with the provisions of all of the Loan Documents, and shall insure that all of the representations and warranties set forth in this Agreement and in the other Loan Documents remain true and correct in all material respects until all Obligations are fully paid, performed and discharged.  Each Loan Party shall immediately notify Lender, by telephone followed by written notice, upon the occurrence of any default under the Loan.

Section 4.18      Compliance with Laws.  Borrower shall comply with all applicable laws, rules, regulations and orders.

Section 4.19      Taxes.  Subject to the escrow provisions set forth in this Agreement, Borrower shall pay or cause to be paid, on or before the last day when payment may be made without interest or penalty, the Impositions; provided, however, that Borrower may contest the validity, applicability or amount of any asserted Imposition in good faith, by appropriate proceedings diligently conducted, and with prior notice to Lender, and against which, if requested by Lender, Borrower shall maintain with Lender reserves in amount and in form (book, cash, bond or otherwise) reasonably satisfactory to Lender. Within fifteen (15) days following request by Lender, Borrower shall exhibit to Lender original receipts or other satisfactory proof of payment of Impositions.  Borrower shall not claim, demand or be entitled to receive any credit on account of the Indebtedness as a result of payment of any Impositions.

Section 4.20      Insurance.  Borrower shall comply with the Insurance Requirements at all times during the term of the Loan.  Subject to the escrow provisions set forth in this Agreement, Borrower shall, at its sole expense, obtain and maintain for the benefit of Borrower and Lender, the insurance policies covering the Project on the terms and coverages required by Exhibit "C."  In

35

the event at any time the Lender (in its reasonable judgment) deems the Project to be underinsured or not properly insured, Lender may require Borrower to obtain additional insurance or insurance as required by the Loan Documents (without regard to whether such insurance is in place by a third party contractor, manager, or tenant; however, if insurance is provided by such parties and is acceptable to Lender, Borrower shall be solely responsible to cause such policies to be in form and as acceptable to Lender).   To the extent proceeds payable under such insurance policies are insufficient to cover the cost incurred due to any loss, casualty or damage otherwise covered by such insurance policies, Borrower has adequate funds available to pay any such deficiencies.

Section 4.21    Imposition Deposits.

(a)    Taxes.  In order to secure the performance and discharge of Borrower's obligations under this Agreement and the Mortgage, but not in lieu of such obligations, Borrower shall pay over to Lender, with each installment on the Note, an amount equal to 1/12th of the next maturing annual Impositions (as estimated by Lender in its reasonable judgment), and on even date hereof an amount equal to twelve (12) months of such sum toward payment of the next maturing annual Impositions.  Upon request by Lender, Borrower shall also pay to Lender such additional funds as may be required to make up any deficiencies in the amounts necessary to enable Lender to pay such Impositions when due. No interest shall be payable to Borrower on any escrow deposits.  Borrower promptly shall provide to Lender all bills for Impositions, together with any other documents required to enable Lender to pay Impositions when due. Notwithstanding anything to the contrary contained herein, upon the occurrence of any Event of Default, Lender, at its option (but without any obligation), may apply to the reduction of the Indebtedness (in accordance with the terms of the Note and this Agreement) all of any portion of the escrow deposits held by Lender. Notwithstanding the foregoing, Borrower's obligations to make monthly payments to Lender for Impositions shall be suspended for so long as the Budget includes sufficient funds to pay Impositions through and including Final Completion (and, thereafter, Borrower shall be obligated to make such monthly payments).  Notwithstanding the foregoing, in lieu of monthly payments, Borrower may make a single annual payment in advance (on the first month of the 12 month period) to Lender for the estimated annual Impositions.

(b)    Insurance. In order to secure the performance and discharge of Borrower's obligations under this Agreement and the Mortgage, but not in lieu of such obligations, Borrower shall upon, written request of Lender, pay over to Lender, with each installment on the Note, an amount equal to 1/12th of the next maturing annual insurance premiums (as estimated by Lender in its reasonable judgment).  Upon request by Lender, Borrower shall also pay to Lender such additional funds as may be required to make up any deficiencies in the amounts necessary to enable Lender to pay such insurance premiums when due. If insurance premiums are paid monthly, upon Request by Lender, Borrower shall pay to Lender an amount equal to 1/4th of the next maturing annual insurance premium (as estimated by Lender in its reasonable judgement). No interest shall be payable to Borrower on any escrow deposits. Borrower promptly shall provide to Lender all bills for insurance premiums, together with any other documents required to enable Lender to pay insurance premiums when due.  Notwithstanding anything to the contrary contained herein, upon the occurrence of any Event of Default, Lender, at its option (but without any obligation), may apply to the reduction of the Indebtedness (in accordance with the terms of the Note and this Agreement) all of any portion of the escrow deposits held by Lender. Notwithstanding the foregoing, Borrower's obligations to make monthly payments to Lender for insurance premiums

shall be suspended for so long as the Budget includes sufficient funds to pay such insurance premiums through and including Final Completion (and, thereafter, Borrower shall be obligated to make such monthly payments). Notwithstanding the foregoing, in lieu of monthly payments, Borrower may make a single annual payment in advance (on the first month of the 12 month period) to Lender for the insurance premium estimate.

Section 4.22    Preservation of Organizational Existence, Etc.  Borrower and each entity Obligor shall preserve and maintain, (i) its existence (corporate or otherwise) and rights (charter and statutory) and (ii) its permits, licenses, approvals, privileges and franchises.

Section 4.23    Compliance with ILSA.  Borrower shall, maintain its exemption from the registration requirements of ILSA throughout the term of the Loan and shall advise Lender as to any fact or circumstance which may result in Borrower having to register the Project under ILSA.

Section 4.24    Service Concurrency Approvals. Borrower shall receive, prior to the Commencement Date, all Service Concurrency Approvals required by any Governmental Authority having jurisdiction over the Project.

Section 4.25    Construction Lien.  A copy of each affidavit required by the Georgia construction lien law, including the Construction Contractor's and other contractors' affidavits of final payment, will be furnished to Lender by Borrower upon request of Lender.  Borrower agrees to furnish to Lender and the Title Company such lien waivers or releases together with such paid receipts and affidavits, in proper form, as Lender and the Title Company may reasonably require from time to time to assure them that all lienable work has been paid for.

Section 4.26    Transactions with Affiliates.  Borrower shall conduct all transactions permitted under the Loan Documents with any of its respective Affiliates on terms that are fair and reasonable and not less favorable to the Loan Parties than they would obtain in a comparable arm's-length transaction with a Person not an Affiliate.

Section 4.27    Representations and Warranties.  Borrower will cause all representations and warranties to remain true and correct in all material respects at all times while any portion of the Loan remains outstanding.

Section 4.28    Borrower Project Deliverables.  Promptly, from time to time, upon the request by Lender, Borrower shall keep Lender apprised of the status of the Project and the status of any matters related thereto.  In addition, Borrower shall deliver (or otherwise make available to Lender at no cost to Lender) such information regarding the Project as requested by Lender, from time to time, including agreements, contracts, documents, instruments, reports, approvals, permits, licenses, Other Contracts, zoning, platting, building and development related documents, and opinions or other documents as are reasonably requested by Lender in connection with the Loan. Notwithstanding anything contained herein or in the Loan Documents to the contrary, Borrower and Guarantor shall, at all times while any portion of the Loan remains outstanding, deliver any and all documents requested by Lender in accordance with this Agreement and the Loan Documents (unless expressly provided otherwise in such document) within fifteen (15) days of the date such request is made to Borrower.

Section 4.29    Architect, Contractor and Engineer. Upon engaging the services of any new architect, contractor and/or engineer for or in connection with the Project, Borrower shall obtain executed originals of Architect's Letter, Contractor's Letter and Opinion of Consultant/Engineer of Record instruments in the form reasonably required by Lender and deliver same to Lender.

Section 4.30    Management.    Subject to the terms of any management agreement, approved by Lender in accordance with the terms of this Agreement, at all times during the term of the Loan, Guarantor shall have day-to-day control over the management and operations of Borrower and the Project. Notwithstanding anything contained herein to the contrary, no transfer by Borrower or any of their members, managers, shareholders, or partners, shall be permitted which, after giving effect thereto, will result in Guarantor no longer having such control over the management and operations, as set forth herein. At all times during the Loan, Guarantor shall maintain, directly or indirectly, day to day Control of Borrower.

Section 4.31    Publicity. Upon the written request of the Lender, Borrower shall install or allow Lender to install a sign at Lender's specification at the Project at a prominent location reflecting that the Lender is providing the funds for the Project (such sign shall be at Lender's cost, but Borrower may not charge Lender any costs or fees for the installation of such sign). Borrower agrees that the Lender may also publicize, in the form of press releases or otherwise, the existence of the Loan (but not the terms thereof other than the loan amount), and Lender may use Borrower's name in connection with such press releases and other publicity.

Section 4.32    In Balance Requirement. At all times during the term of the Loan, the Loan Amount must be sufficient to complete the Construction Project. Completion of the Construction Project shall be defined as receiving all necessary final certificates of completion and any other applicable licenses or permits to open and operate the Project as, with respect to 222 Mitchell, a 333,067 rentable square foot office and retail project and, with respect to Hotel Row, a 53,363 rentable square foot office and retail project (the Hotel Row square footage excludes the Scoville building, which is 18,140 square feet), purchasing and installing all fixtures, furniture and equipment, including tenant improvements, payment of all leasing commissions and sufficient interest reserve to cover any cash flow shortfalls during the term of the Loan (interest reserve is only needed until the Debt Service Coverage Ratio is X to X for a trailing three month period). If any funding deficiency occurs, such that the Loan Amount is not sufficient to complete the Construction Project as described herein, the Loan shall be declared not In Balance and within ten (10) Business Days Borrower shall immediately fund into the Construction Reserve Account an additional amount of Invested Capital, as determined by Lender, to cause the Loan to be In Balance. Lender shall not make or approve any Draw Request from the Construction Reserve Account until the Loan is deemed In Balance.

Section 4.33    Financial Covenants. Borrower must reach and maintain the financial covenants as set forth below. Beginning 18 months from the Closing Date and throughout the term of the Loan. Borrower shall submit, within fifteen (15 days) after the end of each fiscal quarter, to Lender financial statements and rent rolls evidencing compliance with the Leasing Requirements and Maximum Loan-To-Value Ratio covenants set forth below:

(a)    Leasing Requirements. (i) By or before the 18th month after the Closing Date Borrower shall have leased at least X% of the gross leasable square footage of the Project;

(ii) by or before the 24th month after the Closing Date Borrower shall have leased at least X% of the gross leasable square footage of the Project; and (iii) by or before the 30th month after the Closing Date Borrower shall have leased at least X% of the gross leasable square footage of the Project. For purposes of this Section 4.33(a), the term "leased" shall also include those portion of the Project for which Borrower has entered into signed, arm's length letters of intent with unrelated party at market rates. Such letters of intent may be included in the calculations as being "leased" until the termination of negotiations between the parties to such letters of intent.

(b)      Maximum Loan-to-Value Ratio.  Borrower shall maintain a maximum "as is" loan to value ratio of X percent X%), as reflected in an Appraisal report of the Project, reviewed and approved by Lender, from Lender's Appraiser, selected by Lender in Lender's sole and absolute discretion.

Borrower's failure to meet any one or both of the foregoing financial covenants shall not be an Event of Default but, upon such failure, Lender shall have no obligation to complete any Advance or to advance any disbursements from the Construction Reserve Account for any tenant improvement or leasing commissions, excepting only those tenant improvements and leasing commissions relating to leases that were approved before Borrower's failure to comply with the foregoing financial covenants.

Section 4.34    Construction Milestones.  Borrower shall comply with the construction milestones set forth in the Construction Schedule (Schedule "H") and in no event shall any construction milestone set forth in the Construction Schedule for the applicable Construction Project be delayed by more than three (3) months, subject to Force Majeure.

Section 4.35    [Intentionally Omitted.]

## ARTICLE V

## NEGATIVE COVENANTS

Section 5.1    Plans.  After delivery to Lender, Borrower shall not materially amend the Plans without the prior written consent of Lender, which shall not be unreasonably withheld, conditioned or delayed, other than as expressly provided herein. In the event of an aforementioned material amendment which Lender reasonably believes will have a materially adverse effect on the Project, in Lender's sole discretion, Lender shall have the right to object to the amendment(s) to the Plans. Notwithstanding the foregoing, Borrower shall amend the Plans for the Pins building and certain portions of the lobby and common space for 222 Mitchell and Lender shall not unreasonably withhold approval of same.

Section 5.2    Construction Contract.  Borrower shall not enter into any Construction Contract or Other Contract without the prior written consent of Lender, in Lender's sole discretion. In the event Lender approves such Construction Contract or Other Contract Borrower shall not (a) do or fail to do any act which would constitute a default under the Construction Contract or any Other Contract or which would relieve the Construction Contractor or any other contractor as applicable, from its obligations thereunder, or (b) waive any of the material obligations of the Construction Contractor under the Construction Contract or waive any of the material obligations

39

of any other contractor under any Other Contract, or (c) materially modify, amend or terminate the Construction Contract or any Other Contract after delivery to Lender, without the prior written consent of Lender.

Section 5.3    Contracts, Extras and Modifications.    Borrower shall not without the delivery of such document for Lender's prior written approval thereof, which approval shall not be unreasonably withheld, conditioned or delayed (a) in accordance herewith, enter into any contract or subcontract made in connection with the Project which obligates Borrower to pay more than X DOLLARS ($X), or (b) within 30 days thereafter, amend, modify or terminate any contract or subcontract made in connection with the Project except for non-material modifications.

Section 5.4    Liens or Encumbrances.    Borrower shall not cause, permit or allow to remain any lien or encumbrance upon the Project for more than thirty (30) days after being given notice of the filing thereof or otherwise becoming aware of the imposition thereof, whichever is sooner. There shall not be any encumbrances affecting the Project other than the Permitted Encumbrances.

Section 5.5    Other Financing.    Borrower shall not procure or obtain any other financing for the acquisition of the Land or existing Improvements, or the construction of new Improvements, and no Obligor shall create, incur, assume or suffer to exist any Liens on (i) the Land and the Improvements, other than Permitted Encumbrances, or (ii) any other Collateral.

Section 5.6    Sale of Securities.    Borrower shall not, without the Lender's prior written consent, institute or cause to be instituted, be an issuer or underwriter of, or be a party to any public offering with respect to the Land and the Improvements, or either, or any interest in or securities issued by Borrower, within the meaning of the Securities Act of 1933 and the Securities and Exchange Act of 1934, as amended, or any regulations or rulings thereunder.

Section 5.7    Materials For Construction.    Borrower shall not make or cause to be made any contract or subcontract for, or use or permit to be used, materials, equipment, or Fixtures of any kind which are to be incorporated in or to become a part of the Improvements if title to such materials, equipment, or Fixtures is (a) reserved under a conditional sales contract or similar title retention agreement, (b) subject to a security interest in favor of a third person, or (c) subject to a lease agreement. All materials, equipment and Fixtures used in the Project shall be free of all liens. All materials, equipment and Fixtures delivered upon the Land for the purpose of being used in the construction of the Improvements shall be considered annexed thereto and shall become a part of the Land as if actually incorporated in the Improvements and shall be subject to this Agreement. Nothing herein contained shall be construed to make Lender responsible for any loss, damage or injury to such materials, equipment and Fixtures nor for payment of same.

Section 5.8    No Repurchase of Equity Interests.    Neither Borrower nor Pledgor nor any member of Borrower or Pledgor hereunder, shall redeem, retire, purchase or otherwise acquire, directly or indirectly, for value or set apart any sum for the redemption, retirement, purchase or other acquisition of, any of the equity interests of such entity. Borrower does not and shall not, during the term of the loan have any Subsidiaries.

Section 5.9    Merger, Due on Sale and Encumbrance etc.  Borrower shall neither directly nor indirectly, without the prior written consent of Lender (which Lender may grant or withhold in its sole discretion) (a) merge or consolidate Borrower or any Subsidiary of Borrower with or into any other entity unless the Borrower is the surviving or resulting entity; nor (b) sell, lease or otherwise dispose any of the property of the Borrower.  Without the prior written consent of Lender, Borrower nor any other Person having a direct or indirect ownership or beneficial interest in Borrower shall sell, convey, mortgage, grant, bargain, encumber, pledge, assign or transfer any interest, direct or indirect, in Borrower, any entity having a direct or indirect interest in Borrower, any property or any part thereof of Borrower, whether voluntarily or involuntarily, in violation of the covenants and conditions set forth in the Mortgage, the Pledge Agreement, this Agreement or any other Loan Documents. Any and all proceeds received by or due and payable to Borrower in connection with any such matters shall be remitted to Lender and applied toward repayment of the Loan.  Notwithstanding anything herein to the contrary, Lender shall allow Borrower a one-time right to change the ownership structure of 222 Mitchell Owner, so long as (a) no Event of Default is continuing, (b) either Newport US GP, Inc., a Delaware corporation, or Newport South Downtown Master GP LLC, a Delaware limited liability company, at all times control 222 Mitchell Owner (the foregoing condition (b) may be waived by Lender in Lender's sole and absolute discretion) and (c) Lender is provided written notice of the change in ownership structure within ten (10) days of the change in structure.

Section 5.10    Nature of Business, etc.

Borrower shall not:

(a)    Directly or indirectly engage in any business activity which would represent a change from Borrower's normal and customary business activities.

(b)    Amend the organizational documents of any Borrower to add, change, or decrease the number of owners of Borrower.

(c)    Allow the change of the owners or control of any Borrower, or allow a change in the percentage interest of the current owners of such Borrower.

(d)    Use any trade name or change its name, identity or structure without giving at least thirty (30) days' prior written notice to the Lender.

Section 5.11    Except as expressly provided above at Article V, Borrower shall not transfer directly or indirectly, whether through one or a series of transactions, a change in ownership or control with respect to Borrower which directly or indirectly results in any one individual or entity or commonly controlled Person or entity other than individuals having control over the management and operations of any Borrower as of the Closing Date, as set forth on Borrower's organizational structure chart attached as Exhibit B to this Agreement.  Notwithstanding anything contained herein to the contrary, no transfer by Borrower or any of its members, managers, shareholders, or partners, shall be permitted which, after giving effect thereto, will result in any direct or indirect decrease in the percentage ownership or management or voting interest in Borrower or any entity Pledgor.  In the event Borrower requests a transfer, prior to any such proposed transfer of interests in Borrower or any entity Pledgor, Borrower shall furnish to Lender

all items and documentation which Lender requests or otherwise requires related to such transfer and shall further deliver to Lender all such documentation which is proposed to be entered to reflect such transfer. All expenses arising from such transfers shall be paid by parties other than Lender.

Section 5.12   Capital Distributions; Payments to Owners of Borrower. Borrower shall not declare or pay any distribution with respect to any ownership interest (whether by redemption of capital, dividend or otherwise) or make any payment in respect of indebtedness which the Lender shall require to be subordinated to the indebtedness of the Borrower in favor of the Lender during the term of the Loan.

Section 5.13   OFAC, Patriot Act, etc. No Obligor (nor any Affiliate thereof) shall (i) be or become subject to at any time to any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control List) that prohibits or limits the Lender from making any advance or extension of credit to Borrower or from otherwise conducting business with such Obligor, or (ii) fail to provide documentary and other evidence of such Obligor's identity as may be requested by the Lender at any time to enable the Lender to verify such Obligor's identity or to comply with any applicable law or regulation, including, without limitation, Section 326 of the Patriot Act.

Section 5.14   Leases. Except for leases for periods of thirty (30) days or less and entered into in the ordinary course of Borrower's business, Borrower shall not (without Lender's prior written consent) incur or permit to exist any lease or rental obligation for real or personal property with respect to any Collateral. Notwithstanding anything to the contrary herein, Lender's approval shall not be required with respect to any proposed future leases or lease extensions, renewals, amendments or terminations of individual residential apartment units if the following conditions are satisfied: (i) the lease is on a form previously approved by Lender in writing with only arm's length negotiated changes, if any; (ii) the lease complies with the Leasing Parameters; (iii) the lease is a residential lease; (iv) the tenant under the lease is not an Affiliate of Borrower; (v) the lease provides that the rights of any such tenant are unconditionally and automatically subordinate to the rights of any lender of Borrower, without the necessity of the tenant thereunder executing any further document to evidence the subordination; (vi) the lease has a security deposit of at least one (1) month's rent; (vii) the lease does not provide any rights of first refusal, purchase options or rights of first offer; said tenants to be tenants only under unrecorded written leases; (viii) the lease contains rental amounts which are equal to or greater than the then prevailing market rates and terms (taking into account the type and quality of tenant and location and quality of the space to be leased) as of the date such new lease or lease modifications is to be executed; and (ix) the lease complies with all applicable laws (including, without limitation the Borrower's administration, management and operation thereof). Borrower shall not, without Lender's prior written consent not to be unreasonably withheld: (i) allow the assignment of any lease or the sublet of any lease, (ii) release any guarantor under any lease, (iii) accept the payment of rent more than 30 days in advance of when due, or (iv) default in Borrower's obligations under any leases. Notwithstanding the foregoing, any leasing matter for which Lender's consent is needed, if Borrower satisfies the Deemed Approval Requirements, Lenders shall have deemed to have consented to the requested leasing consent.

Section 5.15    Management Agreement; Subordination of Management Fees and Commissions.

(a)      On or before the Estimated Completion Date, Borrower shall engage an independent reputable third party as the manager of the day to day operations, maintenance and repair of the Project (the "Property Manager") pursuant to a written property management, sale or leasing agreement or otherwise (the "Property Management Agreement"). Prior to engaging the Property Manager, Borrower shall provide written notice to Lender together with a copy of the proposed Property Management Agreement, which shall be subject to the written consent of Lender, which consent shall not be unreasonably withheld.  Borrower shall not engage itself, or any of its members or managers, or any Affiliate as the Property Manager. In no event shall Borrower pay or cause to be paid to the Property Manager of the Project as a property management fee or other compensation an amount in excess of X (X%) of the annual operating revenues without the prior consent of Lender, provided, however, that in no event shall any compensation be paid to any such party by Borrower after and during the continuance of an Event of Default hereunder. Additionally, any Property Management Agreement entered into by Borrower with respect to the Project shall contain express provisions subordinating all right, title and interest of the Property Manager appointed thereunder, including any management fees and to the maximum extent allowed by law, any leasing or sales commissions owing thereunder, to the Obligations and any Collateral and Loan Documents in favor of Lender to evidence or secure such Obligations from time to time hereunder and such other provisions as are required by Lender.

(b)      Additionally and without limiting the foregoing, Borrower shall not, without Lender's prior written consent: (a) enter into any Property Management Agreement other than with a Property Manager acceptable to Lender, and executing and delivering an assignment/subordination agreement acceptable to Lender executed by Borrower and such Property Manager; (b) surrender, terminate or cancel any Property Management Agreement; (c) reduce or consent to the reduction of the term of any Property Management Agreement; or (e) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, any Property Management Agreement in any material respect. Borrower shall not permit any manager to assign or subcontract manager's rights, duties or responsibilities under any Property Management Agreement to any other Person without the express written consent of Lender. Following the occurrence and during the continuance of an Event of Default, Borrower shall not exercise any rights, make any decisions, grant any approvals or otherwise take any action under the management agreement without the prior written consent of Lender, which consent may be granted, conditioned or withheld in Lender's sole discretion.

Section 5.16    Prepayments of Long-Term Indebtedness.  Borrower shall not repurchase, prepay, retire or redeem, any indebtedness which by its terms matures more than one year from the date of such prepayment, except for payments or prepayments by the Borrower to the Lender on account of the Loan.

Section 5.17    Zoning. Borrower will not (i) initiate or acquiesce in a change in the zoning classification of and/or restrictive covenants affecting the Project or seek any variance under existing zoning ordinances, (ii) use or permit the use of the Project in a manner which may result in the current use of the Project becoming a non-conforming use under applicable zoning ordinances, or (iii) subject the Project to restrictive covenants.

Section 5.18    Development Fee.  Provided there is no Default or Event of Default under any of the Loan Documents, Borrower shall be authorized to request a development fee as set forth on the Budget attached as Exhibit "E" from the Loan Proceeds as the "Development Fee," provided, however, the Development Fee shall not exceed X Dollars ($X) in the aggregate for both Hotel Row and 222 Mitchell and shall be paid for 222 Mitchell as follows: (i) twenty percent (X%) of the fee shall be paid at Closing, (ii) sixty percent (X%) of the fee shall be paid over fourteen (14) equal monthly payments as part of the Draw Request, and (iii) twenty percent (X%) of the fee shall be paid at the time of core-and-shell completion including receipt of certificate of completion, and completion of punch list items. The Development Fee shall be paid for Hotel Row as follows: (i) eighty percent (X%) of the fee shall be paid in equal monthly installments as part of the Draw Request, and (ii) twenty percent (X%) of the fee shall be paid at the time of core-and-shell completion including receipt of the certificate of completion and completion of punch list items. Further, the Development Fee shall be paid in accordance with the conditions precedent for the disbursement of Additional Advances, provided, however, that the Loan remains In Balance after taking into account the disbursement of the Development Fee with such Additional Advance.

## ARTICLE VI

## ADVANCES

Section 6.1    Loan Advances – Generally.

(a)    Advances shall be made subject to all of the terms and conditions of this Agreement. Subject to the limitations and conditions set forth in this Agreement, Lender shall make the Additional Advance of Loan proceeds into the Construction Reserve Account and interest shall accrue on all such amounts funded, at the applicable Note Rate, from the date Lender makes such Advance. Subject to the terms, conditions and limitations set forth in this Agreement, amounts held in the Construction Reserve Account shall be disbursed in accordance with this Agreement.

(b)    The Initial Advance shall be made at Closing (subject to all the terms and conditions of this Agreement) in the amount of X Dollars ($X) to be spent in line with the Budget. Provided, however, that at least $X of the Initial Advance shall be applied to the Hard Costs of the 222 Mitchell Construction Project.

(c)    At Closing, in conjunction with the funding of the Initial Advance, Borrower shall deposit into the Construction Reserve Account an amount of equity sufficient to complete construction of Hotel Row in its entirety, estimated at X Dollars ($X) (the "Hotel Row Equity Escrow Deposit").

(d)    Borrower shall have satisfied all the Second Advance Requirements and tendered the Second Advance Request Notice to Lender by or before the Second Advance Deadline. Notwithstanding anything herein to the contrary, (i) Lender shall have no obligation to advance the Second Advance prior to 90 days after Lender's receipt of the Second Advance Notice Request; and (ii) Borrower shall not provide the Second Advance Request Notice between October 1 and December 31 of any year and any delivery of any Second Advance Request Notice during

said period shall be deemed to have been received by Lender on January 1 of the following calendar year.

Section 6.2    Conditions Precedent to Initial Advance.  As conditions precedent to the making of the Initial Advance, Borrower shall satisfy to Lender's satisfaction the following conditions precedent:

(a)    The Loan Documents, each in form and substance satisfactory to Lender, shall have been executed and delivered to Lender and, as applicable, recorded in the public records of the county wherein the Land is located.

(b)    Fulfillment of all conditions precedent contained in the Commitment.

(c)    Title Company shall have issued a marked title commitment or proforma Title Insurance Policy to Lender insuring Borrower as the fee simple owner of the Land and insuring the Mortgage as a first priority lien and encumbrance thereon in favor of Lender on the Land, without any exception from coverage except the Permitted Encumbrances, and otherwise in form and substance and with such endorsements as are acceptable to Lender.

(d)    [Intentionally omitted].

(e)    Lender shall have received an Appraisal, in form and content acceptable to Lender, prepared by the Appraiser and addressed to Lender, appraising the value of the Land as required under the Commitment.

(f)    Borrower shall have established or caused to have been established the Interest Reserve Account; the real estate tax escrow, to provide for the payment of a portion of the real estate taxes due during the term of the Loan in accordance with the Mortgage, and any other Pledged Accounts required under this Agreement.

(g)    Borrower shall have established or caused to have been established the Construction Reserve Account, to provide for payment of Budget items, including interest on the Note; the real estate tax escrow, to provide for the payment of a portion of the real estate taxes due during the term of the Loan in accordance with the Mortgage, each Borrower's Operating Account; and any other Pledged Accounts required under this Agreement.

(h)    Lender shall have received an opinion of Borrower's, Pledgor's and Guarantor's legal counsel in form acceptable to Lender and Lender's legal counsel, and a zoning memo from Borrower's counsel in a form acceptable to Lender and Lender's legal counsel.

(i)    The Borrower shall have delivered evidence of compliance with the Zoning Approvals and any required platting, re-platting, unity of title, parking or other Governmental Requirements, as applicable, with respect to the completion of the Construction Project in accordance with the Plans.

(j)    A chart showing the direct and indirect beneficial owners of Borrower that is a trust or entity in such detail as is satisfactory to Lender.

45

(k)    Borrower shall have provided evidence of its compliance with the Insurance Requirements.

(l)    Lender shall have received evidence acceptable to Lender that the Land is zoned under applicable Governmental Requirements to permit the Project and Borrower has all necessary approvals and entitlements from the applicable Governmental Authorities to construct the Project and otherwise in accordance with the Permitted Encumbrances and completion of the Construction Project in accordance with the Plans.

(m)    Borrower's representations and warranties made unto Lender herein and in the other Loan Documents shall not have been materially breached and shall continue to be true in all material respects, Borrower shall have paid and fully performed all of its covenants, agreements and obligations under the Loan Documents, and there shall not have occurred any adverse effect upon the value of the Project or upon Borrower's or the Obligors' ability to repay the Loan and perform as required under the Loan Documents as and when such payment and/or performance is due.

(n)    Lender shall have received paid tax bill receipts for the Land and any Improvements, Fixtures and personal property encumbered by the Mortgage, if any, thereon for all prior years.

(o)    There shall neither be a material adverse change in the financial condition of Borrower or any of the Obligors, nor shall there be any pending or threatened material adverse litigation against the Borrower, the Project, the Obligors, or the Construction Contractor, as applicable. Lender shall, in its sole and absolute discretion, determine what constitutes a material adverse change in financial condition and material adverse litigation.

(p)    All accrued fees and expenses of Lender (including the reasonable accrued fees and expenses of counsel to Lender) shall have been paid in full.

(q)    No event has occurred and is continuing, or would result from such Advance or from the application of the proceeds therefrom, that constitutes a Default or an Event of Default.

(r)    Lender shall have received such other approvals, opinions or documents as Lender may reasonably request.

(s)    Lender shall have received current UCC, litigation, bankruptcy, and judgment searches for Borrower, Pledgor, Guarantor, all of Borrower's Affiliates, and the Project.

(t)    Borrower shall furnish Lender with two (2) sets of the current signed and sealed Plans (including architectural, structural, mechanical, plumbing, electrical, landscaping and soils report) for each Construction Project, which must be approved by all Governmental Authorities (as necessary to construct the Improvements contemplated by the Plans), reviewed and approved by Lender and Lender's Construction Advisor. Neither Lender's approval of the Plans, nor any inspection of the Project by Lender or Lender's Construction Advisor or Lender's representatives, shall constitute (i) a warranty or representation to anyone by Lender or its agents or representatives as to the technical sufficiency of same, (ii) compliance of same with any law,

rule or regulation, or (iii) adequacy or safety of any structure or any of its components or any other physical conditions or structure of the Project.

(u)     Lender shall have received an environmental survey and audit relating to the Project, in form, scope and content acceptable to Lender and its counsel.

(v)     Lender shall have received evidence that the Project meets all Governmental Requirements.

(w)     Borrower shall have obtained and delivered to Lender for its review and approval (which approval may be granted or denied in Lender's reasonable discretion), a copy of the fully executed Construction Contract entered into by and between Borrower and the Construction Contractor, which contract when delivered shall include, without limitation, (a) the schedule of values, (b) construction schedule; and (c) copies of change orders.

(x)     Borrower shall have obtained and delivered to Lender for its review and approval, copies of the contracts entered into by and between Borrower and Borrower's Architect and Borrower's Engineer engaged by Borrower.

(y)     Lender shall have received certificates in favor of Lender in form and substance acceptable to and as required by Lender, from the Construction Contractor, Borrower's Architect and Borrower's Engineer.

(z)     Borrower and Lender shall have entered into an agreement, in a form acceptable to Lender in Lender's sole discretion, relating to the assignment of each of the Construction Contractor's, Borrower's Architect's and Borrower's Engineer's agreements to Lender and the Construction Contractor, Borrower's Architect and Borrower's Engineer, respectively, shall have consented and agreed to such agreement.

(aa)    Borrower shall provide Lender with Subguard Insurance.

(bb)    Borrower shall have obtained and delivered to Lender for its review and approval, a copy of the current Budget for construction of the Improvements contemplated by and in accordance with the Plans.

(cc)    Borrower shall have obtained and delivered to Lender for its review and approval, a copy of the current Construction Schedule.

(dd)    [Reserved].

(ee)    Borrower shall have obtained and delivered to Lender for its review and approval, in Lender's sole, but reasonable discretion, all required approvals and permits necessary for commencement of construction of each Construction Project, including, without limitation, building permit, demolition permit, foundation permits, main building and superstructure permits, and approvals and/or permits related to curb cuts, grading, water and sewer, and encroachments, and variances and certificates.

47

(ff)    Borrower shall have obtained and delivered to Lender for its review and approval, copies of all construction-related contracts entered into by Borrower or the Construction Contractors.

(gg)    Lender shall have received evidence of insurance as required by Lender and the Mortgage, and otherwise conforming in all respects to the requirements of Lender.

(hh)    Lender shall have received the Structuring Fee.

(ii)    The Loan shall be deemed In Balance.

(jj)    Lender shall have received other documents as the Lender may reasonably request.

Section 6.3    Conditions Precedent to Additional Advance.  As a condition precedent to the making of each Additional Advance (which such Additional Advance shall be funded into the Construction Reserve Account and held and disbursed in accordance with this Agreement), the Borrower shall satisfy to Lender's satisfaction the conditions precedent below; however, until all such conditions are so satisfied, Lender's liability hereunder is limited to the amount of the Initial Advance.

(a)    Borrower shall provide Lender with not less than thirty (30) days advance written notice of the Advance Request, on a form approved by Lender, attached hereto as Schedule III, and the Advance Request shall be certified by Borrower that the requested amount does not exceed the then unpaid cost of construction of the Improvements and receipt of all documents required hereunder in form and substance satisfactory to Lender.

(b)    Notwithstanding anything herein to the contrary, (A) Borrower must request the Second Advance be funded and satisfied all of the Second Advance Requirements no later than the Second Advance Deadline, and if Borrower shall fail to comply, Lender has no obligation or liability to fund any Additional Advances (including, without limitation, the Second Advance); (B) Lender shall have no further obligation to make Additional Advances hereunder if $X f the Loan is not funded by or before the earlier of the following dates: (i) 18 months after the Closing Date; and (ii) 12 months after the Additional Equity Escrow Deposit is made to Lender; and (C) Lender shall have no obligation or liability to make any Additional Advances after the earlier of the following dates: (i) 24 months from the Closing Date, subject to Force Majeure, or (ii) 18 months after the complete Additional Equity Escrow Deposit is delivered to Lender; provided however, notwithstanding the foregoing, in the event seventy (X%) percent of the leasable ("leasable" includes all square footage as if the completion of the all work contemplated by the Plans was complete) square footage of the Project is leased by or before 18 months after the Closing Date, Lender shall have no further obligation to make Additional Advances after the earlier of (x) 28 months from the Closing Date, subject to Force Majeure, or (ii) 22 months after the complete Additional Equity Escrow Deposit is delivered to Lender.

(c)    Borrower shall satisfy (i) all conditions precedent for the making of the Initial Advance as set forth in Section 6.2 above, and (ii) all conditions precedent set forth elsewhere in this Agreement, the Commitment and in any other Loan Document.

48

(d)      Borrower has provided sufficient documentation that the Loan is In Balance, as confirmed by Lender and Lender's Construction Advisor, and if not In Balance, the Loan shall be made In Balance by Borrower immediately funding sufficient equity into the Construction Escrow Account.

(e)      An endorsement to the Title Insurance Policy shall have been delivered to Lender, which endorsement shall bring forward the effective date of coverage of the Title Insurance Policy and all endorsements issued in connection therewith (excluding the zoning and same as survey endorsements) and show no exceptions to title other than the Permitted Title Exceptions, and particularly that nothing has intervened to affect the validity or priority of the Mortgage.

(f)      The Borrower's representations and warranties made unto Lender herein and in the other Loan Documents shall not have been materially breached and shall continue to be true in all material respects, Borrower shall have paid and fully performed all of its covenants, agreements and obligations under the Loan Documents, and there shall not have occurred any adverse effect upon the value of the Project or upon the Borrower's or the Obligors' ability to repay the Loan and perform as required under the Loan Documents as and when such payment and/or performance is due as determined by Lender in Lender's sole discretion.

(g)      [Reserved].

(h)      No Default or Event of Default shall have occurred, or default which with the passage of time would constitute a Default or Event of Default under any of the Loan Documents.

(i)      Borrower shall provide a fully executed Borrower's Operating Agreement DACA prior to the Second Advance.

(j)      Borrower shall have obtained and delivered to Lender for its review and approval, in Lender's sole and absolute discretion, a Budget for each Construction Project as updated immediately prior to the Additional Advance.

(k)      The Loan must be In Balance, as confirmed by Lender and Lender's Construction Advisor, and if not In Balance, shall be made In Balance, by Borrower immediately funding sufficient equity into the Construction Equity Account.

(l)      Such other documents as Lender may reasonably request.

(m)      Notwithstanding the forgoing, Borrower must satisfy each of the following requirements before becoming eligible for the Second Advance (in addition to all of the requirements set forth above) (collectively, the "Second Advance Requirements"):

(i)      Borrower shall have obtained and delivered to Lender for its review and approval, in Lender's sole, but reasonable discretion, all required approvals and permits necessary for commencement of construction of the 222 Mitchell Construction Project, including, without limitation, building permit, demolition permit, foundation permits, main building and

superstructure permits, and approvals and/or permits related to curb cuts, grading, water and sewer, and encroachments, and variances and certificates.

(ii)     Lender shall have received evidence of Borrower's Invested Capital. Upon request by Lender, Borrower shall submit to Lender evidence of how the Invested Capital has been used and shall provide Lender such supporting documents as are reasonably requested by Lender.

(iii)    Buy out log evidencing at least X% of subcontractors bought out with respect to the Construction Contract applicable to 222 Mitchell.

(iv)    Borrower shall furnish Lender with the current Plans relating to 222 Mitchell (including architectural, structural, mechanical, plumbing, electrical, landscaping, and soils report) for the construction of the Project, which must be reviewed and approved by Lender and Lender's Construction Advisor. Neither Lender's approval of these Plans, nor any inspection of the Project by Lender or its agents or representatives, shall constitute (i) a warranty or representation to anyone by Lender or its agents or representatives as to the technical sufficiency of same, (ii) compliance of same with any law, rule or regulation, or (iii) adequacy or safety of any structure or any of its components or any other physical condition or structure of the Project.

(v)     Additional Equity Escrow Deposit shall be delivered to Lender.

(vi)    Borrower shall have executed and caused each bank holding a Borrower's Operating Account to enter into a Borrower's Operating Account DACA.

## ARTICLE VII

## DISBURSEMENTS

Section 7.1     Disbursement of Construction Reserve Account Funds. All funds disbursed or allocated into the Construction Reserve Account shall be held by Lender to be used to fund Borrower's Hard Costs and Soft Costs of the Improvements which are not completed as of the date hereof and are contemplated to be constructed on the Land, and as set forth in the Budget and contemplated by the Plans; to be disbursed to Borrower in accordance with this Agreement.  Such Construction Reserve Account funds shall be used exclusively for the Construction Project as contemplated therein (including, the costs of construction and completion of the Improvements, together with the Contingency Reserve and any other contingency or reserve thereunder), and any savings, or contingency (except for the Contingency Reserve) under any line item contained therein shall be reallocated so long as such reallocated funds are used for the Construction Project, do not exceed ten percent (X%) of such line item, and are otherwise used in accordance with an updated Budget delivered by Borrower and approved by Lender and Lender's construction advisor in writing.  The Construction Reserve Account funds (or portions thereof) shall be released by Lender to Borrower or directly to a vendor to pay for the costs of construction and completion of the Improvements (each, such disbursement being a "Construction Disbursement"), as applicable, subject to satisfaction of the following conditions precedent:

(a)    Borrower shall have paid any costs, fees, charges, or expenses (including, without limitation, reasonable attorneys' fees and construction advisor fees) of Lender, Title Company, and Lender's Construction Advisor in connection with the review, completion and administering of such Construction Disbursement.

(b)    Notwithstanding anything contained herein to the contrary, Lender shall not be required to make any Construction Disbursement (a) for any cost not set forth in the Budget, or (b) any disbursement in connection with any line item in the Budget that, when added to all prior disbursements from that line item, would exceed the lesser of (i) the actual cost incurred by Borrower for such line item, or (ii) the total amount allocated for such line item in the Budget (subject to Borrower's right to make reallocations as provided above).

(c)    Lender shall have determined that the following statements shall be true on the date of making any such requested Construction Disbursement:

(i)    the representations and warranties contained in each Loan Document are correct in all material respects on and as of such date as though made on and as of such date other than any such representations or warranties that, by their terms, refer to a specific date other than the date of such Construction Disbursement, in which case as of such specific date; and

(ii)    no event has occurred and is continuing or would result from such advance or from the application of the proceeds therefrom, that constitutes a Default or an Event of Default.

(d)    Each request for a Construction Disbursement from the Construction Reserve Account shall be accompanied by a Draw Request no less than fifteen (15) days prior to the date of the Construction Disbursement. For the purposes hereof, a Draw Request shall only be considered submitted once all the conditions precedent in this Article VII shall have been satisfied. The Draw Request shall (a) include the amount requested, (b) include an AIA Distribution Form from the Construction Contractor in form and substance reasonably acceptable to Lender, and as may otherwise be reasonably satisfactory to Lender and Title Company, (c) be certified by Borrower that the requested amount does not exceed the then unpaid cost of construction of the Improvements since the last certificate provided hereunder, if any, (d) be accompanied by appropriate invoices, bills paid affidavits, lien waivers or releases, title updates, endorsements to the title insurance policy, and other documents as may be reasonably required by Lender and (e) include a summary of soft costs spent by Borrower. Lender shall be authorized to rely on any such documents delivered to Lender by any third party in connection with any Construction Disbursement hereunder without any inquiry into the accuracy, validity, enforceability or contestability of any cost, expense, assessment or claim thereof.

(e)    Each Construction Disbursement may be made either: (a) in reimbursement for expenses paid by Borrower upon delivery by Borrower of reasonably satisfactory evidence of payment for such Construction Project expenditure(s) actually incurred by Borrower, as requested by Lender, or (b) for payment of expenses incurred and invoiced but not yet paid by Borrower, upon delivery by Borrower of sufficient evidence of the sum due and payable for such Construction Project expenditure(s), as requested by Lender and the Title Company, as applicable. Lender, at

51

its option and without further direction from Borrower, may request the disbursement of any Construction Disbursement to the Person to whom payment is due, or through an escrow satisfactory to Lender, or jointly to Borrower and such Person. Borrower hereby irrevocably directs and authorizes Lender to so advance the proceeds of the Construction Project expenditures held in the Construction Reserve Account. All sums held in the Construction Reserve Account shall be pledged to Lender and all Construction Disbursements shall be secured by the Loan Documents, in accordance with the Pledge Account Agreement. Lender may, at Borrower's expense, conduct an audit, inspection, or review of the Construction Project to confirm the amount of the requested Construction Disbursement and/or to confirm that all Improvements made or paid for from prior Construction Disbursements have been completed in accordance with this Agreement and the other Loan Documents.

(f)    Prior to the first Construction Disbursement, Lender shall have received evidence of Borrower's Invested Capital. Upon request by Lender, Borrower shall submit to Lender evidence of how the Invested Capital has been used and shall provide Lender such supporting documents as are reasonably requested by Lender.

(g)    In order to facilitate Lender's verification of any request for a Construction Disbursement, to the extent there are any changes to the Budget, Borrower shall furnish an updated Budget together with such other supporting documents as Lender may reasonably request.

(h)    Any Construction Disbursement borrowed and repaid hereunder may not be reborrowed.

(i)    Borrower hereby represents and covenants that Borrower shall use all Construction Disbursements solely to pay or reimburse itself for costs and expenses actually incurred in connection with the Construction Project and described in the Budget.

(j)    Each Construction Disbursement is subject to verification by Lender, Lender's Construction Advisor and any third party servicer hired by Lender that the expected cost, as reasonably determined by Lender, of all work yet to be completed and materials to be acquired pursuant to the Budget is not greater than the portion of the Loan funds available to be advanced to Borrower in the Construction Reserve Account and the overall progress of the work is In Balance, on schedule to be completed prior to the Estimated Completion Date. Lender shall not be obligated to allow any Construction Disbursement for which a request in accordance with the terms and conditions set forth above has not been received on or before the Maturity Date.

(k)    In the event any expenses incurred by Borrower will exceed or have exceeded the total amount of the Budget for such line item, Borrower shall concurrently with the Construction Disbursement contribute additional equity to pay for any such increase or excess, or, to the extent any cost savings exist, provide Lender an updated Budget reallocating such cost savings to other line items. To the extent Borrower is required to contribute additional equity, the Borrower shall tender such amounts prior to the release of any further funds from the Construction Reserve Account until the Budget and the Loan is back In Balance.

(l)    Notwithstanding anything to the contrary set forth herein, (i) an amount equal to the first X% of the Contingency Reserve may be reallocated to other line items in the

Budget without Lender's consent, (ii) with respect to the remaining X% of the Contingency Reserve, Borrower may request from Lender, at lender's sole discretion, to allocate to, or reallocate from, the Contingency Reserve, and may request a Construction Disbursement to pay for the cost of a change order for any Hard Cost; (iii) the last X% of the Contingency Reserve cannot be used until the Project is X% complete (still need Lender's consent, at Lender's sole and absolute discretion); and (iv) Borrower may reallocate up to $X of "Tenant Improvements" and/or "Leasing Commissions" line item of the Budget from the "Additional Advance" column of the Budget into the "Additional Equity Budget" column of the Budget which will have a simultaneous reallocation of the equal amount, but not more than up to $X of Hard Costs from the "Additional Equity" column of the Budget into the "Additional Advance Budget" column of the Budget. All requests for payments from the Contingency Reserve shall describe the applicable change orders and related costs in reasonable detail and shall be accompanied by appropriate supporting documentation. The Contingency Reserve shall not be allocated to any change order or cost overrun without Lender's prior approval, which may be denied in Lender's sole discretion.

(m)    [Intentionally Deleted.]

(n)    No Construction Disbursement made by Lender shall be deemed to be an approval or acceptance by Lender of any of the work performed by or on behalf of Borrower or the material furnished with respect thereto.

(o)    Borrower may submit a Draw Request no more than once every thirty (30) days without Lender's prior consent.

(p)    From time to time, upon request of Lender, Borrower shall submit to Lender supporting documentation reasonably satisfactory to Lender evidencing that the Construction Disbursements were used in accordance with this Agreement.

(q)    From time to time, upon request of Lender, Borrower shall submit to Lender supporting documentation reasonably satisfactory to Lender evidencing that the Invested Capital has been invested into the Project, how the Invested Capital has been used and that no disbursements to Borrower or Borrower's affiliates have been made other than as expressly approved by this Agreement,

(r)    Borrower agrees to diligently complete any work, construction, and Improvements commenced by Borrower and shown on the Budget in a good and workmanlike manner and in compliance with all Governmental Requirements. Each request for a Construction Disbursement constitutes a representation by Borrower that such actions have been completed in a manner consistent with the Plans and in compliance with all Governmental Requirements.

(s)    Borrower and/or Guarantor shall pay for all cost overruns and/or additional funds required or necessary in excess of the Construction Disbursements actually advanced hereunder to complete, and shall perform and complete the re-construction or construction of, any and all Improvements demolished and/or commenced to be constructed, to be completed, desired by Borrower, and/or necessary to be completed with respect to the completion of any improvements contemplated by the Plans.

        (t)      Lender shall have received such other documents as Lender may reasonably request.

        (u)      If the Construction Disbursement is the final Construction Disbursement from the Construction Reserve Account (and in any event prior to the release of the retainage pursuant to the Construction Contract) or the final disbursement for the Hard Cost line item for either Construction Project, Borrower shall have delivered the following documents to Lender:

        (i)      A certificate of Substantial Completion on AIA Form 743, or equivalent form as provided in the Construction Contract, from Construction Contractor and Subcontractors certifying completion of the Improvements in accordance with the Plans and that all unpaid costs of construction will be paid out of the proceeds of the final Advance.

        (ii)      Any permit and/or approval shall have been issued as required for completion of the Improvements (together with evidence that all permits in connection with construction have been properly closed).

        (iii)      All required affidavits from the Construction Contractor, other contractors of Borrower, and Borrower shall have been delivered to Lender, as requested.

        (iv)      Final releases or waivers of lien, which may be subject to payment of a specific amount and from all applicable contractors and other lienors (including, without limitation, the lien rights of the Construction Contractor), in the form required under the Construction Contract and otherwise reasonably acceptable to Lender and the Title Company in connection of the Title Company's issuance of Lender's title insurance coverage as required hereunder; provided, however, that Borrower shall obtain and deliver to Lender a final unqualified lien waiver from each such party at the time of payment of such specific amount to such party (for avoidance of doubt, Lender agrees to make disbursement to any party subject to receipt of a conditional lien waiver, conditioned solely upon such payment).

        (v)      A certificate from Lender's Construction Advisor within thirty (30) days after receipt of all documentation reasonably required by Lender's Construction Advisor, certifying that the Construction Project has been completed in accordance with the Plans (including completion of the final punch list items, which punch list shall be prepared by or on behalf of Borrower and approved by Lender's Construction Advisor in its reasonable discretion), that all Governmental Requirements with regard to the Project have been satisfied and that direct connection has been made for all utility services to the Project.

        (vi)      A certificate of completion.

        (vii)      A final certified "as-built" survey of the 222 Mitchell property reasonably satisfactory to Lender and Lender's Construction Advisor.

        (viii)    Borrower shall have delivered to Lender certificates of completion from the City of Atlanta for both 222 Mitchell and Hotel Row.

(ix) Borrower shall have delivered to Lender certificates of completion, in form and substance satisfactory to Lender, from Borrower's Architect and the Construction Contractor.

(x) All tenants under any leases entered into by any Loan Party have agreed to accept their premises.

(xi) Evidence of recorded notices of termination of any notices of commencement.

(xii) Borrower shall provide a written statement from the surety to the effect that the Subguard Insurance is in full force and effect, as required by this Agreement.

(xiii) The final endorsement to the Title Insurance Policy, reflecting no exceptions from coverage except the Permitted Encumbrances.

(v) It is acknowledged and agreed by Borrower that until all of the foregoing conditions precedent to such Construction Disbursements from the Construction Reserve Account that Lender shall be under no obligation to approve any Construction Disbursements from the Construction Reserve Account unless and until such time that Lender is satisfied, in Lender's sole but reasonable discretion, that all conditions precedent, requirements, terms and conditions with respect to such Construction Disbursements have been met.

(w) Borrower understands, acknowledges and agrees that Lender shall not be obligated to fund any Construction Disbursements to Borrower should there be (i) insufficient Advanced funds in the Construction Reserve Account or (ii) Unadvanced Loan Proceeds to pay all remaining Debt Service accruing under the Note in Lender's sole but reasonable discretion.

Section 7.2    Materials and FF&E.

(a) Lender shall from time to time, upon the request of Borrower, make Construction Disbursements for major Hard Cost building materials (collectively, the "Materials") which are to be incorporated into the Project but which, at the time of such Construction Disbursement, are stored at the Project (i.e., on-site) or not stored at the Project (i.e., off-site) and are not yet affixed to or incorporated into the Project, provided that:

(i) all conditions for a Construction Disbursement under this Agreement are satisfied;

(ii) the aggregate amount of all Construction Disbursements for on-site or off-site Materials, including FF&E and deposits for materials, shall not exceed X% of the remaining Hard Costs; provided, however, that once installed, the amount paid for such offsite materials and deposits shall no longer apply to the X% threshold;

(iii) the storer of the Materials shall have agreed with Lender that Lender may inspect the Materials at all reasonable times and shall have further agreed not to permit the removal thereof without Lender's prior authorization, except in the ordinary course of construction, which authorization shall not be unreasonably withheld; and

(iv)    Lender has received, if requested by Lender, with respect to each Construction Disbursement, invoices for the full price of the Materials, and evidence that insurance policies as required pursuant to this Loan Agreement cover the Materials and are in full force and effect, which may be the existing insurance policy if the existing policy does not have an exclusion for on-site or off-site Materials.

(b)    No Construction Disbursement shall be made for Materials, or any other furniture, Fixtures, equipment or other property to be incorporated into the Project (the "FF&E"), to be stored off-site, without prior: (1) written notice to Lender; and (2) written consent of Lender, not to be unreasonably withheld, conditioned or delayed.  All Construction Disbursements for off-site Materials and FF&E shall be subject to the following conditions:

(i)    [intentionally omitted];

(ii)    Borrower must be named as additional insured, with appropriate evidence of insurance of Materials and FF&E and transportation coverage; a description of Materials and FF&E must be provided on a certificate of insurance with the Lender named as mortgagee and loss payee;

(iii)    Materials and FF&E must be properly secured in a bonded warehouse and protected from elements, segregated and identified as being owned by Borrower or Construction Contractor, and a bill of sale shall be provided by suppliers to Lender evidencing Borrower's or Construction Contractor's ownership of the Materials or FF&E, as applicable;

(iv)    if the storage facility is owned by someone other than the supplier or Borrower, a landlord's waiver in favor of Lender, in form and substance satisfactory to Lender, shall be executed and delivered to Lender; and

(v)    in connection with the nature of the site being a bonded warehouse, appropriate documentation from the warehouse shall be delivered to Lender.

Section 7.3    Interest Payments.

(a)    Borrower hereby authorizes Lender to utilize funds in the Construction Reserve Account on behalf of Borrower to pay Debt Service and other costs and fees due under the Loan as, and when due on the Note, notwithstanding that Borrower may not have requested a Construction Disbursement of such amount.  Such Construction Disbursement, if made, shall be made by a bookkeeping entry on Lender's records, shall be added to the outstanding principal balance of the Note and shall be deemed paid to and received by Borrower. The authorization hereby granted, however, shall not obligate Lender to make any such Construction Disbursement. Borrower recognizes that the payment of interest by the method described in this Section is for its convenience and benefit. If there are not sufficient funds in the Construction Reserve Account to pay all Debt Service associated with the Loan when due and payable, Borrower shall nevertheless be obligated to timely fund the Debt Service associated with the Note or follow the requirements to request an Additional Advance.

(b)    If Lender, in its reasonable discretion at any time, determines that the amount remaining in the Construction Reserve Account or in the remaining Interest Reserve line

item of the Budget is insufficient to defray the entire amount of interest which Lender reasonably estimates will accrue under the Note through Maturity (the "Interest Insufficiency"), the Loan shall be deemed to not be In Balance and Borrower shall fund the Interest Insufficiency from its own funds into the Construction Reserve Account to maintain the Loan In Balance.

(c)     Interest on each Additional Advance under the Note shall commence as of the date such Advance is funded into the Construction Reserve Account by Lender. When Advances are made by wire transfer, then such monies shall be considered advanced at the time of the transmission of the wire rather than at the time of receipt thereof by the receiving bank. Interest shall continue to accrue until Obligations are fully and finally paid to Lender in immediately available funds.

(d)     Upon an Event of Default, Lender may disburse and retain the entire Construction Reserve Account as yet undisbursed, and apply such amounts as against the Obligations consistent with this Agreement and the other Loan Documents.

## ARTICLE VIII

### EVENTS OF DEFAULT

Section 8.1     Events of Default. An "Event of Default", as used in this Agreement, shall occur at any time or from time to time (regardless of the reason therefor and whether voluntary or involuntary on the part of Borrower or any Obligor, if any):

(a)     Default under Note.  If a default occurs under the Note and such default continues beyond any applicable grace period therein or herein provided;

(b)     Default under Mortgage.  If a default occurs under the Mortgage and such default is not cured within thirty (30) days of notice by Lender to Borrower;

(c)     [INTENTIONALLY OMITTED]

(d)     Default Under Other Loan Documents.  If a default occurs under any Guaranty or any other Loan Document other than the Note or Mortgage or any default shall occur in the payment or performance of any of the Obligations arising under any of the Loan Documents, and such default continues beyond any applicable grace period therein provided;

(e)     Conditions to Initial Advance. If Borrower fails to satisfy, on or before the Closing, all conditions precedent to the Initial Advance.

(f)     In Balance.  Borrower fails to provide sufficient documentation, in Lender's sole discretion, that the Loan is In Balance, and such failure continues for ten (10) Business Days following notice thereof.

(g)     Other Encumbrances.  Any default under any document or instrument, other than the Loan Documents, evidencing or creating a Lien on the Collateral or any part thereof which is not discharged within thirty (30) days of such Lien arising;

57

(h)     Cancellation of Building Permits or Licenses.  If any permits, licenses, or other approval of any Governmental Authority required and issued in connection with the Project is not maintained in full force and effect or is canceled and not reinstated within 30 days of such cancellation;

(i)     Delay in Construction.  If Borrower, after the Commencement Date: (i) fails to continuously and diligently construct the Improvements in a timely manner in accordance with the Construction Schedule, subject to Force Majeure, (ii) permits or allows any material interruption of construction of the Improvements for more than ninety (90) days, except for causes due to Force Majeure, or (iii) fails to cause the construction of the Improvements to be completed (including all approaches, services, utilities and other improvements in connection therewith) and fails to obtain a certificate of completion more than three (3) months after the delivery date set forth in Construction Contract, subject to Force Majeure;

(j)     Improper Materials.  If any of the Materials, Fixtures, or articles used in connection with the Improvements or the appurtenances thereto, or to be used in the operation thereof, are defective or not in accordance with the Plans and have not been remedied within thirty (30) days after notice to Borrower;

(k)     Injunction.  If any party obtains an order or decree in any court of competent jurisdiction enjoining or delaying the construction of the Improvements or completion of the Project or enjoining or prohibiting Borrower, any Obligor, or Lender from carrying out the provisions of this Agreement or any of the other Loan Documents and such order or decree is not vacated within thirty (30) days after the issuance thereof;

(l)     Destruction of Improvements.  Notwithstanding anything in the Mortgage to the contrary, if the Improvements are materially damaged or destroyed by fire or other casualty and the insurance proceeds for such fire or other casualty are insufficient to permit the rebuilding of the Improvements to their condition prior to such fire or casualty (provided that, in order to avoid an Event of Default under this subsection (l) Borrower must be diligently and with continuity of effort repairing the damage and/or rebuilding the improvements that are damaged by such fire or other casualty);

(m)     Failure to Perform Covenants, Terms and Agreements.  If Borrower fails to duly and promptly observe, perform and discharge any covenant, term, condition or agreement contained in this Loan Agreement (other than a covenant, term, condition or agreement requiring the payment of money or otherwise specifically provided for in this Article VIII) or violates any negative covenant contained in Article V hereof, and such failure or violation is not curable, or if curable continues for a period of thirty (30) days after written notice thereof from Lender to Borrower; provided that if such default cannot be cured within such thirty-day period by the exercise of reasonable diligence and Borrower has commenced cure within such thirty-day period, Borrower shall have a further reasonable time (not to exceed sixty (60) days in the aggregate) to complete such cure;

(n)     Inaccuracy of Representation.  If any representation or warranty made by the Borrower or any Obligor in any Loan Document or in any report, certificate, financial statement or other instrument furnished at any time in connection with the Loan Documents shall prove to

58

be false or misleading in any material respect as of the time when made and, if such false or misleading representation or warranty is capable of cure, such representation and/or warranty is not cured by Borrower by or before thirty (30) days after notice from Lender;

(o)        Default under Obligations.  If default shall occur in the payment or performance of any of the Obligations (other than those arising under the Loan Documents) beyond any period of grace applicable thereto;

(p)        Default Under Other Obligations.  If default shall be made with respect to any indebtedness for borrowed money (other than the Obligations) of the Borrower or any Obligor, if any, if the effect of such default is to accelerate, or to permit the holder or obligee thereof (or a trustee on behalf of such holder or obligee) to accelerate the maturity of such indebtedness, or if at maturity (giving effect to any applicable grace periods) such indebtedness shall not be paid as and when due and payable, and such default shall remain unremedied for a period of thirty (30) days after the Lender gives notice thereof to Borrower;

(q)        Insolvency, etc.  If any of the Borrower or Obligors (or all of them), or any Subsidiary shall (i) make an assignment for the benefit of creditors, file a petition in bankruptcy, petition or apply to any tribunal for the appointment of a custodian, receiver or any trustee for any of the Borrower, the Obligors, if any, or the Subsidiaries, as the case may be, or a substantial part of any of its properties or assets, or shall commence any proceeding under any bankruptcy, reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect; or if there shall have been filed any such petition or application, or any such proceeding shall have been commenced against the Borrower or any of the Obligors, or Subsidiaries, as the case may be, in which an order for relief is entered or which remains undismissed for a period of forty-five (45) days or more; or the Borrower or any of the Obligors, or Subsidiaries, by any act or omission shall indicate its consent to, approval of or fail to timely object to any such petition, application or proceeding or order for relief or the appointment of a custodian, receiver or any trustee for the Borrower or any of the Obligors,  or Subsidiaries, as the case may be, or any substantial part of any of its properties or assets, or shall suffer any such custodianship, receivership or trusteeship to continue undischarged for a period of forty-five (45) days or more; or (ii) generally not pay its debts as such debts become due or admit in writing its inability to pay its debts as they mature; or (iii) have concealed, removed, or permitted to be concealed or removed, any part of its properties or assets, with intent to hinder, delay or defraud its creditors or any of them, or made or suffered a transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law; or shall have made any transfer of its property to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid; or shall have suffered or permitted, while solvent, any creditor to obtain a lien upon any of the Collateral through legal proceedings or distraint which is not vacated or "bonded-off" within thirty (30) days from the date thereof; or (iv) be "insolvent", as such term is defined in the Bankruptcy Code, 11 U.S.C. § 101(29), or (v) be insolvent as computed in accordance with generally accepted accounting principles;

(r)        Judgments.  If a final judgment for the payment of money shall be rendered against the Borrower or any of the Obligors, as the case may be, and the same shall remain undischarged or unbonded for a period of thirty (30) consecutive days during which execution shall not be effectively stayed;

59

(s)     [Intentionally Omitted.]

(t)     Violation of Permitted Encumbrances. If any Permitted Encumbrances are violated.

(u)     Death of Guarantor. The death or incapacity of any Guarantor (for purposes hereof, "incapacity" shall mean the inability of a Guarantor whether because of mental or physical disability, to manage his or her financial affairs and/or to provide for his or her personal care) if a replacement Guarantor, acceptable to Lender, in Lender's sole reasonable discretion, is not promptly provided within sixty (60) days after such death or incapacity.

## ARTICLE IX

## REMEDIES

Section 9.1    Default Rate. From and after the occurrence of an Event of Default and unless and until such Event of Default is waived or otherwise ceases to exist, the Note shall and all obligations due under this Agreement or any of the Loan Documents shall bear interest at the Default Rate. Interest shall be calculated on the basis of the actual number of days elapsed divided by 360. Notwithstanding the foregoing, nothing contained in this Agreement, the Note or any other instrument between the parties hereto shall be deemed to establish or require the payment of a rate of interest in excess of the Maximum Rate. In the event that the rate of interest so contracted to be paid should exceed the Maximum Rate, whether as a result of its fluctuation, acceleration of the maturity hereof or otherwise, the rate of interest to be paid hereunder shall be automatically reduced to the Maximum Rate and so much of any interest reserved, charged or taken as would cause the same to exceed the Maximum Rate shall be deemed not to be a credit against interest but rather a prepayment on account of and be automatically credited against outstanding principal evidenced hereby regardless of how the same may appear on Lender's or Borrower's books or records or any memoranda of whatever nature evidencing the same; provided, however, no such application shall operate to cure or as a waiver of any Event of Default occasioning acceleration.

Section 9.2    Remedies. If an Event of Default shall have occurred, Lender may, at its option, use any, some or all of the following remedies, or any other remedies available by law or pursuant to any of the other Loan Documents concurrently or consecutively at any time thereafter, at the sole option of the Lender, and without further notice.

(a)     Remedies Under Note, Mortgage, and Other Loan Documents. Lender may exercise any and all of its rights and remedies provided under the Note, Mortgage and any other Loan Document, including but not limited to Lender's right to foreclose. Lender shall have the right to foreclosure or pursue any other remedies pursuant to the terms of the Mortgage, it being understood that the Collateral described herein shall be deemed cross-collateralized for all purposes and shall secure repayment in full of all indebtedness under the Loan now or hereafter owing to Lender.

(b)     Without limiting or affecting Lender's right to cease Advances upon the occurrence of a Default, Lender may terminate its obligation, if any, to make Advances, or to fund any unfunded portion of the Loan, if any, under this Agreement;

(c)      Lender may (a) declare the Obligations, or any of them, to be forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which, to the extent permitted by applicable law, are hereby expressly waived, anything contained herein or in any Loan Document to the contrary notwithstanding, (b) notify account debtors or the Obligors, if any, under any Collateral to make payments to the Lender and take control of any proceeds of Collateral, (c) take immediate possession of the Collateral, and require the Borrower to assemble the Collateral, at Borrower's expense, and make all of the Collateral available to the Lender at a place designated by the Lender which is reasonably convenient to both parties, (d) enter any of the premises of Borrower or wherever the Collateral shall be located, with or without force or process of law, and keep and store the Collateral in said premises until sold (and if said premises are located at the property of Borrower or any Obligors, Borrower (or such Obligor) agrees not to charge the Lender for use and occupancy or for storage for a period of at least 90 days after sale or disposition of such Collateral); (e) sell or otherwise dispose of all or any Collateral in its then condition, or after any further manufacturing, repair or processing thereof, at public or private sale or sales, wholesale dispositions, or sales pursuant to one or more contracts, with such notice as may be required by law, in lots or in bulk, for cash or on credit, all as the Lender, in its sole discretion, may deem advisable.  Borrower and Obligors, if any, agree that ten (10) days' written notice to Borrower (or Obligors, if any, as the case may be), of any public or private sale or other disposition of Collateral shall be commercially reasonable notice thereof, and such sale shall be at such location(s) as the Lender shall designate in said notice.  The Lender shall have the right to conduct such sales on Borrower's (or any Obligor's) premises, without charge therefor, and such sales may be adjourned from time to time by notice given at the time and place of such sale without further publication or notice.  The Lender shall have the right to bid or credit bid at any such sale on its own behalf which bid may be in whole or any part in the form of cancellation or reduction of the Obligations.  The Lender may elect to sell Collateral for cash, or for credit or future delivery, and shall have no obligation in the event the purchasers shall fail to take delivery of or pay for any property so sold.  The purchasers at any such sale of Collateral shall own the Project so sold absolutely, free and clear of all right of redemption or otherwise in the Borrower or the Obligors, if any, all of which are hereby waived.  The Lender may take any and all action and pursue any and all remedies as may be permitted by the Loan Documents or by applicable law, all of which rights and remedies shall be cumulative and none of which shall be exclusive, including, without limitation, remedies of a secured party under the Code in respect of the Collateral and all rights of banker's lien, counterclaim or set-off against any deposit account maintained by the Borrower or any Obligor at any office of the Lender.

(d)      In addition to all other rights and remedies of Lender contained herein or in any other Loan Document, Lender shall have the right to (but not the obligation) engage a special servicer, including Lender or Lender's affiliate, to administer the Loan on Lender's behalf and may charge a special servicing fee in the amount of one percent (1.0%) of the outstanding principal balance of the Loan, in addition to any third-party costs and expenses in connection therewith, which special servicing fee shall accrue from the date of an Event of Default hereunder until Borrower's cure of such Event of Default. The special servicing fee referenced herein shall be in addition to the Servicing Fee.

(e)      Lender may at any time in its discretion transfer any securities or other property constituting Collateral into its own name or that of its nominee and receive the income thereon and hold the same as security for the Obligations or apply it on principal or interest due

on the Obligations. Insofar as the Collateral shall consist of accounts receivable, other claims and rights to the payment of money, insurance policies, instruments, chattel paper, choses in action or the like, Lender may, without notice to or demand on the Borrower or Obligors, if any, demand, collect, receipt for, settle, compromise, adjust, use, sue for, foreclose or realize upon the Collateral as Lender may determine, whether or not the Obligations or the Collateral are then due and for the purpose of realizing Lender's rights therein, Lender may receive, open and dispose of mail addressed to the Borrower (or Obligors) and endorse notes, checks, drafts, money orders, documents of title or other evidences of payment, shipment or storage or any form of the Collateral on behalf of and in the name of the Borrower (or Obligors, if any). The powers conferred on the Lender by this Section are solely to protect the interest of the Lender and shall not impose any duties on the Lender to exercise any powers.

(f)     Completion of Project. Lender may do any or all of the following to the maximum extent permitted under the laws of the State of Georgia, either in the name of Lender or in the name of Borrower:

(i)     elect to complete Improvements or cause same to be completed in accordance with the terms of this Agreement and the Plans, but with such changes, alterations, or modifications as Lender may deem appropriate.

(ii)     enforce all rights of Borrower under any contract (including, without limitation the Construction Contract) made by Borrower in connection with the Project or may, if Lender deems it advisable, cancel any or all of the foregoing contracts.

(iii)     commence, take over and/or use in the completion of the Improvements all or any part of the Materials, supplies, Fixtures, equipment and other personal property contracted for by Borrower, whether or not previously incorporated into the Improvements.

(iv)     in connection with any construction undertaken to complete the Construction Project, (A) employ builders, contractors, subcontractors, architects, engineers, inspectors and others for the purpose of furnishing labor, Materials, supplies, Fixtures, equipment and other personal property in connection with the completion of the Construction Project; (B) purchase all items necessary, proper, or convenient for completing the Construction Project; (C) pay, settle or compromise all bills and claims that are or may become liens against the Project or any portion thereof, or which have been or may be incurred in any manner in connection with completing the Construction Project and discharge any lien or encumbrance on, or defect in the title of, the Project or any portion thereof; (D) execute all applications and certificates in the name of Borrower which may be required in completing the Construction Project; (E) institute such legal or other proceedings and defend such actions or proceedings as Lender shall deem appropriate in connection with completing the Construction Project; and (F) take, delay in, or refrain from taking, such action hereunder as Lender may from time to time determine.

(v)     at any time discontinue any work commenced with respect to completion of the Construction Project, or any construction thereto, or may abandon completion thereof or change any course of action undertaken by it.

(g)     Security Guards. Lender may (but shall not be obligated to) employ security guards to protect and preserve the Project and the Materials, supplies, Fixtures, equipment and any other personal property located thereon.

(h)     Cure. Lender may cure any Event of Default in such manner as deemed appropriate by Lender.

(i)     Set-off. Lender may exercise any and all rights of set-off Lender may have against any account, fund, or property of any kind, tangible or intangible, belonging to any Borrower or Pledgor which shall be in Lender's possession or under its control.

(j)     Audit. Lender may require an audit at Borrower's cost of all Loan funds in the event that Lender reasonably believes there has been any misappropriation of funds. Lender shall have no obligation to make Additional Advances or releases from the Deposit Account until thirty (30) days after such audit has been completed and delivered to Lender.

(k)     Insurance. Lender may (but shall not be obligated to) fund any insurance policy for the Project immediately upon notice of delinquency, provided that if Lender funds cures such delinquency, the interest rate on such expended funds shall be the lesser of X (X%) or the maximum rate allowable under applicable law.

(l)     Protective Advances. Lender may make any Protective Advances Lender deems necessary or appropriate in Lender's sole discretion. All Protective Advances made shall bear interest at the Default Rate. Notwithstanding the foregoing, Lender shall have no obligation to make any Protective Advances.

Section 9.3     Remedies Cumulative and Concurrent. No right, power or remedy of Lender as provided in this Agreement is intended to be exclusive of any other right, power, or remedy of Lender, but each and every such right, power and remedy shall be cumulative and concurrent and in addition to any other right, power or remedy available to Lender now or hereafter existing at law or in equity and may be pursued separately, successively or concurrently at the sole discretion of Lender. The failure of Lender to exercise any such right, power or remedy shall in no event be construed as a waiver or release thereof.

Section 9.4     Waiver, Delay or Omission. No waiver of any Event of Default hereunder shall extend to or affect any subsequent or any other Event of Default then existing, or impair any rights, powers or remedies consequent thereon, and no delay or omission of Lender to exercise any right, power or remedy shall be construed to waive any such Event of Default or to constitute acquiescence therein. Notwithstanding anything contained in the Loan Documents or herein, Lender shall not be under any obligation to accept a cure of any default after it becomes an Event of Default or waive any Event of Default which is continuing, acceptance of such cure being in Lender's sole and absolute discretion.

Section 9.5     Borrower's Liability for Expenditures and Advances. Borrower shall pay Lender for all costs, charges, expenses and reasonable attorneys' fees and disbursements paid or incurred by Lender in connection with the completion of the Construction Project as set forth in this Article IX or in connection with the employment of security guards as set forth in this Article IX. A statement of such costs, charges, expenses, and fees, verified by the affidavit of an officer

of Lender, shall be conclusive of the amounts so expended and of the propriety of the necessity for such expenditure. Lender shall have the right to apply the Loan proceeds agreed to be advanced hereunder, including, but not limited to, any retainages and monies in escrow, toward completion of the Construction Project pursuant to the Plans and toward all costs, charges, expenses and legal fees incurred incident thereto. Any costs, charges, expenses and fees incurred by Lender in excess of available Loan proceeds, shall earn interest at the Default Rate from the date incurred by Lender. Borrower agrees that any and all expenditures incurred shall be deemed to have been advanced by Lender to Borrower and that all such sums shall be deemed a portion of the Loan and shall be secured by the lien of the Mortgage and the other Loan Documents. For the purpose of Lender exercising its rights under this Article IX, Borrower hereby constitutes and appoints Lender its true and lawful attorney-in-fact with full power of substitution, and empowers said attorney or attorneys to execute, acknowledge and deliver any instruments and to do and perform any acts referred to in this Article IX in the name of and on behalf of Borrower. The powers vested in said attorney-in-fact are and shall be deemed to be coupled with an interest and cannot be revoked.

In addition to the foregoing, in the event of the occurrence of a default, if suit is instituted by Lender to collect an unpaid balance(s) owed by Borrower hereunder, or if Lender deems it necessary or proper to employ an attorney to acquire possession of any Collateral securing the Obligations and/or to enforce this Agreement or any other Loan Documents or to otherwise protect Lender's interests hereunder, including representation in bankruptcy, Borrower agrees to pay all collection and legal expenses and the reasonably attorneys' fees paid or incurred hereunder by Lender.

Section 9.6    Disbursing Agent for Borrower. At any and all times while an Event of Default exists under this Agreement, at its option (without further authorization from Borrower), Lender, or its agents, may (but shall not be required to) act as disbursing agent for Borrower with respect to the Loan proceeds. The Borrower covenants and agrees to pay any and all reasonable fees and charges payable to such disbursing agent.

Section 9.7    Resort to Borrower. Lender, at its option, may pursue any and all rights and remedies directly against Borrower without resort to any Collateral.

Section 9.8    Deficiency. To the extent that the proceeds realized from the disposition of the Collateral shall fail to satisfy any amounts owed to Lender by Borrower, Borrower shall remain liable to pay any deficiency to Lender.

## ARTICLE X

## RELEASE

Section 10.1    Partial Release. Provided there is no Default or Event of Default under any of the Loan Documents, Lender shall the release of the Release Property from the Mortgage upon satisfaction of the following conditions precedent:

(a)    Lender shall have received a written request from Borrower for the release of the Release Property within no less than fourteen (14) days prior to the desired date of release (the "Partial Release Request").

64

(b)      Borrower shall have paid to Lender the Additional Equity Escrow Deposit in full and the Loan shall be In Balance.

(c)      Borrower shall have delivered to Lender a title commitment (and such other documentation as is requested) evidencing the legal description of the Release Property.

(d)      Lender shall have received all costs and expenses associated with any such Partial Release Request, including, without limitation, the cost of any title insurance endorsements requested by Lender, Lender's legal fees in connection with the partial release, and any recording costs in connection with the partial release.

Section 10.2      [Intentionally Omitted.]

## ARTICLE XI

## PLEDGED ACCOUNTS

Section 11.1      Interest Reserve Account.

(a)      Simultaneously with the execution and delivery of this Agreement, a portion of the Loan proceeds in an amount equal to that set forth in the Initial Advance column of the Budget shall be deposited into the Interest Reserve Account (the "Interest Reserve"), to be held by Lender as security for the Note. Thereafter Borrower may request a portion of each Additional Advance be deposited into the Interest Reserve, subject to all of the conditions of an Additional Advance.

(b)      The amount of the Interest Reserve shall be calculated based upon the then-applicable Note Rate.

(c)      The Interest Reserve shall be held by the Lender (and may be comingled with other funds of the Lender). At any time after an Event of Default, Lender may apply the Interest Reserve first to any outstanding accrued, but unpaid interest due in accordance with the Note and then to the then outstanding principal under the Note. If at any time, the Interest Reserve has been completely or partially liquidated in connection with a default or Event of Default prior to payment in full of the outstanding principal balance of the Note, Borrower shall remain responsible for payment to Lender of any and all interest payments still owing thereafter as and when due in accordance with the Note. The Interest Reserve shall not accrue interest in favor of Borrower and Lender shall pay no interest to Borrower in connection with the Interest Reserve. Notwithstanding anything contained herein, Borrower shall pay interest due and payable in connection with the Loan in accordance with the Note from and after the date the Advance is advanced to the Construction Escrow Account.

(d)      Borrower hereby authorizes Lender to utilize such proceeds of the Loan on behalf of Borrower to pay interest as and when due on the Note, notwithstanding that Borrower may not have requested a Construction Disbursement of such amount. Such Construction Disbursement, if made, shall be made by a bookkeeping entry on Lender's records, shall be added to the outstanding principal balance of the Note and shall be deemed paid to and received by

65

Borrower. The authorization hereby granted, however, shall not obligate Lender to make any such Construction Disbursement. Borrower recognizes that the payment of interest by the method described in this Section is for its convenience and benefit.

(e)     Notwithstanding anything herein to the contrary, if Lender in its reasonable discretion at any time determines that an Interest Reserve Insufficiency has occurred, then Lender may, at its option, require Borrower to deposit additional funds into the Interest Reserve and/or pay from Borrower's own funds all further interest charges directly to Lender in accordance with the provisions of the Note until there is no further Interest Reserve Insufficiency. Notwithstanding the foregoing, provided the Loan is In Balance, Lender, in its sole discretion, may permit the Interest Reserve Insufficiency to be paid from the proceeds of the next Construction Disbursement.

(f)     Borrower hereby pledges, assigns, hypothecates and transfers to Lender, and grants to Lender a security interest in, all of Borrower's rights, title and interest in and to the Interest Reserve Account. The security interest granted herein shall apply to and include all renewals, extensions, additions and substitutions with respect to such Interest Reserve Account. Borrower agrees that the Interest Reserve Account shall be titled in the name of Borrower or Lender (or may otherwise reference Borrower) for the benefit of Lender.

(g)     Borrower shall have no right of access to or right of withdrawal of funds from the Interest Reserve Account and Lender shall at all times retain in its possession all original documents and instruments which evidence the ownership of and the right to draw funds from the Interest Reserve Account. The parties acknowledge that the original document which confirms the establishment of the Interest Reserve Account shall at all times be retained by Lender and that the original document shall be indispensable to access and control such account. The Lender shall at all times have exclusive possession and control of the Interest Reserve Account and shall have the sole right to renew such account(s) upon its maturity date. The document which confirms the establishment of the Interest Reserve Account may contain a legend to the following effect:

> Borrower has pledged the account evidenced by this confirmation to Lender as collateral for any and all obligations of Borrower under the Loan. Borrower acknowledges that Lender has retained the original document which confirms the establishment of the above account and that Lender holds a perfected security interest in the above account to secure any and all obligations of Borrower under the Loan.

(h)     Additions to, releases, reductions, exchanges of, or substitutions for the Interest Reserve Account may from time to time be made by Lender without affecting the provisions of this Article XI or the liabilities of the Borrower hereunder.

(i)     If not earlier applied to the Loan by Lender, the Interest Reserve Account may be retained by Lender until such time as the Loan is paid in full and all obligations of Borrower to Lender under the Loan have been satisfied.

(j)     Borrower agrees to reimburse Lender, on demand, for any and all expenses, including the reasonable fees and expenses of Lender's counsel, which Lender may incur in connection with (i) the administration of this Agreement and the Interest Reserve Account, (ii) the

exercise or enforcement of any of its rights and remedies hereunder, and (iii) the failure by Borrower to perform or observe any of the provisions hereof. The payment of all such expenses (including court costs and reasonable attorneys' fees and expenses) of, or incident to, the enforcement of any of the provisions hereof shall be secured by the Interest Reserve Account.

Section 11.2    Construction Escrow Account.

(a)    The Construction Escrow Account shall be held by the Lender (and may be comingled with other funds of the Lender). If at any time, the Loan Proceeds have been completely liquidated, Borrower shall pay any invoices in connection with the construction of the Improvements in accordance with this Agreement. The Construction Escrow Account shall not accrue interest in favor of Borrower and Lender shall pay no interest to Borrower in connection with the Construction Escrow Account.

(b)    Borrower hereby pledges, assigns, hypothecates and transfers to Lender, and grants to Lender a security interest in, all of Borrower's rights, title and interest in and to the Construction Escrow Account. The security interest granted herein shall apply to and include all renewals, extensions, additions and substitutions with respect to such Construction Escrow Account. Borrower agrees that the Construction Escrow Account shall be titled in the name of Borrower or Lender (or may otherwise reference Borrower) for the benefit of Lender.

(c)    Borrower shall have no right of access to or right of withdrawal of funds from the Construction Escrow Account and Lender shall at all times retain in its possession all original documents and instruments evidencing the ownership of and the right to draw funds from the Construction Escrow Account. The parties acknowledge that the original document which confirms the establishment of the Construction Escrow Account shall at all times be retained by Lender and that the original document shall be indispensable to access and control such account. Lender shall at all times have exclusive possession and control of the Construction Escrow Account and shall have the sole right to renew such account(s) upon its maturity date. The document confirming the establishment of the Construction Escrow Account may contain a legend to the following effect:

Borrower has pledged the account evidenced by this confirmation to Lender as collateral for any and all obligations of Borrower under the Loan. Borrower acknowledges that Lender has retained the original document which confirms the establishment of the above account and that Lender holds a perfected security interest in the above account to secure any and all obligations of Borrower under the Loan.

(d)    Additions to, releases, reductions, exchanges of, or substitutions for the Construction Escrow Account may from time to time be made by Lender without affecting the provisions of this Agreement or the liabilities of Borrower hereunder.

(e)    If not earlier applied to the Loan by Lender, the Construction Escrow Account may be retained by Lender until such time as the Loan is paid in full and all obligations of Borrower to Lender under the Loan have been satisfied.

(f)    Borrower agrees to reimburse Lender, on demand, for any and all expenses, including the reasonable fees and expenses of Lender's counsel, which Lender may incur in

connection with (i) the administration of this Agreement and the Construction Escrow Account, (ii) the exercise or enforcement of any of its rights and remedies hereunder, and (iii) the failure by Borrower to perform or observe any of the provisions hereof. The payment of all such expenses (including court costs and reasonable attorneys' fees and expenses) of, or incident to, the enforcement of any of the provisions hereof shall be secured by the Construction Escrow Account.

Section 11.3    General Terms Regarding all Pledged Accounts.

(a)    Without limiting any other rights granted to Lender under this Agreement, if at any time an Event of Default occurs under any of the Loan Documents, Borrower hereby irrevocably authorizes Lender, upon the occurrence of such Event of Default, to take immediate possession and/or control of all proceeds of the Pledged Accounts, including all interest earned thereon (if any), and to apply such proceeds to satisfy all obligations due and owing under the Loan. Borrower hereby irrevocably authorizes Lender to take possession and control and to apply the proceeds of the Pledged Accounts as herein provided, without prior notice to Borrower.

(b)    Upon the occurrence of an Event of Default, Lender shall have: (a) all the rights and remedies of a secured party under the Uniform Commercial Code in effect in the State of Florida with respect to the Escrow Account Pledge Agreement executed by Borrower and Lender dated of even date herewith and the Operating Account Pledge Agreement, and under the Code in connection with all other Pledged Accounts, and without limiting the generality of the foregoing, Lender shall have the right, at its option, and without notice or demand, to declare the entire amount of the Obligations remaining unpaid to be immediately due and payable, less any other charges and any rebates required by law (it being the intention hereof that under no circumstances shall Lender or any holder hereof be entitled to receive at any time any charges not allowed or permitted by law); (b) the right to set off against the Pledged Accounts for all amounts owed to Lender under the Loan, and Lender shall be deemed to have exercised such right of set off and to have made a charge against any such money immediately upon the occurrence of such Event of Default even though such charge is made or entered on the books of Lender subsequent thereto; and (c) all rights under applicable law.

(c)    Borrower agrees that at any time and from time to time, at Borrower's sole expense, Borrower will take all such further actions as are necessary in order for Lender to exercise and enforce its rights and remedies hereunder with respect to the Pledged Accounts and to carry out the intents and purposes hereof. Borrower shall execute and deliver to Lender financing statements describing Lender's security interest in the Pledged Accounts, and Borrower shall pay for the cost of filing and/or recording the same. Borrower shall also execute and deliver to Lender all such further assurances, certificates, opinions and any other documents and do or cause to be done any other acts that Lender may reasonably request from time to time, and at any time, to protect Lender's rights and to insure Borrower's obligations under this Agreement.

(d)    Borrower hereby appoints Lender as Borrower's attorney-in-fact, with full authority in the place and stead of Borrower and in the name of Borrower or otherwise, from time to time in Lender's discretion to take any action and to execute any instrument which Lender may deem necessary to accomplish the purposes of this Agreement.

(e)    Lender shall have, and be entitled to exercise, all such powers hereunder as are specifically delegated to Lender by the terms hereof, together with such powers as are incidental thereto. Lender may execute any of its duties hereunder by or through its agents or employees. None of Lender, nor any member, director, officer, agent or employee of Lender, shall be liable for any action taken or omitted to be taken by it hereunder or in connection herewith, except for its own gross negligence or willful misconduct. Borrower hereby agrees to indemnify and hold harmless Lender and/or any such member, director, officer, agent or employee from and against any and all liability incurred by any of them, hereunder or in connection herewith, unless such liability shall be due to Lender's or such person's gross negligence or willful misconduct.

## ARTICLE XII

## MISCELLANEOUS

Section 12.1    No Representations by Lender. Lender has no obligations in connection with the Project except to advance the proceeds of the Loan as herein provided, and Lender shall not be liable for the performance of any contractor, subcontractor, or supplier of Materials, Fixtures, equipment and any other personal property, or for the quality of workmanship or the quality of such Materials, Fixtures, equipment and other personal property, or for the failure to construct, complete, protect or insure the Improvements, or for the payment of any cost or expenses incurred in connection therewith, or for the performance or non-performance or delay in performance of any obligation of Borrower to Lender. Any inspection by Lender or the Lender's agent of the Project, approval of the Plans or other activities in the nature thereof shall only be for the sole benefit of Lender and for the purpose of protecting the security of Lender, and the same shall in no way be construed as a representation on the part of Lender that there is compliance on the part of Borrower with the Plans or that the construction of the Improvements is free from faulty material, or defective workmanship. The fact that Lender or Lender's agent makes such inspections shall not relieve Borrower from its duty to independently ascertain that the Project is being completed in accordance with the Plans, and Borrower has no right to rely on any procedures required by Lender.

Section 12.2    Immunity. Lender's commitment to make Advances hereunder shall not at any time be subject or liable to attachment or levy at the suit of any creditor of Borrower or any agent, contractor, subcontractor or supplier of Borrower. All rights of the Construction Contractor, other contractors, sub-contractors, laborers and suppliers of Materials, Fixtures, equipment and other personal property shall be and are subordinate and inferior to the Lender's interest and lien under the terms of the Mortgage and this Agreement. Lender shall not be liable to third parties (such as the Construction Contractor, other contractors, subcontractors, laborers, or suppliers of Materials, Fixtures, equipment and other personal property or others) for services, labor, Materials, Fixtures, equipment and other personal property employed upon, furnished or delivered to the Land or the Improvements, and, further, as to such third parties, Lender shall be under no obligation to adhere to the requirements herein imposed as conditions for the disbursement of Loan funds which requirements are expressly intended to be for the sole and exclusive benefit of Lender. No third party is intended to be a beneficiary of, or have any rights to enforce, this Agreement or any of the other Loan Documents, and no third party shall have any privity of contract or any right

to rely upon any Loan Document to any extent or for any purpose whatsoever, and no other person shall have any right of action of any kind hereunder or be deemed a third party beneficiary.

Section 12.3    Lender Not Partner of Borrower.  Notwithstanding anything to the contrary herein contained or implied, Lender, by this Agreement or by any action pursuant hereto, shall not be deemed a partner of or joint venturer with the Borrower.

Section 12.4    Notices.  All notices, demands, requests (except for Disbursements or request for the Additional Advance) and other communications required under this Agreement to be given to Borrower or Lender shall be in writing and given by: (i) hand delivery, (ii) United States mail as first class certified mail with return receipt requested or priority mail, or (iii) overnight delivery service via a nationally recognized courier service with confirmed delivery or rejection, or (iv) delivered by email transmission; or (v) verbally (either in person or by telephone if confirmed in writing within three (3) days thereafter) by another method hereunder; and notice shall conclusively be deemed to have been received if addressed to the party for whom it is intended at its address, email address set forth below (as applicable), whether or not the same is actually received by such party: (i) upon delivery, if given by hand, (ii) three (3) days after sent if sent via United States mail as first class certified mail with return receipt requested or registered mail (first class postage prepaid) or upon delivery if sent via United States priority mail; (iii) upon delivery or rejection, if by nationally recognized courier service if overnight delivery, or (iv) if sent by email transmission upon confirmation or rejection of delivery by certified or registered mail (first class postage prepaid) or guaranteed overnight delivery.

| | |
|---|---|
| If to Lender: | BI 68 LLC |
| | c/o BridgeInvest LLC |
| | 2601 South Bayshore Drive, Suite 1400 |
| | Miami, Florida 33133 |
| | Attention: Alex Horn, Manager |
| | Email: alex.horn@bridgeinvest.com |
| | |
| With a copy to: | Bryan Cave Leighton Paisner LLP |
| | One Atlantic Center, 14th Floor |
| | 1201 West Peachtree Street, N.W. |
| | Atlanta, Georgia 30309 |
| | Attention: Johnny D. Latzak, Jr., Esq. |
| | Email: jay.latzak@bclplaw.com |
| | |
| If to any Borrower: | c/o Newport RE LP |
| | 170 Mitchell Street |
| | Atlanta, Georgia 30303 |
| | Attention: Kevin Murphy |
| | Email: kevin.murphy@newportre.com |
| | Attention: Thomas Bullock |
| | Email: thomas.bullock@newportre.com |

<table>
<tr><td>With a copy to:</td><td>Morris, Manning & Martin, LLP<br>1600 Atlanta Financial Center<br>3343 Peachtree Road, NE<br>Atlanta, Georgia 30326<br>Attention: Duncan Miller, Esq.<br>Email: dwm@mmmlaw.com</td></tr>
</table>

Any party may change the address to which any such notice, report, demand, request or other instrument or communication to such party is to be delivered or mailed, by giving at least ten (10) business days prior written notice of such change to the other party, but no such notice of change shall be effective unless and until received by such other party. Each of the entities comprising Borrower acknowledge and agree that (i) notice, report, demand, request or other instrument or communication authorized or required under this Agreement to be given to Borrower shall be satisfied by Lender delivering any such notice, report, demand, request or other instrument or communication to the party set forth above, (ii) Lender shall not be required to deliver a copy of any such notice, report, demand, request or other instrument or communication to any other entity comprising Borrower, and (iii) delivery of such notice, report, demand, request or other instrument or communication to the party set forth above is and shall be deemed delivery to all other entities comprising Borrower.

Section 12.5    Attorneys' Fees and Expenses.  Wherever provision is made herein for payment for attorneys' or counsel's fees or expenses incurred by the Lender, said provision shall include, but not be limited to, reasonable attorneys' or counsel's fees or expenses incurred in any and all judicial, bankruptcy, insolvency, reorganization, administrative, investigative or other proceedings, including appellate proceedings, whether such fees or expenses arise before proceedings are commenced, or after entry of a final judgment and whether suit be brought or not. Whenever in this Agreement or the other Loan Documents references are made to "attorney's fees" or "reasonable attorney's fees", or "legal fees" or other words of similar import, the same shall be deemed to mean such fees as are reasonable and are actually incurred without regard to the statutory definition of "reasonable attorney's fees" pursuant to Official Code of Georgia Annotated Section 13-1-11.

Section 12.6    Expenses; Indemnification.  Whether or not any Loan is made hereunder, the Borrower shall, on demand, pay or reimburse the Lender and its assignees and participants for (a) all transfer, documentary stamp, intangible taxes and similar taxes, broker's fees and commissions, surveys, travel expenses, photocopying, secretarial overtime and long distance telephone charges (including but not limited to those imposed by Lender's counsel, abstracting charges, policies and all endorsements therefor, license and permit fees, fees and costs of Lender's advisor(s) (including, without limitation, Lender's Construction Advisor and any disbursing agent(s)), and all recording and filing fees, payable in connection with, arising out of or in any way related to the execution, delivery and performance of the Loan Documents or the making of the Loan, and (b) all of the Lender's costs and expenses including reasonable fees and disbursements of legal counsel and other experts employed or retained by the Lender incurred, the Servicing Fee, any special servicing fees, costs and expenses incurred in connection with the servicing of the Loan and any defaults, and all payments made, and indemnify and hold the Lender harmless from and against all losses suffered, by the Lender in connection with, arising out of, or in any way related to (i) the negotiation, preparation, execution and delivery of (A) the Loan Documents

(whether or not executed), (B) any waiver, amendment or consent thereunder or thereto, (ii) the administration of any operations under the Loan Documents and the servicing thereof, (iii) consulting with respect to any matter in any way arising out of, relating to, or connected with, the Loan Documents, including but not limited to the enforcement by the Lender of any of its rights thereunder or the performance by the Lender of any of its obligations thereunder, (iv) protecting, preserving, exercising or enforcing any of the rights of the Lender under the Loan Documents, (v) any appraisals, (vi) any claim (whether asserted by the Lender, the Borrower or any other person and whether asserted before or after the payment, performance and observance in full of the Borrower's obligations hereunder, under the Note, or the other Loan Documents) and the prosecution or defense thereof, in any way arising under, related to, or connected with, the Loan Documents or the relationship established hereunder and thereunder, (vii) any investigation arising out of, relating to, or in any way connected with the Loan Documents, except that the foregoing indemnity shall not be applicable to any loss suffered by the Lender to the extent such loss is determined by a judgment of a court that is binding on the Lender, final and not subject to review on appeal, to be the result of acts or omissions on the Lender's part constituting gross negligence, willful misconduct or knowing violations of law, (viii) any claim (whether asserted by the Lender, the Borrower or any other person and whether asserted before or after the payment, performance and observance in full of the Borrower's obligations hereunder, under the Note, or the other Loan Documents) and the prosecution or defense thereof, in any way arising under, related to, or connected with, any litigation pending, threatened or filed against any Loan Party, or the relationship established hereunder and thereunder; and (ix) any claim (whether asserted by the Lender, the Borrower or any other person and whether asserted before or after the payment, performance and observance in full of the Borrower's obligations hereunder, under the Note, or the other Loan Documents) and the prosecution or defense thereof, in any way arising under, related to, or connected with, the Project, the Lender's security interest in the Collateral, or any other land owner or neighbor or neighborhood association or manager or tenant or operator or occupant or interest holder or any other person. The foregoing indemnification shall be interpreted as broadly as possible in favor of Lender and shall include indemnification by Borrower of Lender as to any and all costs (including, without limitation, reasonable attorneys' fees and expenses of outside counsel), damages, penalties, fines, expenses or losses arising from any and all claims, demands, losses, damages, liabilities, fines, penalties, charges, causes of action, injury to person, property, or natural resources, administrative and judicial proceedings and orders, injunctive relief, judgments, remedial action requirements and enforcement actions of any kind, arising directly or indirectly, in whole or in part, out of or attributable to any of the foregoing matters or otherwise in any way arising under, related to, or connected with, the Loan, except that the foregoing indemnity shall not be applicable to any loss suffered by the Lender to the extent such loss is determined by a judgment of a court that is binding on the Lender, final and not subject to review on appeal, to be the result of acts or omissions on the Lender's part constituting gross negligence, willful misconduct.

Borrower hereby authorizes Lender to pay any and all expenses or other amounts for which Borrower is obligated under this Section from the proceeds of an Advance or disbursement under the Loan, and no further authorization for such disbursement and payment shall be required from Borrower or any Obligor. In no event shall Lender be obligated to make any such disbursement or payment and Borrower shall in any event remain unconditionally obligated to pay any and all such amounts. All obligations of Borrower under this Section shall bear interest at the Default Rate from the date of Lender's payment thereof or request to Borrower for payment thereof

(whichever shall first occur) and shall be part of the Obligations secured by all Collateral encumbered by the Mortgage and the other Loan Documents.

Section 12.7    Limitation of Liability. Neither the Lender nor any assignee, participant or affiliate of the Lender shall have any liability with respect to, and the Borrower and all Obligors, if any, hereby waive, release and agree not to sue upon, any claim for any special, indirect or consequential damages suffered by the Borrower in connection with, arising out of, or in any way related to, this Agreement, the Note or the other Loan Documents or the transactions contemplated and the relationship established by this Agreement, the Note or the other Loan Documents or any act, omission or event occurring in connection therewith.

Section 12.8    Governmental Regulation of Lender. Lender is or may be subject to various Governmental Authorities and the laws, rules and regulations enacted, adopted and promulgated by them. To the extent that Lender's power and authority to perform the Obligations on the part of Lender to be performed under this Agreement, now or hereafter, may be limited or regulated thereby, Lender is hereby excused from such performance.

Section 12.9    Modification, Waiver, Consent.  Any modification or waiver or any provision of this Agreement or any consent to any departure by Borrower therefrom shall not be effective unless the same is in writing and signed by an authorized officer of Lender, and then such modification, waiver or consent shall be effective only in the specific instance and for the specific purpose given. No failure of delay on the party of Lender in exercising any power or right hereunder, and no failure of Lender to give Borrower notice of any default or Event of Default hereunder, shall operate as a waiver thereof, and no single or partial exercise of any such right or power shall preclude any other or further exercise thereof or the exercise of any other right or power hereunder. Any notice to or demand on Borrower not specifically required of Lender hereunder shall not entitle Borrower to any other or further notice or demand in the same, similar, or other circumstances unless specifically required hereunder. Any Advance of Loan proceeds hereunder shall not constitute a waiver of any of the conditions of Lender's obligations to make further Advances nor, in the event Borrower is unable to satisfy any such condition, shall any such waiver have the effect of precluding Lender from thereafter declaring such inability to be an Event of Default hereunder as elsewhere provided in this Agreement.

Section 12.10   Entire Agreement. The Loan Documents contain the entire agreement between the parties hereto and there are no promises, agreements, conditions, undertakings, warranties and representations, whether written or oral, express or implied, between the parties hereto other than as set forth in the Loan Documents. The Commitment is incorporated herein by reference and is considered a part hereof, except that this Agreement and the Loan Documents shall prevail in the event of any conflict between the Loan Documents and the Commitment.

Section 12.11   Assignment by Lender. Any and all of the rights and obligations of Lender under the Loan Documents may be assigned or transferred by Lender to other banks, lenders, financial institutions or investors, including, but not limited to, a related Affiliate of Lender. Lender shall also have the right to participate the Loan with other banks, lenders, financial institutions or investors, including, but not limited to, related Affiliates of Lender. In the event of an assignment, transfer or participation of the Loan, Borrower agrees to attorn to such assignee and to execute such consents thereto and other documentation as may reasonably be required to

73

facilitate such transaction, provided such consents and documentation shall not diminish Borrower's rights or add to the obligations or liabilities of Borrower or the amounts owed under the Loan (including with respect to any taxes due on the transaction, if any) above which would have resulted to Borrower or would have been incurred by Borrower had such assignment, transfer or participation not occurred. Borrower shall not assign this Agreement, the Loan proceeds to be advanced hereunder, or its rights hereunder.

Section 12.12    Strict Performance. Time is of the essence as to all matters provided for in this Agreement.

Section 12.13    Accrual of Interest Under the Note. Interest under the Note shall commence to accrue as of the date of disbursal or wire transfer by Lender (and shall thereafter accrue on the outstanding Loan balance), notwithstanding whether Borrower shall receive the benefit of such monies as of such date and even if such monies are held in escrow pursuant to the terms of any escrow arrangement or agreement. When monies are disbursed by wire transfer from Lender, then such monies shall be considered advanced at the time of the transmission of the wire rather than at the time of receipt thereof by the receiving party. Interest shall continue to accrue until Obligations are fully and finally paid to Lender in immediately available funds.

Section 12.14    Florida Law. The terms and conditions of this Agreement shall be governed by the laws of the State of Florida, exclusive of its conflict of laws principles.

Section 12.15    Invalidity. If any one or more of the provisions contained in this Agreement is declared or found by a court of competent jurisdiction to be invalid, illegal or unenforceable, such provision or portion thereof shall be deemed stricken and severed and the remaining provisions hereof shall continue in full force and effect; provided, however, that should any obligation of the Borrower be determined to be unenforceable, then thereafter Lender shall have no further obligation to make any Advance of the Loan.

Section 12.16    Binding Effect. This Agreement, subject to the provisions of Section 12.11, above, shall be binding upon and shall inure to the benefit of the respective permitted successors and assigns of Borrower and Lender.

Section 12.17    Execution of Counterparts. All Loan Documents may be executed in two or more counterparts, each of which shall be deemed an original, and each such document of which shall constitute one and the same instrument, and in making proof of any Loan Document, it shall not be necessary to produce or account for more than one such counterpart.

Section 12.18    Notice of Conduct. Borrower shall give Lender immediate written notice of any action or inaction by Lender or any agent or attorney of Lender in connection with the Loan Documents or the Obligations that may be actionable against Lender or any agent or attorney of Lender or a defense to payment of any Obligations of Borrower, including commission of a tort or violation of any contractual duty implied by law, and a reasonable opportunity to cure or correct such action or inaction. Upon request by Lender from time to time, Borrower also shall confirm to Lender in writing the status of the Loans and the Obligations, and provide other information reasonably requested by Lender.

Section 12.19   Examinations/Communications.   Lender's examinations, inspections, or receipt of information pertaining to the matters set forth in the Loan Documents shall not in any way be deemed to reduce the full scope and protection of the Loan Documents or the Obligations of any Loan Party related to the Loan Documents.  Lender shall have no duty or obligation of any nature to (i) make any investigation, inspection or review regarding any Collateral at any time, with any such investigation that is undertaken being solely for the benefit of Lender; or (ii) communicate in any manner with Borrower, irrespective of the fact that Lender's information, or lack thereof, could be material to Borrower's actions with respect to the Obligations.

Section 12.20   Borrower Cooperation.   Borrower shall cooperate, and shall cause Guarantor, any party to any Loan Document or any other person (to the extent possible), associated or connected with the Loan to cooperate in all respects with Lender in connection with any syndication, co-investing, leveraging or bifurcating the Loan by Lender.

Section 12.21   Monies.   All references to monies in this Agreement shall be deemed to mean lawful monies of the United States of America.

Section 12.22   Submission to Jurisdiction. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT, THE NOTE OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN ANY COURT OF THE STATE OF FLORIDA OR ANY COURT OF THE UNITED STATES OF AMERICA SITTING IN FLORIDA, AND ANY APPELLATE COURT FROM ANY OF THE FOREGOING, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. TO THE EXTENT PERMITTED BY LAW, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING, WITHOUT LITIGATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS.

Section 12.23   Waiver of Jury Trial, etc.   EACH PARTY HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY.  FURTHER, EACH PARTY HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF THE LENDER, NOR THE LENDER'S COUNSEL, HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION.  FINALLY, EACH PARTY HERETO ACKNOWLEDGES THAT THE PROVISIONS OF THIS PARAGRAPH ARE A MATERIAL INDUCEMENT TO THE LENDER'S EXECUTION OR ACCEPTANCE OF THIS AGREEMENT AND/OR THE OTHER LOAN DOCUMENTS.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, this Loan Agreement was executed, under seal, and delivered the day and year first above written.

BORROWER:

**NEWPORT 0 MITCHELL STREET, L.P.,**
a Delaware limited partnership

By: _____ (SEAL)
Olaf Kunkat
Authorized Signatory

**NEWPORT 76 FORSYTH STREET, L.P.,**
a Delaware limited partnership

By: _____ (SEAL)
Olaf Kunkat
Authorized Signatory

**NEWPORT 110 SPRING STREET, L.P.,** a
Delaware limited partnership

By: _____ (SEAL)
Olaf Kunkat
Authorized Signatory

[SIGNATURES CONTINUED ON FOLLOWING PAGE]

[Signature Page to Loan Agreement]

**NEWPORT 135 FORSYTH STREET,**
**L.P.,** a Delaware limited partnership

By: _____ (SEAL)
Olaf Kunkat
Authorized Signatory


**NEWPORT 136 PEACHTREE STREET,**
**L.P.,** a Delaware limited partnership

By: _____ (SEAL)
Olaf Kunkat
Authorized Signatory


**NEWPORT 138 PEACHTREE STREET,**
**L.P.,** a Delaware limited partnership

By: _____ (SEAL)
Olaf Kunkat
Authorized Signatory


**NEWPORT 140 MITCHELL STREET,**
**L.P.,** a Delaware limited partnership

By: _____ (SEAL)
Olaf Kunkat
Authorized Signatory


[SIGNATURES CONTINUED ON FOLLOWING PAGE]


[Signature Page to Loan Agreement]

**NEWPORT 140 SPRING STREET, L.P.,** a
Delaware limited partnership

By: _____ (SEAL)
Olaf Kunkat
Authorized Signatory


**NEWPORT 142 PEACHTREE STREET,
L.P.,** a Delaware limited partnership

By: _____ (SEAL)
Olaf Kunkat
Authorized Signatory


**NEWPORT 142-150 MITCHELL
STREET, L.P.,** a Delaware limited
partnership

By: _____ (SEAL)
Olaf Kunkat
Authorized Signatory


**NEWPORT 144 PEACHTREE STREET,
L.P.,** a Delaware limited partnership

By: _____ (SEAL)
Olaf Kunkat
Authorized Signatory


[SIGNATURES CONTINUED ON FOLLOWING PAGE]


[Signature Page to Loan Agreement]

**NEWPORT 168 TRINITY AVENUE, L.P.,**
a Delaware limited partnership

By: _____ (SEAL)
Olaf Kunkat
Authorized Signatory

**NEWPORT 170 MITCHELL STREET,**
**L.P.,** a Delaware limited partnership

By: _____ (SEAL)
Olaf Kunkat
Authorized Signatory

**NEWPORT 172 TRINITY AVENUE, L.P.,**
a Delaware limited partnership

By: _____ (SEAL)
Olaf Kunkat
Authorized Signatory

[SIGNATURES CONTINUED ON FOLLOWING PAGE]

[Signature Page to Loan Agreement]

**NEWPORT 222 MITCHELL STREET,
L.P.,** a Delaware limited partnership

By: _____ (SEAL)
Olaf Kunkat
Authorized Signatory

**NEWPORT 223 MITCHELL STREET,
L.P.,** a Delaware limited partnership

By: _____ (SEAL)
Olaf Kunkat
Authorized Signatory

**NEWPORT 235 MITCHELL STREET,
L.P.,** a Delaware limited partnership

By: _____ (SEAL)
Olaf Kunkat
Authorized Signatory

**NEWPORT GORDON COMMERCIAL
LOFTS, L.P.,** a Delaware limited partnership

By: _____ (SEAL)
Olaf Kunkat
Authorized Signatory

[SIGNATURES CONTINUED ON FOLLOWING PAGE]

The undersigned Guarantor and Pledgor joins in this Agreement for the purpose of confirming that all representations applicable to the Guarantor or Pledgor (as applicable) in this Agreement are true and for the purpose of agreeing to comply with all agreements, warranties and covenants contained in this Agreement that are applicable to the Guarantor or Pledgor (as applicable).

GUARANTOR:

_____(SEAL)
**OLAF KUNKAT**, individually


**NEWPORT SOUTH DOWNTOWN MASTER, L.P.**, a Delaware limited partnership

By: _____(SEAL)
Olaf Kunkat
Authorized Signatory


[SIGNATURES CONTINUED ON FOLLOWING PAGE]

[Signature Page to Loan Agreement]

PLEDGOR:

**NEWPORT SOUTH DOWNTWN**
**MASTER, L.P.,** a Delaware limited
partnership

By: _____ (SEAL)
Olaf Kunkat
Authorized Signatory

[SIGNATURES CONTINUED ON FOLLOWING PAGE]

[Signature Page to Loan Agreement]

**LENDER:**

**BI 68 LLC**, a Florida limited liability
company

By: _____ (SEAL)
    Name: Alex Hoy
    Title: Manager

[END OF SIGNATURES]

**EXHIBIT "A"**

LEGAL DESCRIPTION

SEE ATTACHED.

LEGAL DESCRIPTIONS

76 Forsyth Street:

Tract I:

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, City of Atlanta, Fulton County, Georgia and being more particularly described as follows:

Beginning at the intersection formed by the southwesterly right-of-way of Martin Luther King Jr. Drive, (f/k/a Hunter Street (variable right-of-way) and the southeasterly right-of-way of Forsyth Street (variable right-of-way); thence South 55 degrees 11 minutes 58 seconds East along the southwesterly right-of-way of Martin Luther King Jr. Drive a distance of 74.98 feet to a point; thence South 34 degrees 14 minutes 51 seconds West and departing said right-of-way a distance of 123.70 feet to a point; thence South 57 degrees 56 minutes 48 seconds East at distance of 8.27 feet to a point; thence North 34 degrees 35 minutes 31 seconds East a distance of 21.26 feet to a point; thence South 55 degrees 11 minutes 21 seconds East a distance of 90.52 feet to a point on the northwesterly right-of-way of the Broad Street (variable right-of-way); thence South 34 degrees 57 minutes 56 seconds West along the northwesterly right-of-way of Broad Street a distance of 41.56 feet to a point; thence North 55 degrees 07 minutes 14 seconds West and departing the right-of-way of Broad Street a distance of 92.16 feet to a point; thence South 35 degrees 05 minutes 40 seconds West a distance of 39.51 feet to a point; thence South 54 degrees 54 minutes 20 seconds East a distance of 0.66 feet to a point; thence South 34 degrees 17 minutes 53 seconds West a distance of 30.40 feet to a point; thence South 55 degrees 14 minutes 44 seconds East a distance of 7.00 feet to a point; thence South 34 degrees 45 minutes 23 seconds West a distance of 37.79 feet to a point; thence South 56 degrees 28 minutes 00 seconds East a distance of 15.01 feet to a point; thence South 33 degrees 40 minutes 30 seconds West a distance of 14.66 feet to a point; thence North 56 degrees 10 minutes 30 seconds West a distance of 103.67 feet to a point on the southeasterly right-of-way of Forsyth Street; thence Northeasterly along the right-of-way of Forsyth Street North 34 degrees 34 minutes 06 seconds East a distance of 113.55 feet to a point; thence North 34 degrees 12 minutes 00 seconds East a distance of 143.90 feet to the point of beginning. Said property containing 0.566 acre or 24,668 square feet.

The above-described property is more particularly shown as "76-78 Forsyth Street", containing 0.566 of an acre, and is described according to that certain ALTA/ACSM Land Title Survey prepared by Michael Dorman-Potthoff, Georgia Registered Land Surveyor No. 2597, Bock & Clark's National Surveyors Network, dated January 26, 2008, last revised April 3, 2008, said survey being incorporated herein by reference.

Tract II:

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, City of Atlanta, Fulton County, Georgia and being more particularly described as follows:

To reach the point of beginning commence at the intersection formed by the southwesterly right-of-way of Martin Luther King Jr. Drive f/k/a Hunter Street (variable right-of-way) and the southeasterly right-of-way of Forsyth Street (variable right-of-way); thence South 55 degrees 11 minutes 58 seconds East along the southwesterly right-of-way of Martin Luther King Jr. Drive a distance of 74.98 feet to a point; thence South 34 degrees 14 minutes 51 seconds West and departing said right-of-way a distance of 90.78 feet to the

point of beginning. Said the point of beginning thus established, proceed thence South 02 degrees 16 minutes 44 seconds West a distance of 10.27 feet to a point; thence South 34 degrees 35 minutes 31 seconds West a distance of 18.05 feet to a point; thence North 57 degrees 56 minutes 48 seconds West a distance of 8.27 feet to a point; thence North 34 degrees 14 minutes 51 seconds East a distance of 32.92 feet to the point of beginning. Said property containing 0.005 acre or 215 square feet.

The above-described property is more particularly shown as "76-78 Forsyth Street", containing 0.005 of an acre, and is described according to that certain ALTA/ACSM Land Title Survey prepared by Michael Dorman-Potthoff, Georgia Registered Land Surveyor No. 2597, Bock & Clark's National Surveyors Network, dated January 26, 2008, last revised April 3, 2008, said survey being incorporated herein by reference.

Less and Except:

Description for 69 Broad Street

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, of Fulton County, Georgia, and being more particularly described as follows:

Beginning at a point at the Southwesterly intersection of Martin Luther King Jr. Drive ( R/W varies) and Broad Street (R/W varies); thence running Southwesterly S 35°13'44" W a distance of 102.51 feet to a point, being the Point of Beginning. Thence from the Point of Beginning, continuing Southwesterly S 34°57'56" W a distance of 41.66 feet to a point. Thence running Northwesterly along the center of party wall between #89 and #93 Broad Street N 54°51'22" W a distance 90.23 feet to a point. Thence running Northeasterly N 34°57'56" W a distance of 41.66 feet to a point. Thence running Southeasterly along the center of party wall between #87 and #89 Broad Street S 54°51'22" E a distance of 90.23 feet to a point, being into the Point of Beginning.

Said tract or parcel containing 0.086 ± acres or 3,759 ± square feet.

**FURTHER LESS AND EXCEPT** any portion of the property set forth above contained within that certain Quit Claim Deed from Newport 76 Forsyth Street, L.P., a Delaware limited partnership to Newport 80 Forsyth Street, L.P., a Delaware limited partnership, dated June 23, 2021, filed June 30, 2021 and recorded in Deed Book 64045, Page 74, records of the Superior Court of Fulton County, Georgia.

Also described as:

All that tract or parcel of land lying and being in Land Lot #7 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

BEGINNING at a building corner at the intersection of the southerly right-of-way line of Martin Luther King Jr. Drive f/k/a Hunter Street (variable right-of-way) and the easterly right of way line of Forsyth Street (variable right-of-way); Thence along said right-of-way of Martin Luther King Jr. Drive f/k/a Hunter Street, South 55 degrees 31 minutes 43 seconds East a distance of 75.95 feet to a building corner and the westerly side of an alley; Thence leaving said right-of-way, along said alley, South 33 degrees 59 minutes 02 seconds West a distance of 99.60 feet to a building corner; Thence South 02 degrees 45 minutes 03 seconds West a distance of 16.30 feet to a point; Thence South 34 degrees 22 minutes 27 seconds West a distance of 36.75 feet to a point; Thence South 35 degrees 16 minutes 32 seconds West a distance of 29.80 feet to a point; Thence South 35 degrees 18 minutes 32 seconds West a distance of 0.87 feet to a point; Thence South 54 degrees 43 minutes 00 seconds East a distance of 0.69 feet to a point; Thence South 34 degrees 29 minutes 04 seconds West a distance of 30.40 feet to a point; Thence South 55 degrees 03 minutes 33 seconds East a distance of 7.00 feet to a point; Thence South 34 degrees 07 minutes 00 seconds West a distance of 37.68 feet to a point; Thence South 55 degrees 45 minutes 15 seconds East a distance of 15.20 feet to a point; Thence South 33 degrees 14 minutes 45 seconds West a distance of 15.43 feet to a point; Thence North 56 degrees 07 minutes 24 seconds West a distance of 103.92 feet to a building corner on the easterly right of way line of Forsyth Street; Thence along said right-of-way, the following courses and distances: North 34 degrees 17 minutes 50 seconds East a distance of 113.70 feet to a building corner; North 33 degrees 57 minutes 58 seconds East a distance of 143.66 feet to a building corner and the POINT OF BEGINNING.

Said tract of land contains 0.482 Acres/

**LESS AND EXCEPT** any portion of the property set forth above contained within that certain Quit Claim Deed from Newport 76 Forsyth Street, L.P., a Delaware limited partnership to Newport 80 Forsyth Street, L.P., a Delaware limited partnership, dated June 23, 2021, filed June 30, 2021 and recorded in Deed Book 64045, Page 74, records of the Superior Court of Fulton County, Georgia.

## 135 Forsyth Street:

### Tract I:

All that tract or parcel of land lying and being in the City of Atlanta, Georgia, in Land Lot 77 of the 14th District of Fulton County and being more particularly described as follows:

Commencing at the Southwest corner of Nelson and Forsyth Streets, running thence Westerly along the South side of Nelson Street, ninety (90) feet, more or less, to an alley; thence Southerly along the East side of said alley, one hundred five (105) feet to the property now or formerly owned by Hilkemeyer; thence Easterly along said Hilkemeyer property, ninety (90) feet to Forsyth Street; thence Northerly along the West side of Forsyth Street, one hundred five (105) feet to the point of beginning, being property known as 133-5-7-9 Forsyth Street, S.W., Atlanta, Georgia.

### Bonus Tract

All that tract or parcel of land lying and being in the City of Atlanta, Georgia, in Land Lot 77 of the 14th District of Fulton County, Georgia, and being more particularly described as follows:

Beginning at the intersection formed by the northerly side of Trinity Avenue and the northwesterly side of Forsyth Street; running thence northeasterly along the northwesterly side of Forsyth Street 56.3 feet to a point; running thence northwesterly, and at an interior angle of 87 degrees 50 minutes with the northwesterly side of Forsyth Street, 314.1 feet to an iron pin at the line of property now or formerly owned by Doris E. Pinson; running thence southwesterly, along the said property of Doris E. Pinson, 20.5 feet to a point; running thence southeasterly along the line of property of said Doris E. Pinson 56.9 feet to a point, and thence continuing southeasterly, but more southerly than the last line, along the property of said Doris E. Pinson, 20.2 feet to the northerly side of an alley; continuing thence southeasterly, but more easterly than the last line, 19 feet to a point; continuing thence southeasterly 79.85 feet to a point, and thence continuing southeasterly 132 feet to a point on the northerly side of Trinity Avenue; running thence easterly along the northerly side of Trinity Avenue 28.4 feet to the point of beginning, being shown on plat of survey of property of Allright Atlanta, Inc., dated December 17, 1964, prepared by Roy E. Housworth, Jr.

### Tract II:

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District of Fulton County, Georgia, being the same property as shown on plat of survey prepared for Allright Atlanta, Inc., dated March 19, 1968, and being more particularly described as follows:

Beginning at a nail on the North side of the right-of-way of Trinity Avenue 34.22 feet West from the Northwest corner of the intersection of Forsyth Street and Trinity Avenue; running thence North 89 degrees 15 minutes West along the North line of said right-of-way 106.24 feet to an iron pin; running thence North 0 degrees 23 minutes West 67.35 feet to an iron pin; running thence South 58 degrees 33 minutes East 120.18 feet to an iron pin; running thence South 46 degrees 51 minutes West 0.8 feet to an iron pin; running thence South 59 degrees 51 minutes East 5.44 feet to an iron pin; running thence South 0 degrees 26 minutes East 2.83 feet to a nail on the North side of the right-of-way of Trinity Avenue and the point of beginning.

Tract III

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District of Fulton County, Georgia, being the same property as shown on plat of survey prepared for Allright Atlanta, Inc., dated March 19, 1968 and being more particularly described as follows:

Beginning at an iron pin on the North side of the right-of-way of Trinity Avenue 140.46 feet West from the Northwest corner of the intersection of Trinity Avenue and Forsyth Street running thence North 89 degrees 15 minutes West 93.85 feet to an iron pin at the point where the North side of Trinity Avenue is intersected by the East side of a 10-foot alley; running thence North 0 degrees 23 minutes East 83.29 feet to an iron pin; running thence North 4 degrees 26 minutes West 32.7 feet to an iron pin; running thence South 65 degrees 3 minutes East 19.0 feet to an iron pin; running thence South 58 degrees 35 minutes East 76.85 feet to an iron pin; running thence South 0 degrees 23 minutes East 57.35 feet to an iron pin on the North side of Trinity Avenue and the point of beginning.

The above described tracts are further described as follows:

Tract I - 133 Forsyth Street

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

BEGINNING at a PK nail set at the intersection of the Northwesterly right-of-way line of Forsyth Street (60-foot right-of-way) and the Southwesterly right-of-way line of Nelson Street (50-foot right-of-way). Thence along said right-of-way line of Forsyth Street South 33 degrees 19 minutes 40 seconds West, a distance of 105.00 feet to a 5/8-inch rebar set; Thence departing said right-of-way North 56 degrees 16 minutes 08 seconds West, a distance of 90.00 feet to a PK nail set; Thence North 33 degrees 19 minutes 40 seconds East, a distance of 105.00 feet to a 5/8-inch rebar set located on the Southwesterly right-of-way line of Nelson Street; Thence along said right-of-way South 56 degrees 16 minutes 08 seconds East, a distance of 90.00 feet to a PK nail set, said PK nail set being the TRUE POINT OF BEGINNING;

Said tract of land contains 0.217 Acres.

143 Forsyth Street

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

BEGINNING at a PK nail set at the intersection of the Northwesterly right-of-way line of Forsyth Street (60-foot right-of-way) and the Northerly right-of-way line of Trinity Avenue (60-foot right-of-way). Thence along said right-of-way line of Trinity Avenue, North 88 degrees 59 minutes 28 seconds West, a distance of 42.73 feet to a PK nail set.

Thence departing said right-of-way North 00 degrees 26 minutes 24 seconds West, a distance of 2.63 feet to a point; thence North 59 degrees 36 minutes 49 seconds West, a distance of 5.44 feet to a point; thence North 47 degrees 05 minutes 11 seconds East, a distance of 0.80 feet to a point; thence North 58 degrees 18 minutes 38 seconds West, a distance of 120.17 feet to a PK Nail set; thence North 58 degrees 20 minutes 49 seconds West, a distance of 79.85 feet to a PK Nail set; thence North 64 degrees 48 minutes 49 seconds West, a distance of 19.00 feet to a PK Nail set; thence North 08 degrees 47 minutes 48 seconds West, a distance of 76.41 feet to a PK Nail set; thence North 30 degrees 06 minutes 48 seconds East, a distance of 19.07 feet to a PK Nail set; thence South 58 degrees 54 minutes 03 seconds East, a distance of 224.17 feet to a PK Nail set; thence South 58 degrees 16 minutes 08 seconds East, a distance of 90.00 feet to a 5/8-inch rebar set; Thence South 33 degrees 19 minutes 40 seconds West, a distance of 55.34 feet to a PK nail set at the intersection of the Northwesterly right-of-way line of Forsyth Street (60-foot right-of-way) and the Northerly right of way line of Trinity Avenue (50-foot right-of-way), said point being the **TRUE POINT OF BEGINNING.**

Said tract of land contains 0.609 Acres.

Tract II

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

Commencing at a PK nail set at the intersection of the Northwesterly right-of-way line of Forsyth Street (60-foot right-of-way) and the Northerly right of way line of Trinity Avenue (50-foot right-of-way); thence along said right-of-way line of Trinity Avenue thence North 88 degrees 59 minutes 28 seconds West, a distance of 42.73 feet to a PK nail set, said point being the **TRUE POINT OF BEGINNING**. Thence continue along said right-of-way North 88 degrees 59 minutes 28 seconds West, a distance of 106.24 feet to a PK nail set. Thence departing said right-of-way North 00 degrees 06 minutes 22 seconds West, a distance of 87.39 feet to a PK nail set; thence South 58 degrees 18 minutes 38 seconds East, a distance of 120.17 feet to a point; thence South 47 degrees 05 minutes 11 seconds West, a distance of 0.80 feet to a point; thence South 59 degrees 36 minutes 49 seconds East, a distance of 5.44 feet to a point; thence South 00 degrees 26 minutes 24 seconds East, a distance of 2.63 feet to a PK nail set located on the Northwesterly right-of-way line of Trinity Avenue, said PK nail set being the **TRUE POINT OF BEGINNING;**

Said tract of land contains 0.086 Acres.

Tract III

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

Commencing at a PK nail set at the intersection of the Northwesterly right-of-way line of Forsyth Street (60-foot right-of-way) and the Northerly right of way line of Trinity Avenue (50-foot right-of-way); thence along said right-of-way line of Trinity Avenue thence North 88 degrees 59 minutes 28 seconds West, a distance of 42.73 feet to a PK nail set. Thence continue along said right-of-way North 88 degrees 59 minutes 28 seconds West, a distance of 106.24 feet to a PK nail set; said PK nail set being the **TRUE**

POINT OF BEGINNING; Thence continue along said right-of-way North 88 degrees 59 minutes 28 seconds West, a distance of 83.85 feet to a PK nail found; Thence departing said right-of-way North 00 degrees 05 minutes 00 seconds West, a distance of 100.26 feet to a point; Thence North 88 degrees 59 minutes 28 seconds West, a distance of 41.76 feet to a point; Thence North 88 degrees 59 minutes 28 seconds West, a distance of 26.76 feet to a point; Thence North 88 degrees 59 minutes 28 seconds West, a distance of 22.55 feet to a point; Thence North 88 degrees 59 minutes 28 seconds West, a distance of 22.55 feet to a point; Thence North 01 degrees 02 minutes 33 seconds East, a distance of 14.77 feet to a 1-inch iron pin found; Thence South 89 degrees 25 minutes 12 seconds East, a distance of 112.01 feet to a PK nail set; Thence South 64 degrees 48 minutes 49 seconds East, a distance of 19.00 feet to a PK nail set; Thence South 59 degrees 20 minutes 49 seconds East, a distance of 79.85 feet to a PK nail set; Thence South 00 degrees 08 minutes 22 seconds East, a distance of 67.39 feet to a PK nail set located on the Northwesterly right-of-way line of Forsyth Street, said point being the TRUE POINT OF BEGINNING.

Said tract of land contains 0.217 Acres.

## 222 MITCHELL STREET:

Beginning at the intersection formed by the southeasterly right-of-way line of Spring Street and the southwesterly right-of-way line of Mitchell Street; thence South 55 degrees 55 minutes 57 seconds East, a distance of 425.96 feet to a building corner located at the intersection of the southwesterly right-of-way line of Mitchell Street with the northwesterly right-of-way line of Forsyth Street; thence, leaving said right-of-way line of Mitchell street, and along the said right-of-way of Forsyth Street, South 33 degrees 26 minutes 16 seconds West, a distance of 128.51 feet to a point; thence, continuing along said northwesterly right-of-way line, South 33 degrees 40 minutes 30 seconds West, a distance of 82.51 feet to a building corner located at the intersection of the northwesterly right-of-way line of Forsyth Street with the northeasterly right-of-way line of Nelson Street; thence, along said right-of-way line of Nelson Street, North 55 degrees 38 minutes 54 seconds West, a distance of 104.71 feet to a point; thence, continuing along said northeasterly right-of-way line of Nelson Street, North 56 degrees 12 minutes 50 seconds West, a distance of 80.10 feet to a point; thence, continuing along said right-of-way line of Nelson Street, North 55 degrees 45 minutes 39 seconds West, a distance of 44.51 feet to a point; thence continuing along said right-of-way line of Nelson Street, North 55 degrees 51 minutes 09 seconds West, a distance of 138.65 feet to a point; thence, continuing along said right-of-way line of Nelson Street, North 63 degrees 26 minutes 39 seconds West, a distance of 62.65 feet to a point located at the intersection of the northeasterly right-of-way line of Nelson Street with the southeasterly right-of-way line of Spring Street; thence, continuing along said right-of-way line of Spring Street, North 34 degrees 30 minutes 10 seconds East, a distance of 114.45 feet to a point; thence, continuing along said right-of-way of Spring Street, North 34 degrees 47 minutes 40 seconds East, a distance of 103.81 feet to the POINT OF BEGINNING.

Said tract containing 90,256 square feet (2.072 acres), more or less.

ALSO BEING DESCRIBED AS FOLLOWS:

## 222 Mitchell Street

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

**BEGINNING** at a PK nail set at the intersection formed by the southeasterly right-of-way line of Spring Street and the southwesterly right-of-way line of Mitchell Street; Thence along said right-of-way of Mitchell Street, South 56 degrees 11 minutes 52 seconds East a distance of 425.92 feet to a building corner located at the intersection of the southwesterly right-of-way line of Mitchell Street with the northwesterly right-of-way line of Forsyth Street; Thence along said right-of-way of Forsyth Street the following courses and distances: South 33 degrees 14 minutes 24 seconds West a distance of 128.51 feet to a building corner; South 33 degrees 17 minutes 31 seconds West a distance of 81.99 feet to a building corner at the intersection of the northwesterly right-of-way line of Forsyth Street with the northeasterly right-of-way line of Nelson Street; Thence along said right-of-way line of Nelson Street the following courses and distances: North 56 degrees 07 minutes 43 seconds West a distance of 104.97 feet to a building corner; North 56 degrees 24 minutes 42 seconds West a distance of 80.10 feet to a building corner; North 55 degrees 67 minutes 31 seconds West a distance of 44.51 feet to a PK nail set; North 56 degrees 03 minutes 01 seconds West a distance of 138.65 feet to a PK nail set; North 63 degrees 38 minutes 31 seconds West a distance of 62.65 feet to a PK nail set at the intersection of the northeasterly right-of-way line of Nelson Street with the southeasterly right-of-way line of Spring Street; Thence along said right-of-way of Spring Street the following courses and distances: North 34 degrees 18 minutes 18 seconds East a distance of 114.45 feet to a PK nail set; North 34 degrees 35 minutes 48 seconds East a distance of 103.80 feet to a PK nail set and the **TRUE POINT OF BEGINNING.**

Said tract of land contains 2.074 Acres.

**140 SPRING STREET:**

All that tract of land in Land Lot 77 of the 14th District, Fulton County, Georgia, a/k/a 140 Spring Street SW, Atlanta, Georgia, described as follows:

To find the Point of Beginning, commence at the intersection of the northern right-of-way line of Trinity Avenue with the southeastern right-of-way line of Spring Street, if said street lines were extended to form an angle instead of a curve, and run thence North 33 degrees 40 minutes 25 seconds East 68.14 feet to an iron pin found on the southeastern right-of-way line of Spring Street which is the Point of Beginning; and from said point of beginning, running thence North 33 degrees 40 minutes 25 seconds East along the Southeast side of Spring Street 75.66 feet to an iron pin found on the South line of property now or formerly belonging to T. Henry Clarke, IV and John Kenley Martin; thence South 89 degrees 50 minutes 20 seconds East along said Clarke and Martin property 92.43 feet to an iron pin found on the West line of property now or formerly belonging to Willis J. Dunn; thence South 00 degrees 01 minute 59 seconds East along said Dunn property 120.5 feet to an iron pin found on the northern right-of-way line of Trinity Avenue; thence North 89 degrees 58 minutes 29 seconds West along the northern right-of-way line of Trinity Avenue 109.14 feet to an iron pin set; thence clockwise along the arc of a 35.5-foot radius curve 60.46 feet (said arc being subtended by a chord bearing North 26 degrees 07 minutes 17 seconds West 64.31 feet) to the point of beginning.

Said property is shown as Tract 3, containing 0.3449 acres, according to plat of survey made March 23, 1981, revised March 30, 1981, by Travis Pruitt & Associates, P.C., Travis M. Pruitt, Sr., Registered Land Surveyor No. 1729, which plat is incorporated and made a part hereof, which said plat is recorded in Plat Book 121, Page 94, Fulton County, Georgia records.

ALSO DESCRIBED AS:

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

BEGINNING at a PK nail set at easterly most point of the radius intersection of the Southeasterly right-of-way line of Spring Street (60-foot right-of-way) and the Northerly right of way line of Trinity Avenue (60-foot right-of-way). Thence along said right-of-way line of Spring Street and following along a curve to the right having an arc length of 80.46 feet, with a radius of 35.50 feet, being subtended by a chord bearing of North 26 degrees 02 minutes 44 seconds West, for a distance of 64.31 feet to a PK nail set; thence North 34 degrees 44 minutes 58 seconds East, a distance of 75.67 feet to a 3/8-inch rebar found; thence departing said right-of-way South 88 degrees 45 minutes 47 seconds East, a distance of 92.43 feet to a PK nail set; thence South 01 degrees 02 minutes 33 seconds West, a distance of 5.31 feet to a 1-inch iron pin found; thence South 01 degrees 02 minutes 33 seconds West, a distance of 14.77 feet to a point; thence South 01 degrees 02 minutes 34 seconds West, a distance of 100.24 feet to a point located on the Northerly right of way line of Trinity Avenue ; thence along said right-of-way North 89 degrees 59 minutes 28 seconds West, a distance of 108.14 feet to a PK nail set, said PK nail set being the TRUE POINT OF BEGINNING;

Said tract of land contains 0.345 Acres

ALL THAT TRACT or parcel of land lying and being in Land Lot 77 of the 14th Land District of Fulton County, City of Atlanta, Georgia, being shown on a plat of survey for 104 Spring Street, L.L.C., Branch Banking and Trust Company, and Webb, Tanner & Powell, LLP, containing 0.859 acres, dated February 18, 2004, prepared by McClung Surveying Services, Inc., certified by Michael R. Noles, Georgia Registered Land Surveyor No. 2646, and being more particularly described according to said survey as follows:

BEGINNING at the point of intersection of the southwesterly right-of-way line of Nelson Street and the southeasterly right-of-way line of Spring Street; run thence along the southwesterly right-of-way line of Nelson Street South 64 degrees 33 minutes 00 seconds East 67.50 feet to a point; continue thence along said right-of-way South 57 degrees 46 minutes 33 seconds East 263.00 feet to a point; run thence South 31 degrees 48 minutes 55 seconds West 105.00 feet to a point; run thence North 60 degrees 49 minutes 00 seconds West 332.80 feet to a point marked by a rebar found on the southeasterly right-of-way line of Spring Street; run thence North 33 degrees 00 minutes 00 seconds East along said right-of-way line 114.70 feet to a point, said point being the TRUE PLACE OR POINT OF BEGINNING.

Said Parcel Also Being Described As Follows:

110 Spring Street

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

BEGINNING at a 5/8-inch rebar set at the intersection of the Southeasterly right-of-way line of Spring Street (60-foot right-of-way) and the Southerly right-of-way line of Nelson Street (50-foot right-of-way), Thence along said right-of-way line of Nelson Street, South 62 degrees 59 minutes 50 seconds East a distance of 67.50 feet to a 5/8-inch rebar set;
Thence South 56 degrees 13 minutes 23 seconds East a distance of 263.00 feet to a PK nail set; Thence leaving said right-of-way, South 33 degrees 22 minutes 05 seconds West a distance of 105.00 feet to a PK nail set; Thence North 58 degrees 54 minutes 03 seconds West a distance of 214.59 feet to a PK nail set; Thence North 59 degrees 55 minutes 22 seconds West a distance of 118.22 feet to a 5/8-inch rebar set on the Southeasterly right-of-way line of Spring Street; Thence

**110 SPRING STREET:**

along said right-of-way, North 34 degrees 33 minutes 10 seconds East a distance of 114.70 feet to a 5/8-inch rebar set at the intersection of the Southeasterly right-of-way line of Spring Street and the Southerly right-of-way line of Nelson Street, said point being the **TRUE POINT OF BEGINNING.**

Said tract of land contains 0.854 Acres.

As shown on ALTA/NSPS Land Title Survey titled "110 Spring Street" for AFP II Hank, LLC, Newport 110 Spring Street, L.P. and Stewart Title Guaranty Company, prepared by GeoSurvey, Ltd., bearing the seal and certification of David L. Hester, Georgia Registered Land Surveyor No. 3042, dated May 4, 2017, revised August 9, 2017.

**Tract 2:**

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

BEGINNING at a 5/8-inch rebar set at the intersection of the Southeasterly right-of-way line of Spring Street (60-foot right-of-way) and the Southerly right-of-way line of Nelson Street (50-foot right-of-way), Thence along said right-of-way line of Nelson Street, South 62 degrees 59 minutes 50 seconds East a distance of 67.50 feet to a 5/8-inch rebar set; Thence South 56 degrees 13 minutes 23 seconds East a distance of 263.00 feet to a PK nail set; said PK nail set being the TRUE POINT OF BEGINNING. Thence continuing along said right-of-way, South 58 degrees 55 minutes 06 seconds East a distance of 9.50 feet to a PK nail set; Thence leaving said right-of-way, South 33 degrees 19 minutes 40 seconds West a distance of 105.00 feet to a PK nail set; Thence North 58 degrees 54 minutes 03 seconds West a distance of 9.58 feet to a PK nail set; Thence North 33 degrees 22 minutes 05 seconds East a distance of 105.00 feet to a PK nail set on the Southerly right-of-way line of Nelson Street, said PK nail set being the TRUE POINT OF BEGINNING.

Said tract of land contains 0.023 Acres.

## 223 MITCHELL STREET:

All that tract or parcel of land lying and being in the City of Atlanta, in Land Lot 77 of the 14th District of Fulton County, Georgia, more particularly described as follows:

BEGINNING at a point on the northeasterly side of Mitchell Street 214 feet, more or less, northwesterly along the northeasterly side of Mitchell Street from the corner formed by the northeasterly side of Mitchell Street and the northwesterly side of Forsyth Street, said beginning point being at the northwesterly line of property now or formerly owned by H. H. Dean, Jr., Mrs. Helen Dean Wright, Mrs. Carol Dean Spratlin and Mrs. Dorothy Dean Harris, and running thence northwesterly along the northeasterly side of Mitchell Street 50 feet, more or less, to the southeasterly line of property now or formerly owned by O'Keef Realty Company; thence northeasterly along said line and along the southeasterly line of property now or formerly owned by H. H. Dean, Jr., 178 feet, more or less, to the southwesterly line of property now or formerly owned by C. H. Johnson; thence southeasterly along said line 50.55 feet, more or less, to the northwesterly line of said property now or formerly owned by H. H. Dean, Jr., et al; thence southwesterly along said line 178 feet, more or less, to the northeasterly side of Mitchell Street and the point of beginning; being improved property known as Nos. 223 and 225 Mitchell Street, S.W., (formerly known as No. 55 West Mitchell Street), according to the present numbering in the City of Atlanta, and being the same property conveyed by L. and H. Realty Company to W. V. Merriman and E. P. Merriman by warranty deed dated October 15, 1948, recorded in Deed Book 2370, page 333, Fulton County Records.

Said property also being described as:

### 223 Mitchell Street

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

Commencing at a building corner at the intersection of the Easterly right-of-way line of Spring Street and the Northerly right-of-way line of Mitchell Street, Thence along said right-of-way of Mitchell Street the following courses and distances: South 56 Degrees 06 Minutes 19 Seconds East a distance of 50.00 feet to a Building Corner; South 56 Degrees 05 Minutes 08 Seconds East a distance of 50.09 feet to a Building Corner; South 56 Degrees 05 Minutes 08 Seconds East a distance of 62.69 feet to a Building Corner and the **POINT OF BEGINNING**. Thence leaving said right-of-way, North 33 degrees 51 minutes 57 seconds East a distance of 132.40 feet to a point on the building

line; Thence North 33 degrees 51 minutes 57 seconds East a distance of 45.60 feet to a 5/8-inch rebar set; Thence South 56 degrees 08 minutes 36 seconds East a distance of 50.55 feet to a 5/8-inch rebar set; Thence South 33 degrees 58 minutes 02 seconds West a distance of 178.00 feet to a Building Corner on the Northerly right-of-way line of Mitchell Street, Thence along said right-of-way of Mitchell Street, North 56 degrees 08 minutes 38 seconds West a distance of 50.31 feet to a Building Corner and the **POINT OF BEGINNING.**

Said tract of land contains 0.206 Acres.

227 MITCHELL STREET:

## 231 Mitchell Street (aka 227 Mitchell Street)

All that tract or parcel of land lying and being in the City of
Atlanta, in Land Lot 77 of the 14th District of Fulton County,
Georgia, and being a part of City Lot 3 in Block B of the
original subdivision of Land Lot 77 of said District and County,
and more particularly described as follows:

BEGINNING at a point on the northeasterly side of Mitchell
Street, which point is located 100.1 feet southeasterly from the
intersection formed by the northeasterly side of Mitchell Street
with the southeasterly side of Spring Street, said point of
beginning being at the southeastern line of property now or
formerly belonging to McCarty; thence southeasterly, along the
northeastern side of Mitchell Street 62.6 feet to the line of
property now or formerly belonging to L & H Realty Company, Inc.;
thence northeastwardly along the line of said L & H Realty Co.,
Inc. property 132.4 feet to the southwestern line of the property
now or formerly belonging to H. H. Dean; thence northwestwardly
along the southwestern side of the Dean property, 61.15 feet to
the southeastern line of a 19-foot alley; thence southwesterly,
across the end of said 19-foot alley, and along the southeastern
line of the property now or formerly belonging to McCarty, 132.5
feet to the point of beginning; being improved property known as
Nos. 227-229-231 Mitchell Street, S.W., according to the present
system of numbering property in the City of Atlanta, as more
fully shown on plat of survey prepared by L. H. Fitzpatrick,
C.E., dated February, 1950.

The above described property is conveyed together with all right,
title and interest in and to a 19-foot alley extending from the
northwest corner of the within described property in a general
northwestern direction to the southeastern side of Spring Street.

### Said Parcel Also Being Described As Follows:

## 231 Mitchell Street (aka 227 Mitchell Street)

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County,
Georgia, and being more particularly described as follows:

Commencing at a building corner at the intersection of the Easterly right-of-way line of Spring
Street and the Northerly right-of-way line of Mitchell Street, Thence along said right-of-way of
Mitchell Street the following courses and distances: South 56 Degrees 06 Minutes 19 Seconds

East a distance of 50.00 feet to a Building Corner; South 56 Degrees 05 Minutes 08 Seconds West a distance of 50.09 feet to a Building Corner and the **POINT OF BEGINNING**. Thence leaving said right-of-way, North 34 Degrees 25 Minutes 00 Seconds East a distance of 117.00 feet to a PK nail set; Thence North 35 Degrees 24 Minutes 36 Seconds East a distance of 15.45 feet to a PK nail set; Thence South 56 Degrees 02 Minutes 53 Seconds East a distance of 61.15 feet to a point; Thence South 33 Degrees 51 Minutes 57 Seconds West a distance of 132.40 feet to a building corner on the Northerly right-of-way line of Mitchell Street; Thence along said right-of-way, North 56 Degrees 05 Minutes 08 Seconds West a distance of 52.69 feet to a building corner and the **POINT OF BEGINNING**.

Said tract of land contains 0.189 Acres.

233 MITCHELL STREET:

All that tract or parcel of land lying and being in the City of
Atlanta in Land Lot 77 of the 14th District of Fulton County,
Georgia, more particularly described as follows:

BEGINNING at a point on the northeastern side of Mitchell Street
50 feet, more or less, southeastwardly from the corner formed by
the intersection of the northeastern side of Mitchell Street with
the southeastern side of Spring Street (formerly Thompson Street)
which point is at the southernmost corner of property now or
formerly owned by Samuel M. Inman; running thence in a
southeasterly direction along the northeastern side of Mitchell
Street 50 feet, more or less, to the westernmost corner of the
property conveyed by O'Keefe Realty Company to Bernard Walter
Cohen, Freoda Freedman Cohen and Gertrude Cohen Sandusky by
warranty deed dated February 13, 1950, and recorded in Deed Book
2480, page 214, Fulton County Records; thence in a northeasterly
direction along the northwestern line of said property 117 feet,
more or less, to a 19 foot alley; thence in a northwesterly
direction along the southwestern side of said alley 50 feet, more
or less, to the easternmost corner of the Inman property
hereinabove referred to; thence in a southwesterly direction
along the southeastern line of said property 117 feet, more or
less, to the northeastern side of Mitchell Street and the point
of beginning, and being improved property known as Nos. 233-235
Mitchell Street, S.W., according to the present numbering of
houses in the City of Atlanta.

Said Parcel Also Being Described As Follows:

### 233 Mitchell Street

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County,
Georgia, and being more particularly described as follows:

Commencing at a building corner at the intersection of the Easterly right-of-way line of Spring
Street and the Northerly right-of-way line of Mitchell Street; Thence along said right-of-way of
Mitchell Street the following courses and distances: South 56 Degrees 06 Minutes 19 Seconds
East a distance of 50.00 feet to a Building Corner and the **POINT OF BEGINNING**; Thence
leaving said right-of-way; North 34 Degrees 27 Minutes 36 Seconds East a distance of 117.00
feet to a PK nail set; Thence South 56 Degrees 05 Minutes 08 Seconds East a distance of 50.00
feet to a PK nail set; Thence South 34 Degrees 25 Minutes 00 Seconds West a distance of 117.00
feet to a building corner on the Northerly right-of-way line of Mitchell Street, Thence along said
right-of-way of Mitchell Street, North 56 Degrees 05 Minutes 08 Seconds West a distance of
50.09 feet to a Building Corner and the **POINT OF BEGINNING.**

Said tract of land contains 0.134 Acres.

## 211-221 MITCHELL STREET:

All that certain lot, tract or parcel of land situated, lying and being in the City of Atlanta, in Land Lot 77 of the 14th District of Fulton County, Georgia, as more particularly described as follows:

Commencing at a point located at the Northwestern corner of the intersection formed by the rights-of-way of Mitchell and Forsyth Streets; running thence along the Northern edge of the right-of-way of Mitchell Street in a Northwesterly direction for a distance of 107.03 feet to a point, being the POINT OF BEGINNING (said point also being the Southeast corner of the property hereby described); running thence North 55. 02' 53" West along the Northern edge of the right-of-way of Mitchell Street (at the boundary line between buildings and concrete sidewalk) for a distance of 106 feet to a point (said point being the Southwest corner of the property hereby described); running thence North 34. 53' 57" East for a distance of 181.22 feet to a point located at property of the United States Postal Service (said point being the Northwestern corner of the property hereby described); running thence South 55. 40' 40" East for a distance of 106 feet to a point (said point being the Northeast corner of the property hereby described); running thence South 34. 58' 22" West for a distance of 181.36 feet to the point of beginning; being improved property known as 211-221 Mitchell Street, Southwest, according to the present numbering system of the City of Atlanta; being the same property conveyed by Deed dated the 17th day of May, 1963, by H. R. Dean, Jr., Mrs. Helen Dean Wright, Mrs. Carol Dean Sprahlin and Mrs. Dorothy Dean Harris to Rockcliffe Corporation as recorded in the Office of the Clerk of the Superior Court of Fulton County, Georgia in Deed Record Book 4060, Folio 591.

The above-described property is more particularly shown in that certain survey plat dated October 8, 1984, entitled "Land Lot 77, 14th District, Fulton County, Georgia" prepared by Josh L. Lewis, III, Georgia Registered Land Surveyor, No. 1751 for Atlanta Investments Limited, which survey plat by this reference is hereby incorporated herein and made a part hereof for the purpose for more particularly describing the metes and bounds of said property, a copy of said survey plat being recorded in the Office of the Clerk of the Superior Court of Fulton County, Georgia in map or plat record book 137, page 110.

**LESS AND EXCEPT:**

Units 1-19 and Office Unit of Gordon Lofts, a Condominium, as per Survey for Gordon Lofts Condominium Association, Inc., prepared by J.A. Evans & Assoc., bearing the seal of James A. Evans, Jr., Georgia Registered Land Surveyor No. 2167, dated February 17, 1998, filed for record July 26, 1998, recorded in Condominium Plat Book 11, Page 14, Records of Fulton County, Georgia; and Floor Plans of Gordon Lofts Condominiums prepared by Camp Architects, Inc., bearing the seal of William Carlisle Camp, Georgia Registered Architect No. RA004080, dated February 7, 1998, revised February 19, 1998, filed for record March 26, 1998 at 8:56 a.m., recorded in Condominium File Cabinet 2, Folder 343, aforesaid Records, and as more particularly described and delineated in that certain Declaration of Condominium for Gordon Lofts, a Condominium, recorded in Deed Book 24149, Page 148, aforesaid Records.

Said Parcel Also Being Described as Follows:

Legal Description

"Gordon Retail"

211-221 Mitchell Street

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

Commencing at a building corner at the intersection of the Easterly right-of-way line of Spring Street and the Northerly right-of-way line of Mitchell Street, Thence along said right-of-way of Mitchell Street the following courses and distances: South 56 Degrees 06 Minutes 19 Seconds East a distance of 50.00 feet to a Building Corner; South 56 Degrees 05 Minutes 08 Seconds East a distance of 50.09 feet to a Building Corner; South 56 Degrees 05 Minutes 08 Seconds East a distance of 62.69 feet to a Building Corner; South 56 Degrees 08 Minutes 38 Seconds East a distance of 50.31 feet to a Building Corner and the **POINT OF BEGINNING**. Thence leaving said right-of-way, North 33 Degrees 58 Minutes 02 Seconds East a distance of 182.32 feet to a point; Thence South 55 Degrees 44 Minutes 00 Seconds East a distance of 106.31 feet to a point; Thence South 33 Degrees 47 Minutes 25 Seconds West a distance of 181.38 feet to a Building Corner on the northern right-of-way of Mitchell Street; Thence along said right-of-way, North 56 Degrees 14 Minutes 12 Seconds West a distance of 106.87 feet to a Building Corner and the **POINT OF BEGINNING**.

Said tract of land contains 0.445 Acres.

0 Mitchell Street

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District of Fulton County in the City of Atlanta, Georgia; said tract containing 5856.7 S. F., of Parcel D6009 as shown on Property Disposal Map of the South Line of the Metropolitan Atlanta Rapid Transit Authority, said tract being more particularly described as follows:

Beginning at a nail at the point of intersection of the southerly right-of-way of Mitchell Street, said right-of-way varies and the easterly right-of-way of Broad Street, said right-of-way being 70 feet; thence south 54°16'07" east, 53.30 feet along the southerly right-of-way of Mitchell Street to a point on the northwesterly side of a 10 foot alley; thence leaving the said right-of-way, south 33°29'29" west, 109.88 feet along the northwesterly side of said alley to a point; thence south 33°29'12" west, 3.66 feet to a point on the north property line of that tract conveyed by the City of Atlanta to Joseph Herron, et al., at Deed Book 13329, Page 46, Fulton County, Georgia records; thence north 52°51'54" west, 51.72 feet to a point on the easterly right-of-way of Broad Street; thence north 33°19'47" east, 109.88 feet along the easterly right-of-way of Broad Street to a nail and the POINT OF BEGINNING.

Said Parcel Also Being Described As Follows:

Legal Description
0 Mitchell Street

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

BEGINNING at a pk nail set at the intersection of the Easterly right-of-way line of Broad Street (70-foot right-of-way) and the southerly right of way line of Mitchell Street (60-foot right-of-way), Thence along the Southerly right-of-way line of Mitchell Street, South 53 degrees 57 minutes 32 seconds East a distance of 53.30 feet to a PK nail set; Thence leaving said right-of-way, South 34 degrees 07 minutes 55 seconds West a distance of 109.88 feet to a PK nail set; Thence South 34 degrees 07 minutes 47 seconds West a distance of 3.66 feet to a PK nail set; Thence North 51 degrees 53 minutes 19 seconds West a distance of 51.72 feet to a PK nail set on the Easterly right-of-way line of Broad Street; Thence along said right-of-way, North 33 degrees 14 minutes 22 seconds East a distance of 109.88 feet to a PK nail set and the POINT OF BEGINNING.

Said tract of land contains 0.134 Acres.

As shown on ALTA/NSPS Land Title Survey titled "0 Mitchell Street" for NEWPORT 0 Mitchell Street, L.P., Stewart Title Guaranty Company, and AFF II Bank, LLC, prepared by GeoSurvey, Ltd., bearing the seal and certification of David L. Hester, Georgia Registered Land Surveyor No. 3042, dated March 2, 2017, revised July 31, 2017.

## 142-150 Mitchell Street

All that tract or parcel of land lying and being in the City of Atlanta in Land Lot 77 of the 14th District of Fulton County, Georgia, being more particularly described as follows:

Beginning at a point on the southwest side of Mitchell Street 87.00 feet southeast from the intersection of the southwest side of Mitchell Street and the southeast side of Whitehall Street (which point is the southeast side of an alley) and extending thereon southeast along the southwesterly side of Mitchell Street 102.60 feet to the property conveyed by the executor of the Will of A.K. Hawkes, deceased, to C.D. Palmer, et al., by deed recorded in Deed Book 603, Page 264, Fulton County, Georgia Records; thence southwest 100.00 feet; then northwest 34.30 feet to the southeast line of property conveyed to J.C. Sterchi by deed recorded in Deed Book 375, Page 491, Fulton County, Georgia Records, thence southwest 14.00 feet; thence northwest 50.70 feet to the alley above referred to; thence northeasterly along the southeasterly side of said alley 37.10 feet; thence continuing along said alley in a northwesterly direction 25.3 feet; thence in a northeasterly direction along the southeasterly side of said alley 65.00 feet to the POINT OF BEGINNING; said premises improved property known as 142-150 (formerly 7-15) Mitchell Street, according to the present system of numbering houses in the City of Atlanta and being the same property deeded to the grantor herein by the herein by the Phoenix Mutual Life Insurance Company by deed recorded in Deed Book 1777, Page 173.

Also all that tract or parcel of land lying and being in the City of Atlanta in Land Lot 77 of the 14th District Fulton County, Georgia, being more particularly described as follows:

Beginning at a point 100.00 feet southwest from a point on the southwest side of Mitchell Street located 154.85 feet southeast from the southeast corner of Mitchell and Whitehall Streets, said POINT OF BEGINNING being at a corner of a brick building and is located 13.85 feet southwest from the southwest corner of a four-story brick building and it located 13.85 feet southwest from the southeast corner of a four story brick building at 142 Mitchell Street; thence southeast 34.60 feet to the corner of another brick building located 14.20 feet southwest from the southeast corner of said four-story brick building, said corner being also 100.00 feet southwest from Mitchell Street; thence northwest 27.60 feet; thence northwest 34.60 feet; thence northeast 24.30 feet to the POINT OF BEGINNING, in accordance with plat made by J.W. Bumpit, C.E., dated March 13, 1941, and being all of the same property deeded by the administrator or de bonis non cum testimento annexo of A.K. Hawkes to M.D. Porter, recorded in Deed Book 1797, Page 330, Fulton County, Georgia Records.

Also a 100% undivided interest in and to all condominium units being identified and depicted in survey for Counsel House, A Condominium prepared by David H. Lynch, Registered Surveyor, dated December 23, 1983, recorded in Condominium Plat Book 7, at Page 14, Fulton County, Georgia Records and on architectural plans for said Counsel House, A Condominium, drawn and certified by Alan K. Patrick, Architect, recorded in File Folder 185, Condominium File Cabinet 2, Fulton County, Georgia Records, as amended, together with all interest in the common elements of said Counsel House, A Condominium, as provided in that certain Declaration of Condominium for Counsel House, A Condominium, dated December 27, 1983, and recorded in Deed Book 8777, at Page 171, Fulton County, Georgia Records, amended by First Amendment of said Declaration executed November 30, 1984, and recorded in Deed Book 9275, Page 151, said records; by a Second Amendment to said Declaration dated December 13, 1984 and recorded in Deed Book 9296, at Page 413, said records; and by a Third Amendment thereto, dated December 19, 1984, and recorded in Deed Book 9305, at Page 180, said records, as now or hereafter amended as provided therein.

Said Parcel Also Being Described as Follows:

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia; and being more particularly described as follows:

Commencing at a PK nail set at the intersection of the Easterly right-of-way line of Peachtree Street (formerly known as Whitehall Street) (60-foot right-of-way) and the southerly right-of-way line of Mitchell Street (apparent 60-foot right-of-way), Thence along said right-of-way of Mitchell Street, South 56 Degrees 00 Minutes 21 Seconds East a distance of 75.12 feet to a PK nail found; Thence continuing along said right-of-way, South 56 Degrees 00 Minutes 21 Seconds East a distance of 12.00 feet to a PK nail set, said PK nail set being the TRUE POINT OF BEGINNING. Thence continuing along said right-of-way, South 56 Degrees 00 Minutes 21 Seconds East a distance of 102.60 feet to a PK nail set. Thence leaving said right-of-way, South 34 Degrees 17 Minutes 56 Seconds West a distance of 100.00 feet to a PK nail set; Thence North 56 Degrees 10 Minutes 34 Seconds West a distance of 34.80 feet to a PK nail set; Thence South 34 Degrees 44 Minutes 53 Seconds West a distance of 14.00 feet to a PK nail found; Thence North 55 Degrees 52 Minutes 29 Seconds West a distance of 49.89 feet to a PK nail set on the easterly side of an alley; Thence along said alley the following courses and distances: North 34 Degrees 44 Minutes 53 Seconds East a distance of 31.00 feet to a building corner; North 11 Degrees 38 Minutes 56 Seconds West a distance of 25.29 feet to a building corner; North 34 Degrees 24 Minutes 56 Seconds East a distance of 65.31 feet to a PK nail set on the southerly right-of-way line of Mitchell Street and the POINT OF BEGINNING.

As shown on ALTA/NSPS Land Title Survey titled "142-150 Mitchell Street" for Newport 142-150 Mitchell Street, L.P. and Stewart Title Guaranty Company, prepared by GeoSurvey, Ltd., bearing the seal and certification of David L. Hester, Georgia Registered Land Surveyor No. 3042, dated January 24, 2017, last revised June 16 2017.

## 168 Trinity Street

ALL THAT TRACT or parcel of land lying and being in the Land Lot 77 of the 14th District of Fulton County, Georgia, more particularly described as follows:

BEGINNING at a point on the southwest side of Trinity Avenue (formerly Peters Street) 134 feet southeast of the intersection of the southwest side of Trinity Avenue with the southeast side of Whitehall Street) and running thence southeast along the southwest side of Trinity Avenue 41 feet to a 10-foot alley; thence southwest along said alley 104.6 feet; thence northwest 40.4 feet; thence northeast 104.3 feet to the point of beginning; being improved property known as Nos. 168-170 Trinity (old No. 48) Avenue, S.W., Atlanta, Georgia.

Being the same property conveyed to Louis D. Zakas, as to a 50%-undivided interest, Dennis L. Zakas, as to a 12.5% undivided interest, Marietta Edensula Zakas, as to a 12.5% undivided interest, Elizabeth E. Johnston, as Trustee for Virginia Matthews Zakas, as to a 12.5% undivided interest, and Elizabeth E. Johnston, as Trustee for Nancy Page Zakas, as to a 12.5% undivided interest, by Thomas E. Spratley on November 30, 2004 and recorded in Deed Book 38945 Page 391, Fulton County, Georgia.

## Said Parcel Also Being Described as Follows:

### 168 Trinity Avenue

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

Commencing at a point at the intersection of the Easterly right-of-way line of Peachtree Street (formerly known as Whitehall Street) (60-foot right-of-way) and the southerly right-of-way line of Trinity Avenue (apparent 60-foot right-of-way), Thence along said right-of-way of Trinity Avenue, South 55 degrees 53 minutes 51 seconds East a distance of 93.91 feet to a Building Corner; Thence continuing along said right-of-way, South 55 degrees 53 minutes 51 seconds East a distance of 40.00 feet to a point, said point being the TRUE POINT OF BEGINNING; Thence continuing along said right-of-way, South 55 degrees 53 minutes 51 seconds East a distance of 41.00 feet to a Building Corner on the westerly edge of a 10' alley; Thence leaving said right-of-way, along said alley, South 34 degrees 24 minutes 50 seconds, West a distance of 105.02 feet to a PK nail set; Thence North 55 degrees 08 minutes 42 seconds West a distance of 40.53 feet to a point; Thence North 34 degrees 09 minutes 03 seconds East a distance of 104.48 feet to a point on the southerly right-of-way line of Trinity Avenue and the POINT OF BEGINNING.

Said tract of land contains 0.098 Acres.

As shown on ALTA/NSPS Land Title Survey titled "168-172 Trinity Avenue" for Newport 168 Trinity Avenue, L.P., Newport 172 Trinity Avenue, L.P., and Stewart Title Guaranty Company, prepared by GeoSurvey, Ltd., bearing the seal and certification of David L. Hester, Georgia Registered Land Surveyor No. 3042, dated January 24, 2017, last revised June 16, 2017.

**138 PEACHTREE STREET**

All That Tract or Parcel of Land Lying and Being in the City of Atlanta in Land Lot 77 of the
14th District of Fulton County, Georgia, more particularly described as follows:

Beginning at a point on the east side of Peachtree Street (formerly Whitehall Street) twenty-eight
(28) feet south from the southeast corner of Peachtree (Formerly Whitehall) and Mitchell Streets;
said point of beginning being at the southwest corner of property now or formerly owned by
Mrs. Josephine E. Jennings, et al; thence south along the east side of Peachtree Street (formerly
Whitehall Street) forty-one (41) feet to property now or formerly owned by Alvin B. Cates;
thence east along the north line of the Cates property seventy-five (75) feet to a twelve (12) foot
alley; thence north along the west side of said alley forty-one (41) feet to the Jennings property
aforesaid; thence west along the south line of said property seventy-five (75) feet to Peachtree
Street (formerly Whitehall Street) at the point of beginning; being improved property known as
Numbers 138-140 Peachtree Street (formerly Whitehall Street), SW, according to the present
system of numbering houses in the City of Atlanta.

Said Parcel Also Being Described as Follows:

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton
County, Georgia, and being more particularly described as follows:

Commencing at a PK nail set at the intersection of the Easterly right-of-way line of Peachtree
Street (formerly known as Whitehall Street) (60-foot right-of-way) and the southerly right-of-
way line of Mitchell Street (apparent 60-foot right-of-way); Thence along said right-of-way
Peachtree Street, South 34 Degrees 26 Minutes 17 Seconds West a distance of 28.00 feet to a PK
nail set, said PK nail set being the **TRUE POINT OF BEGINNING**. Thence leaving said right-
of-way, South 56 Degrees 00 Minutes 21 Seconds East a distance of 75.13 feet to a point on the
westerly side of an alley; Thence along said alley, South 34 Degrees 15 Minutes 51 Seconds
West a distance of 41.00 feet to a point; Thence leaving said alley, North 56 Degrees 00 Minutes
21 Seconds West a distance of 75.26 feet to a PK nail set on the Easterly right-of-way line of
Peachtree Street (formerly known as Whitehall Street); Thence North 34 Degrees 26 Minutes 17
Seconds East a distance of 41.00 feet to a PK nail set and **POINT OF BEGINNING**.

Said tract of land contains 0.071 Acres.

## 142 PEACHTREE STREET

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District of Fulton County, Georgia, and being more particularly described as follows:

BEGINNING at a point found on the southeasterly side of the right-of-way of Peachtree Street (50 foot right-of-way), which point is 68.9 feet southwesterly from the intersection formed by the southeasterly side of the right-of-way of Peachtree Street with the southwesterly side of the right-of-way of Mitchell Street; running thence south 53 degrees 49 minutes 35 seconds east, 75.00 feet to a point; running thence south 13 degrees 36 minutes 41 seconds east, along the southwesterly side of a 12 foot alley, 26.23 feet to a point; running thence south 36 degrees 00 minutes 35 seconds west, along the northwesterly side of said alley, 27.34 feet to a point; running thence north 53 degrees 57 minutes 50 seconds west, 95.00 feet to a point located on the southeasterly side of the right-of-way of Peachtree Street; running thence north 36 degrees 01 minute 35 seconds east, along the southeasterly side of the right-of-way of Peachtree Street, 44.50 feet to the point of beginning, being improved property having a two-story brick building thereon, known as 142-144 Peachtree Street, according to the present system of numbering in the City of Atlanta, Georgia, and being shown on survey for Despo Zakas, made by Kenneth L. Nutt, Georgia Registered Land Surveyor No. 2104, and dated May 24, 1983.

The within and foregoing being the same property conveyed from Donald Turner to Despo Zakas by Quitclaim Deed dated May 27, 1983, and recorded in Deed Book 8495, Page 277, Fulton County, Georgia Records.

Less and except:

### 144 Peachtree Street

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

Commencing at a PK nail set at the intersection of the Easterly right-of-way line of Peachtree Street (formerly known as Whitehall Street) (60-foot right-of-way) and the southerly right-of-way line of Mitchell Street (apparent 60-foot right-of-way). Thence along said right-of-way Peachtree Street, South 34 Degrees 26 Minutes 17 Seconds West a distance of 28.00 feet to a PK nail set; Thence continuing along said right-of-way, South 34 Degrees 26 Minutes 17 Seconds West a distance of 41.00 feet to a PK nail set; Thence continuing along said right-of-way, South 34 Degrees 26 Minutes 17 Seconds East a distance of 16.69 feet to a point; said point being the TRUE POINT OF BEGINNING. Thence leaving said right-of-way; South 55 Degrees 51 Minutes 37 Seconds East a distance of 95.42 feet to a PK nail set on the westerly side of an alley; Thence along said alley South 35 Degrees 22 Minutes 22 Seconds West a distance of 28.03 feet

to a PK nail found; Thence leaving said alley, North 55 Degrees 55 Minutes 10 Seconds West a distance of 94.96 feet to a PK nail found on the Easterly right-of-way line of Peachtree Street (formerly known as Whitehall Street); Thence along said right-of-way, North 34 Degrees 26 Minutes 17 Seconds East a distance of 28.15 feet to a point and POINT OF BEGINNING.

Said tract of land contains 0.061 Acres.

As shown ALTA/NSPS Land Title Survey titled "142 & 144 Peachtree Street" for Newport 142 Peachtree Street, L.P., Newport 144 Peachtree Street, L.P., and Stewart Title Guaranty Company, prepared by GeoSurvey, Ltd., bearing the seal and certification of David L. Hester, Georgia Registered Land Surveyor No. 3042, dated January 24, 2017, last revised June 16, 2017.

Said Parcel Also Being Described as Follows:

### 142 Peachtree Street

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

Commencing at a PK nail set at the intersection of the Easterly right-of-way line of Peachtree Street (formerly known as Whitehall Street) (60-foot right-of-way) and the southerly right-of-way line of Mitchell Street (apparent 60-foot right-of-way), Thence along said right-of-way Peachtree Street, South 34 Degrees 26 Minutes 17 Seconds West a distance of 28.00 feet to a PK nail set; Thence continuing along said right-of-way, South 34 Degrees 26 Minutes 17 Seconds West a distance of 41.00 feet to a PK nail set, said PK nail set being the TRUE POINT OF BEGINNING, Thence leaving said right-of-way, South 56 Degrees 00 Minutes 21 Seconds East a distance of 75.26 feet to a point on the westerly side of an alley; Thence along said alley, South 15 Degrees 47 Minutes 17 Seconds East a distance of 26.23 feet to a PK nail set; Thence leaving said alley, North 55 Degrees 51 Minutes 37 Seconds West a distance of 95.42 feet to a point on the Easterly right-of-way line of Peachtree Street (formerly known as Whitehall Street); Thence along said right-of-way, North 34 Degrees 26 Minutes 17 Seconds East a distance of 16.69 feet to a PK nail set and POINT OF BEGINNING.

Said tract of land contains 0.033 Acres.

### 170 MITCHELL STREET:

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District of Fulton County, Georgia and more particularly described as follows: COMMENCING at a point on the southwest side of Mitchell Street at the southeast line of an alley (said alley running southwest from Mitchell Street between Whitehall and Forsyth Streets) and running thence eastwardly along the southwest side of Mitchell Street fifty and fifteen hundredths (50.15) feet to the center of a party wall; thence southwesterly along the center of said party wall parallel with Whitehall Street one hundred twelve and four tenths (112.4) feet to a point; thence northwesterly parallel with Mitchell Street fifty and four tenths (50.4) feet to the aforesaid alley; thence northeasterly along the southeast side of said alley one hundred twelve (112) feet to the beginning point; said property being known as Nos. 168-170 Mitchell Street, SW, Atlanta, Georgia according to the present numbering system, being the same property conveyed by Richard Peters to William D. Grant on August 1, 1884, by Warranty Deed recorded in Deed Book UU, page 598, Fulton County Records.

ALSO DESCRIBED AS (DB 57803, Page 449):

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

Commencing at a pk nail set at the intersection of the Easterly right-of-way line of Broad Street (70-foot right-of-way) and the southerly right of way line of Mitchell Street (60-foot right-of-way), Thence along the Southerly right-of-way line of Mitchell Street the following courses and distances: South 55 degrees 57 minutes 32 seconds East a distance of 53.30 feet to a PK nail set; South 55 degrees 57 minutes 57 seconds East a distance of 10.00 feet to a PK nail set and POINT OF BEGINNING. Thence continuing along said right-of-way, South 56 degrees 18 minutes 19 seconds East a distance of 50.15 feet to a building corner; Thence leaving said right-of-way, South 34 degrees 00 minutes 35 seconds West a distance of 112.40 feet to a building corner; Thence North 55 degrees 50 minutes 56 seconds West a distance of 50.39 feet to a PK nail set; Thence North 34 degrees 07 minutes 55 seconds East a distance of 112.00 feet to a PK nail set and the POINT OF BEGINNING.

Said tract of land contains 0.129 Acres.


172 TRINITY AVENUE:

ALL THAT TRACT or parcel of land lying and being in the City of Atlanta in Land Lot 77 of the 14ᵗʰ District of originally Henry, now Fulton County, Georgia, and more particularly described as follows:

BEGINNING at a point on the southwest side of Trinity Avenue (formerly East Peters Street) 84.1 feet southeasterly from the corner formed by the intersection of the southwest side of Trinity Avenue with the southeast side of Peachtree Street (formerly Whitehall Street) ( said point of beginning is the line dividing the property formerly owned by E.P. Chamberlin, Sr., deceased, and property herein described formerly owned by I.S. Mitchell) and running thence southeasterly along the southwest side of Trinity Avenue 40 feet; running thence southwesterly 104.48 feet; running thence northwesterly 39.99 feet to property formerly owned by E.P. Chamberlin, Sr., deceased,· running thence northeasterly along the southeast side of property  formerly owned by E.P. Chamberlin, Sr., deceased, 103.86 feet to the southwest side of Trinity Avenue at the POINT OF BEGINNING.

ALSO DESCRIBED AS (DB 57783, Page 507):

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

Commencing at a point at the intersection of the Easterly right-of-way line of Peachtree Street (formerly known as Whitehall Street) (60-foot right-of-way) and the southerly right-of-way line of Trinity Avenue (apparent 60-foot right-of-way), Thence along said right-of-way of Trinity Avenue, South 55 degrees 53 minutes 51 seconds East a distance of 93.91 feet to a Building Corner, said Building Corner being the **TRUE POINT OF BEGINNING.** Thence continuing along said right-of-way, South 55 degrees 53 minutes 51 seconds East a distance of 40.00 feet to a point; Thence leaving said right-of-way, South 34 degrees 09 minutes 03 seconds West a distance of 104.48 feet to a point; Thence North 55 degrees 08 minutes 42 seconds West a distance of 39.90 feet to a PK nail set; Thence North 34 degrees 06 minutes 01 seconds East a distance of 103.96 feet to a Building Corner on the southerly right-of-way line of Trinity Avenue and the **POINT OF BEGINNING.**

Said tract of land contains 0.096 Acres.

**136 PEACHTREE STREET:**

All that tract or parcel of land lying and being in the city of Atlanta in Land Lot 77 of the 14th District of Fulton County, Georgia, and being more particularly described as follows:

Beginning at the intersection of the southeast side of Whitehall Street and the southwest side of Mitchell Street and running thence southwesterly along the southeast side of Whitehall Street a distance of 28 feet; running thence southeasterly a distance of 75 feet; running thence northeasterly a distance of 28 feet to the southwest side of Mitchell Street; running thence northwesterly along the southwest side of Mitchell Street a distance of 75 feet to the southeast side of Whitehall Street and the point of beginning, said property being known as No. 136 Whitehall Street, Atlanta, Georgia..

Said Parcel Also Being Described as Follows:

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

BEGINNING at a PK nail set at the intersection of the Easterly right-of-way line of Peachtree Street (formerly known as Whitehall Street) (60-foot right-of-way) and the southerly right-of-way line of Mitchell Street (apparent 60-foot right-of-way), Thence along said right-of-way of Mitchell Street, South 56 Degrees 00 Minutes 21 Seconds East a distance of 75.12 feet to a PK nail found on the westerly side of an alley; Thence leaving said right-of-way, along said alley, South 34 Degrees 24 Minutes 11 Seconds West a distance of 28.00 feet to a PK nail set; Thence leaving said alley, North 56 Degrees 00 Minutes 21 Seconds West a distance of 75.13 feet to a PK nail set on the Easterly right-of-way line of Peachtree Street (formerly known as Whitehall Street); Thence along said right-of-way, North 34 Degrees 26 Minutes 17 Seconds East a distance of 28.00 feet to a PK nail set at the intersection of the Easterly right-of-way line of Peachtree Street (formerly known as Whitehall Street) (60-foot right-of-way) and the southerly right-of-way line of Mitchell Street (apparent 60-foot right-of-way) and the POINT OF BEGINNING.

Said tract of land contains 0.048 Acres.

144 PEACHTREE STREET

All that tract or parcel of land lying and being in Land Lot 77
of the 14th District of Fulton County, Georgia, and being more
particularly described as follows:

BEGINNING at a point found on the southeasterly side of the
right-of-way of Peachtree Street (60 foot right-of-way), which
point is 60.9 feet southwesterly from the intersection formed by
the southeasterly side of the right-of-way of Peachtree Street
with the southwesterly side of the right-of-way of Mitchell
Street; running thence south 53 degrees 49 minutes 35 seconds
east, 75.00 feet to a point; running thence south 13 degrees 36
minutes 41 seconds east, along the southwesterly side of a 12
foot alley, 26.23 feet to a point; running thence south 36
degrees 00 minutes 35 seconds west, along the northwesterly side
of said alley, 27.34 feet to a point; running thence north 53
degrees 57 minutes 50 seconds west, 95.00 feet to a point located
on the southeasterly side of the right-of-way of Peachtree
Street; running thence north 36 degrees 01 minute 35 seconds
east, along the southwesterly side of the right-of-way of
Peachtree Street, 44.50 feet to the point of beginning, being
improved property having a two-story brick building thereon,
known as 142-144 Peachtree Street, according to the present
system of numbering in the City of Atlanta, Georgia, and being
shown on survey for Despo Zakas, made by Kenneth L. Butt,
Georgia Registered Land Surveyor No. 2104, and dated May 24,
1983.

The within and foregoing being the same property conveyed from Donald Turner to
Despo Zakas by Quitclaim Deed dated May 27, 1983, and recorded in Deed Book
8495, Page 279, Fulton County, Georgia Records.

Less and except:

### 142 Peachtree Street

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County,
Georgia, and being more particularly described as follows:

Commencing at a PK nail set at the intersection of the Easterly right-of-way line of Peachtree
Street (formerly known as Whitehall Street) (60-foot right-of-way) and the southerly right-of-
way line of Mitchell Street (apparent 60-foot right-of-way), Thence along said right-of-way
Peachtree Street, South 34 Degrees 26 Minutes 17 Seconds West a distance of 28.00 feet to a PK
nail set; Thence continuing along said right-of-way, South 34 Degrees 26 Minutes 17 Seconds
West a distance of 41.00 feet to a PK nail set, said PK nail set being the TRUE POINT OF
BEGINNING, Thence leaving said right-of-way, South 56 Degrees 00 Minutes 21 Seconds East
a distance of 75.26 feet to a point on the westerly side of an alley; Thence along said alley, South
15 Degrees 47 Minutes 17 Seconds East a distance of 26.23 feet to a PK nail set; Thence leaving

said alley, North 55 Degrees 51 Minutes 37 Seconds West a distance of 95.42 feet to a point on the Easterly right-of-way line of Peachtree Street (formerly known as Whitehall Street); Thence along said right-of-way, North 34 Degrees 26 Minutes 17 Seconds East a distance of 16.69 feet to a PK nail set and POINT OF BEGINNING.

Said tract of land contains 0.033 Acres.

As shown ALTA/NSPS Land Title Survey titled "142 & 144 Peachtree Street" for Newport 142 Peachtree Street, L.P., Newport 144 Peachtree Street, L.P., and Stewart Title Guaranty Company, prepared by GeoSurvey, Ltd., bearing the seal and certification of David L. Hester, Georgia Registered Land Surveyor No. 3042, dated January 24, 2017, last revised June 16, 2017.

### Said Parcel Also Being Described as Follows:

#### 144 Peachtree Street

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia; and being more particularly described as follows:

Commencing at a PK nail set at the intersection of the Easterly right-of-way line of Peachtree Street (formerly known as Whitehall Street) (60-foot right-of-way) and the southerly right-of-way line of Mitchell Street (apparent 60-foot right-of-way), Thence along said right-of-way Peachtree Street, South 34 Degrees 26 Minutes 17 Seconds West a distance of 28.00 feet to a PK nail set; Thence continuing along said right-of-way, South 34 Degrees 26 Minutes 17 Seconds West a distance of 41.00 feet to a PK nail set; Thence continuing along said right-of-way,  South 34 Degrees 26 Minutes 17 Seconds East a distance of 16.69 feet to a point; said point being the TRUE POINT OF BEGINNING. Thence leaving said right-of-way, South 55 Degrees 51 Minutes 37 Seconds East a distance of 95.42 feet to a PK nail set on the westerly side of an alley; Thence along said alley South 35 Degrees 22 Minutes 22 Seconds West a distance of 28.03 feet

to a PK nail found; Thence leaving said alley, North 55 Degrees 55 Minutes 10 Seconds West a distance of 94.96 feet to a PK nail found on the Easterly right-of-way line of Peachtree Street (formerly known as Whitehall Street); Thence along said right-of-way, North 34 Degrees 26 Minutes 17 Seconds East a distance of 28.13 feet to a point and POINT OF BEGINNING.

Said tract of land contains 0.061 Acres.

140 Mitchell Street

ALL that tract or parcel of land lying and being in the City of Atlanta, in Land Lot 77 of the 14th District of Fulton County, Georgia, being more particularly described as follows:

BEGINNING at a point on the southwestern side of Mitchell Street, one hundred fifty-three and twenty-five hundredths (153.25) feet, more or less, northwesterly from the intersection of the southwestern side of Mitchell Street with the northwestern side of Pryor Street, said point of beginning being at the northwestern line of property now or formerly owned by C. Arthur Kitchings (said point of beginning described formerly as being eighty-eight and six-tenths (88.6) feet westerly from the ten (10) foot alley adjoining the west side of the Jack Seal Place); thence northwesterly along the southwestern side of Mitchell Street twenty-eight (28) feet to the southeastern line of property now or formerly owned by M. R. Porter (said line being one hundred eighty-nine and six-tenths (189.6) feet southeasterly from Whitehall Street); thence southwesterly along the southeastern line of said Porter property one hundred (100) feet, more or less, to a ten (10) foot alley; thence southeasterly along the northeastern line of said alley, twenty-seven (27) feet to the Kitchings property aforesaid; thence northeasterly along the northwestern line of said property one hundred (100) feet, more or less, to Mitchell Street at the point of beginning; being improved property known as No. 140 (formerly No. 17) Mitchell Street, S.W., according to the present numbering of houses in the City of Atlanta.

Said Parcel Also Being Described as Follows:

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

Commencing at a PK nail set at the intersection of the Easterly right-of-way line of Peachtree Street (formerly known as Whitehall Street) (60-foot right-of-way) and the southerly right-of-way line of Mitchell Street (apparent 60-foot right-of-way), Thence along said right-of-way of Mitchell Street, South 56 Degrees 00 Minutes 21 Seconds East a distance of 75.12 feet to a PK nail found; Thence continuing along said right-of-way, South 56 Degrees 00 Minutes 21 Seconds East a distance of 12.00 feet to a PK nail set; Thence continuing along said right-of-way, South 56 Degrees 00 Minutes 21 Seconds East a distance of 102.60 feet to a PK nail set, said PK nail set being the TRUE POINT OF BEGINNING. Thence continuing along said right-of-way, South 56 Degrees 00 Minutes 21 Seconds East a distance of 28.00 feet to a PK nail set; Thence leaving said right-of-way, South 34 degrees 53 minutes 13 seconds West a distance of 100.29 feet to a point on the northerly side of an alley; Thence along said alley, North 55 degrees 24 minutes 16 seconds West a distance of 27.00 feet to a PK nail set; Thence leaving said alley, North 34 degrees 17 minutes 56 seconds East a distance of 100.00 feet to a PK nail set on the southerly right-of-way line of Mitchell Street and the POINT OF BEGINNING.

Said tract of land contains 0.063 Acres.

As shown on ALTA/NSPS Land Title Survey titled "140 Mitchell Street" for Newport 140 Mitchell Street, L.P. and Stewart Title Guaranty Company, prepared by GeoSurvey, Ltd., bearing the seal and certification of David L. Hester, Georgia Registered Land Surveyor No. 3042, dated January 24, 2017, last revised June 16, 2017.

## EXHIBIT "B"

## BORROWER'S ORGANIZATIONAL STRUCTURE

SEE ATTACHED.



NEWPORT SOUTH DOWNTOWN MASTER REORGANIZATION CHART – FINAL

**Officers:**
Olaf Kunkat – CEO
Boris Schneider – CFO
Manfred Schoenbach – Secretary

**Final –**
(a) NEWPORT 222 Mitchell Street, L.P. will be owned by NEWPORT South Downtown Master, L.P. as 100% LP and NEWPORT US GP, Inc. as 0% GP.
(b) All other Asset LPs owned by NEWPORT South Downtown Master, L.P. as 100% LP and NEWPORT South Downtown Master GP, LLC as 0% GP.

NEWPORT Holding GmbH (Germany)

NEWPORT US GP, Inc., a Delaware corporation*

NEWPORT RE, L.P., a Delaware limited partnership

Additional Limited Partners
No LP owns 20% or greater

NEWPORT South Downtown Master, L.P., a Delaware limited partnership

NEWPORT South Downtown Master GP, LLC, a Delaware limited liability company

100% Shareholder

99.5% LP

16.48% LP

100% Member

0.5% GP

0% GP

0% GP

100% LP

100% LP

Additional Collateral Asset LPs (See Side 2)

NEWPORT 222 Mitchell Street, L.P., a Delaware limited partnership

NEWPORT SOUTH DOWNTOWN MASTER REORGANIZATION CHART – FINAL

2

| Entity Name | General Partner | Limited Partner |
|---|---|---|
| NEWPORT 0 MITCHELL STREET, L.P. | NEWPORT South Downtown Master GP, LLC | NEWPORT South Downtown Master, L.P. |
| NEWPORT 76 FORSYTH STREET, L.P. | NEWPORT South Downtown Master GP, LLC | NEWPORT South Downtown Master, L.P. |
| NEWPORT 110 SPRING STREET, L.P. | NEWPORT South Downtown Master GP, LLC | NEWPORT South Downtown Master, L.P. |
| NEWPORT 135 FORSYTH STREET, L.P. | NEWPORT South Downtown Master GP, LLC | NEWPORT South Downtown Master, L.P. |
| NEWPORT 136 PEACHTREE STREET, L.P. | NEWPORT South Downtown Master GP, LLC | NEWPORT South Downtown Master, L.P. |
| NEWPORT 138 PEACHTREE STREET, L.P. | NEWPORT South Downtown Master GP, LLC | NEWPORT South Downtown Master, L.P. |
| NEWPORT 140 MITCHELL STREET, L.P. | NEWPORT South Downtown Master GP, LLC | NEWPORT South Downtown Master, L.P. |
| NEWPORT 140 SPRING STREET, L.P. | NEWPORT South Downtown Master GP, LLC | NEWPORT South Downtown Master, L.P. |
| NEWPORT 142 PEACHTREE STREET, L.P. | NEWPORT South Downtown Master GP, LLC | NEWPORT South Downtown Master, L.P. |
| NEWPORT 142-150 MITCHELL STREET, L.P. | NEWPORT South Downtown Master GP, LLC | NEWPORT South Downtown Master, L.P. |
| NEWPORT 144 PEACHTREE STREET, L.P. | NEWPORT South Downtown Master GP, LLC | NEWPORT South Downtown Master, L.P. |
| NEWPORT 168 TRINITY AVENUE, L.P. | NEWPORT South Downtown Master GP, LLC | NEWPORT South Downtown Master, L.P. |
| NEWPORT 170 MITCHELL STREET, L.P. | NEWPORT South Downtown Master GP, LLC | NEWPORT South Downtown Master, L.P. |
| NEWPORT 172 TRINITY AVENUE, L.P. | NEWPORT South Downtown Master GP, LLC | NEWPORT South Downtown Master, L.P. |
| NEWPORT 223 MITCHELL STREET, L.P. | NEWPORT South Downtown Master GP, LLC | NEWPORT South Downtown Master, L.P. |
| NEWPORT 235 MITCHELL STREET, L.P. | NEWPORT South Downtown Master GP, LLC | NEWPORT South Downtown Master, L.P. |
| NEWPORT GORDON COMMERCIAL LOFTS, L.P. | NEWPORT South Downtown Master GP, LLC | NEWPORT South Downtown Master, L.P. |

**EXHIBIT "C"**

INSURANCE REQUIREMENTS

1.    Borrower shall, at all times during the term of the Loan, its sole expense, obtain and maintain for the benefit of Borrower and Lender, insurance policies in such amounts as Lender may reasonably require, insuring the Project against all insurable hazards, casualties and contingencies, including, without limitation, the following:

(i)    Fire and other hazards (so called "All Risk" or "ISO Special Form" or its equivalent coverage), and including wind, hail and named storms) in amounts no less than 100% of the full replacement value of the Project, including, without limitation, to the Building, Improvements, betterments, equipment and fixtures, and personal property, with a deductible which shall not exceed $25,000.00, at the time of issuance and at each renewal thereof. A vacant building endorsement will be required with respect to the Project from time to time if the Project is less than 30% occupied;

(ii)    Boiler and machinery insurance, glass, business interruption or loss of rents coverage in an amount equal to not less than gross rents for 12 months, and demolition and contingent liability insurance pertaining to nonconforming uses at the Project;

(iii)    Commercial general liability coverage against claims for property damage and death in an amount no less than $1,000,000.00 per occurrence and against claims for personal and advertising injury in an amount no less than $1,000,000.00 per occurrence; with a minimum of $2,000,000.00 in the aggregate; with a deductible not to exceed $25,000.00.  Such coverage shall also be held by the construction manager until completion of construction of any work being completed with respect to the Project, which may be provided pursuant to an umbrella policy so long as such policy has coverage of not less than $5,000,000.00 per occurrence; $5,000,000.00 in the annual aggregate inclusive of CGL and umbrella liability coverages; with a deductible not to exceed $25,000.00.  Prior to the commencement and during the time which any construction or work is ongoing with respect to the Project and prior to the completion thereof, all general contractors, construction managers and sub-contractors must maintain commercial general liability and umbrella liability coverage naming the Borrower as an additional insured on a primary non-contributory basis and include a waiver of subrogation in favor of the Borrower;

(iv)    Excess/Umbrella liability coverage of not less than $5,000,000 in the aggregate;

(v)    Worker's compensation, employment or similar insurance as may be required by law;

(vi)    Flood hazard insurance if any portion of the Land is in a flood hazard area as designated by the Federal Emergency Management Agency. The minimum amount of flood insurance required is the maximum insurance available, by building, under the National Flood Insurance Program (NFIP). Lender has the right to require excess flood insurance equal to the full replacement cost of the improvements, contents and the full business income and/or rent loss attributable to the effected building(s) held as collateral. The deductible for the NFIP policy or private flood insurance many not exceed $25,000.00; and

(vii)    Such other coverage as Lender may reasonably require.

2.    During the time which any construction or work is ongoing with respect to the Project and prior to the completion thereof, Borrower shall, at its sole expense, obtain and maintain or cause to be maintained for the benefit of Borrower and Lender, the following insurance policies in such amounts as Lender may reasonably require, insuring the Project against all insurable hazards, casualties and contingencies, including, without limitation, the following:

(i)    Builder's risk insurance coverage in an amount equal to 100% of the completed value replacement cost of all Improvements to be constructed (including all change orders), written on a Causes of Loss – Special Form or its equivalent, in a non-reporting completed value form. The loss valuation clause of the policy shall be the replacement cost value. Coverage shall be extended to insure the Construction Project's soft costs, including without limitation 100% of the cost during the construction term of Construction Loan interest, taxes and insurance, and shall insure loss of income or rents due to delay in an amount equivalent to the gross income or loss of rents for an indemnity period of no less than twelve months. Any exclusion for loss or damage to existing structures shall be removed from the policy. The policy shall contain a basic perils deductible not to exceed $25,000.00. Coverage shall permit for partial occupancy by Borrower and shall insure all construction materials and supplies on the construction site, stored off-site and while in transit and all hazards, including damage by fire, hazards covered by extended coverage (broad form), vandalism and malicious mischief, in amounts approved by Lender;

(ii)    Ordinance or Law coverage is required as follows: Coverage A – loss to the undamaged portion of the improvements must equal 100% replacement cost; Coverage B – demolition and debris removal in the minimum must equal 10% of the replacement cost; and Coverage C – increased cost of construction in the minimum must equal 10% of the replacement cost;

(iii)    Borrower shall require of its Construction Contractor, and Construction Contractor shall purchase and maintain, (1) general liability insurance with limits of $5,000,000 each occurrence / $5,000,000 annual aggregate with Lender and Borrower included as Additional Insured with the coverage primary and non-contributory to any other valid and collectible insurance and, (2) worker's compensation as required by statute or law and to insure employer's liability in amount of at least $500,000 per occurrence, (3) Commercial automobile liability insurance with limits of not less than $1,000,000 per accident and shall and include Lender and Borrower as an additional insured on a primary and non-contributory basis, (4) Professional liability (errors & omissions) insurance if performing work and/or services of a professional nature. Professional Liability Insurance shall cover an actual or alleged negligent act, error, or omission arising out of work and/or services of Construction Contractor with limits of not less than $1,000,000 each claim, and (5) any such other insurance as may be required by law, or as Owner or Contractor deems necessary to maintain;

(iv)    Construction Contractor shall require of all sub-contractors, and such sub-contractors shall purchase and maintain, (1) general liability insurance with limits of $1,000,000 each occurrence / $1,000,000 annual aggregate with Lender and Borrower included as Additional

Insured with the coverage primary and non-contributory to any other valid and collectible insurance and, (2) worker's compensation as required by statute or law and to insure employer's liability in amount of at least $100,000 per occurrence. Construction Contractor shall collect and maintain copies of all subcontractors, of any tier, ACORD certificate(s) with required attachments reflecting all of the same insurance coverage as required herein. Borrower shall submit ACORD certificate(s) evidencing with required attachments to Lender upon request; and

      (v)    Such other coverage as Lender may reasonably require.

Borrower shall pay promptly when due any and all premiums on such insurance policies. All such policies shall be issued by an insurer or insurers acceptable to Lender and shall be in form acceptable to Lender, and shall contain such provisions and endorsements as Lender may reasonably require, including, without limitation, (i) a noncontributory standard lender endorsement making all insured losses payable to Lender, (ii) in the case of liability coverage, an endorsement, in form satisfactory to Lender, naming Lender as an additional insured thereunder, and (iii) a non-cancellation rider providing that no act or omission of Borrower shall invalidate such policy as against Lender, and providing that such policy shall not be canceled, terminated or materially altered without at least 30 days' prior written notice to Lender. At least 15 days prior to the expiration date of each such policy, a renewal thereof satisfactory to Lender shall be delivered to Lender by Borrower, together with a receipt evidencing the payment by Borrower of all premiums on such insurance policy or renewal, prepaid for a period of at least one (1) year. In the event of any foreclosure of the Mortgage or any other transfer of title to the Project in extinguishment of all or any part of the Indebtedness, all right, title and interest of Borrower and to all insurance policies shall pass to the purchaser or Lender.

Borrower shall give immediate written notice to Lender of any loss or damage to the Project, and shall, at the direction of Lender, immediately file proofs of claim in connection with such loss or losses. Lender is hereby irrevocably authorized and appointed by Borrower as the agent and attorney-in-fact of Borrower (which appointment shall be deemed to be coupled with an interest), to adjust or compromise any such loss, to collect and receive the proceeds from any such policy in respect of any such loss (which, after deduction of reasonable expenses incurred by Lender in the adjustment or compromise of any insured loss or in the collection or handling of insurance proceeds, including, without limitation, reasonable attorneys' fees, are referred to herein as the "Net Proceeds"), and to endorse Borrower's name on any instrument in payment of such proceeds. Each insurance company issuing any policy relating to the Project shall be irrevocably authorized and directed by Borrower to make payment for any such loss directly to Lender alone and not to Borrower and Lender jointly. Borrower shall immediately pay over to Lender any payments representing insurance proceeds received by Borrower directly from any insurance company. Insurance proceeds received by Lender may be commingled with the general funds of Lender, and no interest shall be payable to borrower in respect of any such proceeds.

Lender, in Lender's sole discretion, may elect to (i) apply the Net Proceeds to the Indebtedness in accordance with the terms of the Note; or (ii) hold the Net Proceeds in escrow, and require Borrower to promptly repair or restore the Project, in a workmanlike manner, to its condition, use and market value immediately prior to such casualty. Lender shall release the Net Proceeds as the work progresses, upon such conditions as Lender may reasonably require.

Although Lender intends to use reasonable efforts to collect insurance proceeds in a timely fashion, Lender shall not be responsible for any failure to collect any insurance proceeds due under the terms of any policy, regardless of the cause of such failure.

Unless all such additional or separate insurance complies with the requirements set forth in this Exhibit "C" and does not cause any Person to become a co-insurer of any loss, Borrower shall not carry any additional or separate insurance concurrent in form or contributing in the event of loss with any insurance required to be maintained hereunder, or in excess of the amounts required hereunder.

**EXHIBIT "D"**

RELEASE PROPERTY

SEE ATTACHED.

LEGAL DESCRIPTIONS - RELEASE PARCELS

F1 and F2

## 138 PEACHTREE STREET

All That Tract or Parcel of Land Lying and Being in the City of Atlanta in Land Lot 77 of the 14th District of Fulton County, Georgia, more particularly described as follows:

Beginning at a point on the east side of Peachtree Street (formerly Whitehall Street) twenty-eight (28) feet south from the southeast corner of Peachtree (formerly Whitehall) and Mitchell Streets, said point of beginning being at the southwest corner of property now or formerly owned by Mrs. Josephine B. Jennings, et al; thence south along the east side of Peachtree Street (formerly Whitehall Street) forty-one (41) feet to property now or formerly owned by Alvin B. Cates; thence east along the north line of the Cates property seventy-five (75) feet to a twelve (12) foot alley; thence north along the west side of said alley forty-one (41) feet to the Jennings property aforesaid; thence west along the south line of said property seventy-five (75) feet to Peachtree Street (formerly Whitehall Street) at the point of beginning; being improved property known as Numbers 138-140 Peachtree Street (formerly Whitehall Street), SW, according to the present system of numbering houses in the City of Atlanta.

Said Parcel Also Being Described as Follows:

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

Commencing at a PK nail set at the intersection of the Easterly right-of-way line of Peachtree Street (formerly known as Whitehall Street) (60-foot right-of-way) and the southerly right-of-way line of Mitchell Street (apparent 60-foot right-of-way), Thence along said right-of-way Peachtree Street, South 34 Degrees 26 Minutes 17 Seconds West a distance of 28.00 feet to a PK nail set, said PK nail set being the TRUE POINT OF BEGINNING. Thence leaving said right-of-way, South 56 Degrees 00 Minutes 21 Seconds East a distance of 75.13 feet to a point on the westerly side of an alley; Thence along said alley, South 34 Degrees 15 Minutes 51 Seconds West a distance of 41.00 feet to a point; Thence leaving said alley, North 56 Degrees 00 Minutes 21 Seconds West a distance of 75.26 feet to a PK nail set on the Easterly right-of-way line of Peachtree Street (formerly known as Whitehall Street); Thence North 34 Degrees 26 Minutes 17 Seconds East a distance of 41.00 feet to a PK nail set and POINT OF BEGINNING.

Said tract of land contains 0.071 Acres.

LEGAL DESCRIPTION - RELEASE PARCELS

F3 and F4

## 142 PEACHTREE STREET

All that tract or parcel of land lying and being in Land Lot 77
of the 14th District of Fulton County, Georgia, and being more
particularly described as follows:

BEGINNING at a point found on the southeasterly side of the
right-of-way of Peachtree Street (60 foot right-of-way), which
point is 68.9 feet southwesterly from the intersection formed by
the southeasterly side of the right-of-way of Peachtree Street
with the southwesterly side of the right-of-way of Mitchell
Street; running thence south 53 degrees 49 minutes 35 seconds
east, 75.00 feet to a point; running thence south 13 degrees 36
minutes 41 seconds east, along the southwesterly side of a 12
foot alley, 26.23 feet to a point; running thence south 36
degrees 00 minutes 35 seconds west, along the northwesterly side
of said alley, 27.34 feet to a point; running thence north 53
degrees 57 minutes 50 seconds west, 95.00 feet to a point located
on the southeasterly side of the right-of-way of Peachtree
Street; running thence north 36 degrees 01 minutes 55 seconds
east along the southeasterly side of the right-of-way of
Peachtree Street, 44.50 feet to the point of beginning, being
improved property having a two-story brick building thereon,
known as 142-144 Peachtree Street, according to the present
system of numbering in the City of Atlanta, Georgia, and being
shown on survey for Despo Zakas, made by Kenneth L. Hutt,
Georgia Registered Land Surveyor No. 2108, and dated May 24,
1983.

The within and foregoing being the same property conveyed from Donald Turner to
Despo Zakas by Quitclaim Deed dated May 27, 1983, and recorded in Deed Book
9495, Page 279, Fulton County, Georgia Records.

Less and except:

### 144 Peachtree Street

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County,
Georgia, and being more particularly described as follows:

Commencing at a PK nail set at the intersection of the Easterly right-of-way line of Peachtree
Street (formerly known as Whitehall Street) (60-foot right-of-way) and the southerly right-of-
way line of Mitchell Street (apparent 60-foot right-of-way). Thence along said right-of-way
Peachtree Street, South 34 Degrees 26 Minutes 17 Seconds West a distance of 28.00 feet to a PK
nail set; Thence continuing along said right-of-way, South 34 Degrees 26 Minutes 17 Seconds
West a distance of 41.00 feet to a PK nail set; Thence continuing along said right-of-way, South
34 Degrees 26 Minutes 17 Seconds East a distance of 16.69 feet to a point; said point being the
TRUE POINT OF BEGINNING. Thence leaving said right-of-way, South 55 Degrees 51
Minutes 37 Seconds East a distance of 95.42 feet to a PK nail set on the westerly side of an alley;
Thence along said alley South 55 Degrees 22 Minutes 22 Seconds West a distance of 28.03 feet

to a PK nail found; Thence leaving said alley, North 55 Minutes 10 Seconds West a distance of 94.96 feet to a PK nail found on the Easterly right-of-way line of Peachtree Street (formerly known as Whitehall Street); Thence along said right-of-way, North 34 Degrees 26 Minutes 17 Seconds East a distance of 28.13 feet to a point and POINT OF BEGINNING.

Said tract of land contains 0.061 Acres.

As shown ALTA/NSPS Land Title Survey titled "142 & 144 Peachtree Street" for Newport 142 Peachtree Street, L.P., Newport 144 Peachtree Street, L.P., and Stewart Title Guaranty Company, prepared by GeoSurvey, Ltd., bearing the seal and certification of David L. Hester, Georgia Registered Land Surveyor No. 3042, dated January 24, 2017, last revised June 16, 2017.

Said Parcel Also Being Described as Follows:

### 142 Peachtree Street

All that tract or parcel of land lying and being in Land Lot 77 of the 14th District, Fulton County, Georgia, and being more particularly described as follows:

Commencing at a PK nail set at the intersection of the Easterly right-of-way line of Peachtree Street (formerly known as Whitehall Street) (60-foot right-of-way) and the southerly right-of-way line of Mitchell Street (apparent 60-foot right-of-way), Thence along said right-of-way Peachtree Street, South 34 Degrees 26 Minutes 17 Seconds West a distance of 28.00 feet to a PK nail set; Thence continuing along said right-of-way, South 34 Degrees 26 Minutes 17 Seconds West a distance of 41.00 feet to a PK nail set, said PK nail set being the TRUE POINT OF BEGINNING. Thence leaving said right-of-way, South 56 Degrees 00 Minutes 21 Seconds East a distance of 75.26 feet to a point on the westerly side of an alley; Thence along said alley, South 15 Degrees 47 Minutes 17 Seconds East a distance of 26.23 feet to a PK nail set; Thence leaving said alley, North 55 Degrees 51 Minutes 37 Seconds West a distance of 95.42 feet to a point on the Easterly right-of-way line of Peachtree Street (formerly known as Whitehall Street); Thence along said right-of-way, North 34 Degrees 26 Minutes 17 Seconds East a distance of 16.69 feet to a PK nail set and POINT OF BEGINNING.

Said tract of land contains 0.033 Acres.

## EXHIBIT "E"

### BUDGET



**EXHIBIT "F"**

[INTENTIONALLY OMITTED]

**EXHIBIT "G"**

[INTENTIONALLY OMITTED]

## SCHEDULE H

### CONSTRUCTION SCHEDULE

SEE ATTACHED.



Hotel Row Schedule

| ID | Task Name | Duration | Start | Finish |
|----|-----------|----------|-------|--------|
| 1 | Design | 223 days | Mon 1/4/21 | Wed 11/10/21 |
| 2 | ADR Design | 61 days | Mon 1/4/21 | Mon 3/29/21 |
| 3 | Complete Contract with S&W | 40 days | Mon 1/4/21 | Fri 2/26/21 |
| 4 | Capture VE Changes | 20 days | Mon 3/1/21 | Fri 3/26/21 |
| 5 | Submit for Permit Adjustment | 0 days | Mon 3/29/21 | Mon 3/29/21 |
| 6 | Civil Design | 198 days | Mon 2/8/21 | Wed 11/10/21 |
| 7 | Complete SDCD Set | 10 days | Mon 2/8/21 | Fri 2/19/21 |
| 8 | Complete 100CD Set | 15 days | Mon 2/22/21 | Fri 3/12/21 |
| 9 | Submit Set for Site Permit | 0 days | Fri 3/12/21 | Fri 3/12/21 |
| 10 | Address Site Permit Comments | 10 days | Thu 10/28/21 | Wed 11/10/21 |
| 11 | Landscape Architecture | 20 days | Mon 2/22/21 | Fri 3/19/21 |
| 12 | Complete SDCD Drawings | 10 days | Mon 2/22/21 | Fri 3/5/21 |
| 13 | Complete 100CD Drawings | 10 days | Mon 3/8/21 | Fri 3/19/21 |
| 14 | Interior and Amenity Design | 35 days | Mon 3/1/21 | Fri 4/16/21 |
| 15 | Design Interior Finishes | 2 wks | Mon 3/1/21 | Fri 3/12/21 |
| 16 | Review Interior Finishes | 1 wk | Mon 3/15/21 | Fri 3/19/21 |
| 17 | FF&E Selection | 2 wks | Mon 3/22/21 | Fri 4/2/21 |
| 18 | FF&E Review | 2 wks | Mon 4/5/21 | Fri 4/16/21 |
| 19 | Third Party Coordination | 250 days | Fri 3/12/21 | Fri 2/25/22 |
| 24 | Utility Coordination | 115 days? | Mon 1/4/21 | Fri 6/25/21 |
| 31 | GMP | 79 days | Mon 1/4/21 | Wed 4/24/21 |
| 32 | VE Exercise | 25 days | Mon 1/4/21 | Fri 2/5/21 |
| 33 | Negotiate LNTP | 5 days | Mon 2/8/21 | Fri 2/12/21 |
| 34 | Sign LNTP | 0 days | Fri 2/12/21 | Fri 2/12/21 |
| 35 | BB Completes Site Walks to Reduce Allowances | 5 days | Thu 2/11/21 | Wed 2/17/21 |
| 36 | S&W Input for Allowance Reduction | 15 days | Thu 2/18/21 | Wed 3/10/21 |
| 37 | Finalize GMP Price | 25 days | Thu 3/11/21 | Wed 4/24/21 |
| 38 | Negotiate GMP Contract Language & Form | 13 wks | Thu 1/14/21 | Wed 4/24/21 |

Page 1

Confidential; Not for Distribution



Hotel Row Schedule

| ID | Task Name | Duration | Start | Finish |
|---|---|---|---|---|
| 39 | Execute GMP | 0 days | Wed 4/14/21 | Wed 4/14/21 |
| 40 | Earliest Possible GMP Execution | 0 days | Thu 3/18/21 | Thu 3/18/21 |
| 41 | Hardscape Permit/GMP Price Reconciliation | 15 days | Mon 3/22/21 | Fri 4/9/21 |
| 42 | Permitting | 169 days | Fri 3/5/21 | Wed 10/27/21 |
| 43 | LDP/Site Permit | 169 days | Fri 3/12/21 | Wed 10/27/21 |
| 44 | Package Submitted | 0 days | Fri 3/12/21 | Fri 3/12/21 |
| 45 | Permit Review Period | 163 days | Mon 3/15/21 | Wed 10/27/21 |
| 46 | Permit Approval | 0 days | Wed 10/27/21 | Wed 10/27/21 |
| 47 | Building C&S Permit | 36 days | Fri 3/5/21 | Fri 4/23/21 |
| 48 | Collect Permits | 1 day | Fri 3/5/21 | Fri 3/5/21 |
| 49 | C&S Permit Amendment | 20 days | Mon 3/29/21 | Fri 4/23/21 |
| 50 | Construction | 260 days | Thu 4/15/21 | Wed 4/13/22 |
| 51 | Construction Start | 1 day | Thu 4/15/21 | Thu 4/15/21 |
| 52 | C&S Construction | 230 days | Thu 4/15/21 | Wed 3/2/22 |
| 53 | Sylvan West | 215 days | Thu 4/15/21 | Wed 2/23/22 |
| 54 | Sylvan East | 220 days | Thu 4/29/21 | Wed 3/2/22 |
| 55 | Scoville | 150 days | Mon 8/2/21 | Fri 2/25/22 |
| 56 | Gordon West | 185 days | Fri 4/30/21 | Thu 1/13/22 |
| 57 | Gordon East | 175 days | Thu 4/22/21 | Wed 12/22/21 |
| 58 | Gordon East Available for TI | 0 days | Tue 12/14/21 | Tue 12/14/21 |
| 59 | Gordon West Available for TI | 0 days | Tue 1/4/22 | Tue 1/4/22 |
| 60 | Sylvan 4th Floor Available for TI | 0 days | Wed 12/29/21 | Wed 12/29/21 |
| 61 | Sylvan 3rd Floor Available for TI | 0 days | Mon 1/24/22 | Mon 1/24/22 |
| 62 | Sylvan 2nd Floor Available for TI | 0 days | Mon 1/24/22 | Mon 1/24/22 |
| 63 | Sylvan 1st Floor Available for TI | 2 days | Wed 1/5/22 | Wed 1/5/22 |
| 64 | Sylvan Basement Available for TI | 0 days | Mon 1/24/22 | Mon 1/24/22 |
| 65 | Substantial Completion | 0 days | Fri 2/25/22 | Fri 2/25/22 |
| 66 | Site Construction | 90 days | Thu 12/9/21 | Wed 4/13/22 |

Printed Wed 12/1/21

Page 2

Confidential, Not for Distribution



222 Mitchell Schedule

| ID | Task Name | Duration | Start | Finish |
|---|---|---|---|---|
| 1 | Milestones | 685 days | Mon 12/14/20 | Fri 4/21/23 |
| 6 | ADR Design | 251 days | Mon 12/28/20 | Mon 12/13/21 |
| 7 | 50 CD Complete | 47 days | Mon 12/28/20 | Tue 3/2/21 |
| 8 | 80 CD Complete | 9 wks | Wed 3/3/21 | Tue 5/4/21 |
| 9 | Addendum 2 (VE Design Completion & Updated Permit Set) | 22 days | Wed 6/2/21 | Thu 7/1/21 |
| 10 | Final VE Incorporation | 4 wks | Tue 10/19/21 | Mon 11/15/21 |
| 11 | 100 CD Complete | 4 wks | Tue 11/16/21 | Mon 12/13/21 |
| 12 | Interior Design | 234 days | Wed 1/27/21 | Mon 12/20/21 |
| 13 | 80% Construction Documents | 33 days | Wed 1/27/21 | Fri 3/12/21 |
| 14 | 100% Construction | 4 wks | Tue 12/16/21 | Mon 12/13/21 |
| 15 | Cellar Interior Design Add Service | 5 days | Tue 12/14/21 | Mon 12/20/21 |
| 16 | Amenity Design | 258 days | Thu 2/18/21 | Mon 2/14/22 |
| 17 | Concept Design | 2 wks | Thu 2/18/21 | Wed 3/3/21 |
| 18 | Interiors SD & DD | 4 wks | Tue 12/14/21 | Mon 1/10/22 |
| 19 | Amenity Space ADR CD Package | 5 wks | Tue 1/11/22 | Mon 2/14/22 |
| 20 | Review | 219 days | Wed 3/3/21 | Mon 1/3/22 |
| 24 | Pricing | 224 days | Wed 3/3/21 | Mon 1/10/22 |
| 25 | Pull 50 CD Price Check | 31 days | Wed 3/3/21 | Wed 4/14/21 |
| 35 | GMP @ 80 CD | 115 days | Wed 5/5/21 | Tue 10/12/21 |
| 36 | 80 CD Pricing Exercise | 4 wks | Wed 5/5/21 | Tue 6/1/21 |
| 37 | Addendum 2 Pricing Update | 10 wks | Fri 7/2/21 | Thu 9/9/21 |
| 38 | Negotiate GMP | 4 wks | Fri 9/10/21 | Thu 10/7/21 |
| 39 | Execute GMP | 0 days | Tue 10/12/21 | Tue 10/12/21 |
| 40 | Permit & GMP Reconciliation Pricing | 4 wks | Tue 12/14/21 | Mon 1/10/22 |
| 41 | Permitting | 321 days | Fri 1/15/21 | Mon 4/11/22 |
| 42 | SAP | 25 days | Fri 1/15/21 | Thu 2/18/21 |
| 43 | SAP Re-Submitted | 0 days¹⁄ʰ | Fri 1/15/21 | Fri 1/15/21 |
| 44 | SAP Review | 5 wks | Fri 1/15/21 | Thu 2/18/21 |
| 45 | SAP Approval | 0 days | Thu 2/18/21 | Thu 2/18/21 |
| 46 | Site Permit | 203 days | Fri 2/19/21 | Tue 11/30/21 |
| 47 | Site Permit Package Submitted | 3 days | Fri 2/19/21 | Tue 2/23/21 |
| 48 | Site Permit Review | 10 mons | Wed 2/24/21 | Tue 11/30/21 |
| 49 | Site Permit Approval | 0 days | Tue 11/30/21 | Tue 11/30/21 |

Confidential; Not for Distribution



222 Mitchel Schedule

| ID | Task Name | Duration | Start | Finish |
|---|---|---|---|---|
| 50 | Hard Demo | 45 days | Wed 3/3/21 | Tue 5/4/21 |
| 51 | Hard Demo Permit Package Prep | 1 wk | Wed 3/3/21 | Tue 3/9/21 |
| 52 | Hard Demo Permit Received | 8 wks | Wed 3/10/21 | Tue 5/4/21 |
| 53 | Building C&S Permit | 36 days | Thu 7/1/21 | Fri 8/20/21 |
| 54 | Submit for Permit | 0 days | Thu 7/1/21 | Thu 7/1/21 |
| 55 | City Permit Review | 6 wks | Fri 7/2/21 | Thu 8/12/21 |
| 56 | Comments Received from City | 0 wks | Thu 8/12/21 | Thu 8/12/21 |
| 57 | Response to City Comments | 1 day | Fri 8/13/21 | Fri 8/13/21 |
| 58 | Review of Response by City | 1 wk | Mon 8/16/21 | Fri 8/20/21 |
| 59 | Issue C&S Permit | 0 wks | Fri 8/20/21 | Fri 8/20/21 |
| 60 | Amenity Space Building Permit | 40 days | Mon 2/14/22 | Mon 4/11/22 |
| 61 | Submit for Permit | 0 days | Mon 2/14/22 | Mon 2/14/22 |
| 62 | City Permit Review | 6 wks | Tue 2/15/22 | Mon 3/28/22 |
| 63 | Comments Received from City | 0 days | Mon 3/28/22 | Mon 3/28/22 |
| 64 | Response to City Comments | 1 wk | Tue 3/29/22 | Mon 4/4/22 |
| 65 | Review of Response by City | 1 wk | Tue 4/5/22 | Mon 4/11/22 |
| 66 | Issue C&S Permit | 0 days | Mon 4/11/22 | Mon 4/11/22 |
| 67 | Construction | 354 days | Mon 12/13/21 | Fri 4/21/23 |
| 68 | Construction Start | 0 days | Mon 12/13/21 | Mon 12/13/21 |
| 69 | C&S Construction | 494 edays | Mon 12/13/21 | Fri 4/21/23 |
| 70 | Tenant Fitout Milestones | 105 days | Sun 11/27/22 | Fri 4/21/23 |
| 71 | Retail A Available for TI | 0 days | Sun 11/27/22 | Sun 11/27/22 |
| 72 | Retail B Available for TI | 0 days | Mon 12/12/22 | Mon 12/12/22 |
| 73 | Retail C Available for TI | 0 days | Mon 2/20/23 | Mon 2/20/23 |
| 74 | Penthouse Available for TI | 0 days | Tue 1/24/23 | Tue 1/24/23 |
| 75 | Floor 7 Available for TI | 0 days | Tue 1/31/23 | Tue 1/31/23 |
| 76 | Floor 6 Available for TI | 0 days | Wed 2/15/23 | Wed 2/15/23 |
| 77 | Floor 5 Available for TI | 0 days | Wed 2/22/23 | Wed 2/22/23 |
| 78 | Floor 4 Available for TI | 0 days | Wed 3/1/23 | Wed 3/1/23 |
| 79 | Floor 3 Available for TI | 0 days | Thu 3/9/23 | Thu 3/9/23 |
| 80 | Floor 2 Available for TI | 0 days | Fri 3/17/23 | Fri 3/17/23 |
| 81 | Substantial Completion | 0 days | Fri 4/21/23 | Fri 4/21/23 |

Printed Wed 12/1/21

Confidential Not for Distribution

<u>**SCHEDULE II**</u>

**FORM OF DRAW REQUEST**

BI 68 LLC
c/o BridgeInvest LLC
2601 South Bayshore Drive
Suite 1400
Miami, Florida 33133
Attention: Mr. Alex Horn, Manager

Re:    NEWPORT 0 MITCHELL STREET, L.P., NEWPORT 76 FORSYTH STREET, L.P.,
NEWPORT 110 SPRING STREET, L.P., NEWPORT 135 FORSYTH STREET, L.P.,
NEWPORT 136 PEACHTREE STREET, L.P., NEWPORT 138 PEACHTREE STREET, L.P.,
NEWPORT 140 MITCHELL STREET, L.P., NEWPORT 140 SPRING STREET, L.P.,
NEWPORT 142 PEACHTREE STREET, L.P., NEWPORT 142-150 MITCHELL STREET,
L.P., NEWPORT 144 PEACHTREE STREET, L.P., NEWPORT 168 TRINITY AVENUE, L.P.,
NEWPORT 170 MITCHELL STREET, L.P., NEWPORT 172 TRINITY AVENUE, L.P.,
NEWPORT 222 MITCHELL STREET, L.P., NEWPORT 223 MITCHELL STREET, L.P.,
NEWPORT 235 MITCHELL STREET, L.P., and NEWPORT GORDON COMMERCIAL
LOFTS, L.P., each a Delaware limited partnership (collectively, "<u>Borrower</u>")

Dear Mr. Horn:

Pursuant to the terms of that certain Construction Loan Agreement dated as of December 16,
2021 (as modified, amended and/or supplemented from time to time, the "<u>Loan Agreement</u>"),
and the representations and warranties set forth therein and herein, Borrower hereby submits
a disbursement request for the amount of $_____. Capitalized terms have the same
meanings as in the Loan Agreement.

This Disbursement Request shall be deemed to be a representation by Borrower and of the
person signing this Disbursement Request that (A) no Event of Default has occurred or will
exist (and no event that with the passage of time or giving of notice has occurred or will exist
that would constitute an Event of Default) upon the making of this requested disbursement;
(B) the representations and warranties contained herein and in the other Loan Documents as
of the date hereof are true and correct in all material respects; (C) all information set forth in
this Disbursement Request, and on any exhibit attached hereto is true, correct and complete
in all material respects; and (D) all conditions precedent to the disbursement to be made in
connection with this Disbursement Request have been satisfied.

(a)    the Borrower has received no notice and has no knowledge of any litigation,
proceedings (including proceedings under Title 11 of the United States Code),
liens or claims of lien, either filed or threatened against the Borrower, any
Guarantor or the Project, except the liens of the Lender and those which have
heretofore been specifically identified in writing to the Lender;

(b)    to Borrower's knowledge, no event, circumstance or condition exists or has

occurred which could delay or prevent the completion of the Project by the Estimated Completion Date;

(c)     all construction related disbursements advanced by the Lender to the Borrower for labor, materials and/or services furnished prior to this draw request have been paid to the parties entitled to such payment, and all Loan proceeds so disbursed have been used for the purposes set forth in the Loan Agreement;

(d)     all work and materials furnished to date for the Project conform with the Plans as delivered and approved by Lender, and the Borrower has approved all work and materials for which a payment is now due and for which this construction disbursement is being requested;

(e)     the total amount of the requested construction disbursement represents the actual amount payable to the general contractor and/or subcontractors who have performed work on the Improvements through the date of the contractor's draw request, and all of the construction disbursement requested hereby will be used as payment for the work on the Property described on the attached documentation and for no other reason;

(f)     all change orders requiring Lender's approval and all material changes to the Plans requiring Lender's approval have been or are being submitted for approval by Lender, or are being submitted for approval by Lender; and

(g)     the Loan is "In Balance" (including, without limitation, any change orders), as contemplated in the Loan Agreement.

The following is an itemized statement of the costs incurred or due for which disbursement is requested with respect to the Project Budget attached as Exhibit E to the Loan Agreement, and the total amount incurred, expended and/or due less prior disbursements.

| ITEM | TOTAL AMOUNT INCURRED LESS PRIOR DISBURSEMENTS |
|---|---|
| 1) | |
| 2) | |
| TOTAL DISBURSEMENT REQUEST | |

This Request is submitted as of _____, 20___.

**BORROWER:**

_____,

a _____

By: _____
                [NAME]
                [TITLE]

## SCHEDULE III

### FORM OF ADVANCE REQUEST

BI 68 LLC
c/o BridgeInvest LLC
2601 South Bayshore Drive
Suite 1400
Miami, Florida 33133
Attention: Mr. Alex Horn, Manager

      Re: NEWPORT 0 MITCHELL STREET, L.P., NEWPORT 76 FORSYTH STREET, L.P., NEWPORT 110 SPRING STREET, L.P., NEWPORT 135 FORSYTH STREET, L.P., NEWPORT 136 PEACHTREE STREET, L.P., NEWPORT 138 PEACHTREE STREET, L.P., NEWPORT 140 MITCHELL STREET, L.P., NEWPORT 140 SPRING STREET, L.P., NEWPORT 142 PEACHTREE STREET, L.P., NEWPORT 142-150 MITCHELL STREET, L.P., NEWPORT 144 PEACHTREE STREET, L.P., NEWPORT 168 TRINITY AVENUE, L.P., NEWPORT 170 MITCHELL STREET, L.P., NEWPORT 172 TRINITY AVENUE, L.P., NEWPORT 222 MITCHELL STREET, L.P., NEWPORT 223 MITCHELL STREET, L.P., NEWPORT 235 MITCHELL STREET, L.P., and NEWPORT GORDON COMMERCIAL LOFTS, L.P., each a Delaware limited partnership (collectively, "Borrower")

Dear Mr. Horn:

      Pursuant to the terms of that certain Loan Agreement dated as of December ____, 2021 by and among BI 68 LLC ("Lender") and Borrower (as modified, amended and/or supplemented from time to time, the "Loan Agreement"), and the representations and warranties set forth therein and herein, Borrower hereby submits this disbursement request for the amount of $_____ (this "Advance Request"). Capitalized terms have the meanings ascribed to such terms in the Loan Agreement.

      This Advance Request shall be deemed to be a representation by Borrower and the undersigned that:

    (a) Borrower understand that the funds advanced under this Advance Request shall be funded into the Construction Reserve Account, and shall only be disbursed to the Borrower after all conditions precedent to a Construction Disbursement have been satisfied, and in any case consistent with the terms of the Loan Agreement and Loan Documents

    (b) Borrower expressly understands that Lender approving the Additional Advance requested herein does not constitute Lender's approval or acceptance of any Draw Request for Construction Disbursements, and that the Additional Advance funds shall

remain in the Construction Reserve Account until Lender's express approval of a Draw Request.

(c) no Event of Default or event that with the passage of time or giving of notice would constitute an Event of Default has occurred as of the date hereof or will exist upon the making of the requested disbursement;

(d) the representations and warranties contained herein and in the other Loan Documents as of the date hereof are true and correct in all material respects, with the same force and effect as though made on and as of the date on which the Borrower submits this Advance Request;

(e) all information set forth in this Advance Request and on any exhibit attached hereto is true, correct and complete in all material respects;

(f) all conditions precedent to the advancing of the disbursement requested in this Advance Request have been satisfied.

(g) the Borrower has received no notice and has no knowledge of any litigation, proceedings (including proceedings under Title 11 of the United States Code), liens or claims of lien, either filed or threatened against the Borrower, any Guarantor or the Project, except the liens of the Lender and the Permitted Encumbrances;

(h) to Borrower's knowledge, no event, circumstance or condition exists or has occurred which could delay or prevent the completion of the Construction Project by the Estimated Completion Date;

(i) all disbursements advanced by the Lender to the Borrower for labor, materials and/or services furnished prior to this Advance Request have been paid to the party(ies) entitled to such payment, and all Loan proceeds so disbursed have been used for the purposes authorized in the Loan Agreement;

(j) all work and materials furnished to date for the Project has been performed in accordance with the Loan Agreement and conforms with the Plans as delivered and approved by Lender;

(k) no mechanics or materialmen's liens or encumbrances have been filed and/or remain in effect against the Project;

(l) all change orders requiring Lender's approval and all material changes to the Plans requiring Lender's approval have been submitted to and approved by Lender prior to the date hereof, or are being submitted for approval by Lender; and

(m) the Loan is "In Balance" (including, without limitation, any change orders), as contemplated in the Loan Agreement.

This Advance Request is submitted as of_____, 20___.

**BORROWER:**

_____,
a _____

By:_____
      [NAME]
      [TITLE]

## SCHEDULE IV

## LEASING PARAMETERS



**SCHEDULE V**
**[LIST OF THE PLANS]**

**Balfour Beatty**

EXHIBIT G
CONTRACT DOCUMENTS
Hotel Row

| Drawings | | |
|---|---|---|
| **SHEET NUMBER** | **SHEET NAME** | **IGMP SET** |
| **GENERAL** | | |
| **GORDON** | | |
| G0.00 | COVER SHEET | 4/3/2020 |
| G0.01 | ALTA SURVEY | 4/3/2020 |
| G0.02 | GENERAL NOTES & DRAWING STANDARDS | 4/3/2020 |
| G1.00 | BASEMENT & FIRST FLOOR LIFE SAFETY PLANS | 4/3/2020 |
| | | |
| **ARCHITECTURE** | | |
| A0.00 | PARTITION NOTES, TYPES & DETAILS | 4/3/2020 |
| A1.00 | DEMOLITION AND PROPOSED FLOOR PLANS | 9/2/2020 |
| A1.10 | ENLARGED PLANS AND DETAILS | 9/2/2020 |
| A1.11 | ENLARGED PLANS AND DETAILS | 9/2/2020 |
| A2.00 | ELEVATIONS | 4/3/2020 |
| A3.00 | BUILDING SECTIONS | 4/3/2020 |
| A5.00 | ADA ACCESSIBLE DETAILS | 4/3/2020 |
| A5.01 | ENLARGED RESTROOM PLANS, ELEVATIONS & DETAILS | 9/2/2020 |
| A6.00 | REFLECTED CEILING PLANS | 9/2/2020 |
| A7.01 | STOREFRONT RENOVATIONS - 211-215 | 4/3/2020 |
| A7.02 | STOREFRONT RENOVATIONS - 217-221 | 4/3/2020 |
| A9.00 | DOOR AND FINISH SCHEDULES | 9/2/2020 |
| | | |
| **STRUCTURAL** | | |
| S0.01 | GENERAL NOTES | 2/19/2020 |
| S0.02 | GENERAL NOTES | 2/19/2020 |
| S1.01 | LEVEL 0 - FOUNDATION PLAN | 3/3/2021 |
| S1.02 | LEVEL 1 - FRAMING PLAN | 3/3/2021 |
| S1.03 | LEVEL 2 - FRAMING PLAN | 3/3/2021 |
| S8.00 | TYPICAL WOOD DETAILS | 3/3/2021 |
| S8.01 | SECTIONS AND DETAILS | 3/3/2021 |
| | | |
| **PLUMBING** | | |
| FP0.01 | FIRE PROTECTION LEGEND, GENERAL NOTES, AND SPECIFICATION | 4/3/2020 |
| FP1.01 | FIRE PROTECTION PLAN LEVEL 1 | 4/3/2020 |
| P0.01 | PLUMBING GENERAL | 3/22/2021 |
| P0.02 | PLUMBING SPECIFICATIONS AND SCHEDULES | 3/22/2021 |
| P1.00 | PLUMBING LEVEL 0 OVERALL PLAN - DWV & STORM | 3/22/2021 |
| P1.01 | PLUMBING LEVEL 1 OVERALL PLAN - DWV & STORM | 3/22/2021 |
| P2.00 | PLUMBING LEVEL 0 OVERALL PLAN - DOMESTIC WATER & NATURAL GAS | 3/22/2021 |
| P2.01 | PLUMBING LEVEL 1 OVERALL PLAN - DOMESTIC WATER & NATURAL GAS | 8/13/2020 |
| P5.01 | PLUMBING RISER DIAGRAMS | 3/22/2021 |
| PD1.00 | PLUMBING LEVEL 0 OVERALL DEMOLITION PLAN | NOT DATED |
| PD1.01 | PLUMBING LEVEL 1 OVERALL DEMOLITION PLAN | NOT DATED |
| | | |
| **MECHANICAL** | | |

**Balfour Beatty**

EXHIBIT G
CONTRACT DOCUMENTS
Hotel Row

| | | |
|---|---|---|
| M0.01 | HVAC GENERAL | 3/22/2021 |
| M0.02 | HVAC SPECIFICATIONS | 3/22/2021 |
| M0.03 | HVAC SPECIFICATIONS | 3/22/2021 |
| M0.04 | HVAC SPECIFICATIONS | 3/22/2021 |
| M1.01 | GORDON BUILDING - NEW WORK-LEVEL 1 HVAC | 3/22/2021 |
| M2.01 | GORDON BUILDING - NEW WORK-LEVEL 1 HVAC PIPING | 3/22/2021 |
| M4.01 | HVAC SECTION PLANS | 3/22/2021 |
| M4.02 | HVAC SECTION PLANS | 3/22/2021 |
| M4.03 | HVAC SECTION PLANS | 3/22/2021 |
| M5.01 | HVAC DETAILS | 3/22/2021 |
| M5.02 | HVAC DETAILS | 3/22/2021 |
| M6.01 | HVAC SCHEDULES | 3/22/2021 |
| M7.01 | OVERALL HVAC ISOMETRIC DIAGRAMS | 3/22/2021 |
| | | |
| ELECTRICAL | | |
| E0.01 | ELECTRICAL SYMBOLS AND ABBREVIATIONS | 4/3/2020 |
| E0.02 | ELECTRICAL SPECIFICATIONS | 4/3/2020 |
| E1.00 | ELECTRICAL PLANS - BASEMENT LEVEL | 3/22/2021 |
| E1.01 | ELECTRICAL PLANS - LEVEL 1 | 3/22/2021 |
| E1.02 | ELECTRICAL-LEVEL 2 PLAN & MECH. SCHEDULES | 3/22/2021 |
| E2.01 | ELECTRICAL RISER DIAGRAMS | 3/22/2021 |
| E3.00 | ELECTRICAL LOAD CALCULATIONS | 3/22/2021 |
| E3.01 | ELECTRICAL PANEL SCHEDULES | 3/22/2021 |
| E4.01 | ELECTRICAL DETAILS | 7/24/2020 |

| | | |
|---|---|---|
| **SYLVAN** | | |
| GENERAL INFORMATION | | |
| G0.00 | COVER SHEET AND SITE PLAN | 6/12/2020 |
| G0.01 | ALTA SURVEY | 6/12/2020 |
| G0.02 | GENERAL NOTES & DRAWING STANDARDS | 6/12/2020 |
| G0.03 | CORE AND SHELL TENANT PLANS | 6/12/2020 |
| G1.00 | BASEMENT LIFE SAFETY PLAN | 6/12/2020 |
| G1.01 | FIRST FLOOR LIFE SAFETY PLAN | 6/12/2020 |
| G1.02 | SECOND FLOOR LIFE SAFETY PLAN | 6/12/2020 |
| G1.03 | THIRD FLOOR LIFE SAFETY PLAN | 6/12/2020 |
| G1.04 | FOURTH FLOOR LIFE SAFETY PLAN | 6/12/2020 |
| | | |
| ARCHITECTURE | | |
| A0.00 | PARTITION NOTES, TYPES & DETAILS | 6/12/2020 |
| A0.01 | PARTITION HEAD DETAILS | 6/12/2020 |
| A1.00 | BASEMENT PLANS | 9/2/2020 |
| A1.01 | FIRST FLOOR PLANS | 9/2/2020 |
| A1.02 | SECOND FLOOR PLANS | 3/22/2021 |
| A1.03 | THIRD FLOOR PLANS | 3/22/2021 |
| A1.04 | FOURTH FLOOR PLANS | 6/12/2020 |
| A1.05 | ROOF PLANS | 9/2/2020 |
| A2.00 | SOUTH ELEVATION | 6/12/2020 |
| A2.01 | NORTH ELEVATION | 9/2/2020 |
| A2.02 | WEST ELEVATION | 6/12/2020 |
| A3.00 | SYLVAN HOTEL - BUILDING SECTIONS | 6/12/2020 |
| A4.00 | LIGHTWELL PLANS, SECTIONS & DETAILS | 3/22/2021 |
| A4.01 | STAIR & RAMP SECTIONS & DETAILS | 3/22/2021 |
| A5.00 | ADA ACCESSIBLE DETAILS | NOT ISSUED. NIC |
| A5.01 | BASEMENT TOILET PLANS, ELEVATIONS, AND DETAILS | 9/2/2020 |
| A5.02 | LEVEL 1 TOILET PLANS, ELEVATIONS, AND DETAILS | 6/12/2020 |
| A5.03 | LEVELS 2 &3 TOILET PLANS, ELEVATIONS, AND DETAILS | 6/12/2020 |

**Balfour Beatty**

EXHIBIT G
CONTRACT DOCUMENTS
Hotel Row

| | | |
|---|---|---|
| A6.00 | BASEMENT RCP | 6/12/2020 |
| A6.01 | FIRST FLOOR RCP | 6/12/2020 |
| A6.02 | SECOND FLOOR RCP | 6/12/2020 |
| A6.03 | THIRD FLOOR RCP | 6/12/2020 |
| A6.04 | FOURTH FLOOR RCP | 6/12/2020 |
| A7.00 | DOOR SCHEDULE | 6/12/2020 |
| A7.01 | STOREFRONT RENOVATIONS - 227-231 | 6/12/2020 |
| A7.02 | STOREFRONT RENOVATIONS - 233-235a | 6/12/2020 |
| A7.10 | EXTERIOR WINDOW FRAME ELEVATIONS & DETAILS | 6/12/2020 |
| A8.00 | STAIR DETAIL, VERTICAL PICKETS | 9/2/2020 |
| A8.01 | STAIR PLANS, SECTIONS & DETAILS | 6/12/2020 |
| A9.00 | FINISH PLANS & SCHEDULES | 9/2/2020 |
| | | |
| STRUCTURAL | | |
| S0.01 | GENERAL NOTES | 3/3/2021 |
| S0.02 | GENERAL NOTES | 3/20/2020 |
| S1.01 | LEVEL 0 - BASEMENT PLAN | 3/3/2021 |
| S1.02 | LEVEL 1 - FRAMING PLAN | 3/3/2021 |
| S1.03 | LEVEL 2 - FRAMING PLAN | 3/3/2021 |
| S1.04 | LEVEL 3 - FRAMING PLAN | 3/3/2021 |
| S1.05 | LEVEL 4 - FRAMING PLAN | 3/3/2021 |
| S1.06 | ROOF – FRAMING PLAN | 3/3/2021 |
| S8.00 | TYPICAL WOOD DETAILS | 3/3/2021 |
| S8.01 | SECTIONS AND DETAILS | 3/3/2021 |
| | | |
| FIRE PROTECTION | | |
| F0.01 | FIRE PROTECTION GENERAL | 6/12/2020 |
| F1.01 | FIRE PROTECTION - BASEMENT | 6/12/2020 |
| F1.02 | FIRE PROTECTION - LEVEL 1 | 6/12/2020 |
| F1.03 | FIRE PROTECTION - LEVEL 2 | 6/12/2020 |
| F1.04 | FIRE PROTECTION -  LEVEL 3 | 6/12/2020 |
| F1.05 | FIRE PROTECTION - LEVEL 4 | 6/12/2020 |
| F4.01 | FIRE PROTECTION DETAILS | 6/12/2020 |
| F5.01 | FIRE PROTECTION RISER DIAGRAMS | 6/12/2020 |
| | | |
| PLUMBING | | |
| P0.01 | PLUMBING GENERAL | 3/22/2021 |
| P0.02 | PLUMBING SPECIFICATIONS AND SCHEDULES | 3/22/2021 |
| P1.01 | PLUMBING - BASEMENT - DWV | 3/22/2021 |
| P1.02 | PLUMBING - LEVEL 1 - DWV | 3/22/2021 |
| P1.03 | PLUMBING - LEVEL 2 - DWV | 3/22/2021 |
| P1.04 | PLUMBING - LEVEL 3 - DWV | 3/22/2021 |
| P1.05 | PLUMBING - LEVEL 4 - DWV | 3/22/2021 |
| P2.01 | PLUMBING - BASEMENT - DOMESTIC WATER | 3/22/2021 |
| P2.02 | PLUMBING - LEVEL 1 - DOMESTIC WATER | 3/22/2021 |
| P2.03 | PLUMBING - LEVEL 2 - DOMESTIC WATER | 3/22/2021 |
| P2.04 | PLUMBING - LEVEL 3 - DOMESTIC WATER | 3/22/2021 |
| P2.05 | PLUMBING - LEVEL 4 - DOMESTIC WATER | 3/22/2021 |
| P5.01 | PLUMBING OVERALL WASTE RISER DIAGRAMS | 3/22/2021 |
| P5.02 | PLUMBING OVERALL DOMESTIC WATER RISER DIAGRAMS | 3/22/2021 |
| | | |
| MECHANICAL | | |
| M0.01 | HVAC GENERAL | 3/22/2021 |
| M0.02 | SPECIFICATIONS | 3/22/2021 |
| M0.03 | SPECIFICATIONS | 3/22/2021 |
| M0.04 | SPECIFICATIONS | 3/22/2021 |
| M1.01 | HOTEL ROW/NEW WORK-LEVEL 1 HVAC | 3/22/2021 |

Exhibit G - Contract Documents
Project No. 16945000

**Balfour Beatty**

EXHIBIT G
CONTRACT DOCUMENTS
Hotel Row

| | | |
|---|---|---|
| M1.02 | HOTEL ROW/NEW WORK-LEVEL 2 HVAC | 3/22/2021 |
| M1.03 | HOTEL ROW/NEW WORK-LEVEL 3 HVAC | 3/22/2021 |
| M1.04 | HOTEL ROW/NEW WORK-LEVEL 4 HVAC | 3/22/2021 |
| M1.05 | HOTEL ROW/NEW WORK-ROOF HVAC | 3/22/2021 |
| M2.00 | HOTEL ROW/NEW WORK-BASEMENT HVAC PIPING | 3/22/2021 |
| M2.01 | HOTEL ROW/NEW WORK-LEVEL 1 HVAC PIPING | 3/22/2021 |
| M2.02 | HOTEL ROW/NEW WORK-LEVEL 2 HVAC PIPING | 3/22/2021 |
| M2.03 | HOTEL ROW/NEW WORK-LEVEL 3 HVAC PIPING | 3/22/2021 |
| M2.04 | HOTEL ROW/NEW WORK-LEVEL 4 HVAC PIPING | 3/22/2021 |
| M3.01 | HVAC SECTIONS | 3/22/2021 |
| M3.02 | HVAC SECTIONS | 3/22/2021 |
| M3.03 | HVAC SECTIONS | 3/22/2021 |
| M4.01 | HVAC DETAILS | 3/22/2021 |
| M4.02 | HVAC DETAILS | 3/22/2021 |
| M4.03 | HVAC DETAILS | 3/22/2021 |
| M5.01 | HVAC SCHEDULES | 3/22/2021 |
| M6.01 | OVERALL ROOF ISOMETRIC DIAGRAM | 3/22/2021 |
| M6.02 | OVERALL HVAC ISOMETRIC DIAGRAM | 3/22/2021 |
| | | |
| **ELECTRICAL** | | |
| E0.01 | ELECTRICAL SYMBOLS AND ABBREVIATIONS | 9/2/2020 |
| E0.02 | ELECTRICAL SPECIFICATIONS | 6/12/2020 |
| E1.00 | ELECTRICAL PLANS - BASEMENT LEVEL | 3/22/2021 |
| E1.01 | ELECTRICAL PLANS - LEVEL 1 | 3/22/2021 |
| E1.02 | ELECTRICAL PLANS - LEVEL 2 | 3/22/2021 |
| E1.03 | ELECTRICAL PLANS - LEVEL 3 | 9/2/2020 |
| E1.04 | ELECTRICAL PLANS - LEVEL 4 AND ROOF | 3/22/2021 |
| E2.01 | ELECTRICAL RISER DIAGRAMS | 3/22/2021 |
| E2.02 | ELECTRICAL TELECOMMUNICATIONS RISER | 6/12/2020 |
| E3.00 | ELECTRICAL LOAD CALCULATIONS AND ENLARGED PLANS | 3/22/2021 |
| E3.01 | ELECTRICAL PANEL "A" SCHEDULES | 3/22/2021 |
| E3.02 | ELECTRICAL PANEL "B" SCHEDULES | 3/22/2021 |
| E3.03 | ELECTRICAL EQUIPMENT SCHEDULES | 3/22/2021 |
| E4.01 | ELECTRICAL DETAILS | 6/12/2020 |
| | | |
| **INTERIORS** | | |
| A200 | ELEVATIONS | NOT DATED |
| A300 | FLOOR FINISH PLAN | NOT DATED |
| A400 | WALL FINISH PLAN | NOT DATED |
| A500 | REFLECTED CEILING PLAN | NOT DATED |
| | | |
| **SCOVILLE** | | |
| **GENERAL INFORMATION** | | |
| G0.00 | COVER SHEET AND SITE PLAN | 2/19/2020 |
| G0.01 | ALTA SURVEY | 2/19/2020 |
| G0.02 | GENERAL NOTES & DRAWING STANDARDS | 2/19/2020 |
| | | |
| **ARCHITECTURE** | | |
| A2.00 | SCOVILLE HOTEL - ELEVATIONS | |
| A2.01 | STOREFRONT RENOVATIONS - 223-225 | |
| | | |
| **ELECTRICAL** | | |
| E0.01 | ELECTRICAL SYMBOLS AND ABBREVIATIONS | 2/19/2020 |
| E01.00 | ELECTRICAL LIGHTING PLANS | 2/19/2020 |
| | | |

EXHIBIT G
CONTRACT DOCUMENTS
Hotel Row

| SPECIFICATIONS | DESCRIPTION | Date Issued - IGMP Set |
|---|---|---|
| **DIVISION 00 – PROCUREMENT AND CONTRACTING REQUIREMENTS** | | |
| 002113 | INSTRUCTIONS TO BIDDERS | 6/12/2020 |
| 004323 | ALTERNATES FORM | 6/12/2020 |
| **DIVISION 01 – GENERAL REQUIREMENTS** | | |
| 12300 | ALTERNATES | 6/12/2020 |
| 12600 | CONTRACT MODIFICATION PROCEDURES | 6/12/2020 |
| 12900 | PAYMENT PROCEDURES | 6/12/2020 |
| 13100 | PROJECT MANAGEMENT AND COORDINATION | 6/12/2020 |
| 13300 | SUBMITTAL PROCEDURES | 6/12/2020 |
| 14000 | QUALITY REQUIREMENTS | 6/12/2020 |
| 15000 | TEMPORARY FACILITIES AND CONTROLS | 6/12/2020 |
| 16000 | PRODUCT REQUIREMENTS | 6/12/2020 |
| 17419 | CONSTRUCTION WASTE MANAGEMENT AND DISPOSAL | 6/12/2020 |
| 17700 | CLOSEOUT PROCEDURES | 6/12/2020 |
| 17823 | OPERATION AND MAINTENANCE DATA | 6/12/2020 |
| 17839 | PROJECT RECORD DOCUMENTS | 6/12/2020 |
| 17900 | DEMONSTRATION AND TRAINING | 6/12/2020 |
| **DIVISION 02 – EXISTING CONDITIONS** | | |
| 024119 | SELECTIVE DEMOLITION | 6/12/2020 |
| **DIVISION 03 - CONCRETE** | | |
| NOT APPLICAPLE | | 6/12/2020 |
| **DIVISION 04 - MASONRY** | | |
| 40110 | MASONRY CLEANING | 6/12/2020 |
| 40120.63 | BRICK MASONRY REPAIR | 6/12/2020 |
| 40120.64 | BRICK MASONRY REPOINTING | 6/12/2020 |
| 42200 | CONCRETE UNIT MASONRY | 6/12/2020 |
| 42613 | MASONRY VENEER | 6/12/2020 |
| **DIVISION 05 – METALS** | | |
| 55000 | METAL FABRICATIONS | 6/12/2020 |
| 55113 | METAL PAN STAIRS | 6/12/2020 |
| 55116 | METAL FLOOR PLATE STAIRS | 6/12/2020 |
| 55213 | PIPE AND TUBE RAILINGS | 6/12/2020 |
| **DIVISION 06 - WOOD, PLASTICS AND COMPOSITES** | | |
| 61000 | ROUGH CARPENTRY | 6/12/2020 |
| 61516 | WOOD ROOF DECKING | 6/12/2020 |
| 61600 | SHEATHING | 6/12/2020 |
| **DIVISION 07 - THERMAL AND MOISTURE PROTECTION** | | |
| 74646 | FIBER-CEMENT SIDING | 3/25/2021 |
| 72100 | THERMAL INSULATION | 6/12/2020 |
| 72726 | FLUID-APPLIED MEMBRANE AIR BARRIERS | 8/10/2020 |
| 76200 | SHEET METAL FLASHING AND TRIM | 6/12/2020 |
| 77200 | ROOF ACCESSORIES | 6/12/2020 |
| 78413 | PENETRATION FIRESTOPPING | 6/12/2020 |
| 79200 | JOINT SEALANTS | 6/12/2020 |
| **DIVISION 08 - OPENINGS** | | |
| 81113 | HOLLOW METAL DOORS AND FRAMES | 6/12/2020 |
| 85200 | WOOD WINDOWS | 6/12/2020 |
| 88000 | GLAZING | 6/12/2020 |
| **DIVISION 09 - FINISHES** | | |
| 92116.23 | GYPSUM BOARD SHAFT WALL ASSEMBLIES | 6/12/2020 |
| 92216 | NON-STRUCTURAL METAL FRAMING | 6/12/2020 |
| 92900 | GYPSUM BOARD | 6/12/2020 |
| 95113 | ACOUSTICAL PANEL CEILINGS | 6/12/2020 |
| 96400 | WOOD FLOORING | 6/12/2020 |
| 99123 | INTERIOR PAINTING | 6/12/2020 |
| **DIVISION 10 - SPECIALTIES** | | |
| 102113.14 | STAINLESS STEEL TOILET COMPARTMENTS | 6/12/2020 |
| 102800 | TOILET, BATH, AND LAUNDRY ACCESSORIES | 6/12/2020 |
| 104413 | FIRE PROTECTION CABINETS | 6/12/2020 |
| 104416 | FIRE EXTINGUISHERS | 6/12/2020 |
| **DIVISION 11 - EQUIPMENT** | | |
| NOT APPLICAPLE | | 6/12/2020 |
| **DIVISION 12 - FURNISHINGS** | | |
| NOT APPLICAPLE | | 6/12/2020 |
| **DIVISION 14 - CONVEYING EQUIPMENT** | | |

EXHIBIT G
CONTRACT DOCUMENTS
Hotel Row

| SPECIFICATIONS | DESCRIPTION | Date Issued - IGMP Set |
|---|---|---|
| 142400 | HYDRAULIC ELEVATORS | 6/12/2020 |
| **DIVISION 21 - FIRE SUPPRESSION** | | |
| | REFERENCE FIRE PROTECTION DRAWINGS | 6/12/2020 |
| **DIVISION 22 – PLUMBING** | | |
| | REFERENCE PLUMBING DRAWINGS | 6/12/2020 |
| **DIVISION 23 - HEATING VENTILATING AND AIR CONDITIONING** | | |
| | REFERENCE MECHANICAL DRAWINGS | 6/12/2020 |
| **DIVISION 25 - LOW VOLTAGE** | | |
| | NOT APPLICABLE | 6/12/2020 |
| **DIVISION 26 – ELECTRICAL** | | |
| | REFERENCE ELECTRICAL DRAWINGS | 6/12/2020 |
| **DIVISION 27 – COMMUNICATIONS** | | |
| | NOT APPLICABLE | 6/12/2020 |
| **DIVISION 31 – EARTHWORK** | | |
| | REFERENCE WORK TO BE DONE IN STRUCTURAL DRAWINGS FOR HOTEL ROW SIDEWALK VAULT REPAIRS PROJECT | 6/12/2020 |
| **DIVISION 32 - EXTERIOR IMPROVEMENTS** | | |
| | REFERENCE WORK TO BE DONE IN STRUCTURAL DRAWINGS FOR HOTEL ROW SIDEWALK VAULT REPAIRS PROJECT | 6/12/2020 |
| **DIVISION 33 - UTILITIES** | | |
| | REFERENCE WORK TO BE DONE IN STRUCTURAL DRAWINGS FOR HOTEL ROW SIDEWALK VAULT REPAIRS PROJECT | 6/12/2020 |
| | END OF TABLE OF CONTENTS | 6/12/2020 |

**EXHIBIT G**
**CONTRACT DOCUMENTS**
Hotel Row

| DOCUMENT NAME | DESCRIPTION | DATE ISSUED |
|---|---|---|
| | | |
| SUPPLEMENTAL A200 | INTERIOR ELEVATIONS - FOR PRICING ONLY | NOT DATED |
| SUPPLEMENTAL A300 | FLOOR FINISH PLAN - FOR PRICING ONLY | NOT DATED |
| SUPPLEMENTAL A400 | WALL FINISH PLAN - FOR PRICING ONLY | NOT DATED |
| SUPPLEMENTAL A500 | RCP - FOR PRICING ONLY | NOT DATED |
| PRECON RFI LOG | DDC - HOTEL ROW - PRECONSTRUCTION RFIS 01 | 8/9/2020 |
| HARDWARE SCHEDULE | HARDWARE SCHEDULE 20202.09.29.docx | 9/29/2020 |
| DELIVERY CONDITIONS | HOTEL ROW DELIVERY CONDITIONS | 9/24/2020 |
| NOVA REPORT | REPORT OF WOOD FLOOR FRAMING CONDITION SURVEY AND TESTING SERVICES | 6/4/2020 |
| | | |
| | | |
| | *For Full list of RFIs without sketches, see  Exhibit B - Clarifications  and  Attachment E - Additional RFI's* | |
| | | |
| | | |

**EXHIBIT G**
CONTRACT DOCUMENTS
222 Mitchell

Balfour Beatty

| DOCUMENT NO. | DESCRIPTION | DATE ISSUED |
|---|---|---|
| | | |
| **GENERAL** | | |
| G0.1 | COVER SHEET | 6/25/2021 |
| G0.2 | SHEET INDEX | 6/25/2021 |
| G0.3 | SHEET INDEX | 6/25/2021 |
| G1.0 | LIFE SAFETY PLAN - CELLAR 00 | 5/4/2021 |
| G1.1B | LIFE SAFETY PLAN - BALCONY 01B | 5/4/2021 |
| G1.1 | LIFE SAFETY PLAN - LEVEL 01 | 6/25/2021 |
| G1.2 | LIFE SAFETY PLAN - LEVEL 02 | 5/4/2021 |
| G1.3 | LIFE SAFETY PLAN - LEVEL 03 | 5/4/2021 |
| G1.4 | LIFE SAFETY PLAN - LEVEL 04 | 5/4/2021 |
| G1.5 | LIFE SAFETY PLAN - LEVEL 05 | 5/4/2021 |
| G1.6 | LIFE SAFETY PLAN - LEVEL 06 | 5/4/2021 |
| G1.7 | LIFE SAFETY PLAN - LEVEL 07 | 5/4/2021 |
| G1.8 | LIFE SAFETY PLAN - PENTHOUSE 08 | 5/4/2021 |
| G2.1 | ACCESSIBILITY NOTES AND DIAGRAMS | 5/4/2021 |
| G2.2 | ACCESSIBILITY DIAGRAMS | 5/4/2021 |
| | | |
| **CIVIL** | | |
| C0.00 | COVER SHEET | 5/4/2021 |
| C0.01 | GENERAL NOTES | 5/4/2021 |
| C0.02 | GENERAL NOTES | 5/4/2021 |
| C0.03 | GENERAL NOTES | 5/4/2021 |
| C0.0S | SURVEY | 5/4/2021 |
| C0.80 | EXISTING CONDITIONS PLAN | 5/4/2021 |
| C1.00 | DEMOLITION PLAN | 5/4/2021 |
| C2.00 | SITE PLAN | 5/4/2021 |
| C2.10 | STREET LIGHT PLAN | 5/4/2021 |
| C2.20 | FIRE PROTECTION PLAN | 5/4/2021 |
| C3.00 | GRADING PLAN | 5/4/2021 |
| C3.01 | DRAINAGE PLAN | 5/4/2021 |
| C3.50 | STORM SEWER PROFILES | 5/4/2021 |
| C4.00 | UTILITY PLAN | 5/4/2021 |
| C4.50 | SANITARY SEWER PROFILES | 5/4/2021 |
| C5.00 | EROSION CONTROL NOTES | 5/4/2021 |
| C5.01 | EROSION CONTROL NOTES | 5/4/2021 |
| C5.10 | EROSION CONTROL PLAN PHASE 1 | 5/4/2021 |
| C5.80 | EROSION CONTROL DETAILS | 5/4/2021 |
| C5.81 | EROSION CONTROL DETAILS | 5/4/2021 |
| C6.00 | CONSTRUCTION DETAILS | 5/4/2021 |
| C6.01 | CONSTRUCTION DETAILS | 5/4/2021 |
| C6.02 | CONSTRUCTION DETAILS | 5/4/2021 |
| C6.03 | CONSTRUCTION DETAILS | 5/4/2021 |
| SAP.L1.00 | APPROVED SITE PLAN | 5/4/2021 |
| | | |
| **LANDSCAPE** | | |
| L0.00 | SITE NOTES | 5/4/2021 |

**EXHIBIT G**
CONTRACT DOCUMENTS
222 Mitchell

Balfour Beatty

| DOCUMENT NO. | DESCRIPTION | DATE ISSUED |
|---|---|---|
| L0.01 | LANDSCAPE NOTES | 5/4/2021 |
| L1.01 | SITE PLAN | 5/4/2021 |
| L1.02 | POCKET PARK ELEVATIONS | 5/4/2021 |
| L1.03 | PLATFORM A ELEVATION | 5/4/2021 |
| L1.04 | PLATFORM B ELEVATION | 5/4/2021 |
| L1.05 | POCKET PARK PERSPECTIVES | 5/4/2021 |
| L1.06 | SITE ELEVATIONS SCREEN WALL AND SCREEN FENCE | 5/4/2021 |
| L1.07 | SECTIONAL ELEVATION SERVICE YARD SCREEN GATE | 5/4/2021 |
| L1.08 | RETAIL PASSAGE ELEVATIONS | 5/4/2021 |
| L1.09 | MITCHELL STREET PLINTH ELEVATIONS | 5/4/2021 |
| L3.01 | GRADING PLAN - WEST | 5/4/2021 |
| L3.02 | GRADING PLAN - EAST | 5/4/2021 |
| L3.03 | GRADING PLAN ENLARGEMENT - POCKET PARK | 5/4/2021 |
| L3.04 | GRADING PLAN ENLARGEMENT - WEST NELSON COURT | 5/4/2021 |
| L3.05 | GRADING PLAN ENLARGEMENT - RETAIL PASSAGE | 5/4/2021 |
| L4.01 | PAVEMENT PLAN - WEST | 6/25/2021 |
| L4.02 | PAVEMENT PLAN - EAST | 6/25/2021 |
| L4.03 | PAVEMENT PLAN ENLARGEMENT - POCKET PARK | 6/25/2021 |
| L4.04 | PAVEMENT PLAN ENLARGEMENT - WEST NELSON COURT | 6/25/2021 |
| L4.05 | PAVEMENT PLAN ENLARGEMENT - RETAIL PASSAGE | 6/25/2021 |
| L4.06 | PAVEMENT MOCKUP PLAN | 5/4/2021 |
| L5.00 | TREE PROTECTION NOTES | 5/4/2021 |
| L5.01 | TREE PROTECTION DETAILS | 5/4/2021 |
| L5.02 | TREE PROTECTION AND REMOVAL EXISTING SITE PLAN | 5/4/2021 |
| L5.03 | TREE PROTECTION AND REMOVAL PROPOSED SITE PLAN | 5/4/2021 |
| L5.04 | TREE PLAN | 5/4/2021 |
| L5.05 | TREE PLANTING DETAILS | 5/4/2021 |
| L5.06 | TREE PLANTING DETAILS FURNITURE ZONE RIGHT - OF - WAY | 5/4/2021 |
| L5.07 | TREE PLANTING DETAILS POCKET PARK | 5/4/2021 |
| L6.01 | PLANTING PLAN - WEST | 5/4/2021 |
| L6.02 | PLANTING PLAN - EAST | 5/4/2021 |
| L6.03 | PLANTING PLAN ENLARGEMENT - POCKET PARK | 5/4/2021 |
| L6.04 | PLANTING PLAN ENLARGEMENT - WEST NELSON COURT | 5/4/2021 |
| L6.05 | PLANTING PLAN ENLARGEMENT - RETAIL PASSAGE | 5/4/2021 |
| L6.06 | PLANT SCHEDULE | 5/4/2021 |
| L6.07 | PLANTING DETAILS | 5/4/2021 |
| L6.08 | PLANT IMAGES | 5/4/2021 |
| L6.09 | PLANT IMAGES | 5/4/2021 |
| L6.10 | PLANT IMAGES | 5/4/2021 |
| L6.11 | PLANT IMAGES | 5/4/2021 |
| L6.12 | PLANT IMAGES | 5/4/2021 |
| L6.13 | PLANT IMAGES | 5/4/2021 |
| L6.14 | PLANT IMAGES | 5/4/2021 |
| L6.15 | PLANT IMAGES | 5/4/2021 |
| L6.16 | PLANT IMAGES | 5/4/2021 |
| L6.17 | PLANT IMAGES | 5/4/2021 |
| L6.18 | PLANT IMAGES | 5/4/2021 |
| L6.19 | PLANT IMAGES | 5/4/2021 |

Exhibit G - Contract Documents

**EXHIBIT G**
CONTRACT DOCUMENTS
222 Mitchell

Balfour Beatty

| DOCUMENT NO. | DESCRIPTION | DATE ISSUED |
|---|---|---|
| L7.01 | FURNITURE PLAN - WEST | 5/4/2021 |
| L7.02 | FURNITURE PLAN - EAST | 5/4/2021 |
| L7.03 | SITE DETAILS FURNITURE | 5/4/2021 |
| L7.04 | SITE DETAILS FURNITURE | 5/4/2021 |
| L8.01 | SITE DETAILS PAVEMENT | 5/4/2021 |
| L8.02 | SITE DETAILS STAIRS | 6/25/2021 |
| L8.03 | SITE DETAILS RAILING | 5/4/2021 |
| L8.04 | SITE DETAILS RAILING | 5/4/2021 |
| L8.05 | SITE DETAILS SCREEN FENCE | 5/4/2021 |
| L8.06 | SITE DETAILS SCREEN FENCE | 6/25/2021 |
| L8.07 | SITE DETAILS PEDESTRIAN GATE | 6/25/2021 |
| L9.01 | SEATING PLATFORM DETAILS | 6/25/2021 |
| L9.02 | PLATFORM A DETAILS | 6/25/2021 |
| L9.03 | PLATFORM A DETAILS | 6/25/2021 |
| L9.04 | PLATFORM B DETAILS | 6/25/2021 |
| L9.05 | PLATFORM B DETAILS | 6/25/2021 |
| L9.06 | PLATFORM C AND D DETAILS | 6/25/2021 |
| L9.07 | PLATFORM C AND D DETAILS | 6/25/2021 |
| L10.01 | SITE SECTION POCKET PARK | 5/4/2021 |
| L10.02 | SITE SECTION POCKET PARK | 5/4/2021 |
| L10.03 | SITE SECTION POCKET PARK | 5/4/2021 |
| L10.04 | SITE SECTION POCKET PARK | 5/4/2021 |
| L10.05 | SITE SECTION POCKET PARK | 5/4/2021 |
| L10.06 | SITE SECTION POCKET PARK | 5/4/2021 |
| L11.01 | SITE SECTION WEST NELSON COURT | 5/4/2021 |
| L12.01 | SECTION RETAIL PASSAGE | 5/4/2021 |
| L12.02 | SECTION RETAIL PASSAGE | 5/4/2021 |
| L12.03 | SECTION RETAIL PASSAGE | 5/4/2021 |
| L12.04 | SECTION RETAIL PASSAGE | 5/4/2021 |
| L13.01 | SITE SECTION - MITCHELL STREET PLINTH | 5/4/2021 |
| L13.02 | SITE SECTION - MITCHELL STREET PLINTH | 5/4/2021 |
| | | |
| **DEMO** | | |
| DS1.0 | BUILDING DEMO PLAN - CELLAR | 5/4/2021 |
| DS1.1B | BUILDING DEMO PLAN - BALCONY 01B | 5/4/2021 |
| DS1.1 | BUILDING DEMO PLAN - LEVEL 01 | 5/4/2021 |
| DS1.2 | BUILDING DEMO PLAN - LEVEL 02 | 5/4/2021 |
| DS1.3 | BUILDING DEMO PLAN - LEVEL 03 | 5/4/2021 |
| DS1.4 | BUILDING DEMO PLAN - LEVEL 04 - 06 | 5/4/2021 |
| DS1.7R | BUILDING DEMO PLAN - LEVEL 7R - ROOF | 5/4/2021 |
| DS1.7 | BUILDING DEMO PLAN - LEVEL 07 | 5/4/2021 |
| DS1.8 | BUILDING DEMO PLAN - LEVEL 08 | 5/4/2021 |
| DS1.9 | BUILDING DEMO PLAN - PENTHOUSE ROOF 9 | 5/4/2021 |
| DS2.01 | DEMOLITION SECTIONS AND DETAILS | 5/4/2021 |
| DS2.02 | DEMOLITION SECTIONS AND DETAILS | 5/4/2021 |
| DS2.03 | DEMOLITION SECTIONS AND DETAILS | 5/4/2021 |
| DA1.0 | DEMOLITION PLAN - CELLAR 00 | 5/4/2021 |
| DA1.1B | DEMOLITION PLAN - BALCONY 01B | 5/4/2021 |

## EXHIBIT G
### CONTRACT DOCUMENTS
222 Mitchell

Balfour Beatty

| DOCUMENT NO. | DESCRIPTION | DATE ISSUED |
|---|---|---|
| DA1.1 | DEMOLITION PLAN - LEVEL 01 | 5/4/2021 |
| DA1.2 | DEMOLITION PLAN - LEVEL 02 | 5/4/2021 |
| DA1.3 | DEMOLITION PLAN - LEVEL 03 | 5/4/2021 |
| DA1.4 | DEMOLITION PLAN - LEVEL 04 - 06 | 5/4/2021 |
| DA1.7 | DEMOLITION PLAN - LEVEL 07 | 5/4/2021 |
| DA1.8 | DEMOLITION PLAN - PENTHOUSE 08 | 5/4/2021 |
| DA1.9 | DEMOLITION PLAN - ROOF 09 | 5/4/2021 |
| DA3.1 | DEMOLITION ELEVATIONS | 5/4/2021 |
| DA3.2 | DEMOLITION ELEVATIONS | 5/4/2021 |
| | | |
| **STRUCTURE** | | |
| S0.01 | GENERAL NOTES | 5/4/2021 |
| S0.02 | GENERAL NOTES | 5/4/2021 |
| S0.03 | TYPICAL DETAILS | 5/4/2021 |
| S0.04 | TYPICAL DETAILS | 5/4/2021 |
| S0.05 | TYPICAL DETAILS | 5/4/2021 |
| S0.06 | TYPICAL DETAILS | 5/4/2021 |
| S0.07 | TYPICAL DETAILS | 5/4/2021 |
| S0.08 | TYPICAL DETAILS | 5/4/2021 |
| S1.1 | TYPICAL FLOOR PENETRATIONS | 5/4/2021 |
| S2.0.1 | FOUNDATION PLANS - CELLAR 00 - SUBAREA A1 | 5/4/2021 |
| S2.0.2 | FOUNDATION PLANS - CELLAR 00 - SUBAREA A2 + B | 5/4/2021 |
| S2.0.3 | FOUNDATION PLANS - CELLAR 00 - SUBAREA C + D | 5/4/2021 |
| S2.0.4 | FOUNDATION PLANS - CELLAR 00 - SUBAREA E | 5/4/2021 |
| S2.1.1 | FRAMING PLANS - LEVEL 01 - SUBAREA A1 | 5/4/2021 |
| S2.1.2 | FRAMING PLANS - LEVEL 01 - SUBAREA A2 + B | 5/4/2021 |
| S2.1.3 | FRAMING PLANS - LEVEL 01 - SUBAREA C + D | 5/4/2021 |
| S2.1.4 | FRAMING PLANS - LEVEL 01 - SUBAREA E | 5/4/2021 |
| S2.1.B | FRAMING PLANS - MEZZ A AND BALCONY B | 5/4/2021 |
| S2.2.1 | FRAMING PLANS - LEVEL 02 - SUBAREA A1 | 5/4/2021 |
| S2.2.2 | FRAMING PLANS - LEVEL 02 - SUBAREA A2 + B | 5/4/2021 |
| S2.2.3 | FRAMING PLANS - LEVEL 02 - SUBAREA C | 5/4/2021 |
| S2.3.1 | FRAMING PLANS - LEVEL 03 - SUBAREA A1 | 5/4/2021 |
| S2.3.2 | FRAMING PLANS - LEVEL 03 - SUBAREA A2 + B | 5/4/2021 |
| S2.3.3 | FRAMING PLANS - LEVEL 03 - SUBAREA C | 5/4/2021 |
| S2.4.1 | FRAMING PLANS - LEVEL 04 - 06 - SUBAREA A1 | 5/4/2021 |
| S2.4.2 | FRAMING PLANS - LEVEL 04 - 06 - SUBAREA A2 + B | 5/4/2021 |
| S2.4.3 | FRAMING PLANS - LEVEL 04 - ROOF - SUBAREA C | 5/4/2021 |
| S2.6R.2 | FRAMING PLANS - LEVEL 6R - ROOF - SUBAREA B | 5/4/2021 |
| S2.7.1 | FRAMING PLANS - LEVEL 07 - SUBAREA A1 | 5/4/2021 |
| S2.7.2 | FRAMING PLANS - LEVEL 07 - SUBAREA A2 + B | 6/25/2021 |
| S2.7R.1 | FRAMING PLANS - LEVEL 07 ROOF - SUBAREA A1 | 5/4/2021 |
| S2.7R.2 | FRAMING PLANS - LEVEL 07 ROOF - SUBAREA A2 | 5/4/2021 |
| S2.8.1 | FRAMING PLANS - PENTHOUSE 08 - SUBAREA A1 | 6/25/2021 |
| S2.8.2 | FRAMING PLANS - PENTHOUSE 08 - SUBAREA A2 + B | 5/4/2021 |
| S2.9.1 | FRAMING PLANS - ROOF 09 - SUBAREA A1 | 5/4/2021 |
| S2.9.2 | FRAMING PLANS - ROOF 09 - SUBAREA A2 | 5/4/2021 |
| S3.0.1 | FOUNDATION SECTIONS + DETAILS | 5/4/2021 |

Exhibit G - Contract Documents

**EXHIBIT G**
CONTRACT DOCUMENTS
222 Mitchell

Balfour Beatty

| DOCUMENT NO. | DESCRIPTION | DATE ISSUED |
|---|---|---|
| S3.0.2 | FOUNDATIONS SECTION + DETAILS | 5/4/2021 |
| S3.1.1 | FOUNDATION SECTIONS + DETAILS | 5/4/2021 |
| S3.2.1 | FOUNDATION SECTIONS + DETAILS | 5/4/2021 |
| S4.0.1 | CONCRETE TYPICAL DETAILS | 5/4/2021 |
| S5.0.1 | FRAMING SECTIONS + DETAILS | 5/4/2021 |
| S5.0.2 | FRAMING SECTIONS + DETAILS | 5/4/2021 |
| S5.0.3 | FRAMING SECTIONS + DETAILS | 5/4/2021 |
| S5.0.4 | FRAMING SECTION + DETAILS | 5/4/2021 |
| S5.0.5 | FRAMING SECTIONS + DETAILS | 5/4/2021 |
| S5.0.6 | FRAMING SECTIONS + DETAILS | 5/4/2021 |
| S5.0.7 | FRAMING SECTIONS + DETAILS | 5/4/2021 |
| S5.0.8 | FRAMING SECTIONS + DETAILS | 5/4/2021 |
| S5.0.9 | FRAMING SECTIONS + DETAILS | 5/4/2021 |
| S5.1.0 | FRAMING SECTIONS + DETAILS | 5/4/2021 |
| S5.1.1 | FRAMING SECTIONS + DETAILS | 5/4/2021 |
| S5.1.2 | FRAMING SECTIONS + DETAILS | 5/4/2021 |
| S5.2.0 | FRAMING SECTIONS + DETAILS | 5/4/2021 |
| S5.2.1 | FRAMING SECTIONS + DETAILS | 5/4/2021 |
| S5.2.3 | FRAMING SECTIONS + DETAILS | 5/4/2021 |
| S5.2.4 | FRAMING SECTIONS + DETAILS | 5/4/2021 |
| S5.2.5 | FRAMING SECTIONS + DETAILS | 5/4/2021 |
| | | |
| **ARCHITECTURE** | | |
| A1.0 | BUILDING PLAN - CELLAR 00 | 5/4/2021 |
| A1.1B | BUILDING PLAN - BALCONY 01B | 5/4/2021 |
| A1.1 | BUILDING PLAN - LEVEL 01 | 6/25/2021 |
| A1.2 | BUILDING PLAN - LEVEL 02 | 5/4/2021 |
| A1.3 | BUILDING PLAN - LEVEL 03 | 5/4/2021 |
| A1.4 | BUILDING PLAN - LEVEL 04 | 5/4/2021 |
| A1.5 | BUILDING PLAN - LEVEL 05 | 5/4/2021 |
| A1.6 | BUILDING PLAN - LEVEL 06 | 5/4/2021 |
| A1.7 | BUILDING PLAN - LEVEL 07 | 5/4/2021 |
| A1.8 | BUILDING PLAN – PENTHOUSE 08 | 5/4/2021 |
| A1.9 | BUILDING PLAN - ROOF 09 | 5/4/2021 |
| A2.0.1 | FLOOR PLANS - CELLAR 00 - SUBAREA A1 | 5/4/2021 |
| A2.0.2 | FLOOR PLANS - CELLAR 00 - SUBAREAS A2 + B | 5/4/2021 |
| A2.0.3 | FLOOR PLANS - CELLAR 00 - SUBAREA C | 5/4/2021 |
| A2.0.4 | FLOOR PLANS - CELLAR 00 - SUBAREA E | 5/4/2021 |
| A2.1.1 | FLOOR PLANS - LEVEL 01 - SUBAREA A1 | 6/25/2021 |
| A2.1.2 | FLOOR PLANS - LEVEL 01 - SUBAREA A2 + B | 5/4/2021 |
| A2.1.3 | FLOOR PLANS - LEVEL 01 - SUBAREA C + D | 5/4/2021 |
| A2.1.4 | FLOOR PLANS - LEVEL 01 - SUBAREA E | 5/4/2021 |
| A2.1B.2 | FLOOR PLANS – BALCONY 01B - SUBAREA B | 5/4/2021 |
| A2.2.1 | FLOOR PLANS - LEVEL 02 - SUBAREA A1 | 5/4/2021 |
| A2.2.2 | FLOOR PLANS - LEVEL 02 - SUBAREA A2 + B | 5/4/2021 |
| A2.2.3 | FLOOR PLANS - LEVEL 02 - SUBAREA C | 5/4/2021 |
| A2.3.1 | FLOOR PLANS - LEVEL 03 - SUBAREA A1 | 5/4/2021 |
| A2.3.2 | FLOOR PLANS - LEVEL 03 - SUBAREA A2 + B | 5/4/2021 |

**EXHIBIT G**
CONTRACT DOCUMENTS
222 Mitchell

Balfour Beatty

| DOCUMENT NO. | DESCRIPTION | DATE ISSUED |
|---|---|---|
| A2.3.3 | FLOOR PLANS – LEVEL 03 - SUBAREA C | 5/4/2021 |
| A2.4.1 | FLOOR PLANS – LEVEL 04 - 06 - SUBAREA A1 | 5/4/2021 |
| A2.4.2 | FLOOR PLANS – LEVEL 04 - 06 - SUBAREA A2 + B | 5/4/2021 |
| A2.4.3 | FLOOR PLANS - ROOF - SUBAREA C | 5/4/2021 |
| A2.7.1 | FLOOR PLANS – LEVEL 07 - SUBAREA A1 | 5/4/2021 |
| A2.7.2 | FLOOR PLANS – LEVEL 07 - SUBAREA A2 + B | 5/4/2021 |
| A2.7R.1 | FLOOR PLANS – LEVEL 07 ROOF - SUBAREA A1 | 5/4/2021 |
| A2.7R.2 | FLOOR PLANS – LEVEL 07 ROOF - SUBAREA A2 | 5/4/2021 |
| A2.8.1 | FLOOR PLANS - PENTHOUSE 08 - SUBAREA A1 | 5/4/2021 |
| A2.8.2 | FLOOR PLANS - PENTHOUSE 08 - SUBAREA A2 | 5/4/2021 |
| A2.9.1 | FLOOR PLANS - ROOF 09 - SUBAREA A1 | 5/4/2021 |
| A2.9.2 | FLOOR PLANS - ROOF 09 - SUBAREA A2 | 5/4/2021 |
| A3.0.1 | RF CEILING PLANS - CELLAR 00 - SUBAREA A1 | 5/4/2021 |
| A3.0.2 | RF CEILING PLANS - CELLAR 00 - SUBAREAS A2 + B | 5/4/2021 |
| A3.0.3 | RF CEILING PLANS - CELLAR 00 - SUBAREA C | 5/4/2021 |
| A3.1.1 | RF CEILING PLANS - LEVEL 01 - SUBAREA A1 | 5/4/2021 |
| A3.1.2 | RF CEILING PLANS - LEVEL 01 - SUBAREA A2 + B | 5/4/2021 |
| A3.1.3 | RF CEILING PLANS - LEVEL 01 - SUBAREA C | 5/4/2021 |
| A3.1B.2 | RF CEILING PLANS - BALCONY 01B - SUBAREA B | 5/4/2021 |
| A3.2.1 | RF CEILING PLANS - LEVEL 02 - SUBAREA A1 | 5/4/2021 |
| A3.2.2 | RF CEILING PLANS - LEVEL 02 - SUBAREA A2 + B | 5/4/2021 |
| A3.2.3 | RF CEILING PLANS - LEVEL 02 - SUBAREA C | 5/4/2021 |
| A3.3.1 | RF CEILING PLANS - LEVEL 03 - SUBAREA A1 | 5/4/2021 |
| A3.3.2 | RF CEILING PLANS - LEVEL 03 - SUBAREA A2 + B | 5/4/2021 |
| A3.3.3 | RF CEILING PLANS - LEVEL 03 - SUBAREA C | 5/4/2021 |
| A3.4.1 | RF CEILING PLANS - LEVEL 04 - 06 - SUBAREA A1 | 5/4/2021 |
| A3.4.2 | RF CEILING PLANS - LEVEL 04 - 06 - SUBAREA A2 + B | 5/4/2021 |
| A3.7.1 | RF CEILING PLANS - LEVEL 07 - SUBAREA A1 | 5/4/2021 |
| A3.7.2 | RF CEILING PLANS - LEVEL 07 - SUBAREA A2 + B | 5/4/2021 |
| A3.8.1 | RF CEILING PLANS - PENTHOUSE 08 - SUBAREA A1 | 5/4/2021 |
| A3.8.2 | RF CEILING PLANS - PENTHOUSE 08 - SUBAREA A2 | 5/4/2021 |
| A4.0.1 | ELEVATIONS | 5/4/2021 |
| A4.0.2 | ELEVATIONS - SUBAREA A | 5/4/2021 |
| A4.0.3 | ELEVATIONS - SUBAREA A | 5/4/2021 |
| A4.0.4 | ELEVATIONS - SUBAREA A | 6/25/2021 |
| A4.0.5 | ELEVATIONS - SUBAREA A | 5/4/2021 |
| A4.0.6 | ELEVATIONS - SUBAREA B | 5/4/2021 |
| A4.0.7 | ELEVATIONS - SUBAREA B | 5/4/2021 |
| A4.0.8 | ELEVATIONS - SUBAREA C | 6/25/2021 |
| A4.1.1 | BUILDING SECTIONS | 5/4/2021 |
| A4.1.2 | BUILDING SECTIONS | 5/4/2021 |
| A4.2.1 | WALL SECTIONS - SUBAREA A | 5/4/2021 |
| A4.2.2 | WALL SECTIONS - SUBAREA A | 5/4/2021 |
| A4.2.3 | WALL SECTIONS - SUBAREA A | 5/4/2021 |
| A4.2.4 | WALL SECTIONS - SUBAREA B | 5/4/2021 |
| A4.2.5 | WALL SECTIONS - SUBAREA B | 5/4/2021 |
| A4.2.6 | WALL SECTIONS - SUBAREA B - A | 5/4/2021 |
| A4.2.7 | WALL SECTIONS - SUBAREA B - A | 5/4/2021 |

**EXHIBIT G**
CONTRACT DOCUMENTS
222 Mitchell

Balfour Beatty

| DOCUMENT NO. | DESCRIPTION | DATE ISSUED |
|---|---|---|
| A4.2.8 | WALL SECTIONS - SUBAREA C | 5/4/2021 |
| A4.2.9 | WALL SECTIONS - SUBAREA C - A | 5/4/2021 |
| A5.0.1 | ENLARGED PLANS - BUILDING CORES - SUBAREA A | 5/4/2021 |
| A5.0.2 | ENLARGED PLANS - BUILDING CORES – SUBAREAS B + C | 5/4/2021 |
| A5.1.1 | ENLARGED PLANS - LOBBY A | 5/4/2021 |
| A5.1.2 | ENLARGED PLANS - LOBBY B + C | 5/4/2021 |
| A5.4.1 | ENLARGED PLANS - BACK OF HOUSE | 5/4/2021 |
| A5.5.10 | STAIR A3 DETAILS | 5/4/2021 |
| A5.5.1 | ENLARGED PLANS AND SECTIONS - STAIR A1 | 6/25/2021 |
| A5.5.2 | ENLARGED PLANS AND SECTIONS - STAIR A2 | 6/25/2021 |
| A5.5.3 | ENLARGED PLANS AND SECTIONS - STAIR A3 | 5/4/2021 |
| A5.5.4 | ENLARGED PLANS AND SECTIONS - STAIR B1 | 6/25/2021 |
| A5.5.5 | ENLARGED PLANS AND SECTIONS - STAIR B2 | 6/25/2021 |
| A5.5.6 | ENLARGED PLANS AND SECTIONS - STAIRS C1, C2, C3, AND C4 | 6/25/2021 |
| A5.5.9 | STAIR DETAILS | 6/25/2021 |
| A5.6.1 | ELEVATOR DRAWINGS - PE1 - PE6 | 5/4/2021 |
| A5.6.2 | ELEVATOR DRAWINGS - PE7 - PE8 | 5/4/2021 |
| A5.6.3 | ELEVATOR DRAWINGS - PE9 | 5/4/2021 |
| A5.6.4 | ELEVATOR DRAWINGS – SE10 | 5/4/2021 |
| A6.0.10 | WINDOW DETAILS - SUBAREA A | 6/25/2021 |
| A6.0.1 | WINDOW SCHEDULE | 5/4/2021 |
| A6.0.20 | WINDOW DETAILS - SUBAREA B | 5/4/2021 |
| A6.0.30 | WINDOW DETAILS - SUBAREA C | 5/4/2021 |
| A6.1.1 | STOREFRONT SCHEDULES | 5/4/2021 |
| A6.1.2 | STOREFRONT ELEVATIONS - SUBAREA A | 5/4/2021 |
| A6.1.3 | STOREFRONT ELEVATIONS - SUBAREA A | 5/4/2021 |
| A6.1.4 | STOREFRONT ELEVATIONS - SUBAREAS B + C | 5/4/2021 |
| A6.1.10 | STOREFRONT TYPES - SUBAREA A | 5/4/2021 |
| A6.1.11 | STOREFRONT TYPES - SUBAREA A | 5/4/2021 |
| A6.1.12 | STOREFRONT TYPES - SUBAREA A | 5/4/2021 |
| A6.1.13 | STOREFRONT TYPES - SUBAREA A | 5/4/2021 |
| A6.1.20 | STOREFRONT TYPES - SUBAREA B | 5/4/2021 |
| A6.1.21 | STOREFRONT TYPES - SUBAREA B | 5/4/2021 |
| A6.1.30 | STOREFRONT TYPES - SUBAREA C | 5/4/2021 |
| A6.2.10 | STOREFRONT DETAILS - SUBAREA A | 5/4/2021 |
| A6.2.11 | STOREFRONT DETAILS - SUBAREA A | 6/25/2021 |
| A6.2.12 | STOREFRONT DETAILS - SUBAREA A | 5/4/2021 |
| A6.2.20 | STOREFRONT DETAILS - SUBAREA B | 5/4/2021 |
| A6.2.21 | STOREFRONT DETAILS - SUBAREA B | 5/4/2021 |
| A6.2.30 | STOREFRONT DETAILS - SUBAREA C | 5/4/2021 |
| A6.3.0 | EXTERIOR FINISH SCHEDULE + REPAIR REQUIREMENTS | 5/4/2021 |
| A6.3.1 | EXTERIOR WALL & SOFFIT ASSEMBLY TYPES | 6/25/2021 |
| A6.3.2 | EXTERIOR WALL & SOFFIT ASSEMBLY TYPES | 6/25/2021 |
| A6.3.3 | EXTERIOR WALL & SOFFIT ASSEMBLY TYPES | 6/25/2021 |
| A6.3.4 | ROOF ASSEMBLY TYPES | 5/4/2021 |
| A6.3.10 | EXTERIOR DETAILS - SUBAREA A TYPICAL WATERPROOFING | 6/25/2021 |
| A6.3.11 | EXTERIOR DETAILS - SUBAREA A TYPICAL WATERPROOFING | 6/25/2021 |
| A6.3.12 | EXTERIOR DETAILS - SUBAREA A TYPICAL WATERPROOFING | 6/25/2021 |

Exhibit G - Contract Documents

**EXHIBIT G**

CONTRACT DOCUMENTS

222 Mitchell

Balfour Beatty

| DOCUMENT NO | DESCRIPTION | DATE ISSUED |
|---|---|---|
| A6.3.13 | EXTERIOR DETAILS - SUBAREA A TYPICAL WATERPROOFING | 6/25/2021 |
| A6.3.20 | EXTERIOR DETAILS - SUBAREA B TYPICAL WATERPROOFING | 5/4/2021 |
| A6.3.23 | EXTERIOR DETAILS - SUBAREA B WATERPROOFING | 5/4/2021 |
| A6.3.30 | EXTERIOR DETAILS - SUBAREA C TYPICAL WATERPROOFING | 5/4/2021 |
| A6.3.31 | EXTERIOR DETAILS - SUBAREA C WATERPROOFING | 5/4/2021 |
| A6.3.32 | EXTERIOR DETAILS - SUBAREA C WATERPROOFING | 6/25/2021 |
| A6.4.0 | EXTERIOR DOOR SCHEDULE | 5/4/2021 |
| A6.4.1 | EXTERIOR DOOR ELEVATIONS | 5/4/2021 |
| A6.4.10 | EXTERIOR DOOR DETAILS - SUBAREA A | 6/25/2021 |
| A6.4.11 | EXTERIOR DOOR DETAILS - SUBAREA A | 6/25/2021 |
| A6.4.12 | EXTERIOR DOOR DETAILS - SUBAREA A | 6/25/2021 |
| A6.4.13 | EXTERIOR DOOR DETAILS - SUBAREA A | 6/25/2021 |
| A6.4.20 | EXTERIOR DOOR DETAILS - SUBAREA B | 5/4/2021 |
| A6.4.30 | EXTERIOR DOOR DETAILS - SUBAREA C | 5/4/2021 |
| A6.4.40 | EXTERIOR LOUVER DETAILS - SUBAREA A | 6/25/2021 |
| A7.0.1 | INTERIOR PARTITION TYPES | 5/4/2021 |
| A7.1.1 | INTERIOR DOOR SCHEDULE | 6/25/2021 |
| A7.3.1 | ROOM FINISH SCHEDULE | 5/4/2021 |
| A7.4.10 | INTERIOR DETAILS - SUBAREA A CORE | 5/4/2021 |
| A7.4.11 | INTERIOR DETAILS - SUBAREA A CORE | 5/4/2021 |
| A7.4.12 | INTERIOR DETAILS - SUBAREA A CORE | 5/4/2021 |
| A7.4.13 | INTERIOR DETAILS - SUBAREA A CORE | 5/4/2021 |
| A7.4.20 | INTERIOR DETAILS - SUBAREA B CORE | 5/4/2021 |
| A7.4.21 | INTERIOR DETAILS - SUBAREA B CORE | 5/4/2021 |
| A7.4.30 | INTERIOR DETAILS - PH TENANT LOBBY | 5/4/2021 |
| A7.4.31 | INTERIOR DETAILS - PH TENANT LOBBY | 5/4/2021 |
| | | |
| **INTERIOR ARCHITECTURE** | | |
| ID5.0.1 | ENLARGED FINISH PLANS - BUILDING A CORE | 5/4/2021 |
| ID5.0.4 | ENLARGED FINISH PLANS - BUILDING A CELLAR LOBBY | 5/4/2021 |
| ID5.0.5 | ENLARGED FINISH PLANS - BUILDING A CELLAR | 5/4/2021 |
| ID5.0.7 | INTERIOR ELEVATIONS - BUILDING A CORE | 5/4/2021 |
| ID5.0.8 | INTERIOR ELEVATIONS - BUILDING A CELLAR | 5/4/2021 |
| ID5.0.9 | INTERIOR ELEVATIONS - BUILDING A CELLAR | 5/4/2021 |
| ID5.1.1 | ENLARGED FINISH - FURNITURE PLANS - LOBBY A | 5/4/2021 |
| ID5.1.2 | ENLARGED FINISH PLANS - LOBBY B + C | 5/4/2021 |
| ID5.1.3 | ENLARGED RCP - LOBBY A | 5/4/2021 |
| ID5.1.4 | ENLARGED RCP - LOBBY B + C | 5/4/2021 |
| ID5.1.5 | INTERIOR ELEVATIONS - LOBBY A | 5/4/2021 |
| ID5.1.6 | INTERIOR ELEVATIONS - LOBBY A | 5/4/2021 |
| ID5.1.7 | INTERIOR ELEVATIONS - LOBBY B + C | 5/4/2021 |
| ID5.3.1 | TYPICAL LOBBY A BANQUETTE | 5/4/2021 |
| ID5.3.2 | LOBBY A MAIN DESK | 5/4/2021 |
| ID5.3.3 | LOBBY A MAIN DESK - MILLWORK DETAILS | 5/4/2021 |
| ID5.3.4 | LOBBY DETAILS | 5/4/2021 |
| ID5.3.5 | LOBBY DETAILS | 5/4/2021 |
| ID5.5.11 | ENLARGED DETAILS - STAIR C1 | 5/4/2021 |
| ID5.5.6 | ENLARGED PLANS AND SECTIONS - STAIR C1 | 5/4/2021 |

Exhibit G - Contract Documents

**EXHIBIT G**
CONTRACT DOCUMENTS
222 Mitchell

Balfour Beatty

| DOCUMENT NO. | DESCRIPTION | DATE ISSUED |
|---|---|---|
| ID5.6.2 | ELEVATOR CAB INTERIORS - PE - 01 | 5/4/2021 |
| ID5.6.3 | ELEVATOR CAB INTERIORS - PE - 02 | 5/4/2021 |
| ID5.6.4 | ELEVATOR CAB INTERIORS - PE - 03 | 5/4/2021 |
| ID5.6.5 | ELEVATOR CAB INTERIORS - PE - 04 - PE - 06 | 5/4/2021 |
| ID5.6.6 | ELEVATOR CAB INTERIORS - PE - 07 | 5/4/2021 |
| ID5.6.7 | ELEVATOR CAB INTERIORS - PE - 08 | 5/4/2021 |
| ID5.6.8 | ELEVATOR CAB INTERIORS - PE - 09 | 5/4/2021 |
| ID5.8.10 | BATHROOMS - CELLAR A103 | 5/4/2021 |
| ID5.8.11 | BATHROOMS - CELLAR A102 | 5/4/2021 |
| ID5.8.12 | BATHROOMS - CELLAR A102 | 5/4/2021 |
| ID5.8.13 | ENLARGED PLANS - CELLAR BIKE STORAGE | 5/4/2021 |
| ID5.8.14 | INTERIOR ELEVATIONS - CELLAR BIKE STORAGE | 5/4/2021 |
| ID5.8.1 | BATHROOMS - TYPICAL BUILDING A TYPE I | 5/4/2021 |
| ID5.8.2 | BATHROOMS - TYPICAL BUILDING A TYPE I | 5/4/2021 |
| ID5.8.3 | BATHROOMS - TYPICAL BUILDING A TYPE II | 5/4/2021 |
| ID5.8.4 | BATHROOMS - TYPICAL BUILDING A TYPE II ELEVATIONS | 5/4/2021 |
| ID5.8.7 | BATHROOMS - TYPICAL LOBBY A UNISEX WC | 5/4/2021 |
| ID5.8.8 | BATHROOMS - CELLAR A104 | 5/4/2021 |
| ID5.8.9 | BATHROOMS - CELLAR A103 | 5/4/2021 |
| ID5.9.1 | BATHROOMS - TYPICAL DETAILS | 5/4/2021 |
| ID5.9.2 | ENLARGED WALL TRANSITION DETAILS | 5/4/2021 |
| ID5.9.3 | ELEVATOR CABS - TYPICAL DETAILS | 5/4/2021 |
| ID7.1.2 | INTERIOR DOOR DETAILS | 5/4/2021 |
| ID7.1.3 | INTERIOR DOOR DETAILS | 5/4/2021 |
| ID7.2.1 | INTERIOR SCHEDULES + DETAILS | 5/4/2021 |
| | | |
| **ELECTRICAL** | | |
| E0.0 | ELECTRICAL LEGEND | 5/4/2021 |
| E0.1 | ELECTRICAL ONE - LINE RISER DIAGRAM - BUILDING A | 6/25/2021 |
| E0.2 | ELECTRICAL ONE - LINE RISER DIAGRAM - BUILDING B & C | 6/25/2021 |
| E0.3 | ELECTRICAL EMERGENCY ONE - LINE RISER DIAGRAM - BUILDING A | 5/4/2021 |
| E0.4 | ELECTRICAL EMERGENCY ONE - LINE RISER DIAGRAM - BUILDING B + C | 5/10/2021 |
| E0.5 | ELECTRICAL GROUNDING RISER DIAGRAM | 5/4/2021 |
| E1.0.1 | ELECTRICAL - SITE PLAN | 5/4/2021 |
| E2.0.1 | ELECTRICAL LIGHTING FLOOR PLANS - CELLAR 00 - SUBAREA A1 | 6/25/2021 |
| E2.0.2 | ELECTRICAL LIGHTING FLOOR PLANS - CELLAR 00 - SUBAREAS A2 & B | 6/25/2021 |
| E2.0.3 | ELECTRICAL LIGHTING FLOOR PLANS - CELLAR 00 - SUBAREA C | 6/25/2021 |
| E2.0.4 | ELECTRICAL LIGHTING FLOOR PLANS - CELLAR 00 - SUBAREA E | 6/25/2021 |
| E2.1.1 | ELECTRICAL LIGHTING FLOOR PLANS - LEVEL 01 - SUBAREA A1 | 6/25/2021 |
| E2.1.2 | ELECTRICAL LIGHTING FLOOR PLANS - LEVEL 01 - SUBAREA A2 & B | 6/25/2021 |
| E2.1.3 | ELECTRICAL LIGHTING FLOOR PLANS - LEVEL 01 - SUBAREA C & D | 6/25/2021 |
| E2.1.4 | ELECTRICAL LIGHTING FLOOR PLANS - LEVEL 01 - SUBAREA E | 6/25/2021 |
| E2.1B.2 | ELECTRICAL LIGHTING FLOOR PLANS - BALCONY 01B - - SUBAREA B | 5/4/2021 |
| E2.2.1 | ELECTRICAL LIGHTING FLOOR PLANS - LEVEL 02 - SUBAREA A1 | 6/25/2021 |
| E2.2.2 | ELECTRICAL LIGHTING FLOOR PLANS - LEVEL 02 - SUBAREA A2 & B | 6/25/2021 |
| E2.2.3 | ELECTRICAL LIGHTING FLOOR PLANS - LEVEL 02 - SUBAREA C | 6/25/2021 |
| E2.3.1 | ELECTRICAL LIGHTING FLOOR PLANS - LEVEL 03 - SUBAREA A1 | 6/25/2021 |
| E2.3.2 | ELECTRICAL LIGHTING FLOOR PLANS - LEVEL 03 - SUBAREA A2 & B | 6/25/2021 |
| E2.3.3 | ELECTRICAL LIGHTING FLOOR PLANS - LEVEL 03 - SUBAREA C | 6/25/2021 |

**EXHIBIT G**
CONTRACT DOCUMENTS
222 Mitchell

Balfour Beatty

| DOCUMENT NO. | DESCRIPTION | DATE ISSUED |
|---|---|---|
| E2.4.1 | ELECTRICAL LIGHTING FLOOR PLANS - LEVEL 04 - 06 - SUBAREA A1 | 6/25/2021 |
| E2.4.2 | ELECTRICAL LIGHTING FLOOR PLANS - LEVEL 04 - 06 - SUBAREA A2 & B | 6/25/2021 |
| E2.7.1 | ELECTRICAL LIGHTING FLOOR PLANS - LEVEL 07 - SUBAREA A1 | 6/25/2021 |
| E2.7.2 | ELECTRICAL LIGHTING FLOOR PLANS - LEVEL 07 - SUBAREA A2 & B | 6/25/2021 |
| E2.8.1 | ELECTRICAL LIGHTING FLOOR PLANS - PENTHOUSE 08 - SUBAREA A1 | 6/25/2021 |
| E2.8.2 | ELECTRICAL LIGHTING FLOOR PLANS - PENTHOUSE 08 - SUBAREA A2 | 6/25/2021 |
| E4.0.1 | ELECTRICAL POWER FLOOR PLANS - CELLAR 00 - SUBAREA A1 | 5/4/2021 |
| E4.0.2 | ELECTRICAL POWER FLOOR PLANS - CELLAR 00 - SUBAREAS A2 + B | 5/4/2021 |
| E4.0.3 | ELECTRICAL POWER FLOOR PLANS - CELLAR 00 - SUBAREA C | 6/25/2021 |
| E4.0.4 | ELECTRICAL POWER FLOOR PLANS - CELLAR 00 - SUBAREA E | 5/4/2021 |
| E4.1.1 | ELECTRICAL POWER FLOOR PLANS - LEVEL 01 - SUBAREA A1 | 6/25/2021 |
| E4.1.2 | ELECTRICAL POWER FLOOR PLANS - LEVEL 01 - SUBAREA A2 + B | 5/4/2021 |
| E4.1.3 | ELECTRICAL POWER FLOOR PLANS - LEVEL 01 - SUBAREA C + D | 5/4/2021 |
| E4.1.4 | ELECTRICAL POWER FLOOR PLANS - LEVEL 01 - SUBAREA E | 5/4/2021 |
| E4.1B.2 | ELECTRICAL POWER FLOOR PLANS - BALCONY 01B - SUBAREA B | 5/4/2021 |
| E4.2.1 | ELECTRICAL POWER FLOOR PLANS - LEVEL 02 - SUBAREA A1 | 5/4/2021 |
| E4.2.2 | ELECTRICAL POWER FLOOR PLANS - LEVEL 02 - SUBAREA A2 + B | 5/4/2021 |
| E4.2.3 | ELECTRICAL POWER FLOOR PLANS - LEVEL 02 - SUBAREA C | 5/4/2021 |
| E4.3.1 | ELECTRICAL POWER FLOOR PLANS - LEVEL 03 - SUBAREA A1 | 5/4/2021 |
| E4.3.2 | ELECTRICAL POWER FLOOR PLANS - LEVEL 03 - SUBAREA A2 + B | 5/4/2021 |
| E4.3.3 | ELECTRICAL POWER FLOOR PLANS - LEVEL 03 - SUBAREA C | 5/4/2021 |
| E4.4.1 | ELECTRICAL POWER FLOOR PLANS - LEVEL 04 - 06 - SUBAREA A1 | 5/4/2021 |
| E4.4.2 | ELECTRICAL POWER FLOOR PLANS - LEVEL 04 - 06 - SUBAREA A2 + B | 5/4/2021 |
| E4.4.3 | ELECTRICAL POWER FLOOR PLANS - LEVEL 04 - 06 - SUBAREA C | 5/4/2021 |
| E4.7.1 | ELECTRICAL POWER FLOOR PLANS - LEVEL 07 - SUBAREA A1 | 5/4/2021 |
| E4.7.2 | ELECTRICAL POWER FLOOR PLANS - LEVEL 07 - SUBAREA A2 + B | 5/4/2021 |
| E4.8.1 | ELECTRICAL POWER FLOOR PLANS - PENTHOUSE 08 - SUBAREA A1 | 5/4/2021 |
| E4.8.2 | ELECTRICAL POWER FLOOR PLANS - PENTHOUSE 08 - SUBAREA A2 | 5/4/2021 |
| E4.9.1 | ELECTRICAL POWER FLOOR PLANS - ROOF 09 - SUBAREA A1 | 5/4/2021 |
| E4.9.2 | ELECTRICAL POWER FLOOR PLANS - ROOF 09 - SUBAREA A2 | 5/4/2021 |
| E5.0.1 | ELECTRICAL LIGHTING ELEVATIONS | 5/4/2021 |
| E5.1.1 | ELECTRICAL PART PLANS - BUILDING A ELECTRICAL | 6/25/2021 |
| E5.1.2 | ELECTRICAL PART PLANS - BUILDING A MDF | 6/25/2021 |
| E5.2.1 | ELECTRICAL PART PLANS - BUILDING B & C ELECTRICAL | 6/25/2021 |
| E5.2.2 | ELECTRICAL PART PLANS - BUILDING B & C IDF | 6/25/2021 |
| E6.0.1 | ELECTRICAL SCHEDULES - EQUIPMENT CONNECTIONS | 5/4/2021 |
| E6.0.2 | ELECTRICAL SCHEDULES - MECHANICAL HEATER CONNECTIONS | 5/4/2021 |
| E6.1.10 | ELECTRICAL PANEL SCHEDULES - BUILDING A LEGALLY REQUIRED | 5/4/2021 |
| E6.1.11 | ELECTRICAL PANEL SCHEDULES - BUILDING B EMERGENCY | 6/25/2021 |
| E6.1.12 | ELECTRICAL PANEL SCHEDULES - BUILDING B LEGALLY REQUIRED | 5/4/2021 |
| E6.1.13 | ELECTRICAL PANEL SCHEDULES - BUILDING C EM - LR | 5/4/2021 |
| E6.1.1 | ELECTRICAL PANEL SCHEDULES - MAINS & BUILDING A | 6/25/2021 |
| E6.1.2 | ELECTRICAL PANEL SCHEDULES - BUILDING A | 6/25/2021 |
| E6.1.3 | ELECTRICAL PANEL SCHEDULES - BUILDING A | 6/25/2021 |
| E6.1.4 | ELECTRICAL PANEL SCHEDULES - BUILDING A | 6/25/2021 |
| E6.1.5 | ELECTRICAL PANEL SCHEDULES - BUILDING B | 6/25/2021 |
| E6.1.6 | ELECTRICAL PANEL SCHEDULES - BUILDING B | 6/25/2021 |
| E6.1.7 | ELECTRICAL PANEL SCHEDULES - BUILDING C | 6/25/2021 |
| E6.1.8 | ELECTRICAL PANEL SCHEDULES - BUILDING C | 6/25/2021 |

## EXHIBIT G
### CONTRACT DOCUMENTS
### 222 Mitchell

Balfour Beatty

| DOCUMENT NO. | DESCRIPTION | DATE ISSUED |
|---|---|---|
| E6.1.9 | ELECTRICAL PANEL SCHEDULES - BUILDING A EMERGENCY | 6/25/2021 |
| E6.2.1 | ELECTRICAL LUMINAIRE SCHEDULE | 5/4/2021 |
| E6.2.2 | ELECTRICAL SPECIALTY LUMINAIRE SCHEDULE | 5/4/2021 |
| E6.2.3 | ELECTRICAL LIGHTING CONTROLS SPACE TYPE MATRIX - BUILDING A | 6/25/2021 |
| E6.2.4 | ELECTRICAL LIGHTING CONTROLS SPACE TYPE MATRIX - BUILDING B + C | 5/4/2021 |
| E6.2.5 | ELECTRICAL LIGHTING COMPLIANCE CERTIFICATE | 5/4/2021 |
| E7.0.1 | ELECTRICAL DETAILS | 5/4/2021 |
| E7.0.2 | ELECTRICAL DETAILS | 5/4/2021 |
| E7.0.3 | ELECTRICAL DETAILS | 5/4/2021 |
| E7.1.1 | ELECTRICAL SPECIALTY LIGHTING CONTROL RISER | 5/4/2021 |
|  |  |  |
| **FIRE ALARM** |  |  |
| FA0.0 | FIRE ALARM RISER, LEGEND AND NOTES | 6/25/2021 |
| FA0.2 | FIRE ALARM OPERATING SEQUENCE | 5/4/2021 |
| FA2.0.1 | FIRE ALARM FLOOR PLANS - CELLAR 00 - SUBAREA A1 | 5/4/2021 |
| FA2.0.2 | FIRE ALARM FLOOR PLANS - CELLAR 00 - SUBAREAS A2 + B | 5/4/2021 |
| FA2.0.3 | FIRE ALARM FLOOR PLANS - CELLAR 00 - SUBAREA C | 5/4/2021 |
| FA2.1.1 | FIRE ALARM FLOOR PLANS - LEVEL 01 - SUBAREA A1 | 6/25/2021 |
| FA2.1.2 | FIRE ALARM FLOOR PLANS - LEVEL 01 - SUBAREA A2 + B | 5/4/2021 |
| FA2.1.3 | FIRE ALARM FLOOR PLANS - LEVEL 01 - SUBAREA C + D | 5/4/2021 |
| FA2.1B.2 | FIRE ALARM FLOOR PLANS - BALCONY 01B - SUBAREA B | 5/4/2021 |
| FA2.2.1 | FIRE ALARM FLOOR PLANS - LEVEL 02 - SUBAREA A1 | 5/4/2021 |
| FA2.2.2 | FIRE ALARM FLOOR PLANS - LEVEL 02 - SUBAREA A2 + B | 5/4/2021 |
| FA2.2.3 | FIRE ALARM FLOOR PLANS - LEVEL 02 - SUBAREA C | 5/4/2021 |
| FA2.3.1 | FIRE ALARM FLOOR PLANS - LEVEL 03 - SUBAREA A1 | 5/4/2021 |
| FA2.3.2 | FIRE ALARM FLOOR PLANS - LEVEL 03 - SUBAREA A2 + B | 5/4/2021 |
| FA2.3.3 | FIRE ALARM FLOOR PLANS - LEVEL 03 - SUBAREA C | 5/4/2021 |
| FA2.4.1 | FIRE ALARM FLOOR PLANS - LEVEL 04 - 06 - SUBAREA A1 | 5/4/2021 |
| FA2.4.2 | FIRE ALARM FLOOR PLANS - LEVEL 04 - 06 - SUBAREA A2 + B | 5/4/2021 |
| FA2.4.3 | FIRE ALARM FLOOR PLANS - LEVEL 04 - 06 - SUBAREA C | 5/4/2021 |
| FA2.7.1 | FIRE ALARM FLOOR PLANS - LEVEL 07 - SUBAREA A1 | 5/4/2021 |
| FA2.7.2 | FIRE ALARM FLOOR PLANS - LEVEL 07 - SUBAREA A2 + B | 5/4/2021 |
| FA2.8.1 | FIRE ALARM FLOOR PLANS - PENTHOUSE 08 - SUBAREA A1 | 5/4/2021 |
| FA2.8.2 | FIRE ALARM FLOOR PLANS - PENTHOUSE 08 - SUBAREA A2 | 5/4/2021 |
| FA2.9.1 | FIRE ALARM FLOOR PLANS - ROOF 09 - SUBAREA A1 | 5/4/2021 |
|  |  |  |
| **FIRE PROTECTION** |  |  |
| FP0.0 | FIRE PROTECTION LEGEND AND NOTES | 6/25/2021 |
| FP2.0.1 | FIRE PROTECTION FLOOR PLANS - CELLAR 00 - SUBAREA A1 | 6/25/2021 |
| FP2.0.2 | FIRE PROTECTION FLOOR PLANS - CELLAR 00 - SUBAREAS A2 + B | 6/25/2021 |
| FP2.0.3 | FIRE PROTECTION FLOOR PLANS - CELLAR 00 - SUBAREA C | 6/25/2021 |
| FP2.0.4 | FIRE PROTECTION FLOOR PLANS - CELLAR 00 - SUBAREA E | 5/4/2021 |
| FP2.1.1 | FIRE PROTECTION FLOOR PLANS - LEVEL 01 - SUBAREA A1 | 6/25/2021 |
| FP2.1.2 | FIRE PROTECTION FLOOR PLANS - LEVEL 01 - SUBAREA A2 + B | 6/25/2021 |
| FP2.1.3 | FIRE PROTECTION FLOOR PLANS - LEVEL 01 - SUBAREA C + D | 6/25/2021 |
| FP2.1.4 | FIRE PROTECTION FLOOR PLANS - LEVEL 01 - SUBAREA E | 6/25/2021 |
| FP2.1B.2 | FIRE PROTECTION FLOOR PLANS - BALCONY 01B - SUBAREA B | 6/25/2021 |
| FP2.2.1 | FIRE PROTECTION FLOOR PLANS - LEVEL 02 - SUBAREA A1 | 6/25/2021 |

**EXHIBIT G**
CONTRACT DOCUMENTS
222 Mitchell

Balfour Beatty

| DOCUMENT NO. | DESCRIPTION | DATE ISSUED |
|---|---|---|
| FP2.2.2 | FIRE PROTECTION FLOOR PLANS - LEVEL 02 - SUBAREA A2 + B | 6/25/2021 |
| FP2.2.3 | FIRE PROTECTION FLOOR PLANS - LEVEL 02 - SUBAREA C | 6/25/2021 |
| FP2.3.1 | FIRE PROTECTION FLOOR PLANS - LEVEL 03 - SUBAREA A1 | 6/25/2021 |
| FP2.3.2 | FIRE PROTECTION FLOOR PLANS - LEVEL 03 - SUBAREA A2 + B | 6/25/2021 |
| FP2.3.3 | FIRE PROTECTION FLOOR PLANS - LEVEL 03 - SUBAREA C | 6/25/2021 |
| FP2.4.1 | FIRE PROTECTION FLOOR PLANS - LEVEL 04 - 06 - SUBAREA A1 | 6/25/2021 |
| FP2.4.2 | FIRE PROTECTION FLOOR PLANS - LEVEL 04 - 06 - SUBAREA A2 + B | 6/25/2021 |
| FP2.4.3 | FIRE PROTECTION FLOOR PLANS - LEVEL 04 - 06 - SUBAREA C | 5/4/2021 |
| FP2.7.1 | FIRE PROTECTION FLOOR PLANS - LEVEL 07 - SUBAREA A1 | 6/25/2021 |
| FP2.7.2 | FIRE PROTECTION FLOOR PLANS - LEVEL 07 - SUBAREA A2 + B | 6/25/2021 |
| FP2.8.1 | FIRE PROTECTION FLOOR PLANS - PENTHOUSE 08 - SUBAREA A1 | 6/25/2021 |
| FP2.8.2 | FIRE PROTECTION FLOOR PLANS - PENTHOUSE 08 - SUBAREA A2 | 6/25/2021 |
| FP2.9.1 | FIRE PROTECTION FLOOR PLANS - ROOF 09 - SUBAREA A1 | 5/4/2021 |
| FP4.0.1 | FIRE PROTECTION PUMP ROOM | 5/4/2021 |
| FP5.0.1 | FIRE PROTECTION DETAILS | 5/4/2021 |
| FP5.0.2 | FIRE PROTECTION DETAILS | 5/4/2021 |
| FP7.1 | FIRE PROTECTION STAIR SECTIONS | 6/25/2021 |
| FP7.2 | FIRE PROTECTION STAIR SECTIONS | 6/25/2021 |
| FP7.3 | FIRE PROTECTION STAIR SECTIONS | 6/25/2021 |
| | | |
| **MECHANICAL** | | |
| M0.0 | HVAC LEGEND | 5/4/2021 |
| M2.0.1 | HVAC FLOOR PLANS - CELLAR 00 - SUBAREA A1 | 5/4/2021 |
| M2.0.2 | HVAC FLOOR PLANS - CELLAR 00 - SUBAREAS A2 + B | 5/4/2021 |
| M2.0.3 | HVAC FLOOR PLANS - CELLAR 00 - SUBAREA C | 5/4/2021 |
| M2.1.1 | HVAC FLOOR PLANS - LEVEL 01 - SUBAREA A1 | 6/25/2021 |
| M2.1.2 | HVAC FLOOR PLANS - LEVEL 01 - SUBAREA A2 + B | 5/4/2021 |
| M2.1.3 | HVAC FLOOR PLANS - LEVEL 01 - SUBAREA C + D | 5/4/2021 |
| M2.1B.2 | HVAC FLOOR PLANS - BALCONY 01B - SUBAREA B | 5/4/2021 |
| M2.2.1 | HVAC FLOOR PLANS - LEVEL 02 - SUBAREA A1 | 5/4/2021 |
| M2.2.2 | HVAC FLOOR PLANS - LEVEL 02 - SUBAREA A2 + B | 5/4/2021 |
| M2.2.3 | HVAC FLOOR PLANS - LEVEL 02 - SUBAREA C | 5/4/2021 |
| M2.3.1 | HVAC FLOOR PLANS - LEVEL 03 - SUBAREA A1 | 5/4/2021 |
| M2.3.2 | HVAC FLOOR PLANS - LEVEL 03 - SUBAREA A2 + B | 5/4/2021 |
| M2.3.3 | HVAC FLOOR PLANS - LEVEL 03 - SUBAREA C | 5/4/2021 |
| M2.4.1 | HVAC FLOOR PLANS - LEVEL 04 - 06 - SUBAREA A1 | 5/4/2021 |
| M2.4.2 | HVAC FLOOR PLANS - LEVEL 04 - 06 - SUBAREA A2 + B | 5/4/2021 |
| M2.4.3 | HVAC FLOOR PLANS - LEVEL 04 - 06 - SUBAREA C | 5/4/2021 |
| M2.7.1 | HVAC FLOOR PLANS - LEVEL 07 - SUBAREA A1 | 5/4/2021 |
| M2.7.2 | HVAC FLOOR PLANS - LEVEL 07 - SUBAREA A2 + B | 5/4/2021 |
| M2.7B.1 | HVAC FLOOR PLANS - LEVEL 08 - INTERSTITIAL SPACE - SUBAREA A1 | 5/4/2021 |
| M2.7B.2 | HVAC FLOOR PLANS - LEVEL 08 - INTERSTITIAL SPACE - SUBAREA A2 | 5/4/2021 |
| M2.8.1 | HVAC FLOOR PLANS - PENTHOUSE 08 - SUBAREA A1 | 5/4/2021 |
| M2.8.2 | HVAC FLOOR PLANS - PENTHOUSE 08 - SUBAREA A2 + B | 5/4/2021 |
| M2.9.1 | HVAC FLOOR PLANS - ROOF 09 - SUBAREA A1 | 5/4/2021 |
| M3.0.1 | HVAC WATER SIDE FLOW SCHEMATIC | 5/4/2021 |
| M3.0.2 | HVAC AIRSIDE FLOW SCHEMATIC | 5/4/2021 |
| M4.0.1 | HVAC PART PLANS | 5/4/2021 |

Exhibit G - Contract Documents

**EXHIBIT G**
CONTRACT DOCUMENTS
222 Mitchell

Balfour Beatty

| DOCUMENT NO. | DESCRIPTION | DATE ISSUED |
|---|---|---|
| M5.0.1 | HVAC DETAILS | 5/4/2021 |
| M5.0.2 | HVAC DETAILS | 5/4/2021 |
| M6.0.1 | HVAC SCHEDULES | 6/25/2021 |
| M6.0.2 | HVAC SCHEDULES | 5/4/2021 |
| M6.0.3 | HVAC SCHEDULES | 5/4/2021 |
| M7.0.1 | HVAC DUCTWORK SECTIONS | 5/4/2021 |
| M7.0.2 | HVAC PIPING SECTIONS | 5/4/2021 |
| M8.0.1 | HVAC CONTROLS – LEGEND | 5/4/2021 |
| M8.0.2 | HVAC CONTROLS – AREA A SELF - CONTAINED A-C UNITS | 5/4/2021 |
| M8.0.3 | HVAC CONTROLS – AREA B SELF - CONTAINED A-C UNITS | 5/4/2021 |
| M8.0.4 | HVAC CONTROLS – AREA C SELF - CONTAINED A-C UNITS | 5/4/2021 |
| M8.0.5 | HVAC CONTROLS - CONDENSER WATER SYSTEM | 5/4/2021 |
| M8.0.6 | HVAC CONTROLS - ENERGY RECOVERY VENTILATORS | 5/4/2021 |
| M8.0.7 | HVAC CONTROLS - WATER SOURCE HEAT PUMPS | 5/4/2021 |
| M8.0.8 | HVAC CONTROLS - TERMINAL UNITS | 5/4/2021 |
| | | |
| **PLUMBING** | | |
| P0.0 | PLUMBING LEGEND | 5/4/2021 |
| P2.0.1 | PLUMBING FLOOR PLAN - CELLAR 00 - SUBAREA 1 | 5/10/2021 |
| P2.0.2 | PLUMBING FLOOR PLAN - CELLAR 00 - SUBAREA A2 + B | 5/10/2021 |
| P2.0.3 | PLUMBING FLOOR PLAN - CELLAR 00 - SUBAREA C | 5/4/2021 |
| P2.1.1 | PLUMBING FLOOR PLAN - LEVEL 1 - SUBAREA A1 | 6/25/2021 |
| P2.1.2 | PLUMBING FLOOR PLAN - LEVEL 1 - SUBAREA A2 + B | 5/10/2021 |
| P2.1.3 | PLUMBING FLOOR PLAN - LEVEL 1 - SUBAREA C | 5/4/2021 |
| P2.1.4 | PLUMBING FLOOR PLANS - LEVEL 1 - SUBAREA E | 5/4/2021 |
| P2.1B.2 | PLUMBING FLOOR PLANS - BALCONY 01B - SUBAREA B | 5/4/2021 |
| P2.2.1 | PLUMBING FLOOR PLANS - LEVEL 02 - SUBAREA A1 | 5/4/2021 |
| P2.2.2 | PLUMBING FLOOR PLANS - LEVEL 02 - SUBAREA A2 + B | 5/4/2021 |
| P2.2.3 | PLUMBING FLOOR PLANS - LEVEL 02 - SUBAREA C | 5/4/2021 |
| P2.3.1 | PLUMBING FLOOR PLANS - LEVEL 03 - SUBAREA A1 | 5/4/2021 |
| P2.3.2 | PLUMBING FLOOR PLANS - LEVEL 03 - SUBAREA A2 + B | 5/4/2021 |
| P2.3.3 | PLUMBING FLOOR PLANS - LEVEL 03 - SUBAREA C | 5/4/2021 |
| P2.4.1 | PLUMBING FLOOR PLANS - LEVEL 04 - 06 - SUBAREA A1 | 5/4/2021 |
| P2.4.2 | PLUMBING FLOOR PLANS - LEVEL 04 - 06 - SUBAREA A2 + B | 5/4/2021 |
| P2.4.3 | PLUMBING ROOF PLANS - LEVEL 04 - 06 - SUBAREA C | 5/4/2021 |
| P2.7.1 | PLUMBING FLOOR PLAN - LEVEL 7 - SUBAREA A1 | 5/4/2021 |
| P2.7.2 | PLUMBING FLOOR PLAN - LEVEL 7 - SUBAREA A2 + B | 5/4/2021 |
| P2.8.1 | PLUMBING FLOOR PLAN - PENTHOUSE - SUBAREA A1 | 5/10/2021 |
| P2.8.2 | PLUMBING FLOOR PLAN - PENTHOUSE - SUBAREA A2 | 5/10/2021 |
| P3.1 | PLUMBING PART PLANS - TOILET ROOM CORES | 5/4/2021 |
| P3.2 | PLUMBING ENLARGED TOILET PLANS | 6/25/2021 |
| P3.3 | PLUMBING PART PLANS - MACHINE ROOM | 5/4/2021 |
| P5.0.1 | PLUMBING DETAILS | 5/4/2021 |
| P5.02 | PLUMBING DETAILS | 5/4/2021 |
| P6.0 | PLUMBING SCHEDULE | 5/4/2021 |
| P7.1 | PLUMBING - WASTE RISER DIAGRAMS | 5/4/2021 |
| P7.2 | PLUMBING - WATER RISER DIAGRAMS | 5/4/2021 |
| P7.3 | PLUMBING - RISER DIAGRAMS | 5/4/2021 |

Exhibit G - Contract Documents

**EXHIBIT G**
CONTRACT DOCUMENTS
222 Mitchell

Balfour Beatty

| DOCUMENT NO. | DESCRIPTION | DATE ISSUED |
|---|---|---|
| P7.5 | PLUMBING - RISER DIAGRAMS | 8/6/2021 |
| | | |
| **SECURITY** | | |
| SC0.0 | SECURITY LEGEND AND GENERAL NOTES | 5/4/2021 |
| SC2.0.1 | SECURITY FLOOR PLANS - CELLAR 00 - SUBAREA A1 | 5/4/2021 |
| SC2.0.2 | SECURITY FLOOR PLANS - CELLAR 00 - SUBAREAS A2 + B | 5/4/2021 |
| SC2.0.3 | SECURITY FLOOR PLANS - CELLAR 00 - SUBAREA C | 5/4/2021 |
| SC2.1.1 | SECURITY FLOOR PLANS - LEVEL 01 - SUBAREA A1 | 5/4/2021 |
| SC2.1.2 | SECURITY FLOOR PLANS - LEVEL 01 - SUBAREA A2 + B | 5/4/2021 |
| SC2.1.3 | SECURITY FLOOR PLANS - LEVEL 01 - SUBAREA C + D | 5/4/2021 |
| SC2.1.4 | SECURITY FLOOR PLANS - LEVEL 01 - SUBAREA E | 5/4/2021 |
| SC2.1B.2 | SECURITY FLOOR PLANS - BALCONY 01B - SUBAREA B | 5/4/2021 |
| SC2.2.1 | SECURITY FLOOR PLANS - LEVEL 02 - SUBAREA A1 | 5/4/2021 |
| SC2.2.2 | SECURITY FLOOR PLANS - LEVEL 02 - SUBAREA A2 + B | 5/4/2021 |
| SC2.2.3 | SECURITY FLOOR PLANS - LEVEL 02 - SUBAREA C | 5/4/2021 |
| SC2.3.1 | SECURITY FLOOR PLANS  LEVEL 03 - SUBAREA A1 | 6/25/2021 |
| SC2.3.2 | SECURITY FLOOR PLANS  LEVEL 03 - SUBAREA A2 + B | 6/25/2021 |
| SC2.3.3 | SECURITY FLOOR PLANS - LEVEL 03 - SUBAREA C | 5/4/2021 |
| SC2.4.1 | SECURITY FLOOR PLANS - LEVEL 04 - 06 - SUBAREA A1 | 6/25/2021 |
| SC2.4.2 | SECURITY FLOOR PLANS - LEVEL 04 - 06 - SUBAREA A2 + B | 6/25/2021 |
| SC2.7.1 | SECURITY FLOOR PLANS - LEVEL 07 - SUBAREA A1 | 5/4/2021 |
| SC2.7.2 | SECURITY FLOOR PLANS - LEVEL 07 - SUBAREA A2 + B | 5/4/2021 |
| SC2.8.1 | SECURITY FLOOR PLANS - PENTHOUSE 08 - SUBAREA A1 | 5/4/2021 |
| SC2.8.2 | SECURITY FLOOR PLANS - PENTHOUSE 08 - SUBAREA A2 | 5/4/2021 |
| SC6.0 | SECURITY - DOOR DETAILS | 5/4/2021 |
| SC6.1 | SECURITY - CAMERA DETAILS | 5/4/2021 |
| SC6.2 | SECURITY - BARRIER DETAILS | 5/4/2021 |
| SC6.3 | SECURITY - DEVICE DETAILS | 5/4/2021 |
| SC6.4 | SECURITY CONTROL ROOM ENLARGED PLANS | 5/4/2021 |
| SC6.5 | SECURITY FUNCTIONAL DIAGRAM | 5/4/2021 |
| | | |
| **TELECOM** | | |
| T0.01 | TELECOM LEGEND | 5/4/2021 |
| T1.01 | TELECOM - SITE PLAN | 5/4/2021 |
| T2.0.1 | TELECOM FLOOR PLANS - CELLAR 00 - SUBAREA A1 | 6/25/2021 |
| T2.0.2 | TELECOM FLOOR PLANS - CELLAR 00 - SUBAREAS A2 + B | 6/25/2021 |
| T2.0.3 | TELECOM FLOOR PLANS - CELLAR 00 - SUBAREA C | 6/25/2021 |
| T2.1.1 | TELECOM FLOOR PLANS - LEVEL 01 - SUBAREA A1 | 6/25/2021 |
| T2.1.2 | TELECOM FLOOR PLANS - LEVEL 01 - SUBAREA A2 + B | 5/4/2021 |
| T2.1.3 | TELECOM FLOOR PLANS - LEVEL 01 - SUBAREA C + D | 5/4/2021 |
| T2.1B.2 | TELECOM FLOOR PLANS - BALCONY 01B - SUBAREA B | 5/4/2021 |
| T2.2.1 | TELECOM FLOOR PLANS - LEVEL 02 - SUBAREA A1 | 5/4/2021 |
| T2.2.2 | TELECOM FLOOR PLANS - LEVEL 02 - SUBAREA A2 + B | 5/4/2021 |
| T2.2.3 | TELECOM FLOOR PLANS - LEVEL 02 - SUBAREA C | 5/4/2021 |
| T2.3 | TELECOM FLOOR PLAN - LEVEL 03 | 6/25/2021 |
| T2.4 | TELECOM FLOOR PLAN - LEVEL 04 | 6/25/2021 |
| T2.5 | TELECOM FLOOR PLAN - LEVEL 05 | 6/25/2021 |
| T2.6 | TELECOM FLOOR PLAN - LEVEL 06 | 5/4/2021 |

**EXHIBIT G**

CONTRACT DOCUMENTS

222 Mitchell

Balfour Beatty

| DOCUMENT NO. | DESCRIPTION | DATE ISSUED |
|---|---|---|
| T2.7 | TELECOM FLOOR PLAN - LEVEL 07 | 5/4/2021 |
| T2.8 | TELECOM FLOOR PLAN - PENTHOUSE | 5/4/2021 |
| T2.9 | TELECOM FLOOR PLAN - ROOF | 5/4/2021 |
| T3.01 | OPERATIONAL TECHNOLOGY TOPOLOGY | 5/4/2021 |
| T3.02 | OPERATIONAL TECHNOLOGY NETWORK DIAGRAM - SUBAREA A | 6/25/2021 |
| T3.03 | OPERATIONAL TECHNOLOGY NETWORK DIAGRAM - SUBAREA B | 6/25/2021 |
| T3.04 | OPERATIONAL TECHNOLOGY NETWORK DIAGRAM - SUBAREA C | 5/4/2021 |
| T3.05 | OPERATIONAL TECHNOLOGY SUBMETERING DIAGRAM | 6/25/2021 |
| T3.06 | OPERATIONAL TECHNOLOGY NETWORK ARCHITECTURE RISER | 6/25/2021 |
| T4.0.1 | TELECOM ENLARGED PLANS - SUBAREA A | 6/25/2021 |
| T4.0.2 | TELECOM ENLARGED PLANS - SUBAREA B | 6/25/2021 |
| T4.0.3 | TELECOM ENLARGED PLANS - SUBAREA C | 5/4/2021 |
| T4.1.1 | TELECOM RACK ELEVATIONS | 5/4/2021 |
| T5.01 | TELECOM GENERAL DETAILS | 5/4/2021 |
| T5.02 | TELECOM GENERAL DETAILS | 5/4/2021 |
| T6.0.1 | OT - MECHANICAL EQUIPMENT SCHEDULE | 6/25/2021 |
| T6.0.2 | OT - OPERATIONAL TECHNOLOGY AND ELECTRICAL EQUIPMENT | 6/25/2021 |
| T7.0.1 | TELECOM CONDUIT AND GROUNDING RISERS | 5/4/2021 |
| T7.0.2 | TELECOM FIBER & COPPER BACKBONE RISERS | 6/25/2021 |
| T7.0.3 | TELECOM RESCUE ASISTANCE SYSTEM RISER | 5/4/2021 |
| | | |

Exhibit G - Contract Documents

EXHIBIT G
CONTRACT DOCUMENTS
222 Mitchell

| SPECIFICATIONS | DESCRIPTION | Date |
|---|---|---|
| **DIVISION 00 – PROCUREMENT AND CONTRACTING REQUIREMENTS** | | |
| 000000 | Cover | 5/4/2021 |
| 000001 | Directory | 5/4/2021 |
| 000107 | Seals Page | 5/4/2021 |
| 000110 | Table of Contents | REV 6/25/2021 |
| 000115 | List of Drawings - See Drawings | 5/4/2021 |
| 003100 | Available Project Information | 5/4/2021 |
| 005000 | Contracting Forms and Supplements | 5/4/2021 |
| 006001 | Contractor Submittals Review Form | 5/4/2021 |
| 006002 | Installer Concurrence Form | 5/4/2021 |
| 006003 | Contractor Warranty Form | 5/4/2021 |
| 006004 | Installer Warranty Form | 5/4/2021 |
| 007100 | Contracting Definitions | 5/4/2021 |
| **DIVISION 01 - GENERAL REQUIREMENTS** | | |
| 011000 | Summary | 5/4/2021 |
| 012000 | Price and Payment Procedures | 5/4/2021 |
| 012100 | Allowances | 5/4/2021 |
| 012300 | Alternates | 5/4/2021 |
| 012500 | Substitution Procedures and Form | 5/4/2021 |
| 012613 | Request for Information (RFI) and Form | 5/4/2021 |
| 012973 | Schedule of Values | 5/4/2021 |
| 013000 | Administrative Requirements | 5/4/2021 |
| 013113 | Coordination | 5/4/2021 |
| 013216 | Construction Progress Schedule | 5/4/2021 |
| 014000 | Quality Requirements | 5/4/2021 |
| 014216 | Definitions | 5/4/2021 |
| 014533 | Structural Testing and Special Inspection Services | 5/4/2021 |
| 015000 | Temporary Facilities and Controls | 5/4/2021 |
| 015100 | Temporary Utilities | 5/4/2021 |
| 015639 | Temporary Tree and Plant Protection | 5/4/2021 |
| 015719 | Temporary Environmental Controls | 5/4/2021 |
| 016000 | Product Requirements | 5/4/2021 |
| 016116 | Volatile Organic Compound (VOC) Content Restrictions | 5/4/2021 |
| 017000 | Execution and Closeout Requirements | 5/4/2021 |
| 017123 | Field Engineering | 5/4/2021 |
| 017419 | Construction Waste Management and Disposal | 5/4/2021 |
| 017800 | Closeout Procedures | 5/4/2021 |
| **DIVISION 02 – EXISTING CONDITIONS** | | |
| 023000 | Subsurface Investigations | 5/4/2021 |
| 024119 | Selective Structure Demolition | 5/4/2021 |
| **DIVISION 03 - CONCRETE** | | |
| 030100 | Maintenance of Concrete | 5/4/2021 |
| 033000 | Cast-in-Place Concrete | 5/4/2021 |
| 033500 | Concrete Grinding and Polishing | 5/4/2021 |
| 033511 | Concrete Floor Finishes | REV 6/25/2021 |
| **DIVISION 04 - MASONRY** | | |
| 040100 | Maintenance of Masonry | 5/4/2021 |
| 040511 | Masonry Mortaring and Grouting | 5/4/2021 |
| 042001 | Masonry Veneer | 5/4/2021 |
| 042200 | Concrete Unit Masonry | 5/4/2021 |
| 044200 | Exterior Stone Cladding | 5/4/2021 |

EXHIBIT G
CONTRACT DOCUMENTS
222 Mitchell

| SPECIFICATIONS | DESCRIPTION | Date |
|---|---|---|
| 047200 | Architectural Cast Stone | 5/4/2021 |
| **DIVISION 05 – METALS** | | |
| 051200 | Structural Steel Framing | 5/4/2021 |
| 053100 | Steel Decking | 5/4/2021 |
| 054000 | Cold-Formed Metal Framing | 5/4/2021 |
| 055000 | Metal Fabrications | 5/4/2021 |
| 055100 | Metal Stairs | 5/4/2021 |
| 055133 | Metal Ladders | 5/4/2021 |
| 055213 | Pipe and Tube Railings - RFI-097 | 5/4/2021 |
| **DIVISION 06 - WOOD, PLASTICS AND COMPOSITES** | | |
| 061053 | Miscellaneous Rough Carpentry | 5/4/2021 |
| 062000 | Finish Carpentry | 5/4/2021 |
| 064100 | Architectural Wood Casework | 5/4/2021 |
| 064200 | Wood Paneling | 5/4/2021 |
| **DIVISION 07 – THERMAL AND MOISTURE PROTECTION** | | |
| 070553 | Fire and Smoke Assembly Identificaion | 5/4/2021 |
| 071113 | Bituminous Dampproofing | 5/4/2021 |
| 071300 | Sheet Waterproofing | 5/4/2021 |
| 071400 | Fluid-Applied Waterproofing | 5/4/2021 |
| 071613 | Polymer Modified Cement Waterproofing | 5/4/2021 |
| 071616 | Crystalline Waterproofing | 5/4/2021 |
| 071800 | Traffic Coatings | 5/4/2021 |
| 071900 | Water Repellents | 5/4/2021 |
| 072100 | Thermal Insulation | 5/4/2021 |
| 072129 | Sprayer Insulation | 5/4/2021 |
| 072400 | Exterior Insulation and Finish System | 5/4/2021 |
| 072500 | Weather Barriers | 5/4/2021 |
| 074213 | Metal Wall Panels | 5/4/2021 |
| 074213.16 | Metal Plate Wall Panesl | 5/4/2021 |
| 075400 | Thermoplastic Membrane Roofing | 5/4/2021 |
| 075556 | Fluid-Applied Protected Membrane Roofing | 5/4/2021 |
| 076200 | Sheet Metal Flashing and Trim | 5/4/2021 |
| 077100 | Roof Specialties | 5/4/2021 |
| 077200 | Roof Accessories | 5/4/2021 |
| 078100 | Applied Fire Protection | 5/4/2021 |
| 078123 | Intumescent Fire Protection | 5/4/2021 |
| 078400 | Firestopping | 5/4/2021 |
| 079200 | Joint Sealants | 5/4/2021 |
| 079513 | Expansion Joing Cover Assemblies | 5/4/2021 |
| **DIVISION 08 - OPENINGS** | | |
| 081113 | Hollow Metal Doors and Frames | 5/4/2021 |
| 081416 | Flush Wood Doors | 5/4/2021 |
| 081433 | Stile and Rail Wood Doors | 5/4/2021 |
| 083100 | Access Doors and Panels | 5/4/2021 |
| 083323 | Overhead Coiling Doors | 5/4/2021 |
| 083813 | Flexible Strip Doors | 5/4/2021 |
| 084226 | Pivot Door Systems | 5/4/2021 |
| 084236 | Balanced Door Entrances | 5/4/2021 |
| 084313 | Aluminum-Framed Storefronts | 5/4/2021 |
| 085113 | Aluminum Windows | 5/4/2021 |
| 085123 | Steel Windows | 5/4/2021 |
| 087100 | Door Hardware | 5/4/2021 |

EXHIBIT G
CONTRACT DOCUMENTS
222 Mitchell

| SPECIFICATIONS | DESCRIPTION | Date |
|---|---|---|
| 088000 | Glazing | 5/4/2021 |
| 088300 | Mirrors | REV 6.25.2021 |
| 089100 | Louvers | 5/4/2021 |
| **DIVISION 09 – FINISHES** | | |
| 090561 | Common Work Results for Flooring Preparation | 5/4/2021 |
| 092116 | Gypsum Board Assemblies | REV 6.25.2021 |
| 092236 | Lath | 5/4/2021 |
| 092400 | Cement Plastering | REV 6.25.2021 |
| 093000 | Tiling | 5/4/2021 |
| 094300 | Stone Wall Panels | 5/4/2021 |
| 095400 | Specialty Ceilings | 5/4/2021 |
| 096500 | Resilient Flooring | 5/4/2021 |
| 097700 | Special Wall Surfacing | 5/4/2021 |
| 099113 | Exterior Painting | 5/4/2021 |
| 099123 | Interior Painting | 5/4/2021 |
| 099300 | Staining and Transparent Finishing | 5/4/2021 |
| 099600 | High-Performance Coatings | 5/4/2021 |
| 099723 | Concrete and Masonry Coatings | 5/4/2021 |
| 099726 | Trowel Applied Concrete Finish | 5/4/2021 |
| **DIVISION 10 - SPECIALTIES** | | |
| 101400 | Signage | 5/4/2021 |
| 102600 | Wall and Door Protection | 5/4/2021 |
| 102800 | Toilet, Bath, and Laundry Accessories | 5/4/2021 |
| 104400 | Fire Protection Specialties | 5/4/2021 |
| 105500 | Postal Specialties | 5/4/2021 |
| 108000 | Other Building Specialties | 5/4/2021 |
| 108213 | Exterior Grilles and Screens | 5/4/2021 |
| **DIVISION 11 - EQUIPMENT** | | |
| 111400 | Pedestrian Control Equipment | 5/4/2021 |
| 118123.13 | Window Washing System | 5/4/2021 |
| 118226 | Facility Waste Compactors | 5/4/2021 |
| **DIVISION 12 - FURNISHINGS** | | |
| 123600 | Countertops | 5/4/2021 |
| 129313 | Bicycle Racks and Equipment | 5/4/2021 |
| **DIVISION 13 - SPECIAL CONSTRUCTION (NOT USED)** | | |
| **DIVISION 14 - CONVEYING EQUIPMENT** | | |
| 142100 | Elevators | 5/4/2021 |
| **DIVISION 21 - FIRE SUPPRESSION** | | |
| 210010 | Fire Suppression General | 5/4/2021 |
| 210090 | Fire Suppression Performance Verification | 5/4/2021 |
| 213000 | Fire Suppression Systems | REV 6.25.2021 |
| **DIVISION 22 – PLUMBING** | | |
| 220010 | Plumbing General | 5/4/2021 |
| 220090 | Plumbing Performance Verification | 5/4/2021 |
| 221113 | Facility Water Distribution Piping | 5/4/2021 |
| 221313 | Facility Sanitary Sewers | 5/4/2021 |
| 222500 | Plumbing Insulation | 5/4/2021 |
| 224200 | Plumbing Fixtures | 5/4/2021 |
| 224300 | Drainage Systems | REV 6.25.2021 |
| 224400 | Water Systems | 5/4/2021 |
| 224500 | Fuel Gas Systems | 5/4/2021 |
| **DIVISION 23 - HEATING VENTILATING AND AIR CONDITIONING** | | |

EXHIBIT G
CONTRACT DOCUMENTS
222 Mitchell

| SPECIFICATIONS | DESCRIPTION | Date |
|---|---|---|
| 230010 | HVAC General | REV 6.25.2021 |
| 230090 | HVAC Performance Verification | 5/4/2021 |
| 230095 | Testing, Adjusting, and Balancing | 5/4/2021 |
| 230923.13 | Energy Meters | 5/4/2021 |
| 230923.14 | Flow Instruments | 5/4/2021 |
| 231000 | Piping, Valves and Accessories | 5/4/2021 |
| 232500 | HVAC Insulation | 5/4/2021 |
| 236000 | Equipment | 5/4/2021 |
| 237000 | Air Distribution | 5/4/2021 |
| 238000 | Automatic Temperature Controls | 5/4/2021 |
| **DIVISION 25 - INTEGRATED AUTOMATION** | | |
| 250000 | Integrated Automation | 5/4/2021 |
| 253900 | Integrated Metering and Submetering | 5/4/2021 |
| **DIVISION 26 – ELECTRICAL** | | |
| 260010 | Electrical General | 5/4/2021 |
| 260090 | Electrical Performance Verification | 5/4/2021 |
| 261100 | Raceways | 5/4/2021 |
| 261120 | Cable Trays | 5/4/2021 |
| 261150 | Underground Ducts, Manholes, and Handholes | 5/4/2021 |
| 261200 | Building Wire and Cable, 600 Volt | REV 6.25.2021 |
| 261300 | Boxes | 5/4/2021 |
| 261430 | Wiring Devices | 5/4/2021 |
| 261480 | Connections to Motors and Equipment | 5/4/2021 |
| 261700 | Circuit and Motor Disconnects | 5/4/2021 |
| 261900 | Supporting Devices | 5/4/2021 |
| 262000 | Emergency Power Supply System | 5/4/2021 |
| 262713 | Electricit Metering | 5/4/2021 |
| 262923 | Variable-Frequency Motor Controllers | 5/4/2021 |
| 264020 | Service Entrance | 5/4/2021 |
| 264400 | Switchboards | 5/4/2021 |
| 264500 | Grounding | 5/4/2021 |
| 264510 | Lightning Protection System | 5/4/2021 |
| 264600 | Dry-Type Transformers | 5/4/2021 |
| 264650 | Low Voltage Busways | 5/4/2021 |
| 264710 | Panelboards | 5/4/2021 |
| 264750 | Overcurrent Protective Devices | 5/4/2021 |
| 264760 | Individual Circuit Breakers | 5/4/2021 |
| 265100 | Luminaires | 5/4/2021 |
| 265910 | Lighting Control Devices | 5/4/2021 |
| 266710 | Surge Protective Devices | 5/4/2021 |
| **DIVISION 27 – COMMUNICATIONS** | | |
| 270010 | Communications General | 5/4/2021 |
| 270090 | Communications Performance Verification | 5/4/2021 |
| 271000 | Structured Cabling Systems | 5/4/2021 |
| 271100 | Broadband Cabling Systems | 5/4/2021 |
| **DIVISION 28 - ELECTRONIC SAFETY AND SECURITY** | | |
| 280500 | Security General | 5/4/2021 |
| 280513 | Security Conductors and Cables | 5/4/2021 |
| 280528 | Security Pathways | 5/4/2021 |
| 280800 | Security Performance Verification | 5/4/2021 |
| 281300 | Access Control Systems | 5/4/2021 |
| 281330 | Vehicle Barriers, Detection and Control Systems | 5/4/2021 |

EXHIBIT G
CONTRACT DOCUMENTS
222 Mitchell

| SPECIFICATIONS | DESCRIPTION | Date |
|---|---|---|
| 282300 | Video Surveillance Systems | 5/4/2021 |
| 283010 | Fire Detection and Alarm General | 5/4/2021 |
| 283090 | Fire Detection and Alarm Performance Verification | 5/4/2021 |
| 283100 | Fire Alarm System | REV 6.25.2021 |
| 283300 | Rescue Assistance Communication System | 5/4/2021 |
| 283400 | Emergency Responder Radio Coverage System | 5/4/2021 |
| 283700 | Security Communications Systems | 5/4/2021 |
| **DIVISION 29 - COMMISSIONING** | | |
| 290010 | Commissioning | 5/4/2021 |
| **DIVISION 31 – EARTHWORK** | | |
| 311000 | Site Clearing | 5/4/2021 |
| 312000 | Earth Moving | 5/4/2021 |
| 313116 | Termite Control - Soil | 5/4/2021 |
| 315000 | Excavation Support and Protection | 5/4/2021 |
| **DIVISION 32 - EXTERIOR IMPROVEMENTS** | | |
| 321216 | Asphalt Paving | 5/4/2021 |
| 321313 | Concrete Paving (Civil) | 5/4/2021 |
| 321313 | Concrete Paving (Hardscape) | 5/4/2021 |
| 321373 | Concrete Paving Joint Sealants | 5/4/2021 |
| 321723 | Pavement Markings and Removal | 5/4/2021 |
| 329113 | Soil Preparation | 5/4/2021 |
| 329116 | Planting Soil (70/30 Composted Topsoil Mix) | 5/4/2021 |
| 329300 | Plants | 5/4/2021 |
| **DIVISION 33 - UTILITIES** | | |
| 330500 | Common Work Results for Utilities | 5/4/2021 |
| 334100 | Storm Utility Drainage Piping | 5/4/2021 |
| **DIVISION 34 - TRANSPORTATION (NOT USED)** | | |
| **APPENDICES AND NOTES** | | |
| APPENDIX 1 - ROOFTOP HELISTOP REFURBISHMENT | | 5/4/2021 |
| APPENDIX 2 - LIGHTING INFORMATION | | 5/4/2021 |
| | | |
| | | |

Exhibit G - Contract Documents

**EXHIBIT 2**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE:                                          :
                                                :
NEWPORT 222 MITCHELL STREET, LLP.,              :            CHAPTER 7
                                                :            CASE NO. 24-54060-SMS
_____Debtor._____      :

**NOTICE OF BANKRUPTCY RULE 2004 EXAMINATION OF BI 68, LLC AND THE
PRODUCTION OF DOCUMENTS**

TO:     GA Registered Agent for BI 68, LLC
        c/o Corporation Service Company
        2 Sun Court, Suite 400
        Peachtree Corners, GA, 30092

        FL Registered Agent for BI 68, LLC
        CAPITOL CORPORATE SERVICES, INC.
        515 E PARK AVE. 2ND FL
        TALLAHASSEE, FL 32301

        Please take notice that, pursuant to Rule 2004 of the Federal Rules of Bankruptcy

Procedure, BI 68, LLC ("**BI**" or the "**Witness**") is required to designate a representative or

representative(s) to attend an examination (the "**Examination**") by Balfour Beatty Construction,

LLC ("**Movant**" or "**Balfour**") and testify on behalf of the BI 68, LLC, pursuant to the Order by

the United States Bankruptcy Court for the Northern District of Georgia dated _____ ____,

2025 (Dkt. No. ____, the "**Examination Order**") authorizing the Examination of BI 68, LLC as

to any and all matters within the scope of the Bankruptcy Case permitted by Rule 2004(b) and

directing the production of Documents.

        The Examination will commence at 10:00 a.m., on _____ ___, 2025, at the offices of

the Law Offices of Henry F. Sewell, Jr., LLC, located at 2964 Peachtree Road NW, Suite 555,

Atlanta, GA 30305, or as otherwise agreed to by the parties. The Examination will be recorded

stenographically, and may be recorded by audio or video tape, before an officer qualified to make such examinations and continue from day to day until completed. The Examination will be taken for the purposes of discovery in the Bankruptcy Case and for all other purposes permitted by law, including use at trial, if and where appropriate.

**PLEASE TAKE NOTICE** that BI 68, LLC is required to designate a representative or representative(s) to attend and testify at the Examination as to any and all matters within the scope of Rule 2004 of the Federal Rules of Bankruptcy Procedure, including, but not be limited to, the following areas of inquiry:

a. Facts, Communications,[1] and Documents[2] and persons with knowledge of facts related to or concerning the loans by BI 68, LLC, including its predecessors (collectively the "**Lender**"), to the above-captioned Debtor ("**Newport**" or "**Debtor**") and/or any entities

---

[1] "**Communication**" or "**communications**" means any contact or act by which any information or knowledge is transmitted or conveyed between two or more Persons and shall include, without limitation, written contact by such means as letters, memoranda, Correspondence, telegrams, telex, or by any document, and oral contact by such means as face-to-face meetings and telephone conversations.

[2] "**Document**" and "**Documents**" are used in the broadest possible sense and include, but are not limited to, all original and all non-identical copies of any writing or record of any type or description, including, but not limited to, the following items, and each draft thereof: writings, recordings, notes, photographs, financial statements, agreements, contracts, legal documents, communications, e-mails, Correspondence, letters, statements, reports, envelopes, phone messages, telephone logs, agendas, books, articles, receipts, purchase orders, sales orders, tape recordings, affidavits, opinions, notices, proposals, invoices, confirmations, telegrams, cables, memoranda, records, summaries of records, summaries of data, summaries of personal conversations or interviews, diaries, appointment books, appointment logs, desk calendars, pocket calendars, forecasts, statistical statements, accounts, work papers and related supporting documents, graphs, charts, maps, diagrams, blue prints, tables, indexes, pictures, tapes, microfilms, charges, analytical records, minutes or records of meetings or conferences, reports and/or summaries of interviews, reports and/or summaries of investigations, opinions or reports of consultants, appraisals, records, reports or summaries of negotiations, brochures, pamphlets, circulars, trade letters, press releases, stenographic, handwritten or any other notes, projections, bank statements, checks (front and back), check stubs or receipts, checkbooks, canceled checks, invoice vouchers, electronically or magnetically recorded or stored data, data tapes and sheets or data processing cards or discs or any other computer-related data compilation, and any other written, recorded, printed, typed, photographed, transcribed, punched, taped, filmed, or electronically or graphically recorded documents or writings of whatever description however produced or reproduced, including but not limited to, any information contained in any computer although not yet printed, within your possession, custody or control or in the possession, custody or control of any agent, employee (including without limitation, attorneys, accountants and investment bankers or advisors), or other Person acting on your behalf.

or parties related to the Debtor and any foreclosure or liquidation of collateral or other payment arising therefrom;

b. The Debtor's development of certain real property located at 222 Mitchell Street SW, Atlanta, Georgia 30303 (the "**Property**") from January, 2020 to and through the Petition Date and BI's involvement and role in such development;

c. The negotiation, drafting and execution of the Construction Contract;[3]

d. Communications and dealings with Balfour regarding the financing of the Project and the payment of Balfour's invoices;

e. The foreclosure of the Property (the "**2nd Foreclosure**"), the events preceding the foreclosure and all communications with the Debtor regarding or related to the 2nd Foreclosure;

f. The value of the Property and any appraisals obtained by the Lender related to the Project, the Property, or any of the Cross-Collateralized Properties, and any communications related to those appraisals;

g. The Budget attached as Exhibit "E" to the Loan Agreement;

h. Calculation of amount due by each obligor before the Lender foreclosed on each of the Cross-Collateralized Properties;

i. Amount recovered by the Lender prior to the foreclosure of the Debtor's Property by the Lender;

j. Amount alleged to be due by the Debtor when the Lender foreclosed on the Property;

---

[3] Capitalized, but undefined terms used herein shall have the meaning ascribed to such terms in the *Motion for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Examination of BI 68, LLC and Directing the Production of Documents* that was filed by the Movant.

k.  The calculation of the foreclosure sales price for each of the Property and the Cross-Collateralized Properties;

l.  Bidding at any foreclosure of the Property and any of the Cross-Collateralized Properties;

m.  All Communications and agreements made in connection with the 2nd Foreclosure including any and all agreements entered into with the Debtor's officers, directors and employees or guarantors of the debt in connection therewith;

n.  Any Communications related to any deficiency owed under the Loan after each foreclosure of any of the Cross-Collateralized Properties;

o.  The development and disposition of the Property and Cross-Collateralized Properties since the 2nd Foreclosure;

p.  Communications and transactions by and between the Debtor, the Lender and contractors employed by the Debtor at the Property including, but not limited to the "Contractors" as defined herein;

q.  All Documents related to the amount of funds Lender agreed to loan related to the Loan Agreement or otherwise to Newport for Balfour's work under the Construction Contract;

r.  All Documents related to your efforts to pursue and/or enforce any remedies provided for under the Completion Guaranty dated December 16, 2021 by OLAF KUNKAT and NEWPORT SOUTH DOWNTOWN MASTER, L.P. to and for the benefit of BI 68 LLC (the "**Completion Guaranty**");

s.  For the time period after the date Lender declared Newport in default, all Communications by and between the Lender and any party to the Completion Guaranty.

4

t.  All Documents related to your efforts to pursue and/or enforce any remedies provided for under the Pledge Agreement dated as of December 16, 2021, by NEWPORT SOUTH DOWNTOWN MASTER, L.P. in favor of BI 68 LLC (the "**Pledge Agreement**");

u.  For the time period after the date Lender declared Newport in default, all communications by and between the lender and any party to the Pledge Agreement;

v.  For the time period after the date Lender declared Newport in default, all Documents related to rights and/or remedies the Lender pursued under the Loan Agreement other than foreclosure;

w.  All Documents generated by the Lender related to the Appraisal of Real Property, Proposed 222 Mitchell, Office Property, 222 Mitchell St. NW. Atlanta, Fulton County, Georgia 30303 that was prepared by Integra Realty Resources – Atlanta for BridgeInvest LLC and BI 68 LLC, their Respective Successors and/or Assigns As Their Interests May Appear under File No 208-2021-0216 with a cover letter dated August 12, 2021 (the "**IRR Appraisal**");

x.  All other appraisals similar to the scope and time-frame of the IRR Appraisal, and for each such similar appraisal produce all Documents generated by the Lender related to said similar appraisal;

y.  All Documents in Lender's possession, custody and control related to any modifications, revisions, drafts or versions of the Budget attached as Exhibit E to the Loan Agreement (whether generated before or after the Loan Agreement execution date);

z.  For the time-period through December 31, 2021, all Documents generated by the Lender related to the review, consideration and/or analysis of the Cash Flow Analysis;

aa. For the time-period through December 31, 2021, all Documents generated by the Lender related to the review, consideration and/or analysis of the Construction Contract;

bb. For the time period through December 31, 2021, all Documents relating to Lender's review and/or revisions to the Contractor's Letter;

cc. All Communications, including Lender's internal Communications, related to Newport, Newport South, Newport Downtown, Newport US, and/or Newport RE regarding or relating to: (a) Balfour; (b) the Project; (c) the Loan Agreement; and/or (d) the Pledged Accounts and the Construction Reserve Account (as those terms are defined in the Loan Agreement);

dd. All Documents in Lender's possession, custody and control relating to the Initial Reserve Account, Construction Reserve Account, and any Pledged Accounts as per Section 6.2 of the Loan Agreement;

ee. All Documents in Lender's possession, custody and control relating to any Borrower's Operating Account as that term is defined in the Loan Agreement, including all documents identifying the amount of the Borrower's Operating Account and the financial institution where the Borrower's Operating Account is located;

ff. All Documents in Lender's possession, custody and control relating to the identity, role, obligations and responsibilities of the Pledgors as per Section 6.2(h) of the Loan Agreement;

gg. All Documents in Lender's possession, custody and control relating to the identity, role, obligations and responsibilities of the guarantors as per Section 6.2(h) of the Loan Agreement;

hh. All Documents in Lender's possession, custody and control relating to each Borrower's Operating Account DACA(s) and/or each Borrower's Operating Account(s) as those terms are defined in the Loan Agreement;

ii. All Documents in Lender's possession, custody and control reflecting, referring, or relating to whether the Loan (as defined in the Loan Agreement) was "In Balance" per Section 6.2 or 6.3 of the Loan Agreement, including all documents demonstrating the Borrower's efforts to bring the Loan "In Balance;"

jj. All Documents related to any Construction Escrow Account as referenced in Section 6.3(d) and Section 11.2 of the Loan Agreement;

kk. All Documents in Lender's possession, custody and control relating to and/or reflecting the Contingency Reserve as referenced in Section 7 of the Loan Agreement;

ll. All assurances, certificates, options or other Documents requested by the Lender for Pledged Accounts required by 11.3(c). of the Loan Agreement;

mm.    All Documents in Lender's possession, custody and control evidencing and/or related to any and all Guarant(y)(ies) (of Olaf Kunkat, Newport South and any others) provided in connection with the Loan Agreement;

nn. All Documents in Lender's possession, custody and control relating to Borrower's Invested Capital as per Section 6.3(m)(ii) of the Loan Agreement, including all  documents submitted to Lender showing how Borrower's Invested Capital has been used, as well as any and all supporting Documents requested by Lender relating to same as per Section 7.1((f)(q);

oo. All Documents in Lender's possession, custody and control relating to draw requests submitted to Lender and Title Company pursuant to Section 7.1(d) of the Loan Agreement;

pp. All Documents provided in due diligence to potential purchasers of the Lender prior to the First Foreclosure;

qq. All Documents in Lender's possession, custody and control relating to communications by and/or between Lender and Olaf Kunkatt related to the Loan Agreement and/or the Property;

rr. All Documents in Lender's possession, custody and control relating to a title insurance policy issued in connection with the Loan Agreement;

ss. All Documents relating to Lender's knowledge and/or awareness about whether Debtor was paying Balfour per the terms of the Construction Contract;

tt. All Documents relating to Lender's decision and consideration of holding Debtor in default under the Loan Agreement; and

uu. Communications and transactions by and between the Debtor, the Lender and contractors employed by the Debtor at the Property including, but not limited to the "Contractors" as defined herein.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Bankruptcy Rule 2004(c), BI 68, LLC is further instructed to produce for inspection and copying at the Law Offices of Henry F. Sewell Jr., LLC, located at 2964 Peachtree Road NW, Suite 555, Atlanta, GA 30305, at 10:00 a.m. on _____ ___, 2025, or as otherwise agreed to by the parties, any Documents, Communications, or Correspondence,[4] related to the following:

a. All Communications, Correspondence, and Documents related to any loans made by the Lender to the Debtor and/or any entities or parties related to the Debtor and any foreclosure or liquidation of collateral or other payment arising therefrom;

---

[4] "**Correspondence**" means all Documents transmitted from one Person to another, including those in electronic form, and all attachments to such Documents.

8

b.  All Communications, Correspondence, and Documents related to any security interest of the Lender in the Property or any of the Cross-Collateralized Properties;

c.  All Communications, Correspondence, and Documents evidencing Communications between the Debtor and the Lender from the period January 1, 2020 to and through the Petition Date;

d.  All agreements between the Lender and the Debtor from the period January 1, 2020 to the Petition Date;

e.  All agreements between the Lender and the Debtor's officers, directors or employees or guarantors of the Lenders debtor from the period from January 1, 2020 to the Petition Date;

f.  All Communications, Correspondence, and Documents evidencing Communications concerning the negotiation, drafting or delivery of any actual or potential agreements between the Lender and the Debtor's officers, directors or employees or guarantors of the Lenders debtor from the period January 1, 2020 to the Petition Date;

g.  All Communications, Correspondence, and Documents evidencing communications concerning or referring to the threatened or actual Foreclosure on the Property or any of the Cross-Collateralized Properties.

h.  All Communications, Correspondence, and Documents concerning or referring to the value of the Property or any of the Cross-Collateralized Properties, including all appraisals, valuations, or other documents referring to or containing values, estimates or projections of the value of the Property or any of the Cross-Collateralized Properties;

i.  Any prospectus, solicitation, offering or similar document concerning the Property or any of the Cross-Collateralized Properties for the period January 1, 2020 to the present date;

j.  Any calculation of or Communications, Correspondence, and Documents detailing the amount due by each obligor before the Lender foreclosed on each of the Cross-Collateralized Properties;

k.  Any Communications, Correspondence, and Documents regarding any foreclosure of the Property or any of the Cross-Collateralized Properties, including, but not limited to any procedures used at each foreclosure;

l.  Any Communications, Correspondence, and Documents regarding the amount recovered by the Lender prior to the foreclosure of the Debtor's Property by the Lender;

m.  Any Communications, Correspondence, and Documents regarding the amount due by the Debtor when the Lender foreclosed on the Property;

n.  Any Communications, Correspondence, and Documents regarding the amount due by each obligor when the Lender foreclosed on each of the Cross-Collateralized Properties;

o.  Any Communications, Correspondence, and Documents regarding the amount recovered by the Lender each time the Lender foreclosed on each of the Cross-Collateralized Properties;

p.  Any Communications, Correspondence, and Documents regarding the determination of the price obtained at any foreclosure of the Property or any of the Cross-Collateralized Properties;

q.  Any Communications, Correspondence, and Documents regarding the actual or potential bidding at any foreclosure of the Property or any of the Cross-Collateralized Properties;

r.  All Communications, Correspondence, and Documents evidencing Communications by and between the Debtor, the Lender and contractors employed by the Debtor at the Property including, but not limited to the "Contractors" as defined herein;

10

s.  All internal Communications, Correspondence, and Documents evidencing such Communications of the Debtor concerning or related to the payment monies owed to the Contractors;

t.  All analyses or summaries of the debts owed to the Contractors and the payment of such debts;

u.  Any Communications, Correspondence, and Documents relating to any confirmation of the Foreclosure under Georgia law;

v.  All Documents related to the amount of funds Lender agreed to loan related to the Loan Agreement or otherwise to Newport for Balfour's work under the Construction Contract;

w.  All Documents related to your efforts to pursue and/or enforce any remedies provided for under the Completion Guaranty;

x.  For the time period after the date Lender declared Newport in default, all Communications by and between the Lender and any party to the Completion Guaranty;

y.  All Documents related to your efforts to pursue and/or enforce any remedies provided for under the Pledge Agreement;

z.  For the time period after the date Lender declared Newport in default, all communications by and between the lender and any party to the Pledge Agreement;

aa. For the time period after the date Lender declared Newport in default, all Documents related to rights and/or remedies the Lender pursued under the Loan Agreement other than foreclosure;

bb. All Documents generated by the Lender related to the IRR Appraisal;

11

cc. All other appraisals similar to the scope and time-frame of the IRR Appraisal, and for each such similar appraisal produce all Documents generated by the Lender related to said similar appraisal;

dd. All Documents in Lender's possession, custody and control related to any modifications, revisions, drafts or versions of the Budget attached as Exhibit E to the Loan Agreement (whether generated before or after the Loan Agreement execution date);

ee. For the time-period through December 31, 2021, all Documents generated by the Lender related to the review, consideration and/or analysis of the Cash Flow Analysis;

ff. For the time-period through December 31, 2021, all Documents generated by the Lender related to the review, consideration and/or analysis of the Construction Contract;

gg. For the time period through December 31, 2021, all Documents relating to Lender's review and/or revisions to the Contractor's Letter;

hh. All Communications, including Lender's internal Communications, related to Newport, Newport South, Newport Downtown, Newport US, and/or Newport RE regarding or relating to: (a) Balfour; (b) the Project; (c) the Loan Agreement; and/or (d) the Pledged Accounts and the Construction Reserve Account (as those terms are defined in the Loan Agreement);

ii. All Documents in Lender's possession, custody and control relating to the Initial Reserve Account, Construction Reserve Account, and any Pledged Accounts as per Section 6.2 of the Loan Agreement;

jj. All Documents in Lender's possession, custody and control relating to any Borrower's Operating Account as that term is defined in the Loan Agreement, including all documents

identifying the amount of the Borrower's Operating Account and the financial institution where the Borrower's Operating Account is located;

kk. All Documents in Lender's possession, custody and control relating to the identity, role, obligations and responsibilities of the Pledgors as per Section 6.2(h) of the Loan Agreement;

ll. All Documents in Lender's possession, custody and control relating to the identity, role, obligations and responsibilities of the guarantors as per Section 6.2(h) of the Loan Agreement;

mm.    All Documents in Lender's possession, custody and control relating to each Borrower's Operating Account DACA(s) and/or each Borrower's Operating Account(s) as those terms are defined in the Loan Agreement;

nn. All Documents in Lender's possession, custody and control reflecting, referring, or relating to whether the Loan (as defined in the Loan Agreement) was "In Balance" per Section 6.2 or 6.3 of the Loan Agreement, including all documents demonstrating the Borrower's efforts to bring the Loan "In Balance;"

oo. All Documents related to any Construction Escrow Account as referenced in Section 6.3(d) and Section 11.2 of the Loan Agreement;

pp. All Documents in Lender's possession, custody and control relating to and/or reflecting the Contingency Reserve as referenced in Section 7 of the Loan Agreement;

qq. All assurances, certificates, options or other Documents requested by the Lender for Pledged Accounts required by 11.3(c). of the Loan Agreement;

rr. All Documents in Lender's possession, custody and control evidencing and/or related to any and all Guarant(y)(ies) (of Olaf Kunkat, Newport South and any others) provided in connection with the Loan Agreement;

ss. All Documents in Lender's possession, custody and control relating to Borrower's Invested Capital as per Section 6.3(m)(ii) of the Loan Agreement, including all  documents submitted to Lender showing how Borrower's Invested Capital has been used, as well as any and all supporting Documents requested by Lender relating to same as per Section 7.1((f)(q);

tt. All Documents in Lender's possession, custody and control relating to draw requests submitted to Lender and Title Company pursuant to Section 7.1(d) of the Loan Agreement;

uu. All Documents provided in due diligence to potential purchasers of the Lender prior to the First Foreclosure;

vv. All Documents in Lender's possession, custody and control relating to communications by and/or between Lender and Olaf Kunkatt related to the Loan Agreement and/or the Property;

ww.      All Documents in Lender's possession, custody and control relating to a title insurance policy issued in connection with the Loan Agreement;

xx. All Documents relating to Lender's knowledge and/or awareness about whether Debtor was paying Balfour per the terms of the Construction Contract;

yy. All Documents relating to Lender's decision and consideration of holding Debtor in default under the Loan Agreement; and

zz. Communications and transactions by and between the Debtor, the Lender and contractors employed by the Debtor at the Property including, but not limited to the "Contractors" as defined herein.

Dated this ___ day of _____, 2025.

LAW OFFICES OF HENRY F. SEWELL JR., LLC

***/s/ Henry F. Sewell, Jr.***
Henry F. Sewell, Jr. (Georgia Bar No. 636265)
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
(404) 926-0053
hsewell@sewellfirm.com
*Counsel for Balfour Beatty Construction, LLC*

**EXHIBIT 3**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| NEWPORT 222 MITCHELL STREET, LLP., | : | CHAPTER 7 |
| | : | CASE NO. 24-54060-SMS |
| _____Debtor._____ | : | |

**ORDER GRANTING MOTION FOR AN ORDER PURSUANT TO BANKRUPTCY
RULE 2004 AUTHORIZING EXAMINATION BI 68, LLC AND DIRECTING THE
PRODUCTION OF DOCUMENTS**

The *Motion for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Examination of*

*BI 68, LLC is and Directing the Production of Documents* [Doc. No. _____] (the "**Motion**") filed

by Balfour Beatty Construction, LLC (the "**Movant**" or "**Balfour**"), having been read and

considered, it is

**ORDERED** that the Motion be, and the same hereby is, **granted** as follows: pursuant to

Fed. R. Bankr. P. 2004(a), the Movant is authorized to proceed with discovery and conduct an

examination (the "**Examination**") of BI 68, LLC ("**BI**" or the "**Witness**") in accordance with Fed.

R. Bankr. P. 2004(b) at a mutually agreed date, time, and place.

**ORDERED** that the Examination may be rescheduled or adjourned from time to time and place to place by agreement of the parties, by announcement at the examination, or as set forth in a notice filed with the Court and served on BI 68, LLC and the Movant. It is further

**ORDERED** that if attendance and, if applicable, production of designated documents in connection with said Examination, cannot be obtained voluntarily, the Movant may compel such attendance and production of documents as stated in Fed. R. Bankr. P. 2004(c) in the manner provided in Fed. R. Bankr. P. 9016, which incorporates the procedure for the issuance of a subpoena as set forth in Federal Rule of Civil Procedure 45. It is further

**ORDERED** that BI 68, LLC shall timely respond to any document requests made by the Movant in accordance with Fed. R. Bankr. P. 2004(c). BI 68, LLC may assert written objections in good faith to the requests as if such requests had been served pursuant to Fed. R. Bankr. P. 7034 and shall produce to the Movant all responsive documents that are not subject to a valid timely asserted objection.

The Clerk is directed to serve a copy of this Order upon counsel for the Movant, BI 68, LLC, the Trustee, and the United States Trustee.

***END OF DOCUMENT***

Prepared and Presented by:
LAW OFFICES OF HENRY F. SEWELL JR., LLC
 */s/ Henry F. Sewell, Jr.*
Henry F. Sewell, Jr.
Georgia Bar No. 636265
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
(404) 926-0053
hsewell@sewellfirm.com
*Counsel for Balfour Beatty Construction, LLC*

**Parties to Be Served**

Law Offices of Henry F. Sewell, Jr., LLC
c/o Henry F. Sewell, Jr., Esq.
Suite 555, 2964 Peachtree Road NW
Atlanta, Georgia 30305

Office of the U. S. Trustee
75 Ted Turner Dr SW, Room 362
Atlanta, GA 30303

Michael F. Holbein
Smith, Gambrell & Russell, LLP
1105 West Peachtree St., N.E.
Suite 1000
Atlanta, GA 30309

S. Gregory Hays, Trustee
Hays Financial Consulting, LLC
2964 Peachtree Road, Suite 555
Atlanta, GA 30305

NEWPORT 222 MITCHELL STREET LP
CO KEVIN MURPHY
170 MITCHELL STREET
ATLANTA GA 30303-3424

GA Registered Agent for BI 68, LLC
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA, 30092

FL Registered Agent for BI 68, LLC
CAPITOL CORPORATE SERVICES, INC.
515 E PARK AVE. 2ND FL
TALLAHASSEE, FL 32301

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE:                                              :
                                                    :
NEWPORT 222 MITCHELL STREET, LLP.,                  :            CHAPTER 7
                                                    :            CASE NO. 24-54060-SMS
_____Debtor._____         :

## CERTIFICATE OF SERVICE

This is to certify that service of the within and foregoing *Motion for an Order Pursuant to Bankruptcy Rule 2004 Authorizing Examination of BI 68, LLC and Directing the Production of Documents* was served via the United States Bankruptcy Court for the Northern District of Georgia's Electronic Case Filing System to all parties who have filed appearances, including the following:

Michael F. Holbein
Smith, Gambrell & Russell, LLP
1105 West Peachtree St., N.E.
Suite 1000
Atlanta, GA 30309

S. Gregory Hays, Trustee
Hays Financial Consulting, LLC
2964 Peachtree Road, Suite 555
Atlanta, GA 30305

NEWPORT 222 MITCHELL STREET LP
CO KEVIN MURPHY
170 MITCHELL STREET
ATLANTA GA 30303-3424

GA Registered Agent for BI 68, LLC
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA, 30092

FL Registered Agent for BI 68, LLC
CAPITOL CORPORATE SERVICES, INC.
515 E PARK AVE. 2ND FL
TALLAHASSEE, FL 32301

This 8th day of May, 2025.

LAW OFFICES OF HENRY F. SEWELL JR., LLC

*/s/ Henry F. Sewell, Jr.*
Henry F. Sewell, Jr.
Georgia Bar No. 636265
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
(404) 926-0053
hsewell@sewellfirm.com
*Counsel for Balfour Beatty Construction, LLC*